J. CHRISTOPHER JACZKO (149317)
ALLISON H. GODDARD (211098)
**JACZKO GODDARD LLP**
4401 Eastgate Mall
San Diego, CA 92121
Telephone: (858) 404-9205
Facsimile: (858) 225-3500

MARTIN B. PAVANE (admitted *pro hac vice*)
TEODOR J. HOLMBERG (admitted *pro hac vice*)
**COHEN PONTANI LIEBERMAN & PAVANE LLP**
551 Fifth Avenue
New York, NY 10176
Telephone: (212) 687-2770
Facsimile: (212) 972-5487
E-mail: mpavane@cplplaw.com
E-Mail: tidge@cplplaw.com

Attorneys for Defendant and Counterclaimant
CAMBRIDGE RESEARCH & INSTRUMENTATION, INC.

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANTICANCER, INC., a California Corporation<br><br>Plaintiff,<br><br>v.<br><br>CAMBRIDGE RESEARCH & INSTRUMENTATION, INC., a Delaware Corporation; MERCK & CO., INC., a New Jersey Corporation; NOVARTIS INSTITUTES FOR BIOMEDICAL RESEARCH, INC., a Delaware Corporation; and DOES 17-50,<br><br>Defendants. | **Case No. 07 CV 00097-JLS-RBB**<br><br>**MEMORANDUM IN SUPPORT OF CRI'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY OF THE '038 AND '159 PATENTS** |
| CAMBRIDGE RESEARCH & INSTRUMENTATION, INC.,<br><br>Counterclaimant<br><br>v.<br><br>ANTICANCER, INC.,<br><br>Counterdefendant | Hearing Date: August 21, 2008<br>Time: 1:30 PM<br>Courtroom: 6 (3rd Floor)<br>Judge: Hon. Janis L. Sammartino |

# TABLE OF CONTENTS


**I. STATEMENT OF FACTS .......... 1**

A. THIS LAWSUIT .......... 1

B. ANTICANCER'S "METAMOUSE" METASTASIS MODELS .......... 2

***1. Tan WO '98 and the '038 patent*** .......... *4*

***2. Tan WO '98 and the '159 patent*** .......... *5*

**II. THE LAW .......... 6**

A. SUMMARY JUDGMENT FOR PATENT INVALIDITY .......... 6

B. INVALIDITY BY ANTICIPATION UNDER 35 U.S.C. §102(B) .......... 6

***1. Incorporation by Reference*** .......... *8*

***2. Inherency*** .......... *8*

**III. THE '038 AND '159 PATENTS ARE ANTICIPATED BY TAN WO '98 .......... 9**

A. THE '038 PATENT .......... 9

***1. Independent Claim 5 and Claims 6-8 Depending Therefrom*** .......... *9*

***2. Independent Claim 9 and Claims 10-12 Depending Therefrom*** .......... *13*

***3. Independent Claim 1 and Claims 2-4 Depending Therefrom*** .......... *14*

B. THE '159 PATENT .......... 18

**IV. CONCLUSION .......... 24**

# TABLE OF AUTHORITIES

## FEDERAL CASES


*Advanced Display Systems, Inc. v. Kent State Univ.*, 212 F.3d 1272 (Fed. Cir. 2000) ........................ 8

*Akzo N.V. v. U.S. International Trade Com.*, 808 F .2d 1471 (Fed. Cir. 1986).................................. 7

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). ......................................................... 6

*Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557 (Fed. Cir. 1988).................................. 8

*Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 835 (Fed. Cir. 1984)......................................................................................................... 6

*Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665 (9th Cir. Cal. 1980)................................ 19

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ......................................................................... 6

*Del-mar Eng'g, Lab v. United States*, 524 F.2d 1178 (Ct. Cl. 1975)............................................ 7

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, 2006 U.S. Dist. LEXIS 36788 (N.D. Cal. May 24, 2006) ........................................................................................ 7, 8, 9

*Gasaway v. Northwestern Mut. Life Ins. Co.*, 26 F.3d 957 (9th Cir. 1994)....................................... 6

*In re Sasse*, 629 F.2d 675 (C.C.P.A. 1980)............................................................................ 7, 9

*Kalman v. Kimberly-Clark Corp.*, 713 F.2d 760 (Fed.Cir.1983) ................................................. 7

*Lewmar Mar., Inc. v. Barient, Inc.*, 827 F.2d 744 (Fed. Cir. 1987)................................................ 7

*Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572 (Fed. Cir. 1996) ......................................................... 7

*McNeil-PPC, Inc. v. L. Perrigo Co.*, 337 F.3d 1362 (Fed. Cir. 2003)............................................... 6

*Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373 (Fed. Cir 2003).................................. 6, 7, 8

*SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331 (Fed. Cir. 2005).................................. 7

*SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878 (Fed. Cir. 1989) ......................... 7

*State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057 (Fed. Cir. 2003).................. 7

*Tillotson, Ltd. v. Walbro Corp.*, 831 F.2d 1033 (Fed. Cir. 1987).................................................. 6

*Upsher-Smith Laboratories, Inc. v. Pan American Laboratories, Inc.*,2003 U.S. Dist. LEXIS 22980 (D.Minn. 2003) ...................................................................................... 11


## FEDERAL STATUTES


35 U.S.C. § 282....................................................................................................... 7

35 U.S.C. §102(b) .................................................................................................. 6


## FEDERAL RULES


Fed. R. Civ. P. 56(e) .............................................................................................. 6

Fed.R.Civ.P. 56(c) ................................................................................................. 6


## LOCAL RULES


Civil Local Rule 7.1(f)(1) ........................................................................................ 1


## TREATISE


CHISUM ON PATENTS § 8.06[2][f] ........................................................................... 11

Pursuant to CivLR 7.1(f)(1), defendant and counterclaimant Cambridge Research & Instrumentation, Inc. ("CRI") hereby files this Memorandum of Points and Authorities in support of its motion for summary judgment of invalidity of plaintiff AntiCancer, Inc.'s ("AntiCancer") U. S. Patent Nos. 6,759,038 ("the '038 patent") and 6,649,159 ("the '159 patent").

## I. STATEMENT OF FACTS

### A. This Lawsuit

On January 12, 2007, AntiCancer initiated this action by filing a complaint solely against CRI for alleged infringement of AntiCancer's U.S. Patent Nos. 6,232,523 ("the '523 patent"), 6,759,038 ("the 038 patent"), 6,235,968 ("the '968 patent"), 6,251,384 ("the '384 patent"), and 6,649,159 ("the '159 patent"). *See* Cmplt. [D.E. 1]. AntiCancer subsequently amended the complaint twice, first adding sixteen other defendants, then removing fourteen of those defendants, finally leaving only CRI, Novartis Institutes For Biomedical Research, Inc. ("NIBRI") and Merck & Co. ("Merck") as defendants. *See* 1st Amd. Cmplt. [D.E. 3]; 2nd Amd. Cmplt. [D.E. 25-2] (entered by Order [D.E. 26]).

CRI filed an answer and counterclaims to AntiCancer's second amended complaint on July 23, 2007, which included counterclaims of, *inter alia*, invalidity of the '159 and '038 patents. CRI's Ans./C-clms. [D.E. 30], pp. 8-9.

On May 14, 2008, this Court granted summary judgment of non-infringement of AntiCancer's patents to CRI's co-defendants Merck and NIBRI based on AntiCancer's deficient PICs, and invited the parties to file supplemental briefs regarding "an appropriate timeline for the claim construction phase of this case". *See* Order [D.E. 115], p. 13, line 11.[1]

In CRI's supplemental brief filed on May 21, 2008, CRI stated, *inter alia*, that it would move for summary judgment of invalidity of the '384, '038, and '159 patents-in-suit based on AntiCancer's own prior art references (CRI's Supp. Brief [D.E. 119], pp. 2-3); subsequently, CRI stated that CRI would move for summary judgment of invalidity by June 30th. *See* CRI's Mot./P.O.

---

[1] This Court had previously vacated the March-April 2008 claim construction briefing and hearing schedule set by CMC Order [D.E. 49], and indicated that a new claim construction schedule would be set after ruling on, *inter alia*, Merck's motion for summary judgment (*See* Order [D.E. 89], p. 3).

[D.E. 130], pp. 4-5.[2] On June 9, 2008, CRI moved for summary judgment of non-infringement of the ‘523 and ‘968 patents based on the deficiencies of AntiCancer’s PICs against CRI. *See* CRI’s S.J./Non-Infr. of ‘523/’968 Pats. [D.E. 126]. CRI also intends to move for summary judgment of non-infringement of the remaining ‘384, ‘038, and ‘159 patents based on deficiencies in AntiCancer’s PICs against CRI. *See* CRI’s Mot./P.O. [D.E. 130], pp. 4-5.[3]

**B. AntiCancer’s “MetaMouse” Metastasis Models**

As early as 1992, AntiCancer was publicizing “MetaMouse” model—a model for cancer metastasis where an intact fragment of a human tumor is surgically implanted in an immunodeficient mouse in the region corresponding to the human origins of the tumor—*i.e.*, a human colon cancer fragment would be surgically implanted in a nude[4] mouse’s colon. AntiCancer has also described this technique as “Surgical Orthotopic Implantation” or “SOI”. *See*, *e.g.*, **Hoffman 1992,**[5] p. 312; **Hoffman 1999**.[6]

From the beginning, a main purpose of AntiCancer’s mouse cancer models was for the “identification of new therapies” for cancer. **Hoffman 1992** (**Ex. 4**), p. 326; *see also* **Hoffman 1999** (**Ex. 5**) (entitled “Orthotopic metastatic mouse models for anticancer drug discovery and evaluation: a bridge to the clinic”); **Furukawa 1993** (entitled “A Novel ‘Patient-like’ Treatment Model of Human Pancreatic Cancer Constructed Using Orthotopic Transplantation of Histologically Intact Human Tumor Tissue in Nude Mice”—testing the efficacy of the antitumor drugs 5-FU and MMC on human pancreatic tumor fragments orthotopically transplanted to the pancreases of immuno-

---

[2] The present motion addresses the ‘159 and ‘038 patents because they are invalidated by the same reference; CRI’s motion for summary judgment of invalidity of the ‘384 patent relies on other references, and will be filed separately.

[3] CRI has deferred that motion based on CRI’s concern that “if CRI first obtains a judgment of non-infringement of the ‘384, ‘038, and ‘159 patents, the Court may prevent CRI from pursuing a judgment of invalidity of the ‘384, ‘038, and ‘159 patents.” CRI’s Supp. Brief [D.E. 119], p. 3, lines 15-18. CRI expects to have the motion for summary judgment of non-infringement filed before July 21, 2008. *See* CRI’s Mot./P.O. [D.E. 130], p. 5.

[4] “Nude”, “athymic”, “SCID” (Severe Combined ImmunoDeficient) mice are immunodeficient, *i.e.*, have a weakened immune system.

[5] Hoffman, R.M., *Patient-Like Models of Human Cancer in Mice: A Review and Critique of Their Development*, in CURRENT PERSPECTIVES ON MOLECULAR & CELLULAR ONCOLOGY 1(B): 311-326 (1992); attached hereto as **Exhibit 4**.

[6] Hoffman, R.M., *Orthotopic Metastatic Mouse Models for Anticancer Drug Discovery and Evaluation: A Bridge to the Clinic*, in INVESTIGATIONAL NEW DRUGS 17(4): 343-359 (1999); attached hereto as **Exhibit 5**.

deficient mice);[7] **Wang 1994** (testing the BB-94 inhibiter on human colon tumors in mice);[8] **An 1996** (testing Interferon gamma on human adenocarcinoma in mice);[9] and **Kanai 1997** (testing inhibitor TNP-470 on human gastric cancer in mice).[10] In all of these tests AntiCancer used the classic scientific method: one set of "subject" nude mice with SOI tumors were treated with the candidate drug or protocol, while another set of "control" nude mice with SOI tumors were not treated. *See*, *e.g.*, **Hoffman 1999** (**Ex. 5**), pp. 140-141.

In 1997, AntiCancer published a series of papers in which the well-known technique of genetically engineering cells to produce or "express" Green Fluorescent Protein ("GFP")[11] was applied to the tumor cells in the mouse cancer model. The first paper, **Chishima 1997a**,[12] described modifying Chinese Hamster Ovary (CHO) cancer cells to contain the GFP gene such that the resulting tumor cell line, which AntiCancer named "Clone-38", produced GFP. These cells were injected into nude mice to grow tumor fragments which were subsequently implanted via SOI in the ovaries of other nude mice. According to AntiCancer, the Clone-38 tumor cell line had both "high-intensity GFP fluorescence and stability". The next paper, **Chishima 1997b**,[13] applied the same method to the human lung cancer cell line Anip 973 (rather than CHO), resulting in another GFP-expressing tumor cell line having "high-intensity GFP fluorescence and stability" which AntiCancer

---

[7] Furukawa, T., Kubota, T., Watanabe, M., Kitajima, M., and Hoffman, R.M. , Int. J. Radiation Oncology Biol. Phys. 36(5): 1177-1187 (1996), attached hereto as **Exhibit 6**.

[8] Wang, X.; Fu, X.; Brown, P.D.; Crimmin, M.J.; Hoffman, R.M., *Matrix metalloproteinase inhibitor BB-94 (Batimastat) inhibits human colon tumor growth and spread in a patient-like orthotopic model in nude mice*, Cancer Res. 54: 4726-4728 (1994); attached hereto as **Exhibit 7**.

[9] An, Z., Wang, X., Astoul, P., Danays, T., Moossa, A.R., and Hoffman, R.M. , *Interferon gamma is highly effective against orthotopically-implanted human pleural adenocarcinoma in nude mice*, Anticancer Res. 16: 2545-2551 (1996); attached hereto as **Exhibit 8**.

[10] Kanai T, Konno H, Tanaka T, Matsumoto K, Baba M, Nakamura S, Baba S., *Effect of angiogenesis inhibitor TNP-470 on the progression of human gastric cancer xenotransplanted into nude mice*, Int. J. Cancer 71(5): 838-841 (1997); attached hereto as **Exhibit 9**.

[11] GFP is a naturally occurring fluorescent protein from the jellyfish *Aequorea Victoria* which emits green light when radiated with blue light.

[12] Chishima, T., Miyagi, Y., Wang, X., Yamaoka, H., Shimada, H., Moossa, A., Hoffman, R.M., *Cancer Invasion and Micrometastasis Visualized in Live Tissue by Green Fluorescent Protein Expression*, Cancer Research 57(10): 2042-2047 (1997); attached hereto as **Exhibit 10**.

[13] Chishima, T., Miyagi, Y., Wang, X., Tan, Y., Shimada, H. Moossa, A., Hoffman, R.M., *Visualization of the metastatic process by green fluorescent protein expression*, Anticancer Research 17: 2377-2384 (1997); attached hereto as **Exhibit 11**.

named "Clone-26". **Chishima 1997c**,[14] **Chishima 1997d**,[15] and **Chishima 1997e**[16] also concern experiments using the Clone-38 and Clone-26 tumor cell lines.

### ***1. Tan WO '98 and the '038 patent***

On April 24, 1997, AntiCancer filed the first in a series of five U.S. applications leading to the '038 patent. The heart of that first application was an almost verbatim description of the experiments in the 1997 Chishima references—*i.e.*, the "recipes" for creating the Clone-38 and Clone-26 tumor cell lines, and administering those tumor cell lines to nude mice. The second application, filed on March 27, 1998, added material concerning the use of a well-known and commercially sold retroviral based expression system for getting the GFP gene into the mouse tumor cells. The third application, filed on April 28, 1998, added an example ("Example 6") of using a retroviral vector for labeling existing tumors (*i.e.*, instead of using the retroviral vector *in vitro* to label tumor cells that are later put in mice, administering the retroviral vector directly to a mouse which already has a tumor, such that the established tumor produces GFP). The next application in the series of five added some material (but no further disclosure concerning the "recipes" for making GFP-expressing tumors in mice), and the fifth application, which subsequently issued as the '038 patent (attached hereto as **Exhibit 1**),[17] had no new material.

AntiCancer also filed the third application in the series of five as an international PCT[18] application, which published on November 5, 1998, as **Tan WO '98** (attached hereto as **Exhibit 2**).[19]

---

[14] Chishima, T., Miyagi, Y., Wang, X., Baranov, E., Tan, Y., Shimada, H., Moossa, A., Hoffman, R., *Metastatic patterns of lung cancer visualized live and in process by green fluorescence protein expression*, Clinical and Experimental Metastasis 15(5): 547-552 (1997); attached hereto as **Exhibit 12**.

[15] Chishima, T.; Yang, M.; Miyagi, Y.; Lingna, L.; Tan, Y.; Baranov, E.; Shimada, H.; Moossa, A.; Penman, S.; Hoffman, R., *Governing step of metastasis visualized in vitro*, Proc. Natl. Acad. Sci. 94(21): 11573-11576 (1997); attached hereto as **Exhibit 13**.

[16] Chishima, T.; Miyagi, Y.; Li, L.; Tan, Y.; Baranov, E.; Yang, M.; Shimada, H.; Moossa, A.R.; and Hoffman, R.M., *Use of histoculture and green fluorescent protein to visualize tumor cell host interaction*, In Vitro Cell. Dev. Biol. 33: 745-747 (LETTER) (1997); attached hereto as **Exhibit 14**.

[17] U.S. Pat. No. 6,759,038, entitled "Metastasis Models Using Green Fluorescent Protein (GFP) As A Marker", with Yuying Tan and Takashi Chishima as inventors, issued to AntiCancer on July 6, 2004.

[18] "PCT" is the Patent Cooperation Treaty, under which an applicant can file an "international PCT application" and thereby delay for a period of 30 months filing a national patent application in one of the PCT signatory nations.

[19] Int'l App. No. PCT/US98/08457, and Int'l Pub. No. WO 98/49336, filed on April 28, 1998, entitled "Metastasis Models Using Green Fluorescent Protein (GFP) As A Marker", with Yuying Tan and Takashi Chishima as inventors.

Based on the priority date of May 29, 2001, for the '038 patent in AntiCancer's preliminary infringement contentions ("PICs"),[20] **Tan WO '98** is prior art under 35 U.S.C. 102(b) to the '038 patent. Because the vast majority of the '038 patent is disclosed verbatim in **Tan WO '98**, the '038 patent is anticipated, and thereby invalidated, by **Tan WO '98**.

***2. Tan WO '98 and the '159 patent***

Although the '159 patent (attached hereto as **Exhibit 3**)[21] is not a direct descendant of **Tan WO '98**, the invention claimed in the '159 patent can be understood as a "translation" of **Tan WO '98** into the language of the art of gene expression monitoring—indeed, anyone performing the steps of Claim 1 of the '159 patent would be performing the same task as described in **Tan WO '98** but the intent would be different, *viz.*, "monitor[ing] the ability of a promoter to promote expression in an animal of an endogenous gene that is controlled by said promoter" (the '159 patent, Claim 1), rather than "monitor[ing] metastasis of a primary tumor" (the '038 patent, Claim 5). AntiCancer said as much during the prosecution of the '159 patent: "[t]he invention resides in adapting an art-known method for tracking tumor metastases to the study of gene expression." AntiCancer's May 15, 2003 Amendment ("5/15/03 Amd."), attached hereto as **Exhibit 21**, p. 6; *see also* p. 8 ("Respectfully, as the Office itself points out, [AntiCancer's **Yang 2000**[22] reference, which applies the methods of **Tan WO '98**] 'discloses the *exact same method steps* as claimed [in the '159 patent application]'") (emphasis added).

Based on the priority date of March 17, 2000 for the '159 patent in AntiCancer's PICs,[23] **Tan WO '98** is prior art under 35 U.S.C. 102(b) to the '159 patent. Because the invention claimed in the '159 patent is disclosed in **Tan WO '98**, the '159 patent is anticipated, and thereby invalidated, by **Tan WO '98**.

---

[20] *See* Order [D.E. 88]; Jan. 31, 2008 Hearing Transcript [D.E. 92], p. 20, ll. 5-15; and AntiCancer's PICs, a copy of which was filed at [D.E. 127-4].

[21] U.S. Patent No. 6,649,159, entitled "Whole-Body Optical Imaging of Gene Expression and Uses Thereof", with Meng Yang and Eugene Baranov as inventors, issued to AntiCancer on November 18, 2003.

[22] Yang, M.; Baranov, E.; Jiang, P.; Sun, F-X.; Li., X-M.; Li, L.; Hasegawa, S.; Bouvet, M.; Al-Tuwaijri, M.; Chishima, T.; Shimada, H.; Moossa, A.R.; Penman, S.; Hoffman, R.M., *Whole-body optical imaging of green fluorescent protein-expressing tumors and metastases*, Proc. Natl. Acad. Sci. (USA) 97(3): 1206-1211 (2000); attached hereto as **Exhibit 20**.

[23] *See* AntiCancer's PICs, a copy of which was filed at [D.E. 127-4], p. 3.

## II. THE LAW

### A. Summary Judgment for Patent Invalidity

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-3 (1986). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. *Id*.; *Gasaway v. Northwestern Mut. Life Ins. Co*., 26 F.3d 957, 960 (9th Cir. 1994).

"Summary judgment is as appropriate in a patent case as in any other." *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd*., 731 F.2d 831, 835 (Fed. Cir. 1984). ). The Federal Circuit has expressly recognized that summary judgment of invalidity is proper. *See, e.g., McNeil-PPC, Inc. v. L. Perrigo Co.*, 337 F.3d 1362, 1367 (Fed. Cir. 2003) (affirming grant of summary judgment of invalidity based on obviousness). But "in considering the [summary judgment] motion, the court must view the evidence in the most favorable light to the non-movant and draw all reasonable inferences in the non-moving party's favor." *Tillotson, Ltd. v. Walbro Corp.*, 831 F.2d 1033, 1037 (Fed. Cir. 1987).

### B. Invalidity by Anticipation under 35 U.S.C. §102(b)

The Patent Act precludes the patenting of any invention that was "described in a printed publication . . . more than one year prior to the date of the application for patent in the United States." 35 U.S.C. §102(b); *see Schering Corp. v. Geneva Pharms., Inc*., 339 F.3d 1373, 1377 (Fed. Cir 2003). To anticipate under §102(b), a single prior art reference must disclose every limitation of

the claimed invention. *See Schering*, 339 F.3d at 1377 (citing *Lewmar Mar., Inc. v. Barient, Inc.*, 827 F.2d 744, 747 (Fed. Cir. 1987)).

Anticipation is a question of fact. *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1343 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 2887, 165 L. Ed. 2d 938 (2006). "However, without genuine factual disputes underlying the anticipation inquiry, the issue is ripe for judgment as a matter of law." *Id.* The burden of proof in all instances falls upon the party seeking to establish the invalidity of a patent claim, who "must overcome the presumption of validity in 35 U.S.C. § 282 by clear and convincing evidence." *State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1067 (Fed. Cir. 2003).

An anticipation analysis involves a three-part inquiry. First, the trier of fact must determine whether the challenging reference is prior art. *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1576-78 (Fed. Cir. 1996); *Del-mar Eng'g, Lab v. United States*, 524 F.2d 1178, 1184, 207 Ct. Cl. 815 (Ct. Cl. 1975). Second, the fact finder must ascertain that the prior art is enabling as to put the invention in the public's possession. *Akzo N.V. v. U.S. International Trade Com.*, 808 F .2d 1471, 1479 (Fed. Cir. 1986), *cert. denied*, 482 U.S. 909, 107 S. Ct. 2490, 96 L. Ed. 2d 382 (1987). Prior art patent references are ***presumed*** enabled. *In re Sasse*, 629 F.2d 675, 681 (C.C.P.A. 1980); *see also Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, 2006 U.S. Dist. LEXIS 36788, at *45 (N.D. Cal. May 24, 2006). In the third step, the trier of fact must ascertain whether the doctrine of identity applies, *i.e.*, whether each element of the accused claim is present either expressly or inherently in a single prior art reference. *Kalman v. Kimberly-Clark Corp.*, 713 F.2d 760, 771 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S. Ct. 1284, 79 L. Ed. 2d 687 (1984).

The third step involves determining whether the limitations of the claims as properly interpreted are met by the prior art. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 882 (Fed. Cir. 1989). "[C]laim interpretation may be resolved as an issue of law by the court on summary judgment taking into account the specification, prosecution history or other evidence". *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1580 (Fed. Cir. 1989).

///

///

***1. Incorporation by Reference***

While it has long been held that anticipation requires that a *single* prior art reference disclose each and every limitation of the claimed invention, the Federal Circuit has also held that "[m]aterial not explicitly contained in the single, prior art document may still be considered for purposes of anticipation if that material is incorporated by reference into the document." *Advanced Display Systems, Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000); *Schering Corp.*, 339 F.3d at 1379. "Incorporation by reference provides a method for integrating material from various documents into a host document -- a patent or printed publication in an anticipation determination -- by citing such material in a manner that makes clear that the material is effectively part of the host document as if it were explicitly contained therein." *Advanced Display Systems*, 212 F.3d at 1282; *see also Fresenius Med. Care Holdings*, 2006 U.S. Dist. LEXIS at *58-9 ("Here, as noted above, the Court is relying upon the CMS08 System *manual* in order to evaluate Fresenius' anticipation defense, and the CMS08 System *manual* clearly refers to, and incorporates by reference, the A2008D") (emphasis in original).

***2. Inherency***

A prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or *inherent*, in the single anticipating reference. *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). "Whether a claim feature is inherent in a prior art reference is a factual issue on which extrinsic evidence may be submitted." *Hazani v. United States ITC*, 126 F.3d 1473, 1477 (Fed. Cir. 1997) (citations omitted). If there is no genuine dispute as to inherency, summary judgment is appropriate. *See Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1561-62 (Fed. Cir. 1988).

It must, however, be "clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill." *In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999). In general, one or more limitations are inherent if they are the "natural result flowing from" the explicit disclosure of the prior art. *Continental Can Co.*, 948 F.2d at 1269. When the anticipatory reference is silent about the asserted inherent characteristic, "such gap in the reference may be filled with recourse to extrinsic evidence."

*Continental Can Co.*, 948 F.2d at 1268. "This modest flexibility in the rule that 'anticipation' requires that every element of the claims appear in a single reference accommodates situations where the common knowledge of technologists is not recorded in the reference; that is, where technological facts are known to those in the field of the invention, albeit not known to judges." *Continental Can Co.*, 948 F.2d at 1269.

## III. THE '038 AND '159 PATENTS ARE ANTICIPATED BY TAN WO '98

**Tan WO '98**, published on November 5, 1998, is prior art under 35 U.S.C. §102(b) to both the '038 patent, which has an effective priority date of May 29, 2001, and the '159 patent, which has an effective filing date of March 17, 2000. *See above*. Moreover, because it became (without any material being added) the '968 patent-in-suit, **Tan WO '98** is presumed to be enabled. *See*, *e.g.*, *In re Sasse*, 629 F.2d at 681; *Fresenius Med. Care Holdings, Inc.*, 2006 U.S. Dist. LEXIS at *45. Thus, the first two parts of the three part anticipation inquiry have been met, and all that remains is to show that each and every claim limitation in the '038 patent and the '159 patent is disclosed, either explicitly or inherently, in **Tan WO '98**.

### A. The '038 Patent

There are three independent claims in the '038 patent, and nine claims depending therefrom. Independent Claim 5, which is directed to a method of monitoring the metastasis of a GFP-expressing primary tumor in an immunodeficient mouse, rat, or rabbit, is arguably the broadest claim, and thus this analysis begins with that claim and the claims depending therefrom. The analysis continues with independent Claim 9 (and its dependent claims), and concludes with independent Claim 1 (and its dependent claims).

#### *1. Independent Claim 5 and Claims 6-8 Depending Therefrom*

As shown in the claim chart below, every limitation in independent Claim 5 of the '038 patent, and Claims 6-8 depending therefrom, is disclosed in **Tan WO '98**:

///

///

///

///

**Claim Chart for '038 Patent Claims 5-8**

| # | '038 Pat. Clms. 5-8 | Tan WO '98 (Ex. 2) |
|---|---|---|
| 5.1 | **5.** A method to monitor metastasis of a primary tumor in a subject which is a mouse, rat or rabbit which contains said primary tumor, and | "The invention provides models which permit the intimate study of formation of metastases from primary tumors in a realistic and real-time setting." - page 3,[24] lines 24-5<br><br>"In general, the model involves modifying a vertebrate, preferably a mammal, so as to contain tumor tissue, wherein the tumor cells have, themselves, been modified to contain an expression system for GFP." - page 6, lines 4-6<br><br>"Suitable vertebrate subjects for use as models are preferably mammalian subjects, most preferably convenient laboratory animals such as rabbits, rats, mice, and the like." - page 7, lines 15-17 |
| 5.2 | wherein said tumor stably expresses green fluorescent protein (GFP) in cells of said tumor when said tumor metastasizes, | Example 1 is a 'recipe' for making tumor cells with "high-intensity GFP fluorescence and stability." **Tan WO '98**, p.10, line 8 – p. 11, line 2, quote from p. 10, lines 26-28, and p. 11, lines 1-2 (= '038 pat., col. 7, line 44 – col. 8, line 13; quote from col. 8, lines 5-6, 12-13); *see also* February 29, 2000 Hoffman Declaration ("2/29/00 Hoffman Dec."), attached hereto as **Exhibit 22**,[25] describing Example 1 in the specification of the '038 patent (and **Tan WO '98**):<br>"As to the stability of our cell lines and GFP expression, we have established cell lines that can proliferate and be subjected to numerous passages and retain their expression of GFP at high levels." |
| 5.3 | wherein said subject contains said tumor that expresses GFP and | "In general, the model involves modifying a vertebrate, preferably a mammal, so as to contain tumor tissue, wherein the tumor cells have, themselves, been modified to contain an expression system for GFP." - page 6, lines 4-6 |

---

[24] The page numbers used herein for **Tan WO '98** are the page numbers at the top of each page of the specification which starts on the third page of **Tan WO '98**, after the first two "cover pages" which contain the abstract and bibliographic information for **Tan WO '98**. *See* **Ex. 2**.

[25] Pursuant to the intent of the Patent Local Rules, the portions of the file history cited herein are from AntiCancer's production of the file histories pursuant to PatLR 3.2(c). AntiCancer labeled the entire prosecution history "ATTORNEY'S EYES ONLY / CONFIDENTIAL", which AntiCancer later admitted was a mistake. *See* Holmberg Declaration attached hereto, ¶25.

| # | **'038 Pat. Clms. 5-8** | **Tan WO '98 (Ex. 2)** |
|---|---|---|
| 5.4 | wherein said subject is a genetically immuno-compromised mouse, rat or rabbit, or a mouse, rat or rabbit which is syngeneic to said tumor; [26] | "In these aspects, the vertebrate subject may constitute a model system, such as a immunocompromised mouse wherein tumor cells or a tumor, modified to express green fluorescent protein has been introduced into the subject."<br>- page 4, lines 5-7<br><br>"Particularly useful are subjects that are particularly susceptible to tumor development, such as subjects with impaired immune systems, typically nude mice or SCID[27] mice."<br>- page 7, lines 18-19 |
| 5.5 | which method comprises monitoring the progression of metastasis by observing the presence, absence or intensity of the fluorescence as a function of time at various locations in said subject | "Once the solid tumors have been implanted, the vertebrate becomes a model system for studying metastasis. The tumor is thus allowed to progress and develop and the vertebrate is monitored for appearance of the GFP labeled cells at sites distal from the original implantation site."<br>- page 6, line 29 - page 7, line 1<br><br>"Advantage is taken of the visible marker green fluorescent protein (GFP) to label tumor cells so that their migration and colonization in tissues distal to the tumor can be followed as the migration and colonization progresses."<br>- page 4, lines 28-30 |
| 5.6 | wherein the subject is intact. | "In some cases the tumors are sufficiently bright that opening the animal is unnecessary—they can be seen directly through the skin."<br>- page 7, lines 4-6 |
| 6 | **6.** The method of claim **5** wherein the progression of metastasis is monitored by fluorescent optical tumor imaging in the intact subject. | "Once the solid tumors have been implanted, the vertebrate becomes a model system for studying metastasis. The tumor is thus allowed to progress and develop and the vertebrate is monitored for appearance of the GFP labeled cells at sites distal from the original implantation site."<br>- page 6, line 29 - page 7, line 1<br><br>"In some cases, abdominal opening is unnecessary as the intraperitoneal tumors can be visualized through intact skin. Tumors were visible in the abdominal cavity …"<br>- Example 7, page 17, lines 12-14 |

[26] When a claim limitation lists alternative items, *e.g.*, "wherein said subject is a genetically immuno-compromised mouse, rat or rabbit, ***or*** a mouse, rat or rabbit which is syngeneic to said tumor" (emphasis added), a prior art reference disclosing any one of those items anticipates that claim limitation. *See, e.g.*, *Upsher-Smith Laboratories, Inc. v. Pan American Laboratories, Inc.*,2003 U.S. Dist. LEXIS 22980 at *15 (D.Minn. 2003) (citing Donald S. Chisum, CHISUM ON PATENTS § 8.06[2][f]).

[27] Nude mice and SCID mice are genetically immunocompromised, *i.e.*, their immunodeficiency is an inherited genetic defect. *See, e.g.*, U.S. Patent Office's March 12, 2003 Office Action on the application which became the '038 patent ("3/12/03 O.A.") (demanding that the limitation "immunocompromised" be changed to the present "genetically immunocompromised" because only SCID and nude mice are disclosed in the specification) attached hereto as **Exhibit 23**; *see also* **Hoffman 1992** (**Ex. 4**), pp. 314, 326.

| # | **'038 Pat. Clms. 5-8** | **Tan WO '98** (**Ex. 2**) |
|---|---|---|
| 7 | **7.** The method of claim **5** wherein said subject contains said tumor by virtue of surgical orthotopic implantation of said tumor. | "The method of any of claims 1-4 wherein said vertebrate subject has been modified to contain a tumor that expresses GFP by surgical orthotopic implantation of said tumor."<br>- Claim 5, page 18, lines15-17 |
| 8.1 | **8.** The method of claim **5** wherein said subject contains said tumor by virtue of injecting cells of a stably transformed tumor cell line | "After amplification and transfer, Clone-38 [a tumor cell line] was selected because of its high-intensity GFP fluorescence and stability."<br>- Example 1, page 10, lines 26-28<br>- *see also* p. 11, ll. 1-2 (re: Clone-26 cell line)<br><br>"In an additional experiment, 5x10$^6$ Clone-38 cells were injected into a nude mouse through the tail vein … ."<br>- Example 2, page 12, lines 21-22<br>- *see also* Example 3, p. 14, ll. 7-8 (re: Clone-26 cells) |
| 8.2 | which has been transfected with an expression vector containing a first nucleotide sequence encoding green fluorescent protein (GFP) and a second nucleotide sequence encoding a selection marker, | Example 5 (page 15, line 21 – page 6, line 14) and accompanying FIGs. 1a and 1b describe an expression vector comprising first nucleotide encoding GFP and a second nucleotide comprising the neomycin resistance selection marker (labeled "neo$^r$" in FIGs. 1a and 1b). *See also* p. 16, l. 30 – p.17, l. 2; and 2/29/00 Hoffman Dec. (**Ex. 22**), p. 3, describing Example 5 in the specification of **Tan WO '98** and the '038 patent as having "selection for neomycin resistance". |
| 8.3 | both said first and second nucleotide sequences being under control of a viral promoter and | "The method of claim 6 wherein said expression system comprises a viral promoter; … ."<br>- Claim 7, p. 18, ll. 22-3<br><br>"Vectors containing various modified forms of GFP to provide various colors are marketed by Clontech. The Clontech vectors intended for mammalian cell expression place the GFP under the control of the cytomegalovirus (CMV) promoter."<br>- page 3, lines 19-21<br><br>*See also* Examples 5-6, pp. 15-17 (*e.g.*, " … commercially available pEGFP series vectors available from Clontech …"; and " … retroviral vector GFP-retrovirus pLEIN … ") |
| 8.4 | wherein said cell line stablely [*sic*] effects high level expression of said GFP in the absence of selection agent and maintains a high level expression of GFP when said cell line proliferates through multiple passages of said cell line. | Clone-38 and Clone-26 are tumor cell lines with "high-intensity GFP fluorescence and stability" (p. 10, lines 26-28, and p. 11, lines 1-2); *see also* 2/29/00 Hoffman Dec. (**Ex. 22**), describing Example 1, quoted in Claim #5.2 above, and, continuing, describing Example 5 in the specification of **Tan WO '98** and the '038 patent:<br>"… As noted in Example 5, on page 18 of the specification, among the tumor cell lines transfected and established as a stable producer was the mouse melanoma cell line B16. As noted in the enclosed [**Yang 2000a**], the cells have a strikingly bright GFP fluorescence that remains stable in the absence of selection agents after numerous passages, citing the earlier publication of Yang, M. et al., Clin. Cancer Res. (1999) 5:3549-3559." |

### *2. Independent Claim 9 and Claims 10-12 Depending Therefrom*

Like independent Claim 5, independent Claim 9 is directed to a method of monitoring metastasis of a primary tumor, but Claim 9 recites that the tumor "expresses GFP as a result of locally administering a retroviral vector". As shown in the claim chart below, every limitation in Claim 9, and Claims 10-12 depending therefrom, is disclosed by **Tan WO '98**:

**<u>Claim Chart for '038 Patent Claims 9-12</u>**

| # | '038 Pat. Clms. 9-12 | Tan WO '98 (Ex. 2) |
|---|---|---|
| 9.1 | **9.** A method to monitor metastasis of a primary tumor in a mammalian subject which contains said primary tumor, and | < *See citations in Claim #5.1 above* > |
| 9.2 | wherein said tumor stably expresses green fluorescent protein (GFP) in cells of said tumor when said tumor metastasizes, | < *See citations in Claim #5.2 above* > |
| 9.3 | wherein said primary tumor is endogenous to said mammalian subject and | "The method of any of claims 1-4 wherein a primary tumor endogenous to said subject has been modified to contain an expression system for GFP." - Claim 6, page 18, lines 19-20 - *see also* Claim 9, p. 19, ll. 6-8; cvr page, Abstract |
| 9.4 | expresses said GFP as a result of locally administering a retroviral vector to said subject in the vicinity of said tumor, said retroviral vector containing an expression system for said GFP; | "Alternatively, the subject may be a human or other vertebrate which natively contains the tumor, but wherein the tumor has been subjected to viral infection or to transfection with a retroviral vector so as to produce said GFP." - page 4, lines 7-10<br><br>"In contrast, when the method of the invention is used to visualize metastasis in tumors that natively occur in a subject such as a human cancer patient, vectors that employ retroviral or other viral promoters are preferred. The use of such vectors permits the insertion of an expression system for GFP into the already existent tumor." - page 8, lines 7-10<br><br>"For use in vivo, the virus is administered, preferably locally to the tumor, which can be observed within hours after injection either of the packaging cells or of the viral containing supernatants." - page 9, lines 14-17 |

| # | '038 Pat. Clms. 9-12 | Tan WO '98 (Ex. 2) |
|---|---|---|
| 9.5 | which method comprises monitoring the progression of metastasis by observing the presence, absence or intensity of the fluorescence as a function of time at various locations in said subject. | < *See citations in Claim #5.5 above* > |
| 10 | **10.** The method of claim **9** wherein the subject is human. | "The method of claim 6 … wherein said vertebrate subject is human; …." - Claim 7, page 18, lines 22-24 |
| 11 | **11.** The method of claim **9** wherein the progression of metastasis is monitored by excising fresh organ tissues from various locations in said subject. | "The method of claim 1 wherein the subject is opened." - Claim 2, page 18, line 8<br><br>"The method of claim 2 at least some of the tissue are excised." - Claim 3, page 18, lines 10<br><br>"Thus, in one aspect, the invention is directed to a method to follow the progression of metastasis of a primary tumor, which method comprises removing fresh organ tissues from a vertebrate subject which has been modified to contain tumor cells that express GFP and observing the excised tissues for the presence of fluorescence." - page 3, line 27 - page 4, line 2 |
| 12 | **12.** The method of claim **11** wherein said excised tissues are observed by microscopic examination of fresh tissue slices. | "The method of claim 3 wherein said excised tissues are observed by microscopic examination." - Claim 4, page 18, lines 12-13 |

### *3. Independent Claim 1 and Claims 2-4 Depending Therefrom*

Independent Claim 1 is directed to a method of using the GFP-expressing tumor mouse model of Claim 5 to evaluate a candidate drug or protocol for inhibiting metastasis, by comparing treated vs. untreated subjects. **Tan WO '98** states that "the method of the invention provides a model system for studying the effects of various therapeutic candidate protocols and substances on metastatic growth of tumors" (p. 6, lines 1-3), but **Tan WO '98** does not elaborate on how that would be done. This is because the scientific method of treating a subject with a candidate drug or protocol and then comparing the results to an untreated control, is a "given" which does not need explanation. See, *e.g.*, *Continental Can Co.*, 948 F.2d at 1269 ("[t]his modest flexibility [*i.e.*, the principle of inherent anticipation] in the rule that 'anticipation' requires that every element of the

claims appear in a single reference accommodates situations where the common knowledge of technologists is not recorded in the reference; that is, where technological facts are known to those in the field of the invention, albeit not known to judges").

That the method of comparing a control vs. a subject in order to test a drug/protocol is a "given" is shown by AntiCancer's own references, in which every time AntiCancer uses its mouse metastasis model for testing a drug or protocol, the drug/protocol is administered to a subject set of mice, while a control set of mice is untreated, and then the two groups are compared. *See, e.g.*, **Hoffman 1997**,[28] pp. 140-141; **Furukawa 1993** (**Ex. 6**), p. 3070-3071; **Wang 1994** (**Ex. 7**), pp. 4726-4727; **An 1996** (**Ex. 8**), p. 2546; and **Kanai 1997** (**Ex. 9**), p. 839; *see also Continental Can Co.*, 948 F.2d at 1268 (when the anticipatory reference is silent about the asserted inherent characteristic, "such gap in the reference may be filled with recourse to extrinsic evidence").

Thus, **Tan WO '98** discloses using its GFP-expressing tumor mouse model in the context of the control vs. treated testing paradigm—*i.e.*, **Tan WO '98**'s disclosure to use a GFP-expressing tumor mouse model to test a candidate drug/protocol inherently discloses administering a candidate drug/protocol to a subject mouse with a GFP-expressing tumor, while not administering the candidate drug/protocol to a control mouse with a GFP-expressing tumor, and then watching the results to determine the efficacy of the candidate drug/protocol. In other words, the use of the control vs. treated paradigm is a "natural result flowing from" **Tan WO '98**'s explicit disclosure that the mouse model could be used to test a candidate drug/protocol. *See, e.g.*, *Continental Can Co.*, 948 F.2d at 1269 ("If, however, the disclosure is sufficient to show that the natural result flowing from the operation as taught would result in the performance of the questioned function, it seems to be well settled that the disclosure should be regarded as sufficient.").

As shown in the claim chart below, every limitation in Claim 1, and Claims 2-4 depending therefrom, is disclosed by **Tan WO '98**.

///

---

[28] Hoffman, R.M., *Fertile seed and rich soil: The development of clinically relevant models of human cancer by surgical orthotopic implantation of intact tissue*, ANTICANCER DRUG DEVELOPMENT GUIDE: PRECLINICAL SCREENING, CLINICAL TRIALS, AND APPROVAL (Teicher, B., ed.), Totowa, NJ: Humana Press Inc., 127-144 (1997); attached hereto as **Exhibit 15**.

**<u>Claim Chart for '038 Patent Claims 1-4</u>**

| # | '038 Pat. Clms. 1-4 | Tan WO '98 |
|---|---|---|
| 1.1 | **1.** A method to evaluate a candidate protocol or drug for the inhibition of metastasis of a primary tumor which method comprises: | "In one application, the method of the invention provides a model system for studying the effects of various therapeutic candidate protocols and substances on metastatic growth of tumors." - page 6, lines 1-3 |
| 1.2 | administering said protocol or drug to a subject | It is inherent that, if one is to "study[] the effects of various therapeutic candidate protocols and substances" (quoted above) using a mouse metastasis model, the candidate drug or protocol must be administered to a model mouse. |
| 1.3 | which is a mouse, rat or rabbit | < *See citations in Claim #5.1 above* > |
| 1.4 | which contains a primary tumor that stably expresses green fluorescent protein (GFP) in cells of said tumor when said tumor metastasizes and | < *See citations in Claim #5.2 above* > |
| 1.5 | monitoring the progression of metastasis by observing the presence, absence or intensity of the fluorescence at various locations in the treated subject; | < *See citations in Claim #5.5 above* > |
| 1.6 | wherein said subject contains said tumor that expresses GFP and wherein said subject is a genetically immunocompromised mouse, rat or rabbit, or a mouse, rat or rabbit which is syngeneic to said tumor; | < *See citations in Claim #5.4 above* > |
| 1.7 | monitoring the progression of metastasis in a control, which contains a similar tumor that expresses green fluorescent protein; | It is inherent that, if one is to test a candidate drug or protocol using a mouse metastasis model, the candidate drug or protocol must be administered to a subject set of model mice, while a control set of model mice are not treated.<br><br>< *See citations in Claim #5.5 above* > |
| 1.8 | wherein said control subject contains said tumor that expresses GFP wherein said control subject is an immunocompromised mouse, rat or rabbit, or a mouse, rat or rabbit which is syngeneic to said tumor; | < *See citations in Claim #5.4 above* > |

| # | **'038 Pat. Clms. 1-4** | **Tan WO '98** |
|---|---|---|
| 1.9 | and comparing the progression of metastasis in said treated subject with the progression of metastasis in said control subject wherein the control subject and treated subject are intact; | It is inherent that, if one is to test a candidate drug or protocol using a mouse metastasis model, one must use the control vs. treated subject model, in which the results of the control vs. treated subjects must be compared. *See above* and, *e.g.*, **Hoffman 1997** (**Ex. 15**), pp. 140-141, describing the testing of matrix metalloproteinase inhibitor BB-94 using AntiCancer's metastasis mouse model: "Treatment with BB-94 eased a reduction of median weight of the primary tumor from 293 mg in the control group to 144 mg in the BB-94-treated group ($P < 0.001$)." |
| 1.10 | whereby a diminution of the progression of metastasis in said treated subject as compared to said control subject identifies the protocol or drug as effective in inhibiting metastasis. | It is inherent that diminution of metastasis indicates that a drug/protocol is effective. *See above* and, *e.g.*, **Hoffman 1997** (**Ex. 15**), pp. 140-141, describing the testing of matrix metalloproteinase inhibitor BB-94 using AntiCancer's metastasis mouse model: "The reduction in tumor progression observed in the BB-94.treated group translated into an improvement in the survival of this group, from a median survival time of 110 d in the control group to a median survival time of 140 d in the treated group ($P < 0.01$). Treatment with BB-94 was not associated with any obvious toxic effect, and these results suggest that such agents may be effective as adjunctive cancer therapies (131)." |
| 2 | **2.** The method of claim **1** wherein the progression of metastasis is monitored by fluorescent optical tumor imaging in the intact subject. | < *See citations in Claim #6 above* > |
| 3 | **3.** The method of claim **1** wherein said subject contains said tumor by virtue of surgical orthotopic implantation of said tumor. | < *See citations in Claim #7 above* > |
| 4.1 | **4.** The method of claim **1** wherein said subject contains said tumor by virtue of injecting cells of a stably transformed tumor cell line | < *See citations in Claim #8.1 above* > |
| 4.2 | which has been transfected with an expression vector containing a first nucleotide sequence encoding green fluorescent protein (GFP) and a second nucleotide sequence encoding a selection marker, | < *See citations in Claim #8.2 above* > |

| # | **'038 Pat. Clms. 1-4** | **Tan WO '98** |
|---|---|---|
| 4.3 | both said first and second nucleotide sequences being under control of a viral promoter and | < *See citations in Claim #8.3 above* > |
| 4.4 | wherein said cell line stably effects high level expression of said GFP in the absence of selection agent and maintains a high level expression of GFP when said cell line proliferates through multiple passages of said cell line**.** | < *See citations in Claim #8.4 above* > |

**B. The '159 Patent**

As stated above, **Tan WO '98** "discloses the exact same method steps as claimed" in the '159 patent (AntiCancer's 5/15/03 Amd. (**Ex. 21**), p. 8). Only the purpose has changed—rather than "monitor[ing] metastasis of a primary tumor" (the '038 patent, Claim 5), one is "monitor[ing] the ability of a promoter to promote expression in an animal of an endogenous gene that is controlled by said promoter" (the '159 patent, Claim 1).

**Tan WO '98/Chalfie '084**[29] expressly discloses monitoring when a promoter is active by observing the GFP produced by the promoter's associated gene. *See, e.g.*, col. 2, lines 65 *et seq*. By incorporating and describing **Chalfie '084** (**Ex. 16**) as teaching that GFP expression can be used "to monitor expression of fused DNA" (p. 2, ll. 11-17), **Tan WO '98** discloses that its GFP-expressing tumor mouse metastasis model can be used to study when a promoter is active in an animal (by seeing when its associated gene produces GFP). *See also* **Tan WO '98/Cheng 1997**,[30] p. 1013 ("GFP is effective as a vital marker to … monitor gene expression …" with detailed disclosure of

[29] U.S. Patent No. 5,491,084, entitled "Uses of green-fluorescent protein", Chalfie, M., and Prasher, D., inventors, issued on Feb. 13, 1996, attached hereto as **Exhibit 16**, is identified at p. 2, ll. 11-17, and incorporated by reference at p. 3, ll. 9-10, of **Tan WO '98**.

Herein, the articles incorporated by reference in **Tan WO '98** will be identified as "**Tan WO '98/Article**".

[30] Cheng, L.; Du, C.; Murray, D.; Tong, X.; Zhang, Y.A.; Chen, B.P.; Hawley, R.G., *A GFP reporter system to assess gene transfer and expression in human hematopoietic progenitor cells*, Gene Therapy 4: 1013-1022 (1997), attached hereto as **Exhibit 17**, is identified at p. 1, l. 30, and incorporated by reference at p. 3, ll. 9-10, of **Tan WO '98**.

such a use); **Tan WO ’98/Levy 1996**,[31] p. 610, teaching the marking of tumor cells for study; and **Tan WO ’98**/**Grignani 1998**,[32] p. 14.

As shown in the claim chart below, every limitation in each claim of the ‘159 patent is disclosed by **Tan WO ’98**.

**Claim Chart for ‘159 Patent**

| # | **‘159 Pat. Clms. 1-13** | **Tan WO ’98 (Ex. 2)** |
| --- | --- | --- |
| 1.1 | **1.** A method to monitor the ability of a promoter to promote expression in an animal of an endogenous gene that is controlled by said promoter, which method comprises | AntiCancer’s Proposed Claim Construction of this limitation (at [D.E. 83], p. 19):[33]<br>“a method to study when a promoter (defined below) is active in an animal so that its associated endogenous gene (defined below) produces a protein”<br><br>**Tan WO ’98**/**Chalfie ‘084** (**Ex. 16**) discloses studying when a promoter is active by observing the GFP produced by the promoter’s associated gene. *See above*. |

[31] Levy, J., Muldoon, R., Zolotukhin, S., Link Jr., C., *Retroviral Transfer and Expression of a Humanized, Red-Shifted Green Fluorescent Protein Gene Into Human Tumor Cells*, Nature Biotechnology 14: 610-614 (1996), attached hereto as **Exhibit 18**, is identified at p. 1, ll. 27-28, and incorporated by reference at p. 3, ll. 9-10, of **Tan WO ‘98**.

[32] Grignani, Fr.; Kinsella, T.; Mencarelli, A.; Valtieri, M.; Riganelli, D.; Grignani, Fa.; Lanfrancone, L.; Peschle, C.; Nolan, G.P.; Pelicci, P.G., *High-Efficiency Gene Transfer and Selection of Human Hematopoietic Progenitor Cells with a Hybrid EBV/Retroviral Vector Expressing the Green Fluorescence Protein*, Cancer Research 58: 14-19 (1998), attached hereto as **Exhibit 19**, is identified at p. 1, ll. 28-29, and incorporated by reference at p. 3, ll. 9-10, of **Tan WO ‘98**.

[33] Because, in the context of a summary judgment motion, all inferences are “required to [be] draw[n] … in the light most favorable to the party opposing the motion” (*Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665, 668 (9th Cir. Cal. 1980)), AntiCancer’s proposed claim constructions are being used herein, without question or comment on their soundness.

| # | '159 Pat. Clms. 1-13 | Tan WO '98 (Ex. 2) |
|---|---|---|
| 1.2 | a) delivering, to an animal, cells containing a nucleic acid encoding a fluorophore operatively linked to the promoter of said endogenous gene whose ability to promote expression is to be analyzed; and | "A method to prepare a vertebrate which harbors a tumor expressing GFP which method comprises subcutaneously administering to a vertebrate subject an amount of the tumor cells of claim 10 sufficient to effect production of a tumor in said subject, …"<br>- Claim 14, page 19, lines 27-31<br><br>"Tumor cells modified to produce GFP, which tumor cells have been transfected with an expression vector containing a nucleotide sequence encoding said GFP under control of heterologous regulatory sequences."<br>- Claim 10, page 19, lines 10-12<br><br>Example 5 discloses that the expression vector which transfected the cells to be administered to the vertebrate encoded a fluorophore (GFP) operatively linked to a promoter (the SV40 promoter) of an endogenous[34] gene encoding either Methioninase (FIG. 1a) or SV40 T-antigen (FIG. 1b). *See* page 15, line 21 *et seq.* |
| 1.3 | b) observing the presence, absence or intensity of the fluorescence generated by said fluorophore at various locations in said animal | "Once the solid tumors have been implanted, the vertebrate becomes a model system for studying metastasis. The tumor is thus allowed to progress and develop and the vertebrate is monitored for appearance of the GFP labeled cells at sites distal from the original implantation site."<br>- page 6, line 29 - page 7, line 1<br><br>"Advantage is taken of the visible marker green fluorescent protein (GFP) to label tumor cells so that their migration and colonization in tissues distal to the tumor can be followed as the migration and colonization progresses."<br>- page 4, lines 28-30 |

[34] Under AntiCancer's Proposed Claim Construction of "endogenous gene" (at [D.E. 83], pp. 19-20), *i.e.*, "[a]ny gene in the animal is endogenous whether original or artificially inserted", these are endogenous genes. Once again, AntiCancer's proposed claim constructions are being used for purposes of this motion, without question or comment on their soundness. *See* Footnote 33.

| # | '159 Pat. Clms. 1-13 | Tan WO '98 (Ex. 2) |
|---|---|---|
| 1.4 | by whole-body external fluorescent optical imaging, | The '159 patent defines this phrase (at col. 5, lines 60-66):<br>"an imaging process in which the presence, absence or intensity of the fluorescence generated by the fluorophore at various locations in the host organism is monitored, recorded, and/or analyzed externally without any procedure, e.g., surgical procedure, to expose and/or to excise the desired observing site from the host organism."<br><br>Since "[observing] the presence, absence or intensity of the fluorescence generated by the fluorophore at various locations in the host organism" is already recited in the previous limitation of this claim, the addition of this phrase only brings in, if anything, the concept that the organism remains intact. For this concept, see:<br><br>"In some cases the tumors are sufficiently bright that opening the animal is unnecessary—they can be seen directly through the skin."<br>- page 7, lines 4-6<br>- *see also* p. 9, ll. 17-18; and Example 7, p. 17, ll. 12-14 |
| 1.5 | whereby the ability of said promoter to promote expression is monitored, and | AntiCancer's Proposed Claim Construction of this limitation (at [D.E. 83], pp. 21-2):[35]<br>"Where the ability of the promoter to causes its associated fluorophore gene to produce a protein is monitored"<br><br>**Tan WO '98**/**Chalfie '084** (**Ex. 16**) discloses monitoring when a promoter is active by observing the GFP (protein) produced by the promoter's associated gene. *See above*. |
| 1.6 | wherein said fluorophore is a protein that is autofluorescent such that no substrates or cofactors are needed for it to fluoresce. | "It [GFP, the fluorophore] requires no additional proteins from its native source nor does it require substrates or cofactors available only in its native source in order to fluoresce."<br>- page 5, lines 8-9 |
| 2 | **2.** The method of claim **1**, wherein the cells are delivered to the animal via a surgical procedure. | "The method of any of claims 1-4 wherein said vertebrate subject has been modified to contain a tumor that expresses GFP by surgical orthotopic implantation of said tumor."<br>- Claim 5, page 18, lines 15-17 |
| 3 | **3.** The method of claim **2**, wherein the cells are delivered to the animal via direct implantation by surgical orthotopic implantation (SOI) at a desired site. | "Techniques for implantation of the solid tumors, now labeled with GFP, into vertebrates include direct implantation by surgical orthotopic implantation (SOI) at the desired site, typically the site from which the tumor cells were derived."<br>- page 6, lines 25-27 |

---

[35] *See* Footnote 33.

| # | '159 Pat. Clms. 1-13 | Tan WO '98 (Ex. 2) |
|---|---|---|
| 4 | **4.** The method of claim **1**, wherein the animal is a human and the fluorophore is a humanized fluorophore. | "The method of claim 6 … wherein said vertebrate subject is human; … "<br>- Claim 7, page 18, lines 22-24<br><br>"The particular humanized hGFP-S65T clone is used in the examples set forth below for illustration."<br>- page 5, lines 28-29 |
| 5 | **5.** The method of claim **1**, wherein the fluorophore is selected from the group consisting of a green fluorescent protein (GFP), a blue fluorescent protein (BFP) and a red fluorescent protein (RFP). | "The label used in various aspects of the invention is green fluorescent protein (GFP)."<br>- page 5, lines 3-4<br><br>"Various forms of GFP exhibit colors other than green, and these too, are included within the definition of 'GFP' and are useful in the methods and material of the invention."<br>- page 5, lines 22-24 |
| 6 | **6.** The method of claim **5**, wherein the animal is a human and the GFP is the humanized hGFP-S65T. | "The method of claim 6 … wherein said vertebrate subject is human; … "<br>- Claim 7, page 18, lines 22-24<br><br>"The particular humanized hGFP-S65T clone is used in the examples set forth below for illustration."<br>- page 5, lines 28-29 |
| 7 | **7.** The method of claim **1**, wherein the animal is a mammal. | "Suitable vertebrate subjects for use as models are preferably mammalian subjects, most preferably convenient laboratory animals such as rabbits, rats, mice, and the like."<br>- page 7, lines 15-17<br><br>"The vertebrate subject of claim 8 which is a mammal; … ."<br>- Claim 9, page 18, lines 31 |
| 8 | **8.** The method of claim **7**, wherein the mammal is selected from the group consisting of a mouse, a rat, a rabbit, a cat, a dog, a pig, a cow, an ox, a sheep, a goat, a horse, a monkey and a non-human primate. | "Suitable vertebrate subjects for use as models are preferably mammalian subjects, most preferably convenient laboratory animals such as rabbits, rats, mice, and the like."<br>- page 7, lines 15-17 |

| # | '159 Pat. Clms. 1-13 | Tan WO '98 (Ex. 2) |
|---|---|---|
| 9 | **9.** The method of claim **1**, wherein the endogenous gene is normally expressed in a tissue or organ specific manner. | **Tan WO '98**/**Chalfie '084** (**Ex. 16**) teaches that the promoter's associated gene or "DNA sequence" may be "normally expressed" in its host cell, and thus endogenous (*see* col. 5, l. 12-14), and that the "DNA sequence" may be expressed in a tissue-specific manner:<br>"This invention provides a method for determining the tissue-specificity of a DNA sequence in a subject which comprises: a) introducing into a cell of the subject a DNA molecule having the DNA sequence linked to DNA sequence encoding a green-fluorescent protein such that the DNA sequence will control expression of the green-fluorescent protein; b) culturing the subject in conditions permitting the expression of the green-fluorescent protein; and c) detecting the expression of the green-fluorescent protein in different tissue of the subject, thereby determining the tissue-specificity of the DNA sequence., …"<br>- **Tan WO '98**/**Chalfie '084** (**Ex. 16**), col. 5, lines 57-67 |
| 10 | **10.** The method of claim **9**, wherein the tissue is selected from the group consisting of connective, epithelium, muscle and nerve tissues. | It is inherent that the tissue may be one of these different types of tissue. |
| 11 | **11.** The method of claim **9**, wherein the organ is selected from the group consisting of brain, lung, liver, spleen, bone marrow, thymus, heart, lymph, blood, bone, cartilage, pancreas, kidney, gall bladder, stomach, intestine, testis, ovary, uterus, rectum, nervous system, gland, and internal blood vessels. | It is inherent that the organ may be one of these different types of organ. |
| 12 | **12.** The method of claim **1**, wherein the endogenous gene is an endogenous tumor or cancer associated gene. | Example 5 (p. 15, l. 21 *et seq.*) discloses a "fusion of GFP and methioninase", where methioninase is a tumor or cancer associated gene, and "a fusion protein of GFP with the SV40 T-antigen", where the SV40 T-antigen is also a tumor or cancer associated gene. *See also below.* |
| 13 | **13.** The method of claim **12**, wherein the tumor or cancer associated gene is an oncogene or a tumor suppressor gene | Example 5 (p. 15, l. 21 *et seq.*) discloses a "fusion of GFP and methioninase", where the methioninase gene acts as a tumor suppressor gene, and "a fusion protein of GFP with the SV40 T-antigen", where the SV40 T-antigen is an oncogene. *See* AntiCancer's U.S. Pat. No. 6,524,571 ("Methioninase Gene Therapy for Tumor Treatment"), attached hereto as **Exhibit 24**. |

## IV. CONCLUSION

Because each and every limitation of all of the claims in the ‘038 and ‘159 patents is disclosed, either explicitly or inherently, in **Tan WO ’98**, CRI’s motion for summary judgment of invalidity of the ‘038 and ‘159 patents should be granted.

COHEN PONTANI LIEBERMAN & PAVANE LLP

Dated: June 30, 2008

By: /s Teodor J. Holmberg
Martin B. Pavane
Teodor J. Holmberg
Attorneys for Defendant and Counterclaimant
CAMBRIDGE RESEARCH & INSTRUMENTATION, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was this date served upon all counsel of record by electronic transmission through the Case Management/Electronic Case Filing (CM/ECF) system of the U.S. District Court for the Southern District of California, and that all parties in this case are represented by counsel who are CM/ECF participants.

Dated: June 30, 2008 By: /s Teodor J. Holmberg

Teodor J. Holmberg
Attorney for Defendant
CAMBRIDGE RESEARCH & INSTRUMENTATION, INC.
e-mail: tidge@cplplaw.com