# EXHIBIT N



Case 3:07-cv-00097-JLS-RBB   Document 185-3   Filed 10/10/2008   Page 2 of 16
-24-2008 15:11 From: LAWTON LAW FIRM   6195951520   To:16507983500   P.1/15

# LAWTON LAW FIRM

Emerald Plaza
402 WEST BROADWAY
SUITE 1860
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 595-1370
TELEFACSIMILE (619) 595-1520
www.lawtonlaw.com

**DAN LAWTON**
DIRECT DIAL (619) 595-1406
INTERNET E-MAIL
dlawton@lawtonlaw.com

**JOSEPH C. KRACHT**
DIRECT DIAL (619) 595-1318
DIRECT FAX (619) 496-9744
INTERNET E-MAIL
jkracht@lawtonlaw.com

**MATT VALENTI**
DIRECT DIAL (619) 595-1775
DIRECT FAX (619) 595-7964
INTERNET E-MAIL
mvalenti@lawtonlaw.com

**LISA M PISANO**
DIRECT DIAL (619) 595-1412
DIRECT FAX (619) 595-7056
INTERNET E-MAIL
lisa@lawtonlaw.com

## FACSIMILE TRANSMISSION SHEET

July 24, 2008

TO: James C. Pistorino, Esq.
HOWREY LLP
(650) 798-3600
(650) 798-3500 (Telephone)

FROM: Dan Lawton

RE: *AntiCancer, Inc., v. Novartis Institutes for BioMedical Research, Inc., et al.*

TOTAL NUMBER OF PAGES TRANSMITTED:   16

ORIGINAL TO FOLLOW:   YES ( )   NO (X)

FAXED BY:   Emi

COMMENTS:   James, here's the draft complaint we discussed.

*********************************************************************

If you are not receiving properly or if you do not receive all pages, please telephone us immediately at (619) 595-1317. Thank you.

RECEIVED TIME  JUL. 24.  3:24PM

Dan Lawton (State Bar No. 127342)
Joseph C. Kracht (State Bar No. 228507)
Matt Valenti (State Bar No. 253978)
LAWTON LAW FIRM
550 West C Street, Suite 1400
San Diego, CA 92101
(619) 595-1370
(619) 595-1520 (Telefacsimile Number)

Attorneys for Plaintiff AntiCancer, Inc.

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTICANCER, INC., a California corporation, <br><br> Plaintiff, <br><br> v. <br><br> NOVARTIS INSTITUTES FOR BIOMEDICAL RESEARCH, INC., a Delaware corporation; NOVARTIS PHARMACEUTICALS CORPORATION, a Delaware corporation; NOVARTIS AG, a Swiss corporation; MERCK & CO., INC., a New Jersey corporation; and DOES 1-20, inclusive, <br><br> Defendants. | Case No. <br><br> COMPLAINT FOR DAMAGES AND PRELIMINARY AND PERMANENT INJUNCTIONS FOR INFRINGEMENT OF U.S. PATENTS NOS. 6,251,384, 6,649,159, AND 6,759,038; DEMAND FOR TRIAL BY JURY AND FOR SPEEDY HEARING |

## JURISDICTION AND VENUE

1. This action arises under the patent laws of the United States, Title 35 of the United States Code, and under 28 U.S.C. § 2201 and Fed. R. Civ. P. 57.

2. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338(a), and 2201.

///

RECEIVED TIME JUL. 24. 3:24PM

3. Venue is proper in this judicial district under pertinent law, including, *inter alia*, 28 U.S.C. § 1391(c) and 28 U.S.C. § 1400.

## THE PARTIES

4. Plaintiff is a corporation organized and existing under the laws of the State of California and having as its principal place of business San Diego, California.

5. Defendant Novartis Institutes for BioMedical Research, Inc. (hereinafter "NIBRI") is a corporation organized and existing under the laws of Delaware and having as its principal places of business various locations, including without limitation the State of Massachusetts. Defendant Novartis Pharmaceuticals Corporation is a corporation organized and existing under the laws of the State of Delaware. Defendant Novartis AG is a corporation organized and existing under the laws of Switzerland. NIBRI, Novartis Pharmaceuticals Corporation, and Novartis AG are referred to sometimes hereinafter collectively as "Novartis."

6. Defendant Merck & Co., Inc. (hereinafter "Merck") is a corporation organized and existing under the laws of the State of New Jersey and having as its principal places of business in various locations, including without limitation Whitehouse Station, New Jersey.

7. The true names and capacities, whether individual, corporate, associate, representative or otherwise, of DOES 1 through 20, inclusive, are unknown to plaintiff, who therefore sues them by such fictitious names. Plaintiff will seek leave to amend this complaint to show the true names and capacities of said defendants when they are ascertained. Plaintiff is informed and believes, and thereupon alleges, that each of the defendants named as a Doe, along with the named defendants, is responsible in some manner for the occurrences herein alleged, and that plaintiff's injuries herein alleged were legally or proximately caused by said defendants. Wherever it is alleged that any act or omission was also done or committed by any specifically named defendant, or by defendants generally, plaintiff intends thereby to allege, and does allege, that the same act or omission was also done and committed by each and every defendant named as a Doe, and each named defendant, both separately and in concert or conspiracy with the named defendants.

8. At all times mentioned herein, defendants, and each of them, were the agents, servants, co-conspirators, or employees of one another, and the acts and omissions herein alleged were done or suffered by them, acting individually and through or by their alleged capacity, within the scope of their authority. Each of the defendants aided and abetted and rendered substantial assistance in the accomplishment of the acts complained of herein. In taking the actions, as particularized herein, to aid and abet and substantially assist in the commission of the misconduct complained of, each defendant acted with an awareness of his or its primary wrongdoing and realized that his or its conduct would substantially assist in the accomplishment of that misconduct and was aware of his, her or its overall contribution to, and furtherance of the conspiracy, common enterprise, and common course of conduct. Defendants' acts of aiding and abetting included, *inter alia*, all of the acts each defendant is alleged to have committed in furtherance of the conspiracy, common enterprise, and common course of conduct complained of herein.

## PATENTS IN SUIT

9. The patents in suit are U.S. Patent Nos. 6,251,384 (the "'384 patent"), 6,759,038 (the "'038 patent"), and 6,649,159 (the "'159 patent"). True and correct copies of the '384, '038, and '159 patents accompany this complaint as Exhibits A, B, and C, respectively.

10. Metastasis is a major part of the life-threatening aspects of cancer. Metastasis is the spread of cancer in the body. It includes the growth of secondary tumors at sites different from the primary tumor. Metastasis can defy surgical removal of the primary tumor, making it impossible to arrest cancer's spread. In order to understand metastasis, a real-time model which permits identification of small numbers of tumor cells against a background of many host cells (so that secondary tumor emboli and micrometastases can be observed over the course of real time) is needed.

11. AntiCancer's invention of methods taught by the '384 and '038 patents (which share the same specification) provides a real-time model of tumor invasion and metastasis formation. The method enables testing of candidate protocols or drugs in animal models

1 before they are tried in the clinic. The methods of the invention can be applied not only to
2 models of tumor growth and metastasis, but, through the use of retroviral and other vectors,
3 can be employed to obtain clinical data in human subjects bearing tumors.

4     12. A key term in these patents is green fluorescent protein ("GFP"). The '384 and
5 '038 patents define GFP as a fluorescent protein of any color. For example, the '384 patent
6 states:

> By suitable modification, the spectrum of light emitted by the GFP can be altered. Thus, although the term "GFP" is used in the present application, the proteins included within this definition are not necessarily green in appearance. Various forms of GFP exhibit colors other than green and these, too, are included within the definition of "GFP" and are useful in the methods and materials of the invention. In addition, it is noted that green fluorescent proteins falling within the definition of "GFP" herein have been isolated from other organisms, such as the sea pansy, *Renilla reriformis*. Any suitable and convenient form of the GFP gene can be used to modify the tumor cells useful in the models of the invention, and for retroviral transformation of endogenous tumors.

14 Ex. A at 4:30-44 (the '038 specification is identical).

15     13. The '159 patent does not limit the methods by which the images produced by
16 fluorescent optical tumor imaging can be monitored or captured. Instead, any suitable
17 methods are encompassed by the claims of the '159 patent. For example, Example 1 of the
18 '159 patent provides that high resolution images can be captured by computer, or
19 continuously through video output onto video tape. Ex. C at 13:57-60.

20     14. The '159 patent has the broadest claim, covering any flurophore (*i.e.*, any color
21 of fluorescent protein).

22                                  DEFENDANTS' WRONGFUL COURSE OF CONDUCT

23     15. NIBRI is a self-proclaimed "global research organization" with a "record of
24 innovative drug discovery." NIBRI is headquartered in Cambridge, Massachusetts.

25     16. In May 2001 AntiCancer's president and founder, Dr. Robert M. Hoffman,
26 attended a meeting at the National Cancer Institute in Maryland. At it, the head of Novartis
27 oncology in the United States, Dr. Peter Lassota, gave a talk about GFP imaging to the
28 scientists and others there assembled. In his talk, Lassota seemed very familiar with GFP

imaging. Lassota said GFP was very inferior to luciferase-based imaging. Lassota specifically disparaged AntiCancer for using GFP. Lassota said also that AntiCancer lacked the ability to license this technology and that everybody should use luciferase.

17. During the ensuing State court lawsuit[1] (to which three NIBRI affiliates were named parties), AntiCancer deposed a Novartis-affiliated employee, Gene Liau. Liau repeatedly and clearly admitted that Novartis used GFP imaging even with intact animals. These were candid admissions of infringement of AntiCancer's patents.

18. In about 2002 an AntiCancer employee named Fang-Xian Sun resigned from AntiCancer. Dr. Sun was very familiar with AntiCancer's GFP animal models. In fact, working with that technology comprised his entire duties at AntiCancer. Dr. Sun produced animal models of cancer by patented transplantation techniques developed at AntiCancer, and he performed GFP-based imaging as part of his work.

19. When Dr. Hoffman reminded Dr. Sun of the confidentiality agreement and non-compete agreement he had signed, and asked him where he would be working, he replied in writing, "I cannot tell you." AntiCancer eventually learned that Dr. Sun was working for a Novartis affiliate, the Genomics Institute of the Novartis Research Foundation.

20. During the ensuing case against Dr. Sun, emails produced made clear that Dr. Sun was using GFP imaging at the Genomics Institute of the Novartis Research Foundation.

21. AntiCancer filed a prior action on January 12, 2007, *AntiCancer, Inc., v. Cambridge Research & Instrumentation, Inc., et al.*, Case No. 07CV97 JLS (RBB) (the "prior action"), naming NIBRI as a defendant shortly afterward. AntiCancer correctly

---

[1] *AntiCancer v. Novartis Institute for Biomedical Research*, San Diego Superior Court Case No. GIC 772297.

Though AntiCancer prevailed against NIBRI's affiliates at the trial court level, the California Court of Appeal disagreed with the trial court. It reversed the trial court and ordered AntiCancer's claims against NIBRI's affiliates dismissed. In so doing it reasoned that Dr. Lassota's defamations were "protected speech under the First Amendment[,]" making the State court case a SLAPP as to NIBR's affiliates. *See AntiCancer, Inc. v. Novartis Institute for Biomedical Research*, 2003 Cal. App. Unpub. LEXIS 10005, * 16 (2003).

1  alleged NIBRI's co-defendant CRI[2] was infringing AntiCancer's '384, '038, and '159 patents
2  by making, using, and selling the Maestro. AntiCancer correctly alleged NIBRI was a CRI
3  customer who was infringing by using the Maestro to do GFP-based imaging.

4  22.   Since, NIBRI admitted under oath in the prior action (in the sworn declaration
5  of Thomas Krucker, its supervisor of molecular imaging and the employee in charge of
6  NIBRI's Maestro machine) that NIBRI owns and uses a Maestro. The Krucker declaration
7  does not deny NIBRI's use of the Maestro to perform GFP-based *in vivo* imaging (and, in
8  fact, suggests that NIBRI is using the Maestro to do that very thing).[3]

9  23.   AntiCancer served its preliminary infringement contentions in the prior action
10 on October 17, 2007. The contentions contained inadequacies. AntiCancer served proposed
11 amended contentions as to NIBRI on November 12, 2007. NIBRI moved for summary
12 judgment on March 14, 2008. The Court granted summary judgment on May 14, 2008, on
13 the sole basis of the inadequacy of AntiCancer's preliminary infringement contentions. The
14 Court did not evaluate any evidence submitted by AntiCancer on the motion. *See* prior
15 action, Document 115 (May 14, 2008).

16 24.   Novartis Pharmaceuticals Corp. also owns and operates both IVIS and Maestro
17 imaging equipment (both of these machines have uses which infringe the '384, '038, and
18 '159 patents). Novartis Pharmaceuticals Corp. has used the IVIS, Olympus IV 100, and the
19 Maestro imaging equipment for infringing purposes by using them to perform GFP-based *in*
20 *vivo* imaging of tumor cells in laboratory animals.

21 25.   Novartis AG also owns and operates the IVIS, Olympus IV 100, and Maestro
22 imaging equipment (all of these machines have uses which infringe the '384, '038, and '159
23 patents. Novartis AG has used the IVIS, Olympus IV 100, and the Maestro imaging
24 equipment for infringing purposes.

---

[2] Cambridge Research & Instrumentation, Inc.

[3] Though the Krucker declaration carefully omits the term "GFP," it goes so far as to admit NIBRI uses the Maestro to do "fluorescence-based . . . *in vivo* . . . imaging of disease models (animals . . .)[.]" *Id.*, ¶ 3. This phrasing strongly suggests NIBRI is using GFP to do this imaging. Certainly it would have been easy enough for Dr. Krucker to deny NIBRI is using GFP to do such imaging were that really the truth.

26. Defendant Novartis Pharmaceuticals Corporation owns and operates Maestro imaging equipment (manufactured by Cambridge Research & Instrumentation) and IVIS machines (manufactured by Caliper Life Sciences). The Maestro and IVIS machines have uses which infringe the '384, '038, and '159 patents. Novartis personnel have admitted that Novartis "infringe[s] whenever we need to." The essence of this statement is that Novartis and affiliates do not feel themselves bound by patents owned by others and seek to get away with infringement whenever they believe that they can get away with it (as in this instance).

27. Merck is a one of the largest pharmaceutical companies in the world. Merck is headquartered in Whitehouse Station, New Jersey. Merck employs over 61,000 employees in 120 countries worldwide.

28. In 2000, Merck invited Dr. Hoffman to visit Merck's facilities in West Point, Pennsylvania. There, he presented information about AntiCancer's patented methods for imaging laboratory animals using fluorescent proteins to Merck scientists. Afterward Merck invited Dr. Hoffman to make similar presentations at Merck facilities.

29. In 2003 Dr. Ray Gibson (of Merck's imaging division) contacted Dr. Hoffman. Dr. Gibson told him that Merck was interested in AntiCancer's GFP imaging technology. Dr. Gibson said that Merck was interested in taking a preliminary or exploratory license on AntiCancer's GFP technology.

30. AntiCancer sent Dr. Gibson information on GFP imaging. Dr. Gibson said he and his team at Merck (including Debbie Defeo-Jones) were anxious and excited to begin working with AntiCancer's technology. There appeared to be intense interest from Merck in GFP imaging. It seemed there were people in Merck's lab ready to do it or already doing it.

31. Jennifer Loebach replaced Mr. Gibson in the process of negotiating a license. Ms. Loebach told AntiCancer that Merck had allocated $150,000.00 for this license, and that the negotiations were essentially complete but for some paperwork.

32. Merck eventually told AntiCancer that Merck was not going to take a license after all. *See* Exhibit 2. When Dr. Hoffman asked Jennifer Loebach why, she refused to give an answer other than the "patent landscape" had changed.

33. Shortly thereafter Merck entered into a licensing deal with Xenogen, AntiCancer's principal competitor at the time, whom AntiCancer was then pursuing in State court for defamation and other torts.[4] Merck bought nine of Xenogen's IVIS instruments — all capable of imaging using GFP.

34. During pretrial discovery in the State court case, AntiCancer deposed Dr. Bohumil Bednar and Ms. Debbie Defeo-Jones. At Dr. Bednar's deposition, he admitted to having used GFP imaging, including non-invasive imaging, on live mice in his lab at Merck. Ms. Defeo-Jones admitted the same at her deposition. Together, their testimony made clear that Merck was doing imaging of GFP-expressing tumor cells in live mice a clear infringement of AntiCancer's patents.

35. Ray Gibson, too, testified at deposition in the State court case. He admitted that Dr. Bednar had used GFP for *in vivo* imaging at Merck's facility in West Point, Pennsylvania. When asked about the results of the experiments, Gibson replied, "IP" (which he said meant, "intellectual property"). Dr. Bednar's group's experiments included imaging of laboratory animals implanted with GFP. Merck did them within a few months before Gibson's deposition (in November 2005).

36. In September of 2005, Dr. Hoffman attended a Society for Molecular Imaging meeting in Cologne, Germany. There, he discovered that Merck was exhibiting a poster entitled "Optical Imaging Tumor Models for Drug Discovery Based on Rat Adenocarcinoma Cells MAT BIII Constitutively Expressing GFP, DsRed, or Firefly Luciferase." (The copy of this poster is hard to read, but the letters "GFP" appear in the upper third of the page underneath the words "Detection Limits" and elsewhere on the page.) The poster compares imaging techniques using cancer cells expressing three different compounds: GFP, DsRed (the most common red fluorescent protein), and luciferase.[5]

---

[4] In a settlement brokered in this courthouse by Magistrate Judge Battaglia on March 3, 2006, Xenogen paid AntiCancer $1,000,000.00 in cash to settle the State court case. The settlement was not confidential.

[5] Luciferase is a luminous enzyme occurring naturally in fireflies and certain bacteria. It produces light via a chemical reaction.

Case 3:07-cv-00097-JLS-RBB   Document 206-2   Filed 12/11/08   PageID.6684   Page 11 of 16
JUL-24-2008 15:16 From:LAWTON LAW FIRM  6195951520         To:16507983600   P.10/15
Case 3:07-cv-00097-JLS-RBB   Document 185-3   Filed 10/10/2008   Page 11 of 16

37. This poster shows that Merck researchers implanted breast cancer cells expressing either GFP or DsRed or luciferase into mice, and then tried to show the relative effectiveness of each method. Merck got and displayed non-invasive images as well as open images. AntiCancer's '384, '038, and '159 patents claim the process whereby such imaging using both GFP and red fluorescent proteins is done. The '159 patent very clearly applies to the imaging of any fluorescent protein in animals, including GFP and Ds Red.

38. In September of 2007, at a meeting of the Society for Molecular Imaging in Providence, Rhode Island, Dr. Bednar of Merck visited AntiCancer's booth. He and Dr. Hoffman had a discussion. During it, Dr. Bednar freely admitted Merck's use of GFP and RFP in his laboratory at Merck, claiming that he got better results with luciferase.

39. At the recent American Association for Cancer Research (AACR) meeting held in San Diego between April 12 and April 16, 2008, Dr. Hoffman received a handout entitled "Co-Registration of Multi-Modal Images of Small Animals." Dr. Bednar co-authored this handout. This handout showed Merck's research using unidentified fluorescent proteins. It describes a series of fluorescent images as being captured using a Carestream Image Station *in-vivo* FX model. The handout says that the images are courtesy of Dr. Bednar of Merck.

40. While the fluorescent protein is not identified in these images, it is likely that the reporter used was red florescent protein, and perhaps yellow fluorescent protein.

41. AntiCancer's '384, '038, and '159 patents claim the use of these proteins for *in vivo* imaging of the precise sort depicted in Dr. Bednar's images.

42. Realizing that Merck had repeatedly infringed on AntiCancer's patents, AntiCancer named Merck as a defendant in the prior action on February 12, 2007. AntiCancer alleged that Merck's co-defendant CRI[6] was infringing AntiCancer's '384, '038, and '159 patents by making, using, and selling its Maestro *In Vivo* Imaging System ("Maestro"). Maestro is a fully-integrated system allowing researchers to use real-time imaging technology  including AntiCancer's patented GFP-based methods – to monitor and record cellular and genetic activity in laboratory animals. AntiCancer had learned Merck was

---

[6] Cambridge Research & Instrumentation, Inc.

a CRI customer whose infringements now included GFP-based imaging using CRI's Maestro equipment.

43. On August 15, 2007, Merck served initial disclosures. Merck admitted operating a Maestro machine. Merck identified Bohumil Bednar, Ray Gibson, and Debbie DeFeo-Jones as witnesses knowledgeable concerning "Merck's operation of the CRI Maestro machine and the tests conducted thereon."

44. AntiCancer served its preliminary infringement contentions in the prior action on October 17, 2007. Merck complained about inadequacies therein. AntiCancer responded by serving proposed amended contentions as to Merck on November 13, 2007. Merck filed a motion for summary judgment on the preceding day. On May 14, 2008, the Court granted the motion on the same basis as it granted NIBRI's motion. See Doc. 115.

45. The Court's rulings in the prior action are not *res judicata* of any issue in this case. See *Jumpsport Inc. v Hedstrom Corp.*, 2004 U.S. Dist. LEXIS 20382 (N.D. Cal. September 29, 2004).

### FIRST CLAIM FOR RELIEF
(Infringement of Patent)
(Against All Defendants)

46. Plaintiff realleges and incorporates by reference as though fully set forth preceding paragraphs 1 through 46.

47. United States Patent No. 6,759,038 (the "'038 Patent") issued on July 6, 2004. A true and correct copy of the '038 Patent is attached hereto as Exhibit A and incorporated herein by this reference.

48. Plaintiff is the sole owner of the '038 Patent.

49. Novartis and Merck infringed, and still are infringing, the '038 patent by making, using, selling, offering for sale and/or licensing products and services covered by one or more claims of the '038 Patent without plaintiff's authorization or consent. These products and services include, *inter alia*, CRI's Maestro *In Vivo* Imaging System and Caliper's IVIS machines (fully-integrated systems allowing researchers to use real-time

Case 3:07-cv-00097-JLS-RBB Document 206-2 Filed 12/11/08 PageID.6686 Page 13 of 16
Case 3:07-cv-00097-JLS-RBB Document 185-3 Filed 10/10/2008 Page 13 of 16
JUL-24-2008 15:16 From:LAWTON LAW FIRM 6195951520

1  imaging technology, including plaintiff's patented technology, to monitor and record cellular
2  and genetic activity within laboratory animals).
3      50.  Defendants have infringed the '038 Patent, and will continue to do so unless
4  enjoined by this Court.
5      51.  Plaintiff is informed and believes, and on that basis, alleges that defendants are
6  aware of the '038 Patent and that their infringement has been willful.
7      52.  By reason of the foregoing, plaintiff has suffered damages in an amount to be
8  proven at trial and, in addition, has suffered irreparable loss and injury.
9      53.  The acts of infringement described above are willful, deliberate and in reckless
10 disregard of plaintiff's patent rights.

## SECOND CLAIM FOR RELIEF
### (Infringement of Patent)
### (Against All Defendants)

14     54.  Plaintiff realleges and incorporates by reference as though fully set forth
15 preceding paragraphs 1 through 54.
16     55.  United States Patent No. 6,251,384 (the "'384 Patent") issued on June 26,
17 2001. A true and correct copy of the '384 Patent is attached hereto as Exhibit B and
18 incorporated herein by this reference.
19     56.  Plaintiff is the sole owner of the '384 Patent.
20     57.  Novartis and Merck infringed, and still are infringing, the '384 patent by
21 making, using, selling, offering for sale and/or licensing products and services covered by
22 one or more claims of the '384 Patent without plaintiff's authorization or consent. These
23 products and services include, *inter alia*, CRI's Maestro *In Vivo* Imaging System and
24 Caliper's IVIS machines (fully-integrated systems allowing researchers to use real-time
25 imaging technology, including plaintiff's patented technology, to monitor and record cellular
26 and genetic activity within laboratory animals).
27     58.  Defendants have infringed the '384 Patent, and will continue to do so unless
28 enjoined by this Court.

59. Plaintiff is informed and believes, and on that basis, alleges that defendants are aware of the '384 Patent and that their infringement has been willful.

60. By reason of the foregoing, plaintiff has suffered damages in an amount to be proven at trial and, in addition, has suffered irreparable loss and injury.

61. The acts of infringement described above are willful, deliberate and in reckless disregard of plaintiff's patent rights.

### THIRD CLAIM FOR RELIEF
(Infringement of Patent)
(Against All Defendants)

62. Plaintiff realleges and incorporates by reference as though fully set forth preceding paragraphs 1 through 62.

63. United States Patent No. 6,649,159 (the "'159 Patent") issued on November 18, 2003. A true and correct copy of the '159 Patent is attached hereto as Exhibit C and incorporated herein by this reference.

64. Plaintiff is the sole owner of the '159 Patent.

65. Novartis and Merck infringed, and still are infringing, the '159 patent by making, using, selling, offering for sale and/or licensing products and services covered by one or more claims of the '159 Patent without plaintiff's authorization or consent. These products and services include, *inter alia*, CRI's Maestro *In Vivo* Imaging System and Caliper's IVIS machines (fully-integrated systems allowing researchers to use real-time imaging technology, including plaintiff's patented technology, to monitor and record cellular and genetic activity within laboratory animals).

66. Defendants have infringed the '159 Patent, and will continue to do so unless enjoined by this Court.

67. Plaintiff is informed and believes, and on that basis, alleges that defendants are aware of the '159 Patent and that their infringement has been willful.

68. By reason of the foregoing, plaintiff has suffered damages in an amount to be proven at trial and, in addition, has suffered irreparable loss and injury.

1  69. The acts of infringement described above are willful, deliberate and in reckless
2  disregard of plaintiff's patent rights.
3
4  ### PRAYER FOR RELIEF
5  WHEREFORE, Plaintiff AntiCancer prays for relief as follows:
6  A. That all defendants, and each of them, be adjudged to have infringed the '384,
7  '038, and '159 patent(s) under 35 U.S.C. § 271(a), (b), (c) and (g);
8  B. That all defendants, and each of them, be adjudged to have willfully infringed
9  the '384, '038 and '159, patent(s) under 35 U.S.C. § 271(a), (b), (c) and (g);
10 C. That defendants, and each of them, as well as their respective officers, agents,
11 servants, employees and attorneys, and those persons in active concert or participation with
12 them be preliminarily and permanently restrained and enjoined under 35 U.S.C. § 283 from
13 directly or indirectly infringing the '384, '038, and/or '159 patent(s);
14 D. That the Court award damages to compensate AntiCancer for the defendants'
15 infringement of the '384, '038, and '159 patent(s), as well as enhanced damages pursuant to
16 35 U.S.C. § 284;
17 E. That the Court award AntiCancer its attorney's fees pursuant to 35 U.S.C.
18 § 285;
19 F. That the Court assess pre-judgment and post-judgment interest and costs of suit
20 against defendants, and award such interest and costs to AntiCancer;
21 G. That AntiCancer have such other and further relief as this Court may deem just
22 and proper.
23
24                              Respectfully submitted,
25 Dated: July 25, 2008         LAWTON LAW FIRM
26
27
28                              By:   s/Dan Lawton
                                      Dan Lawton
                                      Attorney for Plaintiff AntiCancer, Inc.

Case No. 3:07-CV-00097-B-RBB

13

## DEMAND FOR TRIAL BY JURY AND FOR SPEEDY HEARING

Plaintiff hereby demands a trial by jury as to all issues triable by jury, specifically including, but not limited to, the infringement of United States Patent Nos. 6,251,384, 6,649,159, and 6,759,038. Plaintiff also requests a speedy hearing of its claim for declaratory judgment pursuant to Fed. R. Civ. P. 57.

Respectfully submitted,

Dated: July 25, 2008          LAWTON LAW FIRM

By:    s/Dan Lawton
       Dan Lawton
       Attorney for Plaintiff AntiCancer, Inc.