J. CHRISTOPHER JACZKO (149317)
ALLISON H. GODDARD (211098)
**JACZKO GODDARD LLP**
4401 Eastgate Mall
San Diego, CA 92121
Telephone: (858) 404-9205
Facsimile: (858) 225-3500

MARTIN B. PAVANE (admitted *pro hac vice*)
TEODOR J. HOLMBERG (admitted *pro hac vice*)
**COHEN PONTANI LIEBERMAN & PAVANE LLP**
551 Fifth Avenue
New York, NY 10176
Telephone: (212) 687-2770
Facsimile: (212) 972-5487
E-mail: mpavane@cplplaw.com
E-Mail: tidge@cplplaw.com

Attorneys for Defendant and Counterclaimant
CAMBRIDGE RESEARCH & INSTRUMENTATION, INC.

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

ANTICANCER, INC., a California Corporation

Plaintiff,

v.

CAMBRIDGE RESEARCH & INSTRUMENTATION, INC., a Delaware Corporation

Defendant.

CAMBRIDGE RESEARCH & INSTRUMENTATION, INC.,

Counterclaimant

v.

ANTICANCER, INC.,

Counterdefendant

**Case No. 07-CV-00097-JLS-RBB**

**DEFENDANT AND COUNTERCLAIMANT CAMBRIDGE RESEARCH & INSTRUMENTATION'S OPENING CLAIM CONSTRUCTION BRIEF**

Hearing Date: December 2, 2009
Time: 9:00 AM
Courtroom: 6 (3rd Floor)
Judge: Hon. Janis L. Sammartino

# TABLE OF CONTENTS


**I. THE LAW OF CLAIM CONSTRUCTION ..... 1**

A. THE HIERARCHY OF EVIDENCE TO CONSIDER ..... 1

B. CLAIM CONSTRUCTION IS TO RESOLVE *DISPUTES* OVER THE MEANING OF CLAIM TERMS/PHRASES ..... 2

**II. BACKGROUND ..... 3**

A. THE PRESENT STATUS OF THE INSTANT CASE: ONLY PATENT INVALIDITY LEFT PENDING ..... 3

B. ANTICANCER'S '384/'038 PATENTS ..... 3

C. ANTICANCER'S '159 PATENT ..... 4

**III. CRI'S PROPOSED CLAIM CONSTRUCTIONS ..... 4**

A. TERMS/PHRASES THAT NEED NO CONSTRUCTION ..... 4

*1. The Court need not construe every word in 25 of the 31 Claims ..... 4*

*2. Concepts to be discussed at the tutorial ..... 4*

B. DISPUTED TERMS/PHRASES IN THE '384/'038 PATENTS ..... 5

*1. "candidate protocol" ..... 5*

*2. "metastasis" ..... 6*

*3. "a primary tumor that stably expresses green fluorescent protein (GFP) in cells of said tumor when said tumor metastasizes" ..... 7*

*4. "expresses" ..... 8*

*5. "fluorescence" ..... 8*

*6. "fluorescent optical tumor imaging" ("FOTI") ..... 9*

*7. "surgical orthotopic implantation" ("SOI") ..... 10*

*8. "SCID mouse" ..... 11*

*9. "syngeneic" ..... 12*

*10. "control subject" ..... 13*

*11. "retroviral vector" ..... 13*

*12. "vicinity of said tumor" ..... 14*

*13. "viral promoter" ..... 15*

*14. "virus" ..... 15*

*15. "proliferates through multiple passages" ..... 16*

*16. "tumor" ..... 16*

*17. "expression vector" ..... 17*

C. DISPUTED TERMS/PHRASES IN THE '159 PATENT ....................18

1. *"a method to monitor the ability of a promoter to promote expression in an animal of an endogenous gene that is controlled by said promoter"* ....................18

2. *"promoter"* ....................19

3. *"fluorophore"* ....................20

4. *"promoter of said endogenous gene"* ....................20

5. *"whole-body external fluorescent optical imaging"* ....................21

6. *"whereby the ability of said promoter to promote expression is monitored"* ....................22

7. *"humanized fluorophore"* ....................23

8. *"expressed in a tissue or organ specific manner"* ....................24

9. *"tumor or cancer associated gene"* and *"cancer associated gene"* ....................24

# TABLE OF AUTHORITIES

## CASES

*ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082 (Fed. Cir. 2003)........ 2

*Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615 (Fed. Cir. 1995)........ 1

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294 (Fed. Cir. 2003)........ 1

*CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359 (Fed. Cir. 2002)........ 11

*Columbia Sportswear N. Am., Inc. v. Cerf Bros. Bag Co.*, 2007 U.S. Dist. LEXIS 45862 (D. Or. June 19, 2007) ........ 5, 13

*Graham v. John Deere Co.*, 383 U.S. 1 (1966) ........ 20

*Guttman, Inc. v. Kopykake Enters.*, 302 F.3d 1352 (Fed. Cir. 2002) ........ 2, 6, 21, 23, 24

*Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323 (Fed. Cir. 2001) ........ 1

*Jonsson v. Stanley Works*, 903 F.2d 812 (Fed. Cir. 1990)........ 22

*Laitram Corp. v. Morehouse Indus., Inc.*, 143 F.3d 1456 (Fed. Cir. 1998)........ 22

*Lemelson v. Gen. Mills, Inc.*, 968 F.2d 1202 (Fed. Cir. 1992) ........ 21

*Markman v. Westview Instrum.*, 52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996)........ 1

*Maytag Corp. v. Electrolux Home Prods.*, 411 F. Supp. 2d 1008 (N.D. Iowa 2006)........ 2

*Microsoft Corp. v. Multi-Tech Systems, Inc.*, 357 F.3d 1340 (Fed. Cir. 2004) ........ 22

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351 (Fed. Cir. 2008)........ 8, 16

*Orion IP, LLC v. Staples, Inc.*, 406 F. Supp. 2d 717 (E.D. Tex. 2005)........ 3, 8, 13

*Phillips v. AWH. Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ........ 1, 2, 8, 9, 16, 21

*PSC Computer Prods., Inc. v. Foxconn Int'l*, 355 F.3d 1353 (Fed. Cir. 2004)........ 3

*United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)........ 2, 20, 23

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996)........ 2, 6, 21, 23, 24

*Vivid Techs., Inc. v. American Science & Eng'g, Inc.*, 200 F.3d 795 (Fed. Cir. 1999)........ 2, 8

*Websidestory, Inc. v. Netratings, Inc.*, 2007 U.S.Dist. LEXIS 50186 (S.D.Cal. July 10, 2007) ........ 5, 20

## LOCAL RULES

Patent Local Rule 4.4(a) ........ 1

# LIST OF EXHIBITS

| No. | Shortname | Description |
|---|---|---|
| **1** | **Worksheet** | Joint Claim Construction Worksheet [D.E. 255], as amended and re-filed Sept. 23, 2009, and ***colorized*** as described herein |
| **2** | **Support Chart** | Joint Claim Construction Chart [D.E. 253], as filed Sept. nn, 2009, and ***colorized*** as described herein |
| **3** | **'384 patent** | U.S. Patent No. 6,251,384 (T. Chishima and Y. Tan, inventors) |
| **4** | **'038 patent** | U.S. Patent No. 6,759,038 (T. Chishima and Y. Tan, inventors) |
| **5** | **'159 patent** | U.S. Patent No. 6,649,159 (M. Yang and E. Baranov, inventors) |
| **6** | **11/16/99 Interview Summary** | Interview Summary of an in-person interview on Nov. 16, 1999 between the Patent Office Examiner and AntiCancer's representative concerning the '384 patent application |
| **7** | **Dorland's Medical Dictionary (1994)** | Dorland's Illustrated Medical Dictionary, 28th ed. (1994), W.B. Saunders Co. Philadelphia, PA, pp. 827, 1023, 1194, 1351, 1363, 1644, 1761, 642, and 1493. |
| **8** | **Hoffman 1993** | Hoffman, R.M., *Microsurgery, orthotopic human tumor transplantation and the nude mouse: Patient-like metastatic models of human cancer*, Proc. 1st Cong. Internat'l Soc. Exper. Microsurg. (1993), pp. 128-145 |
| **9** | **Nobel Prize 2008d** | *The Nobel Prize in Chemistry 2008 – How the Jellyfish's Green Light Revolutionised Bioscience*, The Royal Swedish Academy of Sciences (www.kva.se); released as "Information to the Public" in 2008; downloaded 5/7/09 from nobelprize.org |
| **10** | **Stedman's Medical 1995** | American Heritage Stedman's Medical Dictionary, Houghton-Mifflin Co. (Boston), 1995, pp. 288 and 858 |
| **11** | **5/15/03 Amd.** | AntiCancer's May 15, 2003 Amendment filed in the '159 patent application |
| **12A** | **5/5/09 O.A.** | The Patent Office's May 5, 2009 Office Action regarding AntiCancer's U.S. Pat. App. Ser. No. 10/714,068, a divisional application claiming priority to the '159 patent ("the '159 divisional application") |
| **12B** | **8/4/09 Amd.** | AntiCancer's August 4, 2009 Amendment to the '159 divisional application |

Pursuant to Patent Local Rule 4.4(a) and this Court's Order [D.E. 250], defendant and counterclaimant Cambridge Research & Instrumentation, Inc. ("CRI") hereby files this opening claim construction brief concerning the proposed constructions shown in the Joint Claim Construction Worksheet [D.E. 255], based on the intrinsic and extrinsic support identified in the Joint Claim Construction Chart [D.E. 253].

# I. THE LAW OF CLAIM CONSTRUCTION

## A. The Hierarchy of Evidence To Consider

Claim construction is a question of law to be decided by the Court. *Markman v. Westview Instrum.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).

In construing the terms of a patent claim, the Court begins with words of the claims themselves, and those words "are generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*), *cert.denied*, 126 S. Ct. 1332 (2006); *see also Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620 (Fed. Cir.1995). The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application. *Phillips*, 415 F.3d at 1313. A claim construction must be logical and must accord with the plain import of the claim language. *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) ("In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves").

Where the ordinary and customary meaning of a term is not readily apparent, a court may determine the meaning of the term by looking to the intrinsic evidence, which includes "the words of the claims themselves," the specification (the written description and drawings of the patent), and the prosecution history (the record of the proceedings in the U.S. Patent and Trademark Office leading to issuance of the patent). *Id.* at 1314; *see also Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1300 (Fed. Cir. 2003) ("While certain terms may be at the center of the claim construction debate, the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms.").

//

The patent's specification is always "highly relevant" and usually "dispositive" in determining the acquired meaning of a claim term . . . ." *Phillips*, 415 F.3d at 1315-16 (citations omitted) ("[The specification] is the single best guide to the meaning of a disputed term."). The general rule is that an explicit definition of a claim term in the specification usually is dispositive of the claim term's meaning. *Guttman, Inc. v. Kopykake Enters.*, 302 F.3d 1352, 1360 (Fed. Cir. 2002) ("Where . . . the patentee has clearly defined a claim term, that definition 'usually . . . is dispositive; it is the single best guide to the meaning of a disputed term.'") (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996)).

If after reviewing the intrinsic evidence the court is unable to determine the meaning of a term, the court may examine extrinsic evidence—*i.e.*, the evidence outside of the patent and its prosecution history. *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1090 (Fed. Cir. 2003). Within the class of extrinsic evidence, courts rely upon dictionaries (technical dictionaries preferably), treatises, and expert testimony. *Phillips*, 415 F.3d at 1318. Though extrinsic evidence can be useful to a court, "it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319

**B. Claim Construction is to Resolve *Disputes* Over The Meaning of Claim Terms/Phrases**

The district courts construe patent claims only to the extent necessary to resolve the dispute at issue between the parties:

> The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term in order to comply with the ruling that claim construction is for the court. Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy.

*United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997); *see also Vivid Techs., Inc. v. American Science & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ("only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy"); *Maytag Corp. v. Electrolux Home Prods.*, 411 F. Supp. 2d 1008, 1036 (N.D. Iowa 2006) (to "construe terms to a greater extent than necessary to resolve the present controversy" "would . . . constitute an impermissible advisory opinion"). Indeed, the Federal Circuit has

acknowledged that where there is no dispute as to the meaning of a patent's claims, the claim construction process may be omitted entirely. *See PSC Computer Prods., Inc. v. Foxconn Int'l*, 355 F.3d 1353, 1356 (Fed. Cir. 2004) (approving decision to omit claim construction phase where there was no dispute as to the meaning of the claims); *see also Orion IP, LLC v. Staples, Inc.*, 406 F. Supp. 2d 717, 737-738 (E.D. Tex. 2005) (observing that "although every word used in a claim has a meaning, not every word requires a construction" and specifically holding that "terms . . . used in accordance with their ordinary lay meanings" do not require construction).

## II. BACKGROUND

### A. The Present Status of The Instant Case: Only Patent Invalidity Left Pending

AntiCancer started this action by filing a complaint on January 12, 2007, asserting that CRI infringed five AntiCancer patents, to which CRI answered with, *inter alia*, counterclaims that those five patents were invalid. *See* AntiCancer's 2nd Amd. Cmplt. [D.E. 25-2], entered by Order [D.E. 26]; and CRI's Ans./C-clms. [D.E. 30]. The claims concerning two of the original five patents were subsequently dismissed. *See* Order [D.E. 150]. On February 13, 2009, the Court granted summary judgment of non-infringement to CRI regarding the three remaining patents. *See* Order [D.E. 214].

Thus, only CRI's invalidity counterclaims with respect to the three remaining patents remain pending in this case, and the present claim construction will be used later for the purpose of determining whether, *inter alia*, prior art references asserted by CRI invalidate AntiCancer's patent claims.

### B. AntiCancer's '384/'038 Patents

U.S. Pat. Nos. 6,251,384 ("the '384 patent", attached hereto as **Exhibit 3**) and 6,759,038 ("the '038 patent", attached hereto as **Exhibit 4**) are descendants from the same application, share the same specification, and have similar claims—because of this, they and their specification are often referred to herein jointly as "the '384/'038 patents" and "the '384/'038 specification", respectively. The '384/'038 patent claims recite methods to (i) monitor metastasis by observing the fluorescence generated by tumor cells which have been modified to express (*i.e.*, produce) green fluorescent protein ("GFP"); and (ii) evaluate candidate drugs and/or protocols (by applying the aforesaid method to monitor metastasis).

### C. AntiCancer's '159 Patent

U.S. Pat. No. 6,649,159 ('the '159 patent", attached hereto as **Exhibit 5**) is not related to the '384/'038 patent family (and consequently has a completely different specification), lists different inventors, and recites a different method. The '159 patent has only one independent claim, and it is directed to a method for monitoring the activity of a promoter[1] of a gene by linking the promoter to a fluorophore, such as GFP, and then observing the fluorescence that is generated whenever the promoter is active.

## III. CRI'S PROPOSED CLAIM CONSTRUCTIONS

### A. Terms/Phrases that Need No Construction

#### *1. The Court need not construe every word in 25 of the 31 Claims*

AntiCancer is asking the Court to construe every single word in 25 of the 31 claims in the suit patents. Most of these "constructions" consist of unnecessary paraphrases of terms/phrases which need no construction.[2] Moreover, much of the language in the 25 claims for which AntiCancer proposes constructions is identical, yet AntiCancer repeatedly construes these identical terms and phrases every time they appear.[3] CRI will be filing a motion to strike these unnecessary claim constructions—the ones indicated in yellow in the copy of the Joint Claim Construction Worksheet [D.E. 255], attached as **Exhibit 1** hereto (hereinafter referred to as "the Worksheet").

#### *2. Concepts to be discussed at the tutorial*

AntiCancer also construes certain terms/phrases which (i) embody concepts CRI believes are better explored at the tutorial preceding the Claim construction hearing; and (ii) are used in the same

---

[1] As discussed briefly below (and will be explained more fully at the tutorial preceding the claim construction hearing), and the "promoter" is essentially an on/off switch for controlling a gene.

[2] One example is AntiCancer's proposed construction of dependent Claim 8 of the '159 patent, which merely recites a list of various mammals (*i.e.*, the claim states "… wherein the mammal is selected from the group consisting of a mouse, a rat, a rabbit, …", and AntiCancer proposes "… wherein the animal used as part of this method is either a mouse, a rat, a rabbit, …"). *See*, *id.*, **Ex. 1** hereto, pp. 37-8.

[3] For example, dependent Claims 6, 7, and 8 of the '038 patent are verbatim copies of dependent Claims 2, 3, and 4 of the '038 patent, yet AntiCancer gives separate constructions for them all. *See*, *id.*, **Ex. 1** hereto, pp. 17-22 (Clms. 2-4) and pp.24-27 (Clms. 6-8). Independent Claim 9 of the '038 patent is mostly identical to independent Claim 5 of the '384 patent, yet, once again, AntiCancer constructs every single word in both claims. *See*, *id.*, **Ex. 1** hereto, pp. 10-12 ('384 Clm. 5) and pp.27-30 ('038 Clm. 9).

manner in the prior art literature—*i.e.*, these words are not "in dispute" for purposes of claim construction. *See infra* and the Worksheet, **Ex. 1** hereto, where these terms are indicated in green.

**B. Disputed Terms/Phrases in the '384/'038 Patents**

Each of the '384/'038 patents has three (3) independent claims directed to observing the fluorescence generated by GFP-expressing tumor cells. The claims differ by, *inter alia*, (1) the type of subject in which the GFP-expressing tumor cells are glowing; and (2) how the GFP-expressing tumor cells got into the subject (*i.e.*, injection/implantation or genetic alteration of tumor cells *in situ*). Independent Claims 1 in the '384/'038 patents are much longer and more detailed than the other independent claims (which just recite the monitoring of metastasis) because in Claims 1 metastasis is being monitored in the context of testing a candidate drug/protocol by comparing treated vs. control subjects.

***1. "candidate protocol"***

AntiCancer wants the Court to construe "candidate protocol" as "proposed therapy regimen". *See*, *e.g.*, Worksheet, **Ex. 1**, p. 1. CRI believes no construction is necessary and, moreover, there is no benefit from (or support for) substituting AntiCancer's construction for the words of the claim. *See*, *e.g.*, *Columbia Sportswear N. Am., Inc. v. Cerf Bros. Bag Co*., 2007 U.S. Dist. LEXIS 45862 at *20 (D. Or. June 19, 2007) ("district courts construe patent claims only to the extent necessary to resolve the dispute at issue between the parties"); *Websidestory, Inc. v. Netratings, Inc*., 2007 U.S.Dist. LEXIS 50186 (S.D.Cal. July 10, 2007) ("After consideration of the parties' arguments and the '479 Patent, the Court concludes that the word 'includes' does not need to be construed, and the Court will not substitute the word 'contains' in its place.").

//

//

//

//

//

//

***2. "metastasis"***

| CRI's Proposed Construction | AntiCancer's Proposed Construction | Where used |
|---|---|---|
| the growth of secondary tumors at sites different from the primary tumor | **the spread of cancer from its initial or primary tumor site to another part of the body,** and/or growth of secondary tumors at that other part of the body | ▪ All Indep. Claims in the '384/'038 patents (*see* 1st instance on p. 1 of Worksheet, **Ex. 1**)[4] |

Because CRI's construction is a verbatim copy of the definition of "metastasis" given in the specification of the '384/'038 patents (*see* **Ex. 3**, '384 patent, col. 1, lines 22-24[5]), it should be adopted by the Court. *See, e.g., Guttman, Inc. v. Kopykake Enters.*, 302 F.3d 1352, 1360 (Fed. Cir. 2002) ("Where . . . the patentee has clearly defined a claim term, that definition 'usually . . . is dispositive; it is the single best guide to the meaning of a disputed term.'") (quoting *Vitronics Corp.*, 90 F.3d at 1582).

AntiCancer's construction takes one of the definitions for "metastasis" from a dictionary and adds that extrinsic definition (shown in bold above) to the definition given in the specification (*i.e.*, CRI's construction). *See* Joint Claim Construction Chart [D.E. 253] (a modified version of which is attached hereto as **Exhibit 2**,[6] hereinafter referred to as "the Support Chart"), p. 2 (where AntiCancer cites as its support Merriam-Webster's Collegiate Dictionary (11th ed. 2004), p. 780, in which the 2nd definition of "metastasis" is "the spread of a disease-producing agency (as cancer cells) from the initial or primary site of disease to another part of the body"). But there is no support nor reason for altering the definition provided in the '384/'038 patents. *See Vitronics Corp.*, 90 F.3d at 1583 ("[i]n most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed term. In such circumstances, it is improper to rely on extrinsic evidence"), nor has AntiCancer explained how its proposed construction substantively differs from the definition in the patent, if at all.

---

[4] The page numbers when referring to the Worksheet, **Ex. 1**, will be the original page numbers from the original Worksheet [D.E. 255], even though each page of **Ex. 1** has two of those original pages on it (i.e., page 1 has pages 1-2; page 3 has pages 3-4; *etc*.).

[5] Since the '384 and '038 patents share the same specification, this brief will only cite to the '384 patent for convenience, rather than duplicating the slightly different line references from the '038 patent.

[6] Like the Worksheet, **Ex. 1**, the page numbers when referring to the Support Chart, **Ex. 2**, will be the original page numbers from the original Chart [D.E. 253], even though each page of **Ex. 2** has two of those original pages on it (*i.e.*, page 1 has pages 1-2; page 3 has pages 3-4; *etc*.)

### 3. *"a primary tumor that stably expresses green fluorescent protein (GFP) in cells of said tumor when said tumor metastasizes"*

| CRI's Proposed Construction | AntiCancer's Proposed Construction | Where used |
|---|---|---|
| a primary tumor whose cells and whose daughter cells express GFP during metastasis | a primary tumor whose cells and whose daughter cells **consistently** express GFP during metastasis | ▪ All Indep. Claims in the '384/'038 patents (*see* 1st instance on p. 2 of Worksheet, **Ex. 1**) |

The semantic difference between the parties' respective constructions is AntiCancer's addition of the adverb "consistently" (bolded above) to modify the verb "express". The substantive difference is that CRI believes that the meaning of "stable expression"[7] in the claim phrase is effectively defined by the phrase "whose cells and whose daughter cells express …" — *i.e.*, "stable expression" simply means that the expression in the parent cell is inherited or "maintained" by the daughter cells. *See* **Ex. 3**, '384 patent, col. 2, lines 11-18, 38-49; col. 4, lines 53-65; and col. 7, line 43, to col. 13, line 53 (Examples 1-8); *see also* **Exhibit 6**, 11/16/99 Interview Summary from the '384 prosecution file (where "the meaning of stable expression" is "the maintenance of GFP expression over a particular number of cell divisions").

Thus, the adverb "consistently" in AntiCancer's proposed construction is an unnecessary addition. Indeed, it is unclear how AntiCancer intends to further limit the claim phrase by adding "consistently", and why such a limitation is necessary. Moreover, AntiCancer has not offered any intrinsic or extrinsic support for its construction—not a single citation to the patent itself, the prosecution history, a dictionary, a treatise, *nothing*. *See* Support Chart, **Ex. 2**, p. 3 (where the lack of support is marked).

Because (i) CRI's construction has intrinsic support and correctly states the concept of "stable expression"; and (ii) AntiCancer proffers no support for its construction nor any reason to depart from CRI's intrinsically supported construction, the Court should reject AntiCancer's construction and adopt CRI's construction.

//

---

[7] As explained in the next section, CRI believes the general concept of "expression" should be explored at the tutorial preceding the Claim Construction Hearing.

***4. "expresses"***

The background concept of "[gene] expression" embodied in the term "expresses" needs to be understood, but the term itself need not be construed by the Court as if it were disputed. As far as is presently known to CRI, the term "expresses" is used in the same manner in the prior art references as in these patent claims—*i.e.*, CRI can foresee no dispute over whether the meaning of "expresses" in an allegedly invalidating prior art reference is different from the meaning of "expresses" in the patent claims. *See, e.g., Vivid Techs., Inc. v. American Science & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ("only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy"); *Orion IP, LLC v. Staples, Inc.*, 406 F. Supp. 2d 717, 737-738 (D. Tex. 2005) (observing that "although every word used in a claim has a meaning, not every word requires a construction").

The basic outline of how a cell "expresses" a gene, *i.e.*, transcription, should be explained and discussed in the tutorial preceding the claim construction hearing. The tutorial will include a discussion of the cell's machinery for producing proteins: the DNA "blueprint" contained in the cell's nucleus, the RNA copy that is made from that blueprint, and the machinery in the cell's cytoplasm (outside the nucleus) which builds proteins based on the RNA copy.

***5. "fluorescence"***

This term need not be construed by the Court, because: (1) "fluorescence" is used in the same manner in the prior art references as in these patent claims—*i.e.*, CRI can foresee no dispute over whether the meaning of "fluorescence" in a prior art reference is different than its meaning in the patent claims; and (2) a layman's understanding of "fluorescence" is adequate for construing the patent claims. *See, e.g., O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("this court has repeatedly held that a district court is not obligated to construe terms with ordinary meanings, lest trial courts be inundated with requests to parse the meaning of every word in the asserted claims. … In some cases, the ordinary meaning of claim language . . . may be readily apparent even to lay judges, ….") (citing *Phillips v. AWH Corp.*, 415 F.3d at 1312-13). To the extent the Court believes a more rigorous understanding of "fluorescence" is required, it can be discussed at the tutorial.

### *6. "fluorescent optical tumor imaging" ("FOTI")*

| CRI's Proposed Construction | AntiCancer's Proposed Construction | Where used |
|---|---|---|
| acquiring a light image, by any means, of a fluorescent tumor in the subject, including observation by the naked eye | acquiring a light image of a fluorescent tumor or fluorescent tumor cells of an animal, **in real time and on a continuous basis**, from anywhere in the animal | ▪ All Indep. Claims in the '384 patent (*see* 1st instance on p. 4 of Worksheet, **Ex. 1**); ▪ Dep. Claims 2 & 6 in the '038 patent (*see* pp.17-8 & 24 of Worksheet, **Ex. 1**) |

The parties agree that "fluorescent optical tumor imaging" (hereinafter, "FOTI" for brevity's sake) requires "acquiring a light image" of a fluorescent tumor in a subject (which, in the '384/'038 claims, is always an animal). The parties disagree on the scope of "FOTI": CRI believes the phrase should be given a scope consistent with the ordinary meaning of its constituent words, whereas AntiCancer wants to add limitations—*i.e.*, "in real time and on a continuous basis" (bolded above)—which modify the phrase in a way unsupported by the ordinary meaning of either the phrase as a whole or any of its constituent words. Put another way, AntiCancer's construction describes a specific non-limiting example of "FOTI", *i.e.*, in real time and on a continuous basis, while CRI's construction encompasses the full scope of the phrase.

The only support AntiCancer cites for adding the limitation of "in real time and on a continuous basis" to "FOTI" is col. 3, lines 15-18, of the '384 patent. *See* Support Chart, **Ex. 2**, p. 6. This sentence from the '384/'038 specification reads: "In one embodiment, however, it is unnecessary to remove organ tissues; rather, the fluorescence can be visualized in the whole animal by real-time fluorescence [*sic*] optical tumor imaging (FOTI)." But rather than supporting AntiCancer's construction, AntiCancer's cited support argues against it, because if "FOTI" inherently included "real time", the reference to "real time" in the sentence from the '384/'038 specification would be redundant. *See, e.g.*, *Phillips v. AWH*,415 F.3d at 1314 ("[t]o take a simple example, the claim in this case refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of steel.").

When understood in its proper breadth, "FOTI" includes "observation by the naked eye", as stated in CRI's construction. CRI has proffered many citations to the '384/'038 specification as support for its construction and its inclusion of "observation by the naked eye". *See* Support Chart, **Ex. 2**, pp. 6-

7, citing, *e.g.*, **Ex. 3**, '384 patent, abstract, lines 6-7 ("fluorescence can also be monitored by observing the tissues in situ"); *id.*, col. 3, line 65, to col. 4, line 2 ("[s]ince sufficient intensity can be achieved to observe the migration of fluorescent cells in the intact animal, in addition to determining the migration of cells by excising organs, the progression of metastasis can be observed in the intact subject"); and col. 5, lines 29-32 ("[i]n some cases, the tumors are sufficiently bright that opening the animal is unnecessarily—they can be seen directly through the skin."). Even AntiCancer's single piece of intrinsic/extrinsic evidence for its construction (quoted above) is consistent with CRI's construction (*i.e.*, "…the fluorescence can be ***visualized*** in the whole animal …") (emphasis added).

As stated above, AntiCancer's construction describes ***an example*** of what is covered by "FOTI", but fails to encompass its full scope. The substantive difference between the parties' constructions is that CRI believes (1) "FOTI" is not limited to "in real time and on a continuous basis"; and (2) "FOTI" includes "observation by the naked eye". Thus, as long as those two conditions are met, CRI does not oppose the adoption of the other clauses (*i.e.*, "or fluorescent tumor cells" and "from anywhere in the animal") in AntiCancer's construction.

### *7. "surgical orthotopic implantation" ("SOI")*

| CRI's Proposed Construction | AntiCancer's Proposed Construction | Where used |
|---|---|---|
| surgical implantation of cells at the site of tissue of the type from which the cells were derived. The cells need not have originated within the host organism. | surgical implantation of tumor or tumor fragments at the site of the tissue from which the tumor or tumor fragments were derived. The cells need not have originated within the host organism. | ▪ Indep. Claims 1 & 4 in the '384 patent (*see* 1st instance on p. 4 of Worksheet, **Ex. 1**);<br>▪ Dep. Claims 3 & 7 in the '038 patent (*see* pp.18 & 24 of Worksheet, **Ex. 1**)<br>▪ Dep. Claim 3 in the '159 patent (*see* pp. 35-6 of Worksheet, **Ex. 1**) |

Here, too, the parties agree to the broad outlines of what the phrase means, but disagree as to scope. The parties agree that the tumors, tumor fragments, and/or tumor cells need not have originated within the subject—*i.e.*, the tumor cells need only be implanted at the site of the **same type** of tissue within the host (*e.g.*, lung cancer cells are implanted in the lung of the host, *etc.*). *See, e.g.*, **Ex. 3**, '384 patent, col. 12, lines 41-60 (Example 8) ("tumor fragments are then used for surgical implantation into the **corresponding** tissue (surgical orthotopic implantation (SOI)") (emphasis added.)

The parties disagree as to the scope of **what** is implanted: CRI believes the ‘384 Claims 1-4 and ‘038 Claims 3 and 7 cover the implantation of full-fledged tumors, fragments of tumors, and tumor cells (*e.g.*, by injection), while AntiCancer wants to limit these claims to only the implantation of full-fledged tumors and tumor fragments, thereby excluding tumor cells.

Once again, AntiCancer has not offered any intrinsic or extrinsic support for its construction excluding the injection of tumor cells from the coverage of these claims—not a single citation to the patent itself, the prosecution history, a dictionary, a treatise, *nothing*. *See* Support Chart, **Ex. 2**, p. 7. Indeed, the references in the record do not exclude the injecting of tumor cells. *See* Support Chart, **Ex. 2**, pp. 7-8 (CRI’s citations); *see also CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366-67 (Fed. Cir. 2002) (for the specification to narrow the meaning of a claim term, there must be a statement of manifest exclusion or restriction that represents a “clear disavowal” of claim scope). At least because AntiCancer proffers no support for its construction excluding the injection of tumor cells, and there is no such clear exclusion in the patent, the Court should adopt CRI’s construction.

***8. “SCID mouse”***

| CRI’s Proposed Construction | AntiCancer’s Proposed Construction | Where used |
|---|---|---|
| a mouse in which the mouse’s immune system has **s**evere **c**ombined **i**mmuno**d**eficiency | a mouse that has been genetically modified to carry a mutation that severely impairs immune system development and cannot produce either T or B cells | ▪ Indep. Claims 1 & 4 in the ‘384 patent (*see* 1st instance on p. 5 of Worksheet, **Ex. 1**) |

“SCID” is an acronym for “severe combined immunodeficiency” (*see*, *e.g.*, **Exhibit 7**, Dorland’s Medical Dictionary (1994), p. 1493 (DEFS-003904)); thus, CRI defines “SCID mouse” as “a mouse in which the mouse’s immune system has severe combined immunodeficiency.” Since CRI’s definition accurately conforms with the acronym, it should be adopted by the Court, and any further discussion of the what, how, and why of the SCID mouse can be handled during the tutorial preceding the Claim construction hearing.

Moreover, AntiCancer’s construction could be read to unnecessarily limit the meaning of “SCID”. For example, a useful type of SCID mouse for lab testing is the SCID-hu mouse, which lacks a **mouse** immune system but has an engrafted **human** immune system. In other words, it lacks murine

(*i.e.*, mouse) T or B cells, but has human T and/or B cells. As explained by AntiCancer after SCID-hu mice were first developed:

> A mouse both deficient in T-cells as well as B-cells, has recently been isolated. The mouse has been determined the SCID mouse, standing for "severe combined immunodeficiency" [33], as was mentioned briefly in this report. Recent studies have indicated that the SCID mouse can be engrafted with human T- and B-cells as well as with human tumors. Thus, possibilities have opened up to put in a single animal both the patient tumor and the patient's immune system. These animals should allow the study of the effects of immunoenhancers and biological response modifiers in the treatment of human cancer, as well as the effects of standard cytotoxic drugs. Thus, a new era should be opening where cancer patients should be able to have rodent models established for their tumors as standard practice. Such models should enhance the identification of effective new therapies.

**Exhibit 8**, Hoffman 1993, p. 140 (DEFS-004727). A SCID mouse clearly encompasses a SCID-hu mouse, *i.e.*, both are lacking a murine immune system, but AntiCancer's proposed construction appears to exclude the SCID-hu mouse.

Accordingly, CRI believes the Court should adopt either CRI's construction (since it merely spells out what the acronym stands for), but CRI would not oppose AntiCancer's construction, as long as it is expressly understood that "SCID mouse" includes a SCID-hu mouse.

***9. "syngeneic"***

| **CRI's Proposed Construction of: "syngeneic"** | **AntiCancer's Proposed Construction of: "or a mouse which is syngeneic to said tumor"** | **Where used** |
|---|---|---|
| genetically identical | or the tumor used for implantation is derived from said mouse or a genetically identical source | ▪ Indep. Claims 1 & 4 in the '384 patent (*see* 1st instance on p. 5 of Worksheet, **Ex. 1**);<br>▪ Indep. Claims 1 & 5 in the '038 patent (*see* 1st instance on p. 15 of Worksheet, **Ex. 1**) |

CRI proffers a construction of "syngeneic" when it first appears in the patent claims, but AntiCancer does not. *See* Worksheet, **Ex. 1**, p. 5. However, two pages later, AntiCancer proffers a construction for a phrase which includes "syngeneic" in it. *See* Worksheet, **Ex. 1**, p. 7, and table above.

There does not seem to be a real dispute between the parties regarding the meaning of "syngeneic"—at least none that CRI understands. In broad strokes, the parties agree that "syngeneic" means "genetically identical"; however, AntiCancer's construction of the phrase adds the example of

when the "genetically identical source" is the mouse itself (*i.e*., when "the tumor … is derived from said mouse").

The term "syngeneic" never appears in the '384/'038 specification, so CRI uses a contemporaneous dictionary to provide a definition. *See* **Ex. 7**, Dorland's Medical Dictionary (1994), p. 1644 (DEFS-003861). The recent dictionary definition AntiCancer proffers as support appears to exclude AntiCancer's additional example of being derived from the mouse itself. *See*, Support Chart, **Ex. 2**, p. 11 (citing Merriam-Webster's Collegiate Dictionary (11th ed. 2004), p. 1268, in which the definition of "syngeneic" is "involving, derived from, or being genetically identical or similar, individuals in the same species esp. with respect to antigenic interactions").

At least because AntiCancer's construction, with its additional example of being derived from the mouse itself, is completely unsupported by any intrinsic or extrinsic support, the Court should adopt CRI's construction.

***10. "control subject"***

This term need not be construed by the Court. To the extent the scientific approach of comparing treated subject(s) to untreated "control" subject(s) (an approach which is spelled out in the claims) needs to be explained, it can be discussed during the tutorial preceding the Claim construction hearing. CRI can foresee no dispute over whether or not a prior art reference is referring to a "control subject". *See, e.g., Columbia Sportswear N. Am., Inc. v. Cerf Bros. Bag Co*., 2007 U.S. Dist. LEXIS 45862 at *20 (D. Or. June 19, 2007) ("district courts construe patent claims only to the extent necessary to resolve the dispute at issue between the parties"); *see also Orion IP, LLC v. Staples, Inc.*, 406 F. Supp. 2d 717, 737-738 (E.D. Tex. 2005) (observing that "although every word used in a claim has a meaning, not every word requires a construction" and specifically holding that "terms . . . used in accordance with their ordinary lay meanings" do not require construction).

***11. "retroviral vector"***

The science regarding "retroviral vector[s]" needs to be understood, but the term itself need not be construed by the Court as if it were disputed. As far as is presently known by CRI, "retroviral vector" is used in the same manner in the prior art references as in AntiCancer's patent claims—*i.e.*, CRI can foresee no dispute over whether the meaning of "retroviral vector" in a prior art reference has a

different meaning than in the patent claims. The tutorial preceding the Claim construction hearing will include a discussion of the means, commonly called "vectors," used to introduce foreign genetic material into a cell.

Although CRI believes that "retroviral vector" need not be construed by the Court, CRI has proffered an alternative construction in the event the Court decides to construe this term:

***"retroviral vector"***

| **CRI's Proposed Construction** | **AntiCancer's Proposed Construction** | **Where used** |
|---|---|---|
| a vector of retroviral origin | a specially constructed retrovirus to introduce foreign genetic material into a propagatable host cell in order to replicate and amplify the foreign gene sequence | ▪ Indep. Clm. 5 in the '384 patent (*see* p. 11 of Worksheet, **Ex. 1**)<br>▪ Indep. Clm. 9 in the '038 patent (*see* pp. 28-9 of Worksheet, **Ex. 1**) |

CRI's construction more accurately conveys what makes a "retroviral vector" retroviral, while AntiCancer's construction is comprised mostly of a definition of what an "expression vector" is (*i.e.*, a means "to introduce foreign genetic material into a propagatable host cell in order to replicate and amplify the foreign gene sequence"—*see* §17 below for discussion of "expression vector"), which does nothing to convey what makes a "retroviral vector" different from other vectors. Accordingly, if the Court elects to construe this term, it should adopt CRI's construction.

***12. "vicinity of said tumor"***

| **CRI's Proposed Construction** | **AntiCancer's Proposed Construction** | **Where used** |
|---|---|---|
| - *none* - | administering at or near the location of the tumor a retroviral vector which is effective at producing GFP when incorporated into the cells of a tumor | ▪ Indep. Clm. 5 in the '384 patent (*see* p. 12 of Worksheet, **Ex. 1**) |

The majority of AntiCancer's construction consists of limitations and proposed constructions of other phrases and terms in the same claim. Clearly, "vicinity of said tumor", a phrase devoid of a verb, can not be construed as "administering" anything. The only relevant aspect of AntiCancer's proposed construction is the replacement of the word "vicinity" in the patent claim with the words "at or near". There is no reason for the Court to make that substitution.

//

***13. "viral promoter"***

The background concept embodied in "viral promoter" needs to be understood, but the term itself need not be construed by the Court as if it were disputed. As far as is presently known to CRI, the term "viral promoter" is used in the same manner in the prior art references as in these patent claims—*i.e.*, CRI can foresee no dispute over whether a reference to a viral promoter in a prior art reference has a different meaning than in the patent claims. As noted above, the tutorial preceding the claim construction hearing will explain the cell's machinery for producing proteins—during which the function and different types of promoters will be discussed. For now, suffice it to say that a promoter acts as the on/off switch for gene expression. *See, e.g.*, **Exhibit 9**, Nobel Prize 2008d, p. DEFS-004659 (showing graphic where promoter is depicted as a switch with brief explanation); *see also* §C.2 below concerning the definition of "promoter".

Although CRI believes that "viral promoter" need not be construed by the Court, CRI has proffered an alternative construction in the event the Court decides to construe this term:

***"viral promoter"***

| **CRI's Proposed Construction** | **AntiCancer's Proposed Construction** | **Where used** |
|---|---|---|
| a promoter of viral origin | a promoter of viral origin which is a nucleotide sequence in DNA to which RNA polymerase binds to begin transcription | ▪ Dep. Clms. 4 & 8 in the '038 patent (*see* pp. 20 & 26-7 of Worksheet, **Ex. 1**) |

CRI's construction more accurately conveys what makes a "viral promoter" viral, while AntiCancer's construction is comprised mostly of a definition of what a promoter is (*i.e.*, "a nucleotide sequence in DNA to which RNA polymerase binds to begin transcription"), which does nothing to convey what makes a "viral promoter" different from other types of promoters. *See* §C.2 below concerning the definition of "promoter". Accordingly, if the Court elects to construe this term, it should adopt CRI's construction.

***14. "virus"***

This term need not be construed by the Court, because the word "virus" appears nowhere in any of the patent claims. Moreover, to the extent the concept of a "virus" is embedded in other claim terms – such as "viral promoter," a layman's understanding of "virus" is adequate. *See, e.g.*,

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("this court has repeatedly held that a district court is not obligated to construe terms with ordinary meanings, lest trial courts be inundated with requests to parse the meaning of every word in the asserted claims. … In some cases, the ordinary meaning of claim language . . . may be readily apparent even to lay judges, ….") (citing *Phillips v. AWH Corp.*, 415 F.3d at 1312-13).

To the extent the Court believes a more rigorous understanding of "virus" is required, it can be discussed at the tutorial.

***15. "proliferates through multiple passages"***

| CRI's Proposed Construction | AntiCancer's Proposed Construction | Where used |
|---|---|---|
| - *none* - | the cell line can reproduce multiple times while maintaining a high level of production of GFP | ▪ Dep. Clm. 4 in the '038 patent (*see* p. 22 of Worksheet, **Ex. 1**) |

Once again, the majority of AntiCancer's construction consists of limitations and proposed constructions of other phrases and terms from the same claim. Clearly, "proliferates through multiple passages" can not be construed as including "the cell line" and "GFP". The only relevant aspect of AntiCancer's proposed construction is replacing the phrase "proliferates through multiple passages" in the patent claim with the words "can reproduce multiple times". There is no reason for the Court to make that substitution.

***16. "tumor"***

This term need not be construed by the Court, because: (1) "tumor" is used in the same manner in the prior art references as in these patent claims—*i.e.*, CRI can foresee no dispute over whether the meaning of "tumor" in a prior art reference is different from the meaning in the patent claims; and (2) a layman's understanding of "tumor" is adequate for construing the patent claims. *See, e.g.*, *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("this court has repeatedly held that a district court is not obligated to construe terms with ordinary meanings, … In some cases, the ordinary meaning of claim language . . . may be readily apparent even to lay judges, ….") (citing *Phillips v. AWH Corp.*, 415 F.3d at 1312-13).

To the extent the Court believes a more rigorous understanding of "tumor" is required, it can be discussed at the tutorial. Although CRI believes that "tumor" need not be construed by the Court,

CRI has proffered an alternative construction in the event the Court elects to construe this term:

***"tumor"***

| **CRI's Proposed Construction** | **AntiCancer's Proposed Construction** | **Where used** |
|---|---|---|
| an abnormal growth of tissue resulting from uncontrolled, progressive multiplication of cells and serving no physiological function; a neoplasm | a mass of cells, generally derived from a single cell, that is not controlled by normal regulators of cell growth | ▪ All Indep. Claims in the '384/'038 patents (*see* 1st instance on p. 1 of Worksheet, **Ex. 1**; AntiCancer offers its construction on p. 25) |

AntiCancer has not offered any intrinsic or extrinsic support for its construction—not a single citation to the patent itself, the prosecution history, a dictionary, a treatise, *nothing*. *See* Support Chart, **Ex. 2**, p. 28. By contrast, CRI's construction consists of a verbatim repetition of a contemporaneous dictionary definition. *See* **Exhibit 10**, Stedman's Medical 1995, p. 858. At least because AntiCancer proffers no support for its construction, and CRI's construction is supported by a definition by a contemporaneous dictionary, the Court, if it elects to construe this term, should adopt CRI's construction.

***17. "expression vector"***

The background concept embodied in "expression vector" needs to be understood, but the term itself need not to be construed by the Court as if it were disputed. As far as is presently known to CRI, the term "expression vector" is used in the same manner in the prior art references as in the patent claims—*i.e.*, CRI can foresee no dispute over whether the meaning of "expression vector" in a prior art reference is different from the meaning in the patent claims.

As stated above in reference to "retroviral vector", the tutorial preceding the claim construction hearing will explain the various methods used to integrate foreign genetic material into a cell and/or to make a cell produce foreign proteins, and will include a discussion of the types of "vectors" used to introduce foreign genetic material into a host cell.

Although CRI believes that "expression vector" need not be construed by the Court, CRI has proffered an alternative construction in the event the Court elects to construe this term:

//

//

***"expression vector"***

| CRI's Proposed Construction | AntiCancer's Proposed Construction | Where used |
|---|---|---|
| A vector, such as a plasmid, yeast, or animal virus genome, used to introduce foreign genetic material into a host cell in order to replicate and amplify the foreign DNA sequences as a recombinant molecule | A virus or plasmid that carries a DNA sequence into a suitable host cell and there directs the synthesis of a specific protein | ▪ Dep. Clms. 4 & 8 in the '038 patent (*see* pp. 20 & 26-7 of Worksheet, **Ex. 1**) |

CRI's construction more accurately conveys what constitutes an "expression vector", *i.e.*, something for introducing "***foreign*** genetic material" into a host cell in order to "replicate and amplify" that foreign genetic material, and CRI's construction consists of a verbatim repetition of a contemporaneous dictionary definition. *See*, *e.g.*, **Ex. 10**, Stedman's Medical 1995, p. 288. By contrast, AntiCancer's construction is less clear, and AntiCancer's cited extrinsic evidence supports CRI's construction more than AntiCancer's. *See* Support Chart, **Ex. 2**, p. 29 (where AntiCancer cites as its support Stedman's Medical Dictionary for the Health Professions and Nursing (6th ed. 2008), p. 551, in which the definition of "expression vector" is "[a]n agent (plasmid, yeast, or animal virus genome) used experimentally to introduce foreign genetic material into a propagatable host cell to replicate and amplify the foreign DNA sequences as a recombinant molecule").

Accordingly, if the Court elects to construe this term, it should adopt CRI's construction.

## C. Disputed Terms/Phrases in the '159 Patent

### *1. "a method to monitor the ability of a promoter to promote expression in an animal of an endogenous gene that is controlled by said promoter"*

| CRI's Proposed Construction | AntiCancer's Proposed Construction | Where used |
|---|---|---|
| a method to monitor when a promoter of an endogenous gene (defined below) is active (i.e., switched on), thereby causing its associated endogenous gene to be expressed in an animal | a method to study when a promoter (defined below) is active in an animal so that its associated endogenous gene (defined below) produces a protein | ▪ Preamble of Indep. Clm. 1 (the only independent claim) in the '159 patent (*see* p. 31 of Worksheet, **Ex. 1**) |

There appears to be no substantive dispute between the parties regarding this phrase—besides the meaning of "promoter of an endogenous gene", discussed in §3 below.

### *2. "promoter"*

The background concept embodied in "promoter" needs to be understood, but the term itself need not be construed by the Court as if it were disputed. As far as is presently known to CRI, the term "promoter" is used in the same manner in the prior art references as in the patent claims—*i.e.*, CRI can foresee no dispute over whether the meaning of promoter as referred to in a prior art reference is different than the meaning of promoter in the patent claims. As stated above in reference to "viral promoter", the tutorial preceding the claim construction hearing will explain the concept and different types of "promoter". For now, suffice it to say that a promoter acts as the on/off switch for gene expression. *See*, *e.g.*, **Ex. 9**, Nobel Prize 2008d, p. DEFS-004659 (showing graphic where promoter is depicted as a switch with brief explanation)

Although CRI believes that "promoter" need not be construed by the Court, CRI has proffered an alternative construction in the event the Court elects to construe this term:

***"promoter"***

| CRI's Proposed Construction | AntiCancer's Proposed Construction | Where used |
|---|---|---|
| a segment of DNA or RNA that controls transcription of the DNA or RNA to which it is operatively linked | a specific sequence of DNA that is involved in controlling the production of a protein from its corresponding gene | ▪ Indep. Clm. 1 in the '159 patent (*see* p. 31 of Worksheet, **Ex. 1**) |

CRI's construction more accurately conveys the relationship between the promoter and its corresponding gene (they are "operatively linked")[8]. Moreover the language in CRI's construction tracks the language used as a definition for "promoter region or promoter element" in the specification of the '159 patent. *See* '159 patent, **Ex. 5**, col. 6, lines 34-37. Accordingly, if the Court elects to construe this term, it should adopt CRI's construction.

//

//

//

[8] "operatively linked" has the AGREED construction: "the functional relationship of DNA with regulatory and effector sequences of nucleotides, such as promoters, enhancers, transcriptional and translational stop sites, and other signal sequences. For example, operative linkage of DNA to a promoter refers to the physical and functional relationship between the DNA and the promoter such that the transcription of such DNA is initiated from the promoter by an RNA polymerase that specifically recognizes, binds to and transcribes the DNA." (p. 32 of Worksheet, **Ex. 1**).

***3. "fluorophore"***

| CRI's Proposed Construction | AntiCancer's Proposed Construction | Where used |
|---|---|---|
| - *none* - | a protein that is autofluorescent such that no other substrates or co-factors are needed for it to fluoresce | ▪ Indep. Clm. 1 in the '159 patent (*see* p. 32 of Worksheet, **Ex. 1**) |

AntiCancer's construction is not the general definition of "fluorophore", but is instead a verbatim repetition of how the "fluorophore" recited in Claim 1 is already limited. *See* last clause in '159 Clm. 1, p. 35, Worksheet, **Ex. 1** ("wherein said fluorophore is a protein that is autofluorescent such that no substrates or cofactors are needed for it to fluoresce"). There is no reason for the Court to construe a term as being limited in a manner already recited in the claim itself. *See, e.g., Websidestory, Inc. v. Netratings, Inc.*, 2007 U.S.Dist. LEXIS 50186 (S.D.Cal. July 10, 2007) ("Claims construction is 'not an obligatory exercise in redundancy') (citing *U.S. Surgical Corp.*,103 F.3d at 1568).

***4. "promoter of said endogenous gene"***

| CRI's Proposed Construction | AntiCancer's Proposed Construction | Where used |
|---|---|---|
| a promoter associated with a gene that is endogenous to the animal rather than an artificially employed promoter such as a viral promoter (*e.g.*, a CMV promoter). **A promoter whose performance is affected by surrounding tissues, drugs, and other conditions is included.** | a promoter associated with a gene that is endogenous to the animal rather than an artificially employed promoter such as a viral promoter (*e.g.*, a CMV promoter). | ▪ Indep. Clm. 1 in the '159 patent (*see* p. 33 of Worksheet, **Ex. 1**) |

The parties' claim constructions share an identical first sentence; however, AntiCancer's construction lacks the second sentence from CRI's construction (bolded above). This second sentence is taken verbatim from the prosecution history of the '159 patent. *See, e.g.*, **Exhibit 11**, 5/15/03 Amd., pp. 5-12, *e.g.*, p. 8 ("… rather than including [a] promoter whose performance is unaffected by [its] surroundings and thus is not to be evaluated (*i.e.*, the CMV promoter) applicants have provided an expression system where the fluorophore is coupled to a **promoter whose expression may be influenced by surrounding tissue, drugs, etc**., and controls, in its endogenous state, a gene of interest") (emphasis added). *See, e.g., Graham v. John Deere Co.*, 383 U.S. 1, 33 (1966) ("An invention

is construed not only in the light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office."); *see also Phillips v. AWH Corp.*, 415 F.3d at 1316 ("Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent.") (citing *Lemelson v. Gen. Mills, Inc.*, 968 F.2d 1202, 1206 (Fed. Cir. 1992)).

In view of the direct intrinsic support proffered for CRI's construction, and because AntiCancer proffers no support for excluding the second sentence of CRI's construction, the Court should adopt CRI's construction of "promoter of an endogenous gene".

### *5. "whole-body external fluorescent optical imaging"*

| CRI's Proposed Construction | AntiCancer's Proposed Construction | Where used |
|---|---|---|
| an imaging process in which the presence, absence or intensity of the fluorescence generated by the fluorophore at various locations in the host organism is monitored, recorded and/or analyzed externally without any procedure, *e.g.*, surgical procedure, to expose and/or excise the desired observing site from the host organism. This includes merely "looking" at the animal. | acquiring an external light image from an intact animal, in real-time and on a continuous basis, of fluorescent light emitted from the animal, without any surgical incision performed. | ▪ Indep. Clm. 1 in the '159 patent (*see* p. 33 of Worksheet, **Ex. 1**) |

The first sentence of CRI's construction repeats verbatim the definition of "whole-body external fluorescent optical imaging" in the '159 patent (*see* **Ex. 5**, '159 patent, col. 5, lines 60-66), and as such it should be adopted by the Court. *See, e.g.*, *Guttman, Inc. v. Kopykake Enters*., 302 F.3d 1352, 1360 (Fed. Cir. 2002) ("Where . . . the patentee has clearly defined a claim term, that definition 'usually . . . is dispositive; it is the single best guide to the meaning of a disputed term.'") (quoting *Vitronics Corp.*, 90 F.3d at 1582).

The second sentence of CRI's construction is taken verbatim from the Patent Office Examiner's comments concerning the phrase "whole-body external fluorescent optical imaging" during the prosecution of a divisional patent application claiming priority to, and having the same specification as, the '159 patent (hereinafter, "the '159 divisional application"). In an Office Action dated May 5, 2009 concerning the '159 divisional application, the Patent Office Examiner quoted the definition of "whole-body external fluorescent optical imaging" from the specification, *i.e.*, the first sentence in CRI's

construction, and commented: "This definition is so broad as to encompass merely 'looking' at the animal." *See* **Exhibit 12A**, 5/5/09 O.A. from the '159 Div. App. File, p. 5 (DEFS-003910); *see also* **Exhibit 12B**, AntiCancer's 8/4/09 Amd. from the '159 Div. App. File (where AntiCancer did not dispute the Examiner's characterization).

When two related patent applications share the same specification, the prosecution history of one may be used construe the meaning of the same term appearing in the other. *See*, *e.g.*, *Laitram Corp. v. Morehouse Indus., Inc.*, 143 F.3d 1456, 1460 n.2 (Fed. Cir. 1998) (applying the prosecution histories of two sibling patents, which shared a common written description, to one another); *see also Microsoft Corp. v. Multi-Tech Systems, Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004), *cert. denied* , 543 U.S. 821 (2004) ("[a]lthough … the above-quoted statement [was made] during prosecution of the '627 patent, it is also applicable to both the '649 and the '532 patents. In the past, we have held that the prosecution history of one patent is relevant to an understanding of the scope of a common term in a second patent stemming from the same parent application.") (citing *Jonsson v. Stanley Works*, 903 F.2d 812, 818 (Fed. Cir. 1990)).

AntiCancer consistently varies from the definition in the patent, and, by contrast to the direct intrinsic support proffered for CRI's construction, AntiCancer has not offered any intrinsic or extrinsic support for its construction—not a single citation to the patent itself, the prosecution history, a dictionary, a treatise, *nothing*. *See* Chart [D.E. 253], p. 38. Because CRI's construction is supported by the intrinsic evidence and because AntiCancer proffers no support for its construction, the Court should adopt CRI's construction of "whole-body external fluorescent optical imaging".

***6. "whereby the ability of said promoter to promote expression is monitored"***

| CRI's Proposed Construction | AntiCancer's Proposed Construction | Where used |
|---|---|---|
| - *none* - | where the ability of the promoter to causes [*sic*] its associated fluorophore gene to produce a protein is monitored | ▪ Indep. Clm. 1 in the '159 patent (*see* pp. 34-5 of Worksheet, **Ex. 1**) |

AntiCancer's construction merely replaces the claim phrase "to promote expression" with the phrase "to [cause] its associated fluorophore gene to produce a protein"—*i.e.*, this is not a claim construction, but simply another way to express what happens during gene expression. As stated above,

the background concept of "expresses" (or, as above, "expression") needs to be understood, but the term itself need not be construed by the Court as if it were disputed. As far as is presently known to CRI, the term "expresses" is used in the same manner in the prior art references as in the patent claims—*i.e.*, CRI can foresee no dispute over whether the meaning of "expression" in a prior art reference is different than its meaning in the patent claims. *See, e.g.*, *United States Surgical Corp.*, 103 F.3d at 1568 (Fed. Cir. 1997) ("The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term in order to comply with the ruling that claim construction is for the court.").

The basic outline of how a cell "expresses" a gene, *i.e.*, transcription, should be explained and discussed in the tutorial preceding the claim construction hearing. The tutorial will include a discussion of the cell's machinery for producing proteins: the DNA "blueprint" contained in the cell's nucleus, the RNA copy that is made from that blueprint, and the machinery in the cell's cytoplasm (outside the nucleus) which builds proteins based on the RNA copy.

***7. "humanized fluorophore"***

| CRI's Proposed Construction | AntiCancer's Proposed Construction | Where used |
|---|---|---|
| a fluorophore whose **codon is** modified according to the codon usage pattern in human genome to enhance its expression while substantially maintaining its fluorescent characteristics | a fluorophore whose **codons are** modified according to the codon usage pattern in human genome to enhance its expression while substantially maintaining its fluorescent characteristics | ▪ Dep. Clm. 4 in the '159 patent (*see* p. 36 of Worksheet, **Ex. 1**) |

The only difference between the parties' constructions is that CRI's construction uses the singular "codon" and AntiCancer's construction uses the plural "codons" (as indicated in bold above). However, CRI's construction is a verbatim copy of the definition provided in the '159 patent (*see* **Ex. 5**, '159 patent, col. 7, lines 1-5), and as such it should be adopted by the Court. *See, e.g.*, *Guttman, Inc. v. Kopykake Enters*., 302 F.3d 1352, 1360 (Fed. Cir. 2002) ("Where . . . the patentee has clearly defined a claim term, that definition 'usually . . . is dispositive; it is the single best guide to the meaning of a disputed term.'") (quoting *Vitronics Corp.*, 90 F.3d at 1582). By contrast, there is no support for the plural "codons" in AntiCancer's construction, as shown by the fact that AntiCancer has cited no support at all for its construction. *See* Support Chart, **Ex. 2**, p. 41 (marked). Accordingly, the Court should reject AntiCancer's construction and adopt CRI's construction.

***8. "expressed in a tissue or organ specific manner"***

| CRI's Proposed Construction | AntiCancer's Proposed Construction | Where used |
|---|---|---|
| a gene expression pattern in which a gene is expressed, either transiently or constitutively, only in certain tissues or organs, but not in other tissues or organs | the endogenous gene used in the method is **normally specifically** expressed, either transiently or constitutively, by cells in certain tissues or organs but not in other tissues or organs | ▪ Dep. Clm. 9 in the '159 patent (*see* pp. 38-9 of Worksheet, **Ex. 1**) |

Here, too, CRI's construction is a verbatim copy of the definition provided in the '159 patent (*see* **Ex. 5**, '159 patent, col. 7, lines 27-30), and as such it should be adopted by the Court. *See, e.g.*, *Guttman*, 302 F.3d at 1360 ("Where . . . the patentee has clearly defined a claim term, that definition 'usually . . . is dispositive; it is the single best guide to the meaning of a disputed term.'") (quoting *Vitronics Corp.*, 90 F.3d at 1582).

The substantive difference between the parties' constructions is that AntiCancer's construction adds "normally specifically" (as indicated in bold above), but there is no support or reason for adding these words to the definition provided in the '159 patent. *See, e.g.*, Support Chart, **Ex. 2**, p. 43 (AntiCancer cites the same definition as CRI and two instances where the phrase is used, none of which suggests that the definition should be limited by "normally" or "specifically"). Because CRI's construction is the definition from the '159 patent and AntiCancer's construction has no support, the Court should reject AntiCancer's construction and adopt CRI's construction.

***9. "tumor or cancer associated gene" and "cancer associated gene"***

***"tumor or cancer associated gene"***

| CRI's Proposed Construction | AntiCancer's Proposed Construction | Where used |
|---|---|---|
| a gene associated with tumors or cancer | - *none* - | ▪ Dep. Clm. 12 in the '159 patent (*see* p. 40 of Worksheet, **Ex. 1**) |

***"cancer associated gene"***

| CRI's Proposed Construction | AntiCancer's Proposed Construction | Where used |
|---|---|---|
| a gene associated with cancer | a gene that is specifically expressed in cancers and can release the cell from normal restraints on growth. A cancer associated gene is any gene specifically associated with a type or types of cancer | ▪ Dep. Clm. 13 in the '159 patent (*see* pp. 40-1 of Worksheet, **Ex. 1**) |

The phrase "tumor or cancer associated gene" is first used in dependent Claim 12, where AntiCancer offers no construction. *See* Worksheet, **Ex. 1**, p. 40. When the same phrase is repeated in Claim 13 (depending from Claim 12), AntiCancer isolates one part of the phrase (*i.e.*, "cancer associated gene"), and proffers a construction for that part only. Although the whole phrase "tumor or cancer associated gene" includes the types of genes described in AntiCancer's construction, the scope of the entire phrase is far broader, because Claim 13 states that "a tumor or cancer associated gene" can be a "tumor suppressor gene", which is a gene "which must be mutated or otherwise inactivated before a cell can proceed to rapid division [as required by tumor/cancer cells]" (AGREED construction of "tumor suppressor gene" on pp. 40-41 of the Worksheet, **Ex. 1**)—*i.e.*, a tumor suppressor gene is ***not*** "a gene that is specifically expressed in cancers and can release the cell from normal restraints on growth", as required by AntiCancer's construction.

The Court should adopt the CRI's construction of the entire phrase "tumor or cancer associated gene" as it accurately conveys that ***both*** genes that are expressed in cancers/tumors ***and*** genes that are inhibited or inactivated in cancers/tumors are included. AntiCancer's partial construction of a partial phrase should be rejected.

COHEN PONTANI LIEBERMAN & PAVANE LLP

Dated: October 16, 2009 By: /s Teodor J. Holmberg

Martin B. Pavane
Teodor J. Holmberg
Attorneys for Defendant and Counterclaimant
CAMBRIDGE RESEARCH & INSTRUMENTATION, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was this date served upon all counsel of record by electronic transmission through the Case Management/Electronic Case Filing (CM/ECF) system of the U.S. District Court for the Southern District of California, and that all parties in this case are represented by counsel who are CM/ECF participants.

Dated: October 16, 2009 By: /s Teodor J. Holmberg

Teodor J. Holmberg
Attorney for Defendant
CAMBRIDGE RESEARCH & INSTRUMENTATION, INC.
e-mail: tidge@cplplaw.com