THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

HONORABLE JANIS L. SAMMARTINO
UNITED STATES DISTRICT JUDGE PRESIDING

---

ANTICANCER, INC., A CALIFORNIA CORPORATION,
PLAINTIFF,
VS.
CAMBRIDGE RESEARCH & INSTRUMENTATION, INC., A DELAWARE CORPORATION; MERCK & CO., A NEW JERSEY CORPORATION; NOVARTIS CORP. A NEW YORK CORPORATION; AND DOES 17-50,
DEFENDANTS.

NO. 07-CV-0097-JLS

---

CLAIMS CONSTRUCTION HEARING

---

REPORTER'S TRANSCRIPT OF PROCEEDINGS
DECEMBER 2, 2009
SAN DIEGO, CALIFORNIA

GAYLE WAKEFIELD, RPR, CRR
OFFICIAL COURT REPORTER
UNITED STATES COURTHOUSE
940 FRONT STREET, ROOM 3142
SAN DIEGO, CALIFORNIA 92101-8900
PH: 619-239-0652
GAYLE5@SBCGLOBAL.NET

APPEARANCES:

FOR THE PLAINTIFF: DAN LAWTON
JOSEPH C. KRACHT
REZA SAVARI
MATT VALENTI
LAWTON LAW FIRM
EMERALD PLAZA
402 WEST BROADWAY, SUITE 1860
SAN DIEGO, CA. 92101

FOR THE DEFENDANT: MARTIN PAVANE
TEODOR J. HOLMBERG
COHEN PONTANI LIEBERMAN & PAVANE
551 FIFTH AVENUE
NEW YORK, NY. 10176

ALLISON H. GODDARD
JACZKO GODDARD LLP
4401 EASTGATE MALL
SAN DIEGO, CA. 92121

DECEMBER 2, 2009

MORNING SESSION

THE CLERK: NUMBER ONE ON THE CALENDAR, 2007-CV-0097, ANTICANCER INCORPORATED VS. CAMBRIDGE RESEARCH AND INSTRUMENTATION, FOR CLAIMS CONSTRUCTION HEARING.

THE COURT: GOOD MORNING. PLEASE ENTER YOUR APPEARANCES, COUNSEL.

MR. LAWTON: THANK YOU, YOUR HONOR, GOOD MORNING, DAN LAWTON APPEARING ON BEHALF OF THE PLAINTIFF AND THE COUNTER DEFENDANT ANTICANCER, INC. AND WITH ME AT THE TABLE IN ORDER FROM THE COURT'S LEFT TO RIGHT ARE MY CLIENT, DR. ROBERT HOFFMAN, WHO IS THE PRESIDENT OF ANTICANCER.

DR. HOFFMAN: GOOD MORNING, YOUR HONOR.

MR. LAWTON: JOE KRACHT.

MR. KRACHT: GOOD MORNING, YOUR HONOR.

MR. LAWTON: REZA SAVARI AND MATT VALENTI, ALL OF WHOM ARE MY COLLEAGUES.

IN THE BACK, TO THE COURT'S RIGHT, DR. ZHIJIAN YANG, WHO IS ONE OF OUR SCIENTISTS AT ANTICANCER, AND TO HIS RIGHT DR. BRUCE PETERS OF INDEC SYSTEMS, INC., AND THOSE TWO DOCTORS WILL BE ASSISTING WITH OUR LIVE DEMONSTRATION DURING OUR TUTORIAL THIS MORNING.

THE COURT: THANK YOU.

MS. GODDARD: GOOD MORNING, YOUR HONOR, ALLISON GODDARD ON BEHALF OF CAMBRIDGE RESEARCH AND INSTRUMENTATION. I HAVE

WITH ME MARTIN PAVANE, MY CO-COUNSEL.

MR. PAVANE: GOOD MORNING, YOUR HONOR.

THE COURT: GOOD MORNING.

MS. GODDARD: TIDGE HOLMBERG, MY CO-COUNSEL.

MR. HOLMBERG: GOOD MORNING, YOUR HONOR.

THE COURT: GOOD MORNING.

MS. GODDARD: DR. PATRICIA PESAVENTO, WHO WILL BE HELPING US WITH OUR DEMONSTRATION.

THE COURT: GOOD MORNING.

MS. GODDARD: AND THE CHIEF SCIENCE OFFICER OF CAMBRIDGE RESEARCH AND INSTRUMENTION, PETER MILLER.

THE COURT: THANK YOU. GOOD MORNING.

EVERYBODY'S IN RECEIPT OF THE SCHEDULE THAT THE COURT HOPES TO FOLLOW TODAY, AND WITH THAT I'M INCLINED TO JUST START RIGHT IN AND SEE THE FIRST DEMONSTRATION/TUTORIAL, IF YOU WOULD, AND THAT WOULD BE YOUR PRESENTATION.

MR. PAVANE: THANK YOU, YOUR HONOR.

FOR PURPOSES OF THE PRESENTATION, DR. PATRICIA PESAVENTO WILL BE DOING THE TALKING. I WILL BE ASSISTING TO SOME SMALL EXTENT TO MAKE SURE IT MOVES ALONG IN A TIMELY FASHION.

WOULD YOUR HONOR LIKE TO HEAR A LITTLE BIT ABOUT DR. PESAVENTO'S BACKGROUND BEFORE WE START THE TUTORIAL?

THE COURT: VERY BRIEFLY.

DR. PESAVENTO: I'M DR. PATRICIA PESAVENTO. I HAVE MY

B.A. IN BIOLOGY FROM SWARTHMORE AND THEN A PH.D. FROM HARVARD, AND I SPENT SIX YEARS THERE WORKING ON MOLECULAR AND CELLULAR BIOLOGY. WHEN I WANTED TO WORK ON INFECTIOUS DISEASES, I WENT TO VETERINARY SCHOOL. AND I AM CURRENTLY AN ANATOMIC PATHOLOGIST ON FACULTY AT UC DAVIS. MY JOB THERE INVOLVES A CLINICAL POSITION. IT INVOLVES RESEARCH ON HOW VIRUSES ENTER CELLS, AND IT ALSO INVOLVES, AND MOST IMPORTANTLY INVOLVES, TEACHING, AND IT'S THE MOST IMPORTANT JOB TO DATE AS WELL.

I'M HOPING THAT THIS WILL BE ABOUT 35 MINUTES IN TOTAL, BUT I REALLY WELCOME ANY QUESTIONS THAT YOU HAVE AS WE GO ALONG BECAUSE IT SHOULD BE A BUILDING PROCESS. SO IF THERE'S ANYTHING THAT YOU HAVE TO ASK, PLEASE ASK AS WE GO.

THE COURT: OKAY, THANK YOU.

DR. PESAVENTO: THIS IS A BASIC OUTLINE OF WHAT WE'RE GOING TO TALK ABOUT TODAY. SO I'LL START RIGHT IN ON CELLS, THEY'RE A VERY, VERY DYNAMIC STRUCTURE.

AND IF I MOVE AWAY TOO FAR FROM THE MIC I HAVE A VERY LOUD VOICE. LET ME KNOW IF IT'S A PROBLEM.

THEY'RE A VERY DYNAMIC STRUCTURE WITH A WHOLE LOT OF THINGS GOING ON, BUT I AM -- FOR THE PURPOSES OF TODAY'S TALK, I CAN REALLY SIMPLIFY THIS WITH THIS PROTOTYPE CELL THAT WE HAVE HERE, BASICALLY THIS CIRCLE OF LIGHT BLUE, WHICH INCLUDES THE CELL CYTOPLASM, AND WITHIN THE CELL CYTOPLASM THE ORGANELLE THAT WE'RE GOING TO BE TALKING ABOUT WITHIN THE CYTOPLASM IS THE RIBOSOME, WHICH IS A PROTEIN FACTORY. AND THEN, MOST

IMPORTANTLY, THE CELL NUCLEUS IN DARKER BLUE, WHICH HERE IS SHOWN WITH THE CHROMOSOMES ARE THE LINEAR DNA CARTOONED RIGHT HERE, WHICH IS WITHIN THE NUCLEAR MEMBRANE OF THE NUCLEUS.

SO JUST TO TALK ABOUT HOW CELLS MAKE PROTEINS, BECAUSE AGAIN THIS IS THE BUILDING BLOCK OF ALL THE TERMS THAT ARE IMPORTANT TO US, JUST TO TALK ABOUT HOW CELLS MAKE PROTEINS, THAT DNA IS ARRANGED IN GENETIC UNITS. AGAIN, I HAVE THEM CARTOONED AS THE WHITE BOX BEING THE GENE AND SOME OTHER ELEMENTS IN FRONT OF THEM BEING IN DIFFERENT COLORS.

EVERY SINGLE CELL IN OUR BODY, EVERY SINGLE CELL HAS 20,000 TO 30,000 GENES IN THE CASE OF A HUMAN, AND 20,000 TO 30,000 GENES ARE AN ENORMOUS NUMBER OF GENES. THERE'S ALSO A LOT OF NON-COATING MATERIAL.

SO WHETHER OR NOT A CELL IS GOING TO BE A SKIN CELL, LET'S SAY A PROTECTIVE CELL, OR WHETHER OR NOT A CELL IS GOING TO BE A VERY, VERY INTRICATE NEURON THAT CAN EXTEND WITH ITS FINE TENDRILS FROM YOUR TOE ALL THE WAY UP TO YOUR SPINE, REALLY DEPENDS ON THE CHOICES OF WHICH GENES THAT CELL WILL EXPRESS OR THE PROTEINS THAT YOU'RE GOING TO MAKE IN THAT PARTICULAR CELL. SO EVERY CELL HAS THE EXACT SAME MAP, HAS THE EXACT SAME DNA, BUT DIFFERENT GENES ARE CHOSEN, SAY, FROM A MENU, AND WHAT PROTEINS THEY EXPRESS ARE GOING TO DETERMINE WHAT CELL TYPE THAT IS.

AND REALLY WHAT IS DOING THE MOST OF THE CHOOSING OF WHICH GENES AND WHICH CELLS ARE CHOSEN IS THE DNA THAT LIES IN

FRONT OF THAT GENE, AND THAT'S WHAT I HAVE CARTOONED IN COLOR HERE, WHICH IS CALLED THE PROMOTER, AND PROMOTER SEQUENCES ARE SEQUENCES THAT CONTROL WHETHER OR NOT A GENE IS ON OR OFF IN A CELL.

SO IF A GENE IS CHOSEN TO BE EXPRESSED OR CHOSEN TO PRODUCE A PROTEIN IN A PARTICULAR CELL, THEN THAT PROMOTER IS TURNED ON BY A VARIETY OF SIGNALS, AND THAT GENE, THAT DNA IS TRANSCRIBED INTO RNA.

NOW, RNA IS A TEMPLATE JUST LIKE DNA, VERY, VERY SIMILAR, WITH A DIFFERENCE IN SUGAR ONLY. THAT RNA IS THEN TRANSPORTED AS A TEMPLATE INTERMEDIATE OUT TO THE RIBOSOME, AND THE RIBOSOME, AS I SAID, IS A PROTEIN FACTORY. SO THAT GENE, WHEN IT IS EXPRESSED OR WHEN IT MAKES PROTEINS, WILL MAKE A SPECIFIC PROTEIN ON THE RIBOSOME THAT WILL BE PUT INTO THAT CELL.

THAT PROTEIN MIGHT BE A STRUCTURAL PROTEIN, SAY A STRUT THAT HOLDS THE CELL TOGETHER, OR IT MIGHT BE A PROTEIN THAT LEAVES THE CELL AND GOES OFF AND COMMUNICATES WITH ANOTHER CELL. PROTEINS ARE FUNCTIONAL, AND THEY'RE WHAT MAKES THE CELL -- GIVES THE CELL THE CHARACTERISTICS THAT IT NEEDS.

THIS IS THE BASICS OF WHAT WE NEED TO UNDERSTAND, WHAT IS GENE EXPRESSION, AND THIS IS NORMAL GENE EXPRESSION IN A CELL.

SO I'M GOING TO TALK A LITTLE BIT MORE ABOUT THE PROMOTER BECAUSE AMONG ALL OF THE VERY COMPLICATED THINGS A

CELL CAN DO TO REGULATE WHETHER ITS GENES ARE ON OR OFF, THERE ARE VERY FEW THAT WE CAN REALLY PLAY WITH, AND ONE OF THE THINGS THAT WE CAN PLAY WITH ARE THE SEQUENCES OF THE GENES AND THE PROMOTER. WE CAN USE THE PROMOTER, AND WE WILL USE IT IN ENGINEERING, AS WE'LL TALK ABOUT IN A LITTLE BIT. SO I'LL TALK A LITTLE BIT MORE ABOUT THAT UNIT.

THERE ARE TWO BASIC TYPES OF PROMOTERS IN A EUKARYOTE OR IN A MAMMALIAN SYSTEM. ONE OF THEM IS CALL A CONSTITUTIVE PROMOTER, AND CONSTITUTIVE MEANS THAT IT IS ALWAYS ON. THERE'S NO SWITCH INVOLVED. IT'S CONSTANTLY TRANSCRIBING RNA AND CONSTANTLY SENDING THAT RNA OUT TO BE MADE INTO PROTEIN SO GENE EXPRESSION IS ALWAYS TURNED ON.

AN INDUCIBLE PROMOTER OR A SWITCHABLE PROMOTER IS ONE THAT REQUIRES A SIGNAL TO BE TURNED ON. I HAVE SOME SYNONYMS OF CONSTITUTIVE AND INDUCIBLE UP HERE. I LIKE THOSE TWO THE BEST -- I'M JUST BIASED -- A CONSTITUTIVE PROMOTER IS ALSO CALLED AN UNREGULATED PROMOTER. AN INDUCIBLE CAN BE CALLED A REGULATED, A FACULTATIVE OR A SWITCHABLE PROMOTER.

I HAVE SOME EXAMPLES HERE OF SWITCHABLE PROMOTERS. THE INSULIN GENE IS REALLY QUITE A LOVELY EXAMPLE. AFTER YOU EAT A MEAL, GLUCOSE IN YOUR BLOOD GOES UP. THAT GLUCOSE SIGNALS TO THE PROMOTER OF THE INSULIN GENE FOR INSULIN TO TURN ON. INSULIN WILL MAKE THE TEMPLATE OF RNA AND PRODUCE THE PROTEIN INSULIN WHICH WILL THEN BE IN CIRCULATION IN YOUR BODY.

IT IS EXTREMELY, EXQUISITELY IMPORTANT THAT WHEN THAT

GLUCOSE GOES AWAY, AND THAT INSULIN DEGRADES, THAT THAT GENE IS TURNED BACK OFF AGAIN. HIGH LEVELS OF INSULIN IN YOUR BODY ALL THE TIME IS A VERY DANGEROUS THING. SO THAT'S A PERFECT EXAMPLE OF A HIGHLY, HIGHLY REGULATED PROMOTER THAT'S IN OUR SYSTEMS.

A SECOND EXAMPLE I HAVE HERE OF INDUCIBLE PROMOTERS ARE HEAT SHOCK PROMOTERS, AND THESE ARE SIMPLY BITS OF SEQUENCE THAT RESPOND TO STRESS IN A CELL. SO, FOR EXAMPLE, IF YOU RAISE THE TEMPERATURE AROUND A CELL, THESE BITS OF SEQUENCE, THESE HEAT SHOCK PROMOTERS, WILL TURN ON GENES NEAR THEM. SO YOU CAN IMAGINE THAT THE GENES THAT ARE NEAR HEAT SHOCK PROMOTERS WOULD BE ONES THAT WOULD HELP PROTECT THE CELL. AND OTHER TYPES OF THINGS CAN TURN THESE ON AS WELL, WHATEVER SHOCKS A CELL MIGHT BE PRECEDED BY A HEAT SHOCK PROMOTER OR CONTROLLED BY A HEAT SHOCK PROMOTER.

I HAVE EXAMPLES OF CONSTITUTIVE PROMOTERS, THE ONE ON THE BOTTOM, ACTIN IS A STRUCTURAL GENE THAT MANY, MANY CELLS NEED AND THEY NEED IT ALL THE TIME, AND THERE'S A TURNOVER OF ACTIN THAT JUST MAINTAINS THE INTEGRITY OF A CELL. SO THAT'S AN EXAMPLE OF A GENE IN A NORMAL BODY OR IN A NORMAL CELL WHERE THE PROMOTER IS BASICALLY ALWAYS FUNCTIONING, ALWAYS ON.

VIRAL PROMOTERS, AND WE'RE VERY INTERESTED IN VIRAL PROMOTERS, ARE ALWAYS ON IN THE SENSE THAT A VIRUS HAS EVERY DESIRE TO REPRODUCE ITSELF, AND THAT'S MORE OF A PHILOSOPHICAL QUESTION THAN A SCIENTIFIC QUESTION, BUT IF THE GOAL OF A VIRUS

IS TO MAKE MORE VIRUS, THEN THEY WANT A PROMOTER THAT IS VERY, VERY HOT, THAT'S ALWAYS, ALWAYS ON. AND SO SOME OF THE STRONGEST PROMOTERS THAT WE KNOW ABOUT ARE THE PROMOTERS THAT TURN ON THE GENES THAT A VIRUS NEEDS TO MAKE ITSELF, AND THOSE ARE CALLED VIRAL PROMOTERS.

THE COURT: DOCTOR, ALL CELLS HAVE BOTH.

DR. PESAVENTO: ALL CELLS HAVE EXAMPLES OF BOTH CONSTITUTIVE --

THE COURT: OF BOTH.

DR. PESAVENTO: YES, ABSOLUTELY.

SO WE'LL SWITCH TO THE SECOND PART OF THIS, WHICH IS HOW A CELL -- WE CAN GET A CELL -- OR IN THIS CASE A VIRUS CAN GET A CELL TO MAKE SOMETHING OTHER THAN WHAT ITS NORMAL GENES ARE BECAUSE THIS GENETIC MANIPULATION. IN A VIRUS, THERE IS NOTHING THAT DOES THIS BETTER THAN A MICROBE, ALMOST ANY KIND OF MICROBE, BUT VIRUSES ARE EXQUISITELY GOOD AT STEALING THE MACHINERY OF A CELL AND MAKING THEMSELVES AT THE EXPENSE OF THE CELL MAKING ITSELF.

WE CAPITALIZE ON A LOT OF THE METHODS THAT VIRUSES USE, SO I AM GOING TO PAUSE AND TALK ABOUT HOW A VIRUS IS ABLE TO MANIPULATE A CELL INTO MAKING THE PROTEINS OR THE VIRUS PARTICLES THAT IT WANTS.

SO I HAVE CARTOONED HERE, AGAIN, OUR PROTOTYPE CELL, WITH A NATIVE DNA INSIDE, AND OUR RIBOSOME, WHICH IS OUR CYTOPLASMIC PROTEIN FACTORY. AND OUR VIRUS HERE IS A PACKAGE

OF GENETIC MATERIAL, IN THIS CASE DNA, AND IT'S WITHIN AN ENVELOPE OR A CAPSID, SOME TYPE OF PACKAGING SYSTEM, AND THAT'S A BASIC VIRUS. AND THAT VIRUS IS GOING TO ENTER THE CELL FIRST BY BINDING TO THE CELL MEMBRANE, AND IT HAS A LOT OF VERY DIFFERENT WAYS OF DOING THIS, AND THEN BY UNLOADING THE GENETIC MATERIAL THAT IT HAS INTO THE CELL, INTO THE CYTOPLASM, WHERE IT TRAVELS INTO THE NUCLEUS, AND WITHIN THE NUCLEUS YOU KNOW THE STORY FROM HERE.

NOW IT'S GOING TO ACT LIKE ANY OTHER GENE WITH ANY OTHER PROMOTER THAT'S WITHIN THAT CELL. SO HERE OUR NATIVE DNA, AND HERE'S THIS EXOGENOUS OR NOT NATIVE VIRAL DNA AND THAT CAN BE USED AS A TEMPLATE, THAT PARTICULAR DNA CAN STEAL THE MACHINERY THAT'S WITHIN A NUCLEUS AND MAKE RNA, WHICH YOU'VE SEEN. THAT RNA WILL BE TRANSPORTED TO THE CELL'S RIBOSOME AND INSTEAD OF MAKING CELL PROTEINS TO HOLD THE CELL OPEN, TO HOLD THE CELL STRUTTED, TO MAKE A NEURON, INSTEAD OF MAKING CELL PROTEINS, INSTEAD THAT CELL IS NOW A FACTORY THAT WILL CREATE VIRUSES, AND WILL CREATE AN ENORMOUS NUMBER OF VIRUSES. THEY ARE VERY EFFICIENT AT THIS.

ONCE THOSE VIRUSES ARE MADE WITHIN A CELL, THEY HAVE A COUPLE OF OPTIONS OF LEAVING THE CELL; THEY CAN JUST KILL THE CELL, SLICE THE CELL, AND ESCAPE FROM THE CELL, OR THEY CAN FUSE WITH THE MEMBRANE AND BUTT OFF AND KEEP THE CELL ALIVE AS THEIR OWN LITTLE FACTORY, AND THERE ARE LOTS OF EXAMPLES OF BOTH OF THOSE THINGS.

I WANT YOU TO NOTICE THAT IN THIS DNA VIRUS EXAMPLE THAT WE HAVE HERE THAT THAT ACTUAL VIRAL DNA IS NOT INCORPORATED IN THE CELLS GENOME. IT'S NOT PART OF OUR CELL'S CHROMOSOMES OR DNA. IT'S BY ITSELF ON THE SIDE JUST USING THE MACHINERY. A NORMAL VIRUS, OR A VIRUS LIKE I'VE TALKED TO YOU ABOUT A DNA VIRUS, WON'T EVER BECOME PART OF THE NATIVE DNA. WE'RE GOING TO TALK ABOUT AN EXAMPLE OF A RETROVIRUS, WHICH IS A VERY IMPORTANT AND SPECIFIC EXAMPLE, WHICH DOES BECOME PART OF OUR NATIVE DNA.

SO A RETROVIRUS NOW, IN PROTOTYPE OVER HERE, CONTAINS BOTH AN RNA TEMPLATE, SO NOW INSTEAD OF THE GENETIC MATERIAL OF THE VIRUS BEING A DNA IT'S JUST THAT INTERMEDIATE RNA TEMPLATE, AND IT ALSO PACKAGES A VARIETY OF ENZYMES THAT IT NEEDS IN ORDER TO DO ITS JOB, WHICH IS TO REPRODUCE.

SO THAT VIRUS WILL BE DELIVERED TO THE CELL AND FUSED IN A WAY THAT IS SIMILAR TO THE TRADITIONAL VIRUS THAT I JUST TALKED ABOUT, AND IT WILL DELIVER BOTH THE NUCLEIC ACID OR THE RNA AND THE ENZYMES INTO THE CYTOPLASM OF THAT CELL.

WHAT'S ABSOLUTELY FASCINATING ABOUT RETROVIRUSES IS THEY'RE THE ONES WHO HAVE BUCKED THE DOGMA OF WHAT I TALKED WITH YOU ABOUT BEFORE IN THE CELLS. SO CELLS USUALLY MAKE DNA, DNA MAKES RNA, RNA MAKES PROTEIN.

A RETROVIRUS IS CALLED A RETROVIRUS BECAUSE IT HAS ONE ENZYME THAT ALLOWS IT TO TAKE THAT RNA TEMPLATE AND NOW MAKE A DNA TEMPLATE. THAT WAS REVOLUTIONARY. THIS IS A VERY, VERY

AMAZING THING AND BRILLIANT OF THE VIRUS.

SO ONCE THAT'S MADE A DNA TEMPLATE, THE ENZYMES THAT IT HAS PACKAGED WITH IT OR THE PROTEINS IT NEEDS TO CARRY OUT THESE JOBS WILL BE DELIVERED INTO THE NUCLEUS, ALONG WITH THE VIRAL DNA, AND SOME OF THOSE ENZYMES ARE RESPONSIBLE FOR ACTUALLY CUTTING OUR GENOME, OR THE GENES THAT ARE WITHIN OUR CELLS OR THE DNA THAT'S WITHIN OUR CELLS, AND FUSING OR STICKING THAT VIRAL DNA RIGHT STRAIGHT INTO OUR OWN GENOME. THIS IS A REALLY IMPORTANT DISTINCTION BECAUSE NOW THIS IS PART OF THE GENETIC MATERIAL OF THIS CELL. SO IF THIS CELL DIVIDES, THAT VIRAL DNA WILL DIVIDE WITH IT AND WILL BECOME PART OF ALL THE DAUGHTER CELLS OF THAT CELL.

THIS STORY YOU KNOW, ONCE IT'S PART OF THAT IT CAN BE USED AS A TEMPLATE FOR MAKING RNA AND THAT RNA IS SHUTTLED OUT TO THE RIBOSOME WHERE IT MAKES A PROTEIN. IN THIS CASE WE'RE MAKING THE RETROVIRAL PROTEINS FOR MAKING RETROVIRUSES, LOTS OF RETROVIRUSES THAT CAN ESCAPE THE CELL.

IF WE SWITCH OVER TO HOW WE CAN MANIPULATE CELLS, AS MOLECULAR BIOLOGISTS HOW WE CAN MANIPULATE, WE, IN AN UMBRELLA TERM, CALL THAT GENETIC ENGINEERING. A WHOLE LOT OF WHAT WE CAN DO RECAPITULATES OR STEALS FROM WHAT VIRUSES CAN DO. SO YOU'VE GOT A LOT OF THE BUILDING BLOCKS OF WHAT WE'RE DOING WITH GENETIC ENGINEERING ALREADY.

IF OUR GOAL IS TO PUT INTO A CELL SOME GENE, FOR WHATEVER PURPOSE, SAY, WE WANTED TO DO GENE THERAPY OR, SAY, WE

WANTED TO MARK THAT CELL OR WE WERE INTERESTED IN HOW A PROTEIN FUNCTIONS, OUR GOAL IS TO GET OUR GENE INTO A CELL, ALL RIGHT.

WE HAVE BASICALLY TWO METHODS OF DOING THAT; ONE SET OF THOSE METHODS RELIES ON THE COMPONENTS OF THE VIRUS THAT WE'VE TALKED ABOUT ALREADY, ALL RIGHT, AND THE OTHER SET IS CALLED NONVIRAL METHODS -- OR WE'RE CALLING HERE NONVIRAL METHODS. THESE ARE COLLECTIVELY CALLED TRANSFECTION, AND THESE ARE MORE EITHER CHEMICAL OR ELECTRIC WAYS OF BASICALLY VIOLATING A CELL SO THAT WE CAN SHOVE OUR DNA INTO IT, SO IT WILL GO THROUGH HOLES IN THAT CELL. SO NOT NEARLY AS ELEGANT AS WHAT A VIRUS DOES, WHICH IS TO FUSE AND KEEP THE CELL INTACT, BUT IT WORKS, AND IT WORKS QUITE WELL.

SO NO MATTER WHICH OF THE METHODS WE'RE USING TO GET OUR DNA INTO A CELL, WE'RE GOING TO START WITH OUR DNA, AND IF WE'RE USING DNA IN ANY KIND OF CONSTRUCT OR ANY VEHICLE FOR FOREIGN MATERIAL, IN THIS CASE A VECTOR, IS ANY VEHICLE FOR FOREIGN MATERIAL, ALL RIGHT, THAT VECTOR HERE IS CALLED AN EXPRESSION VECTOR BECAUSE IT CONTAINS A GENE THAT CAN BE EXPRESSED INTO A PROTEIN. SO IN GENERAL USE A VECTOR IS JUST ABOUT ANYTHING, BUT IN SPECIFIC USE, AN EXPRESSION VECTOR IS OUR GENETIC MATERIAL WHICH, ONCE IT'S IN THE CELL, CAN EXPRESS THE PROTEINS OF THAT GENE, OKAY.

A PLASMID, IN PARTICULAR, IS A TERM THAT'S VERY IMPORTANT, AND WE HAVE USED THESE FOR A LONG TIME, BUT IT'S A VECTOR THAT CONTAINS OUR GENE OF INTEREST -- A CIRCULAR VECTOR

THAT CONTAINS OUR GENE OF INTEREST AND, FOR EXAMPLE, A PROMOTER REGION, LIKE WE TALKED ABOUT.

SO IF I WANTED MY GENE OF INTEREST, WHATEVER IT WAS, IF I WANTED IT TO BE PUT INTO A CELL AND THEN EXPRESSED AT A VERY HIGH LEVEL, I MIGHT CHOOSE, FOR EXAMPLE, A VIRAL PROMOTER TO ENGINEER INTO THIS SPACE SO THAT MY GENE WILL ALWAYS BE TRANSCRIBED AND TRANSLATED.

SO AMONG THE NONVIRAL METHODS OF TRANSFERRING MY DNA INTO A CELL, I'M GOING TO BE TALKING ONLY ABOUT ONE OF THEM, WHICH IS LIPOFECTAMINE. IT'S VERY, VERY COMMONLY USED, AND IT WAS LAUNCHED IN 1993 AS A METHOD FOR GETTING DNA INTO A CELL.

SO BASICALLY LIPOFECTAMINES ARE FAT GLOBULES, AND FAT GLOBULES VERY EASILY INTERCALATE INTO A CELL MEMBRANE BECAUSE THAT'S WHAT A CELL MEMBRANE IS, FAT, AND SO IT SLIPS RIGHT IN. JUST LIKE SOAP DOES WHEN IT'S TRYING TO TAKE OUT FAT FROM CLOTHES, OR WHATEVER, IT WILL JUST SLIP RIGHT IN. BECAUSE IT HAS A CHARGE ON IT, AND BECAUSE THESE PLASMIDS OR OUR GENES HAVE A CHARGE ON THEM, THESE TWO WILL ASSOCIATE, AND WHEN THESE GUYS GET DRAGGED INTO A CELL, THEY'LL BRING THE DNA WITH THEM. SO THEY'LL SHUTTLE THAT RIGHT INTO A CELL, AND THIS IS A FAIRLY GENTLE WAY OF BRINGING OUR DNA INTO A CELL, JUST LIKE A VIRUS DOES.

SO I WOULD TAKE THESE IN A TEST TUBE AND INCUBATE THEM TOGETHER AND PLACE THEM ONTO CELLS THAT WERE IN A DISH, OKAY, AND THEN I WOULD NEED TO BE ABLE TO CHOOSE THE CELLS WHERE THIS

WORKED, AND IT DOESN'T ALWAYS WORK. IT'S DEFINITELY NOT A HUNDRED PERCENT.

SO ANOTHER TERM THAT'S VERY IMPORTANT THAT WE WANT TO TALK ABOUT IS SELECTION. I HAVE A WHOLE BUNCH OF CELLS IN A DISH, THOUSANDS OF CELLS IN A DISH, SOME OF THEM HAVE MY GENES AND SOME DON'T. HOW DO I KNOW WHICH ONES HAVE MY GENES? AND THAT'S THE METHOD CALLED SELECTION.

SO THE EXAMPLE WE HAVE HERE, BECAUSE IT'S THE MOST COMMON, WOULD BE AN ANTIBIOTIC RESISTANCE GENE. IF I WERE SHUTTLING THIS DNA INTO A BACTERIA, ALL I WOULD HAVE TO DO WAS PUT ON AMPICILLIN RESISTANT GENE ON THERE, AND THEN I WOULD GROW THOSE CELLS IN THE PRESENCE OF AMPICILLIN. THE ONLY CELLS THAT ARE GOING TO LIVE, THE ONLY BACTERIA THAT WOULD POSSIBLY LIVE, WOULD BE THE ONES THAT ARE RESISTANT BECAUSE THEY HAVE THE GENE I GAVE THEM. SO THAT'S A WAY OF MAKING THIS A VERY ACCURATE AND A VERY EFFICIENT PROCESS.

MR. PAVANE: IF I COULD JUST INTERRUPT, SO BASICALLY ARE YOU SAYING THAT THAT DRAWING ON THE SCREEN IS A PLASMID, AS YOU CALLED IT, AND IT'S NOW GOT THIS ADDITIONAL ANTIBIOTIC RESISTANCE SECTION.

DR. PESAVENTO: RIGHT.

MR. PAVANE: SO WHEN YOU GROW THE CELLS IN A -- WHAT DID YOU SAY, AMPICILLIN?

DR. PESAVENTO: IF I GROW THE CELLS IN THE PRESENCE OF AMPICILLIN, YES, IF THIS IS AN ANTIBIOTIC RESISTANT GENE THAT

IS RESISTANT TO AMPICILLIN.

MR. PAVANE: SO THE CELLS THAT DON'T HAVE THAT PLASMID, THE ONES WHERE IT DIDN'T GO IN, ARE GOING TO DIE.

DR. PESAVENTO: THEY'RE GOING TO DIE.

MR. PAVANE: AND YOU'LL ONLY BE LEFT WITH THE ONES YOU WANT --

DR. PESAVENTO: THE ONES WHERE --

THE COURT: YOU'RE TALKING OVER EACH OTHER SO MY COURT REPORTER CAN'T GET IT.

DR. PESAVENTO: OH, SORRY.

THE COURT: GO AHEAD AND FINISH, SIR.

MR. PAVANE: I WAS JUST GOING TO SAY, SO WHEN YOU'RE DONE, THE ONLY CELLS LEFT IN THE PETRI DISH THAT ARE ALIVE ARE THE ONES THAT HAD THAT ANTIBIOTIC RESISTANCE, WHICH ARE ALSO THE ONES THAT HAVE YOUR GENE OF INTEREST. THE ONES WHERE THAT PLASMID DIDN'T GET INTO THE CELL, BECAUSE IT JUST DIDN'T GO IN, FOR WHATEVER REASON, THOSE DIE AND THEY'RE GONE, SO NOW YOU'VE GOT ALL GOOD CELLS WITH YOUR PLASMID IN IT.

DR. PESAVENTO: AND THESE PLASMIDS ARE QUITE AVAILABLE COMMERCIALLY. YOU CAN BUY THEM WITH CASSETTES TO PUT IN YOUR GENE OF INTEREST, THAT HAVE THESE RESISTANCE GENES IN THEM, AND WE'LL TALK A LITTLE BIT MORE ABOUT PLASMID CONSTRUCTS AND THINGS JUST A LITTLE BIT MORE AT THE END.

BUT THIS IS A BASIC PLASMID, AND THIS IS BASICALLY HOW WE DO MOST GENETIC ENGINEERING, WHETHER, AGAIN, IT'S GENE

THERAPY OR RESEARCH OR ANYTHING ELSE.

VIRAL METHODS OF GETTING DNA INTO A CELL OR FOREIGN DNA INTO A CELL ARE USING VIRUSES OR THE PARTS OF THE VIRUSES THAT ARE NECESSARY TO GET THE DNA IN TO INTRODUCE GENES. I'M GOING TO JUST -- THIS IS A LOT MORE OF A COMPLICATED PROCESS, OR AT LEAST IT'S A ONE STEP MORE COMPLICATED PROCESS THAN PUTTING IN THE PLASMID JUST FREELY AS ITSELF, AND IT REQUIRES SOMETHING CALLED PACKAGING CELLS, AND THOSE PACKAGING CELLS ARE LITTLE FACTORIES FOR MAKING THE VIRAL PACKAGES, NOW THE VIRAL PACKAGE BEING OUR VECTOR FOR INTRODUCING DNA, AND I HAVE THAT IN CARTOON FORM HERE.

SO HERE'S OUR PLASMID WITH OUR GENE OF INTEREST ON IT AND PARTS OF OUR VIRUS ON IT AS WELL. WE'RE GOING TO TRANSFECT THAT INTO OUR CELL, FOR EXAMPLE, WITH LIPOSOMES, OR WHATEVER ELSE WE USE TO SHUTTLE IT IN THERE. THAT PACKAGING CELL CONTAINS PROTEINS THAT RECOGNIZE THAT WHEN THIS PLASMID RNA IS MADE IT WILL BE PACKAGED INTO A VIRAL PARTICLE. SO THESE ARE FACTORIES FOR PRODUCING VIRAL PARTICLES THAT CONTAIN THE GENES THAT WE'RE INTERESTING IN, RECOMBINANT RETROVIRAL PARTICLES. THIS IS THE EXTRA STEP.

THE NEXT STEP YOU KNOW VERY WELL, YOU TAKE THOSE VIRUSES THAT HAVE YOUR GENES OF INTEREST IN THEM AND YOU LET THEM FUSE TO THE CELL MEMBRANE, INCORPORATE OR INTEGRATE INTO THE GENOME OF THE CELL, WHERE THEY MAKE RNA, AND ON THE RIBOSOME WE'LL MAKE PROTEINS THAT ARE YOUR PROTEINS OF

INTEREST, OKAY? SO THAT --

MR. PAVANE: SO THAT WOULD BE A RETROVIRAL VECTOR, RIGHT, BECAUSE IT'S INCORPORATED INTO THE DNA?

DR. PESAVENTO: BECAUSE IT'S INCORPORATED INTO THE GENOME, THAT'S CORRECT. AND THERE ARE VIRAL VECTORS BASED ON MANY, MANY DIFFERENT VIRUSES, BUT WE'RE TALKING, PARTICULARLY IN HERE, ABOUT THE RETROVIRAL VECTOR BECAUSE IT HAS THIS VERY IMPORTANT STEP OF INTEGRATION. BEING INTEGRATED MEANS IT'S ETERNAL OR IMMORTALIZED ALONG WITH THE CELL. SO WE HAVE OUR METHODS OF SELECTING. WE HAVE AN INTEGRATED PIECE OF FOREIGN DNA, AND WE CAN ACCOMMODATE IN THIS VECTOR FAIRLY LONG STRETCHES OF DNA. IT'S A VERY, VERY POWERFUL WAY OF INTRODUCING DNA.

OKAY, SO THIS IS THE WIND-DOWN TO TALK ABOUT A COUPLE OTHER SORT OF TERMS AND THINGS WE USE WHEN WE'RE DOING GENETIC ENGINEERING, AND THE FIRST OF THOSE WOULD BE MOUSE MODELS. MOUSE MODELS ARE LABORATORY -- A MOUSE MODEL IS A LABORATORY STRAIN OF MICE THAT HAVE BEEN INBRED FOR HUNDREDS, AND SOMETIMES HUNDREDS AND HUNDREDS, OF GENERATIONS.

SO MICE LIKE BALB/C, WHICH WAS THE FIRST TO HAVE THIS DONE TO IT, LIKE THIS BALB/C MOUSE, WHICH IS THIS ALBINO MOUSE OVER HERE, HAVE BEEN BRED FOR SO MANY GENERATIONS, THEY'RE WHAT WE CALL SYNGENEIC. THEY'RE EXACT GENETIC DUPLICATES OF EACH OTHER. THE POWER IN THAT IS MANY, MANY FOLD, THE MOST IMPORTANT OF THAT WAS THAT WE COULD -- FOR EXAMPLE, I COULD

HERE IN CALIFORNIA WORK WITH A BALB/C MOUSE, FIND A TUMOR IN THAT MOUSE, OR DOING SOMETHING IN THAT MOUSE, MAKE A CELL IN THAT MOUSE THAT I THOUGHT WAS VERY, VERY INTERESTING, SHIP IT OFF TO DENMARK, AND IF I NEEDED TO TRANSPLANT -- THEY NEEDED TO TRANSPLANT THAT TISSUE INTO ANOTHER MOUSE, THEY WOULD BE ASSURED THAT IF THEY TRANSPLANTED IT INTO ANOTHER BALB/C MOUSE THAT IT WOULDN'T BE REJECTED BECAUSE I HAVE GENETIC CLONAL EQUIVALENCE. BEFORE THAT TIME, IF YOU TOOK ANY TWO MICE AND YOU TRIED TO TRANSPLANT ANY TISSUE, OR IF YOU TOOK HUMAN TISSUE AND TRIED TO TRANSPLANT IT IN A MOUSE, OF COURSE, IT WOULD BE REJECTED.

MR. PAVANE: WHEN YOU SAY REJECTED, THE IMMUNE SYSTEM OF THE MOUSE --

DR. PESAVENTO: THE IMMUNE SYSTEM WOULD GET RID OF IT, CLEAR IT OUT.

MR. PAVANE: BECAUSE THE MICE WERE NOT GENETICALLY IDENTICAL.

DR. PESAVENTO: RIGHT.

MR. PAVANE: BUT WHEN THEY'RE GENETICALLY IDENTICAL, THEIR IMMUNE SYSTEM --

DR. PESAVENTO: DOESN'T RECOGNIZE --

MR. PAVANE: THE IMMUNE --

THE COURT REPORTER: YOU HAVE TO STOP TALKING OVER EACH OTHER.

THE COURT: I MEAN, BACK AND FORTH IS GOOD, BUT NICE

AND LOUD AND NOT OVER EACH OTHER. GO AHEAD, SIR.

MR. PAVANE: I'M SORRY, I WAS JUST POINTING OUT THAT WHEN THE MOUSE ARE GENETICALLY IDENTICAL, IF YOU TAKE ONE FROM GENETICALLY IDENTICAL MOUSE AND PUT IT IN THE OTHER ONE, THEN SINCE THEY'RE GENETICALLY IDENTICAL THEIR IMMUNE SYSTEMS ARE THE SAME. SO THE STUFF THAT'S COMING FROM THE OTHER ONE INTO THE SECOND ONE IT THINKS IT'S ITS OWN BECAUSE IT'S GENETICALLY IDENTICAL AND IT DOESN'T REJECT IT.

THE COURT: SO THAT'S WHAT I WAS GOING TO SAY, IT WOULDN'T BE REJECTED BY THAT NEW MOUSE.

DR. PESAVENTO: CORRECT.

MR. PAVANE: EXACTLY. WHEREAS, IF I TOOK SOMETHING FROM A MOUSE, FOR EXAMPLE, AND TRIED TO PUT IT IN MY BODY, MY BODY WOULD TRY TO KILL IT IMMEDIATELY OR EVEN AMONG TWO DIFFERENT TYPES OF MICE.

DR. PESAVENTO: AND C57 BLACK, WHICH IS JUST LISTED HERE, IS JUST ANOTHER EXAMPLE OF THAT THAT'S BEEN GENERATED FOR HUNDREDS AND HUNDREDS OF GENERATIONS AND THAT IT IS SYNGENEIC OR A GENETIC EQUIVALENT IN THIS STRING.

THE COURT: SO BOTH OF THOSE ARE GENETICALLY IDENTICAL DUE TO BREEDING.

DR. PESAVENTO: YEP. SO I HAVE THIS BLUE LINE THAT OVERLIES SOME OTHER MODELS OF MICE THAT WE USE. NUDE MICE, WHICH WERE DISCOVERED FIRST IN 1937, AND THEY'RE CALLED NUDE BECAUSE -- AND I THINK YOU'LL SEE SOME OF THEM, I SAW A PREVIEW

-- BECAUSE THEY HAVE NO HAIR. THESE MICE, IN ADDITION TO NOT HAVING HAIR, AND MUCH MORE DISTRESSINGLY, HAVE A VERY DEFICIENT IMMUNE SYSTEM. THEY'RE LACKING WHAT ARE CALLED T CELLS, WHICH IS A VERY IMPORTANT ARM OF THE IMMUNE SYSTEM. THOSE T CELLS ARE VITAL FOR RECOGNIZING, FOR EXAMPLE, CANCER CELLS AND REJECTING CANCER CELLS. IN THE ABSENCE OF T CELLS, THEY'RE NOT GOING TO REJECT CANCER CELLS.

SO NOW WE HAVE A MOUSE IF YOU TAKE A DIFFERENT STRAIN THAT'S NOT SYNGENEIC AND YOU PUT IT INTO A NUDE MOUSE THAT MOUSE IS GOING TO ACCEPT IT. DESPITE THE FACT THAT IT'S GENETICALLY DIFFERENT, IT WILL ACCEPT IT BECAUSE ITS IMMUNE SYSTEM IS COMPROMISED.

AND A SCID MOUSE, WHICH IS CALLED A SEVERE COMBINED IMMUNODEFICIENCY MOUSE, IS SIMILAR, EVEN MORE DEFICIENT BECAUSE IT LACKS BOTH ARMS OF THE IMMUNE SYSTEM, WHICH ARE T CELLS AND B CELLS. B CELLS ARE WHAT ARE RESPONSIBLE FOR PRODUCING ANTIBODIES, AND IT'S JUST ONE STEP FURTHER, IMMUNO COMPROMISED AND NUDE MICE, AND THESE ARE VERY, VERY COMMONLY USED, ALL OF THESE STRAINS.

THE COURT: ARE THE NUDE MOUSE AND THE SCID MOUSE GENERICALLY THE SAME ALSO?

DR. PESAVENTO: ARE THEY -- IN OTHER WORDS, IS THIS AN INBRED STRAIN OF MOUSE? YES, THEY CAN PUT IT ON A BACKGROUND THAT'S AN INBRED STRAIN, ABSOLUTELY.

I WANT TO INTRODUCE THE CONCEPT OF WHAT A TISSUE

CULTURE CELL IS, AND I'M DOING THIS AFTER I'VE ALREADY MENTIONED THAT WE HAVE CELLS IN DISHES, BUT A TISSUE CULTURE OR A CELL LINE IS A CELL LINE THAT'S BASICALLY IMMORTALIZED. THAT MEANS THAT THAT CELL I CAN PUT IT IN A DISH, I CAN GIVE IT FOOD THAT IT NEEDS, AND IT WILL REPLICATE, GROW, DIVIDE, AND I CAN SPLIT IT INTO ANOTHER DISH AND I CAN KEEP DOING THAT ETERNALLY. THAT'S A TISSUE CULTURE CELL LINE.

THERE ARE MANY, MANY TISSUE CULTURE CELL LINES THAT WE'VE CREATED. AS YOU CAN IMAGINE, WE'RE INTERESTED IN THE DIFFERENCES BETWEEN LIVER CELLS AND KIDNEY CELLS AND SKIN LINES. SO THERE ARE MANY, MANY DIFFERENT TISSUE CULTURE LINES.

THERE ARE SOME THAT ARE VERY COMMONLY IN USE, FOR EXAMPLE, CHINESE HAMSTER OVARY CELLS, WHERE A CELL CREATED FROM A NORMAL OVARY OF A CHINESE HAMSTER, AND THESE PARTICULAR CELLS WERE GROWN IN A DISH UNTIL THEY MUTATED, AND THAT WAS A SPONTANEOUS MUTATION IN THIS CASE, SO THAT THEY GREW FOREVER AND EVER, WHICH THEY WOULDN'T NORMALLY DO. NORMALLY OUR SKIN CELLS DIVIDE AND THEN THEY DIE. SO THERE'S SOME KIND OF MODIFICATION THAT MAKES THESE IMMORTALIZE. SO BASICALLY THEY'RE BEHAVING LIKE A TUMOR CELL NOW IN A DISH.

SOME LINES ARE JUST DERIVED DIRECTLY FROM TUMORS AND THEY ALREADY HAVE THAT CAPACITY OF IMMORTALIZATION, THAT'S THE PROBLEM, RIGHT, THEY GROW ETERNALLY IN YOUR BODY AND THEY DON'T STOP DIVIDING. THAT'S THE DEFINITION OF A NEOPLASURE TUMOR LINE. SO THESE TUMOR LINES, LIKE CERVICAL, THIS HELA LINE,

FROM A CERVICAL CANCER PATIENT, OR T CELL LEUKEMIA WERE DERIVED AND PUT DIRECTLY IN THE DISH AND ARE USED AS TISSUE CULTURE, COMMON TISSUE CULTURE LINES.

SO WHY DO WE HAVE THESE LINES? IF WE WANT TO STUDY -- IN OUR MOUSE MODELS, IF WE WANT TO STUDY WHAT CANCER'S GOING TO DO, HOW IT'S GOING TO BEHAVE IN A MOUSE, WE CAN TAKE ANY ONE OF THESE LINES, PUT IT INTO A MOUSE, SAY, FOR EXAMPLE, TAKE THE HUMAN HELA CERVICAL CANCER LINE, PUT IT INTO A NUDE MOUSE, AND IT WOULD REPLICATE AND NOT BE REJECTED. SO THIS IS A MODEL OF, FOR EXAMPLE, NEOPLASIA OR CANCER.

MR. PAVANE: IF I COULD JUST ALSO POINT OUT THAT, AND PLEASE CORRECT ME IF I'M WRONG HERE, BUT THESE CELL LINES ARE WIDELY AVAILABLE, AND ONE OF THE ADVANTAGES OF THAT IS SO YOU CAN GO -- AND CERTAIN COMPANIES SELL THEM. SO, FOR EXAMPLE, IF YOU HAVE A RESEARCHER IN CALIFORNIA, AND ANOTHER ONE IN NEW YORK, AND THEY WANT TO EXPERIMENT ON THE SAME TUMOR AND SEE IF THEY CAN FIND SOME DRUG THAT MIGHT KILL IT, THEY COULD BOTH TAKE THAT SAME CELL LINE, PUT IT INTO THE SAME TYPE OF MOUSE WITH A BAD IMMUNE SYSTEM, SUCH AS A SCID MOUSE, THEY KNOW IT'S GOING TO GROW IN THERE, AND THEN CAN INJECT IT INTO THE MOUSE OR OTHERWISE GET INTO THE MOUSE SOME KIND OF DRUG, FOR EXAMPLE, AND SEE IF THAT DRUG SHRINKS THAT TUMOR, AND THEY CAN DO THE RESEARCH IN VARIOUS PLACES AROUND THE WORLD BECAUSE OF THAT UNIFORMITY.

DR. PESAVENTO: IT'S A REALLY GOOD POINT, AND IT'S THE

BASIS FOR THOUSANDS AND THOUSANDS OF EXPERIMENTS WHERE YOU'RE GOING TO TEST A DRUG OR TEST THE EFFECT OF SOME ENVIRONMENT ON HOW A CANCER, FOR EXAMPLE, BEHAVES.

SO THE LAST PORTION OF THIS TUTORIAL IS TO TALK ABOUT SOMETHING CALLED GREEN FLUORESCENT PROTEIN, AND GREEN FLUORESCENT PROTEIN IS HERE WITH US IN A BIG WAY BECAUSE OF THESE THREE GENTLEMEN, SHIMOMURA, CHALFIE AND TSIEN. THIS IS VERY, VERY MUCH IN THE FOREFRONT OF PEOPLE'S MINDS BECAUSE THESE THREE WERE JOINTLY AWARDED THE NOBEL PRIZE FOR CHEMISTRY LAST YEAR. THEY ALL HAD DIFFERENT CONTRIBUTIONS TO DESCRIBING WHAT GREEN FLUORESCENT PROTEIN IS, AND HOW TO USE IT, AND TO MAKE IT COMMONLY USED IN THE LAB.

I'LL TALK BRIEFLY ABOUT WHAT THAT IS. DR. SHIMOMURA WAS ACTUALLY ABLE TO IDENTIFY THE GENES IN THIS LITTLE JELLYFISH CALLED AEQUOREA VICTORIA, WAS ABLE TO IDENTIFY THE GENE THAT WAS THE GENE THAT ENCODED THE PROTEIN FOR GREEN FLUORESCENT PROTEIN, BECAUSE IT'S A PROTEIN ITSELF. HE WAS ABLE --

WHAT I WANT TO SAY ABOUT THE JELLYFISH IS IF YOU HIT THEM WITH AN ULTRAVIOLET LIGHT THAT PROTEIN WILL FLUORESCE. IT'S A GREEN COLOR. SO THAT'S THE DEFINITION OF A FLUORESCENT PROTEIN IS ONE THAT WHEN YOU HIT IT WITH A CERTAIN WAVELENGTH OF LIGHT IT GIVES YOU A COLOR BACK. HE ISOLATED THAT. HE PURIFIED THAT, AND HE DESCRIBED THAT PROTEIN.

MR. PAVANE: JUST TO MAKE ONE SMALL POINT THERE. SHE

MENTIONED FLUORESCENCE, AND EVERYBODY HEARS FLUORESCENT LIGHTS, AND SO ON AND SO FORTH, BUT IN SCIENCE IT HAS A SPECIFIC MEANING. A FLUORESCENT PROTEIN, AND THEY ARE PROTEINS SO THEY PRODUCE IN THE NUCLEUS JUST LIKE THE PROTEINS YOU SAW EARLIER IN THE DISCUSSION.

BUT A FLUORESCENT PROTEIN DOES NOT SPONTANEOUSLY GLOW, IN OTHER WORDS, IT WILL NOT GENERATE LIGHT IF IT'S JUST SITTING THERE. IT'S GOT TO BE BOMBARDED BY WHAT WE CALL AN EXCITATION LIGHT. SHE MENTIONED ULTRAVIOLET LIGHT. SO THAT'S TO BE CONTRASTED WITH SOMETHING CALLED BIOLUMINESCENCE. BIOLUMINESCENCE PARTICLES GLOW SPONTANEOUSLY. THEY DON'T NEED EXCITING LIGHT, BUT A FLUORESCING PROTEIN REQUIRES SOME EXCITING LIGHT.

DR. PESAVENTO: SO IF WE MOVE ON TO ROGER TSIEN, HIS CONTRIBUTION WAS REALLY TO -- VERY POWERFUL BECAUSE WHAT HE WAS ABLE TO DO WAS TO UNRAVEL THE STRUCTURE OF THAT GREEN FLUORESCENT PROTEIN. HE'S THE ONE WHO DESCRIBED WHY DOES THIS THING GLOW. WE HAVE A LOT OF PROTEINS THAT DON'T GLOW. WHAT MAKES THIS ONE GLOW. IN HIS BREAKDOWN OF WHAT THAT PROTEIN WAS -- AND THIS IS JUST A MODEL, WHAT'S CALLED A RIBBON DRAWING, OF WHAT THAT PROTEIN IS. WHEN HE WAS ABLE TO DO THAT, HE WAS ALSO ABLE TO MANIPULATE THAT, WHICH HE DID, AND HE MANIPULATED IT, FOR EXAMPLE, TO MAKE A VARIETY OF DIFFERENT COLORS, TO MAKE A BRIGHTER COLOR, AND TO MAKE A MORE STABLE COLOR THAN WHAT THE JELLYFISH COULD DO ITSELF, AND SO THIS WAS

DR. TSIEN'S CONTRIBUTION.

MARTY CHALFIE WAS REALLY THE GUY WHO HAD THE VISION THAT THIS PROTEIN COULD BE USED IN GENETIC ENGINEERING. SO HE HEARD ABOUT THIS AT A SEMINAR IN 1989 AND REALIZED HE COULD USE IT AS A GENETIC TAG, ALL RIGHT, FOR BIOLOGY, FOR OTHER GENES THAT WE WERE LOOKING AT. WHAT HE DID -- AND HE WORKED ON A LITTLE SOIL WORM CALLED SANDEROBDIDIS ELEGANCE, A LITTLE SOIL NEMATODE, THAT WORM AT THE TIME WAS EXTREMELY HOT IN DEVELOPMENTAL BIOLOGY AND EMBRYOLOGY. EVERYONE HAD FOLLOWED ALL THE DIFFERENT CELL LINES THROUGH ALL THEIR PATTERNS. IT'S COMPLETELY MAPPED. WE KNOW WHERE EVERY CELL IN A WORM IS GOING TO END UP AT THE END OF ITS LIFE. THIS WAS RIGHT DURING THAT TIME.

AND WHAT HE DID IS HE TOOK A PROMOTER THAT TOLD A CERTAIN GENE IN A NEURON TO TURN ON, AND HE PUT IT IN FRONT OF THAT FLUORESCENT GFP PROTEIN, ALL RIGHT, AND THEN HE PUT IT INTO THIS WORM. SO NOW THE ONLY CELLS THAT ARE GOING TO BE GLOWING IN THIS WORM, WHICH IS ON THE COVER OF SCIENCE OVER HERE, THE ONLY CELLS THAT ARE GOING TO BE GROWING IN THIS -- GLOWING IN THIS WORM ARE GOING TO BE THE CELLS THAT HAVE THE GFP PROTEINS COUPLED TO A NEURONAL PROMOTER THAT WILL ONLY TURN ON IN THOSE NEURONAL CELLS. SO YOU CAN SEE ACTUALLY THE SHAPE OF THOSE CELLS AND THEIR DISTRIBUTION IN THAT WORM.

THIS WAS A REALLY HOT DEAL WHEN IT HAPPENED. HE WAS THE FIRST TO PUT IT BASICALLY IN AN ORGANISM -- IN A LIVING

ORGANISM.

SINCE THAT TIME, AND VERY, VERY QUICKLY AFTER THAT TIME, ACTUALLY, PEOPLE PUT THE GREEN FLUORESCENT PROTEIN INTO A VARIETY OF DIFFERENT ORGANISMS AND THAT LED TO AN EXPLOSION -- A REAL EXPLOSION IN THE PAPERS THAT WERE PUBLISHED THAT HAD TO DO WITH GFP. IT WAS REALLY -- THE REASON IT'S SUCH A BIG REVOLUTION, AS YOU CAN IMAGINE, IS THAT ANY MARKER WE HAD BEFORE, AND WE DID HAVE MARKERS BEFORE, BUT THEY WEREN'T MARKERS WE COULD PUT INTO LIVING ANIMALS. WE COULD PUT IN OUR MARKERS. THEY WOULD DISTRIBUTE IN THE ANIMAL, AND THEN WE HAD TO KILL THE ANIMAL TO SEE WHERE THEY WERE. THAT GIVES YOU A SNAPSHOT IN TIME, BUT NOTHING LIKE WHAT IT GIVES YOU IF YOU CAN WATCH WHERE THEY'RE MOVING, WHERE THEY'RE GOING. AND SO THIS IS WHAT CHALFIE SAW, AND THESE THREE TOGETHER HAVE BEEN ABLE TO PROVIDE TO US.

MR. PAVANE: JUST TO CLARIFY ONE POINT, DR. PESAVENTO USED THE WORD "MARKER," BASICALLY WHAT SHE WAS INDICATING IS THAT WHEN YOU WANT TO FOLLOW SOME PROCESS IN A CELL, YOU HAVE TO HAVE SOMETHING THERE THAT YOU CAN SEE OR OBSERVE OR DETECT SO THAT YOU CAN SEE WHAT'S HAPPENING OR WHAT OCCURRED, AND IN THE PAST THEY USED THINGS LIKE DYES AND VARIOUS OTHER THINGS, BUT THIS GFP WAS WONDERFUL BECAUSE IF YOU LINKED IT RIGHT TO THE CELL -- SO, FOR EXAMPLE, WHEN A CELL TURNED ON, LIKE THE NEURON WE SAW IN THE LAST PICTURE, SO WHEN THE NEURON WAS ACTIVATED BY ITS PROMOTER, AT THE SAME TIME THE GFP GOT

ACTIVATED BECAUSE IT WAS LINKED TO THE SAME PROMOTER. SO THE NEURON GOES ON, THE GFP GOES ON, WE SHINE A LIGHT ON WHATEVER IT IS, THE ANIMAL OR THE WORM IN THAT CASE, AND ALL OF A SUDDEN WE HAVE SOMETHING GLOWING GREEN AND SAYING, "OH, HERE'S EXACTLY WHERE IT'S HAPPENING." SO THAT GFP IS NOW THE MARKER. WE CAN JUST OBSERVE IT BECAUSE IT'S IN VISIBLE LIGHT. GREEN IS A VISIBLE COLOR.

DR. PESAVENTO: I THINK I'M GOING TO HAVE MARTY TEACH MY GRADUATE STUDENTS IN THE FUTURE. I THINK THAT WOULD BE GOOD.

MR. PAVANE: YOU'RE TOO KIND.

DR. PESAVENTO: SO BY 1995 A NUMBER OF DIFFERENT COMPANIES WERE OFFERING TOOLS AND KITS SO THAT YOU COULD -- THAT HAD PLASMIDS IN THEM, SO HERE'S, AGAIN, OUR PLASMID. NOW THE GENE OF INTEREST I HAVE IN THERE IS MY GFP, WHICH IS REPRESENTED IN BRIGHT GREEN, AND IF WE TRANSFECT THIS CELL NOW WITH THAT PLASMID WE'RE GOING TO PRODUCE -- WITH OTHER GENES THAT WE HAVE COUPLED IN HERE, WE'RE GOING TO PRODUCE THAT GREEN FLUORESCENT PROTEIN AND THAT CELL WILL BE MARKED GREEN, OKAY.

SO THE FIRST VECTOR THAT WAS INTRODUCED WAS BY CLONTECH IN JANUARY OF 1995, AND THEY AT THE TIME HAD IT AS A COVER STORY IN THEIR FLIER, AND IN THEIR ABSTRACT OF THIS ARTICLE THAT THEY WROTE THEY WRITE THAT THEIR REPORTER MOLECULE OR GREEN FLUORESCENT PROTEIN COULD BE USED FOR MONITORING GENE EXPRESSION IN VIVO, IN SITU OR IN REAL TIME.

BY "IN VIVO," THEY MEANT EXACTLY WHAT MARTY CHALFIE HAD DONE, WHICH IS THAT YOU COULD PUT IT INTO A CELL AND FOLLOW IT IN AN ANIMAL OR IN AN ORGANISM, OKAY.

THAT'S THE LAST SLIDE.

MR. PAVANE: IF YOUR HONOR HAS ANY QUESTIONS, OBVIOUSLY.

THE COURT: NOT AT THIS TIME.

MR. PAVANE: OKAY, THANK YOU.

THE COURT: THANK YOU.

DR. PESAVENTO: THANK YOU.

THE COURT: THANK YOU, DOCTOR.

MR. LAWTON: THANK YOU, YOUR HONOR.

THE COURT: GO AHEAD, MR. LAWTON.

MR. LAWTON: COUNSEL, MAY IT PLEASE THE COURT. YOUR HONOR, OUR TUTORIAL THIS MORNING IS INTENDED TO GIVE SOME CONTEXT, SORT OF BE A CLASSIC TUTORIAL, BEFORE WE DIVE INTO CLAIM CONSTRUCTION. OUR TUTORIAL WILL HAVE THREE PARTS TODAY, AND THE THREE PARTS ARE DISPLAYED ON THE SCREEN.

NUMBER ONE, A DISCUSSION OF THE BACKGROUND OF GFP, THAT IS, GREEN FLUORESCENT PROTEIN, AND HOW ANTICANCER'S PATENTED METHODS EMPLOY IT.

NUMBER TWO, A LIVE DEMONSTRATION INVOLVING NUDE MICE AND THE FLUORVIVO IMAGING SYSTEM THAT THE COURT SEES HERE IN THE WELL.

THREE, A QUICK OVERVIEW OF THE MAIN CLAIM TERMS THAT

WILL BE AT ISSUE IN THIS HEARING. MY GOAL IS TO DO ALL THIS IN ABOUT 40 MINUTES.

LET'S TALK FIRST ABOUT BACKGROUND, AND THE BACKGROUND OF GFP. GFP IS A CLAIM TERM WHOSE MEANING IS NOT DISPUTED BY THE PARTIES IN THIS HEARING. IT IS A PROTEIN THAT OCCURS NATURALLY IN THE CRYSTAL JELLY, WHICH IS A SPECIES OF JELLYFISH KNOWN AS AEQUOREA VICTORIA, AS DR. PESAVENTO SAID. THAT JELLYFISH IS FOUND OFF THE COAST OF NORTH AMERICA, FROM CENTRAL CALIFORNIA TO ABOUT VANCOUVER. IT ALSO OCCURS NATURALLY IN SOME OTHER ANIMALS, LIKE THE SEA PANSY AND IN CERTAIN TYPES OF CORALS.

IT'S MADE UP OF ABOUT 238 AMINO ACIDS IN A SORT OF BARREL SHAPE, AS DR. PESAVENTO DEMONSTRATED, THAT SORT OF BARREL SHAPED LOOKING PROTEIN, AND WE'LL SEE ANOTHER PICTURE OF THAT IN A MOMENT. IT FLUORESCES, AS MR. PAVANE SAID, WHEN LIGHT IS SHINED ON IT. THOSE SKILLED IN THE ART USE THE TERM EXCITATION TO DESCRIBE THE PROCESS OF SHINING A LIGHT ON A FLUORESCENT PROTEIN AND CAUSING IT TO FLUORESCE. TAKE AWAY THE LIGHT, THE FLUORESCENCE GOES AWAY.

GREEN FLUORESCENT PROTEIN AS A TERM HAS A -- SORT OF A TERM OF ART ASPECT TO IT OR ODDITY. PEOPLE SKILLED IN THE ART UNDERSTAND GREEN FLUORESCENT PROTEIN TO MEAN NOT ONLY PROTEINS THAT LOOK GREEN BUT ALSO PROTEINS THAT FLUORESCE RED AND BLUE AND IN OTHER COLORS. SOME OF THOSE FLUORESCING PROTEINS OCCUR NATURALLY IN NATURE, LIKE A PROTEIN CALLED DS RED, OTHERS ARE

MUTANTS OF TRULY GREEN FLUORESCENT PROTEIN AND THEY CAN BE MADE IN A LABORATORY, BUT GFP MEANS FLUORESCING PROTEINS THAT FLUORESCE IN ANY COLOR, INCLUDING GREEN.

YOU CAN ENGINEER GFP IN A LABORATORY, AS I SAID, AND THEN YOU CAN PUT IT IN AN ANIMAL, LIKE A MOUSE, AND THE COURT WILL SEE THAT TODAY, IN WHICH IT OBVIOUSLY DOESN'T OCCUR NATURALLY. MICE DON'T HAVE FLUORESCENT PROTEINS IN THEM NATURALLY. AFTERWARD, WITH THE RIGHT EQUIPMENT AND THE RIGHT METHODS, THE GFP CAN BECOME A SORT OF LANTERN FOR ILLUMINATING ACTIVITY INSIDE LIVING CELLS, AND THE COURT WILL SEE EXACTLY WHAT I MEAN WHEN WE DO OUR LIVE DEMONSTRATION IN A COUPLE OF MINUTES.

THE THREE SCIENTISTS WHO SHARED THE NOBLE PRIZE FOR CHEMISTRY IN 2008 WERE, AS IDENTIFIED BY DR. PESAVENTO, DR. SHIMOMURA, DR. MARTIN CHALFIE, AND UCSD FACULTY MEMBER ROGER TSIEN, WHO IS ONE OF DR. HOFFMAN'S COLLEAGUES ON THE UCSD FACULTY, AND THOSE ARE THREE MEN WE'LL LEARN MORE ABOUT IN A BRIEF CLIP WE'LL PLAY IN A MOMENT.

THERE WERE A COUPLE OF INACCURACIES, AND I'M SURE THEY WERE INADVERTENT. DR. SHIMOMURA DID NOT IDENTIFY THE GFP GENE, AND DR. TSIEN DID NOT DESCRIBE THE STRUCTURE OF GFP OR SHOW WHY IT GLOWS.

WHY DON'T WE START THIS OVER. I SHOULD GIVE A LITTLE MORE INTRODUCTION. WHAT I'M ABOUT TO DO IS TO PLAY A VERY SHORT VIDEO CLIP OF THE BBC -- OR PRODUCED BY THE BBC ABOUT GFP

AND THE DISCOVERY OF SOME OF ITS POSSIBLE APPLICATIONS.

MR. LARSON, IF WE COULD MAKE SURE WE HAVE ENOUGH VOLUME ON THE AUDIO.

YOUR HONOR, I'VE TOLD THE COURT REPORTER -- I'VE WARNED HERE IN ADVANCE -- WE'RE DOING THIS AND WE'RE NOT EXPECTING A TRANSCRIPT OF THE AUDIO PORTION OF THIS.

THE COURT: THANK YOU.

MR. LAWTON: YOU'RE WELCOME. IF WE COULD DIM SOME LIGHTS, TOO, YOUR HONOR, IT MIGHT MAKE FOR A BETTER PRESENTATION. THANK YOU.

(VIDEO PLAYED.)

MR. LAWTON: I APOLOGIZE FOR THE PROBLEMS WITH THE AUDIO AT THE OUTSET OF THAT.

WHY DO WE SHOW THIS? FIRST OF ALL, I THINK IT'S USEFUL FOR BACKGROUND, BUT ALSO ANY TIME A NOBLE PRIZE IS AWARDED IN A FIELD LIKE THIS, GREAT INTEREST FOLLOWS. DR. PESAVENTO SHOWED THE SPIKE IN PUBLICATIONS. THERE'S A SIMILAR SPIKE IN INTEREST IN A TECHNOLOGY WHEN A NOBLE PRIZE IS AWARDED, A GREAT DEAL OF COMMERCIAL INTEREST, AND, THEREFORE, INTEREST IN VALIDATING THE ANTICANCER PATENTS WHICH, AS I'LL EXPLAIN IN A MOMENT, ARE FOCUSED ON DOING GFP-BASED IMAGING OF CELLS AND GENE EXPRESSION IN LIVING ANIMALS.

WHERE DOES ANTICANCER FIT IN? ANTICANCER IS A SMALL, LOCALLY-BASED BIOTECHNOLOGY COMPANY FOUNDED IN 1984. IT'S SAN DIEGO'S OLDEST FREE-STANDING BIOTECH COMPANY. AND AMONG ITS

MAIN TECHNOLOGIES ARE THE USE OF GFP FOR IMAGING OF TUMOR CELLS AND IMAGING OF GENE EXPRESSION IN LIVE ANIMALS. TWENTY OF ANTICANCER'S PERSONNEL ARE PH.D.S OR MEDICAL DOCTORS. DR. HOFFMAN, WHO YOU SEE THERE IN THE MIDDLE IN THE BACK ROW, AND ALSO PRESENT IN COURT TODAY, IS THE PRESIDENT AND CHAIRMAN AND A COLLEAGUE OF ROGER TSIEN, WHO WE'VE DISCUSSED.

WHAT DO THEY DO AT ANTICANCER EXACTLY? HOW CAN WE SHOW THAT HERE IN THE TUTORIAL? AT ANTICANCER THEY'VE DEVELOPED METHODS WHICH ALLOW RESEARCHERS TO TRACK THE GROWTH OF TUMOR CELLS IN LIVE ANIMALS THROUGH USING GFP. THIS SLIDE DEPICTS AN EXAMPLE. THIS IS A MOUSE WHOSE BRAIN CONTAINS A TUMOR EXPRESSING RED FLUORESCENT PROTEIN. IF YOU'RE A PHARMACEUTICAL COMPANY DOING DRUG RESEARCH ON A DRUG THAT YOU'RE INTERESTED IN SEEING WHETHER IT CAN STOP CANCER, YOU CAN MONITOR THIS MOUSE IN REAL TIME AND SEE WHETHER THE TUMOR IS REGRESSING, WHETHER IT'S IN STASIS OR WHETHER IT'S METASTASIZING. VERY USEFUL TO BE ABLE TO DO THAT IN REAL TIME AND NONINVASIVELY WITHOUT HAVING TO SACRIFICE THE ANIMAL. SO WHEN WE SPEAK OF A LANTERN ILLUMINATING ACTIVITY INSIDE LIVING CELLS, THIS IS ONE EXAMPLE OF WHAT WE'RE TALKING ABOUT.

ANTICANCER SELLS THE CELL LINES, AND DR. PESAVENTO TOLD US WHAT CELL LINES WERE. THESE CELL LINES ARE ENCODED TO EXPRESS FLUORESCENT PROTEINS AND ANTICANCER ALSO SELLS MICE THAT EXPRESS FLUORESCENT PROTEINS, AND THIS SLIDE IS AN EXAMPLE OF A MOUSE. THERE ARE DIFFERENT WAYS -- A MOUSE OF THE SORT

THAT ANTICANCER SELLS COMMERCIALLY.

THERE ARE DIFFERENT WAYS TO GET FLUORESCING PROTEINS INTO A MOUSE, ONE WAY IS TO DO IT TRANSGENICALLY, TO CREATE A TRANSGENIC MOUSE, TO INJECT THE DNA CODING FOR GFP INTO THE ZYGOTE OR THE FERTILIZED EGG OF A MOUSE AND THAT RESULTS IN THE BIRTH OF A MOUSE, ALL OF WHOSE CELLS WILL EXPRESS THE GFP WHEN YOU PUT HIM OR HER UNDER A YELLOW FILTER AND SHINE A BLUE LIGHT, LIKE THIS. SAME MOUSE, MUCH DIFFERENT IMAGE. ALL OF THAT MOUSE'S CELLS, AS THE COURT CAN SEE, EXPRESS GREEN FLUORESCENT PROTEIN. THIS MOUSE IS A TRANSGENIC ANIMAL WHO, WHEN SHE WAS AN EMBRYO, HAD DNA FOR GFP INJECTED INTO THE FERTILIZED EGG THAT RESULTED IN HER.

IMAGING SYSTEMS ARE VERY IMPORTANT IN PRACTICING ANTICANCER'S METHODS. IMAGING SYSTEMS, LIKE WE SEE TO THE COURT'S RIGHT DOWN IN THE WELL -- BY "IMAGING SYSTEMS" I MEAN CAMERAS, MICROSCOPES, LIGHT FILTERS, COMPUTERS, IMAGE PROCESSING SOFTWARE. THIS IS AN EXAMPLE. WHAT'S DEPICTED ON THE SLIDE IS THE INDEC SYSTEMS FLUORVIVO IMAGING SYSTEM, WHICH DID PURCHASE A LICENSE FROM ANTICANCER BECAUSE IN ORDER TO DO WHAT THIS MACHINE DOES YOU HAVE TO PRACTICE OUR PATENTS. INDEC DID PURCHASE A LICENSE. CRI DID NOT.

AND CRI'S EQUIPMENT THAT THEY MANUFACTURE, JUST BY THE WAY, IS VERY SIMILAR TO THIS. IF YOU LOOKED AT IT, IT WOULD LOOK VERY SIMILAR.

LET'S DISCUSS, YOUR HONOR, THE PATENTS THEMSELVES, JUST

WHAT THEY ARE. THERE'S THREE OF THEM, AS THE COURT KNOWS, ALL THREE PROSECUTED BY DR. KATE MURISHIGE, WHO IS AN ATTORNEY HERE WITH MORRISON AND FORESTER IN SAN DIEGO. EACH OF THE PATENTS CLAIMS METHODS OF USING FLUORESCENT PROTEINS IN A UNIQUE WAY. THE '384 AND THE '038 PATENTS ARE VERY SIMILAR. THEY'RE TWINS, ESSENTIALLY, AND WE SAY "TWINS" BECAUSE THEY SHARE THE SAME SPECIFICATION. THEY BOTH RELATE TO DOING IMAGING OF TUMOR PROGRESSION USING GFP. THERE ARE NO MAJOR DIFFERENCES BETWEEN THESE TWO PATENTS, THE '384 AND THE '038. THE DIFFERENCES ARE IN CLAIM, SCOPE AND IN LANGUAGE, AND I'LL GET TO THOSE IN A MOMENT.

THE '384 CLAIMS METHODS FOR, NUMBER ONE, EVALUATING DRUGS, FOR INHIBITING METASTASIS OF TUMORS VIA METHODS INCLUDING GIVING A DRUG TO A MAMMAL THAT'S GOT A TUMOR AND THEN MONITORING THE PROGRESS OF THE TUMOR AFTERWARD BY USING A PROCESS CALLED FOTI, F-O-T-I. THAT'S ONE OF THE CLAIMS IN DISPUTE TODAY, FLUORESCENT OPTICAL TUMOR IMAGING. THE MEANING OF THAT TERM IS IN DISPUTE, AND I WON'T BE ARGUING ABOUT THAT IN THIS TUTORIAL.

HOW WOULD YOU PRACTICE THE METHODS IN THIS PATENT? HOW WOULD YOU USE THEM IN DOING CANCER RESEARCH? YOU COULD GIVE A LAB ANIMAL -- OR YOU COULD IMPLANT INTO A LAB ANIMAL HUMAN BREAST CANCER CELLS, AND THEN YOU COULD GIVE THAT ANIMAL A CHEMOTHERAPY REGIMEN AND AFTERWARD YOU COULD STUDY WHAT THE TUMOR WAS DOING; WAS IT REGRESSING, AS I SAID EARLIER; WAS IT

IN STASIS OR WAS IT METASTASIZING, AND YOU COULD DO IT WITHOUT SACRIFICING THE ANIMAL. THAT'S WHAT THE '384 REALLY IS ALL ABOUT.

THE '038 PATENT IS VERY SIMILAR. IT ALSO CLAIMS METHODS FOR FOLLOWING METASTASIS, BUT IT HAS SOME DIFFERENT METHODS, ONE OF WHICH INVOLVES TAKING OUT FRESH ORGAN TISSUES FROM THE ANIMAL AND THEN STUDYING THEM TO SEE WHETHER THEY ARE EXPRESSING FLUORESCENT PROTEINS. YOU'RE AFTER THE SAME PURPOSE BUT YOU'RE PRACTICING A SLIGHTLY DIFFERENT METHOD. YOU'RE TAKING ORGAN TISSUES OUT OF THE ANIMAL. THE '038 ALSO INVOLVES THE USE OF CONTRAST DYES TO CREATE CONTRAST SO YOU CAN SEE THE SIGNAL IN A WAY THAT'S MORE USEFUL.

ONE OF THE WAYS IN WHICH THE USE OF CONTRAST DYES IS USEFUL IS IN STUDYING ANGIOGENESIS, ANGIOGENESIS MEANING THE CREATION OR THE BIRTH OF BLOOD VESSELS IN A TUMOR, WHICH IS SOMETHING THAT'S VERY IMPORTANT TO LEARN FOR STUDYING WHAT A TUMOR IS DOING.

THE THIRD PATENT IN SUIT IS THE '159 PATENT. THIS PATENT CLAIMS METHODS FOR IMAGING GENE EXPRESSION IN THE WHOLE BODY OF AN ANIMAL USING FLUOROPHORES THAT ARE LINKED TO THE PROMOTERS OF GENES. A GENE, AS THE COURT KNOWS, IS A SEGMENT OF DNA. IT'S A FUNCTIONAL UNIT OF HEREDITY. A PROMOTER IS A PIECE OF DNA THAT CONTROLS THE PRODUCTION OF A PROTEIN. SO WHEN YOU'RE STUDYING --

WHY WOULD YOU WANT TO STUDY THAT? WHY WOULD YOU WANT

TO STUDY HOW GENES MANIFEST OBSERVABLE CHARACTERISTICS? YOU WOULD BE INTERESTED, FOR EXAMPLE, IF YOU WERE STUDYING DIABETES. YOU CAN LINK A FLUOROPHORE LIKE GFP, AND A FLUOROPHORE IS ANY SUBSTANCE THAT EXPRESSES, GFP IS ONE EXAMPLE OF IT, YOU CAN LINK A FLUOROPHORE TO THE INSULIN GENE AND THEN YOU CAN STUDY OVER TIME WHETHER INSULIN IS BEING MANUFACTURED BY SEEING WHETHER THERE'S FLUORESCENCE OR WHETHER INSULIN IS NOT BEING MADE, AND THAT WOULD BE USEFUL IF YOU WERE STUDYING AN ANTIDIABETES DRUG. SO THERE ARE DISEASES THAT YOU CAN STUDY APART FROM CANCER, COMPLETELY UNRELATED TO CANCER, PRACTICING THE METHODS OF THE '159 PATENT.

LET'S MOVE TO OUR LIVE DEMONSTRATION, AND I APOLOGIZE IN ADVANCE TO THE COURT, THERE ARE SOME THINGS THAT WHEN I WENT TO LAW SCHOOL I NEVER THOUGHT THAT I WOULD BE DOING SOME DAY AND ONE OF THOSE THINGS WAS BRINGING LIVE MICE INTO A COURTROOM. THIS IS THE PART OF OUR TUTORIAL WHERE DR. BRUCE PETERS FROM INDEC SYSTEMS, AND HE HAS A DEGREE FROM HARVARD UNIVERSITY, I BELIEVE IN NEUROBIOLOGY.

DR. PETERS: THAT'S CORRECT.

MR. LAWTON: AND DR. ZHIJIAN YANG FROM ANTICANCER WILL PERFORM A DEMONSTRATION USING LIVE MICE.

WE HAVE SEVEN MICE TODAY. TWO OF THOSE MICE ARE TRANSGENIC MICE, ONE ALL RED, THE OTHER ALL GREEN. THE FIVE OTHER MICE ARE NOT TRANSGENIC MICE, BUT THEY HAVE HAD FLUORESCENT TUMOR CELLS IMPLANTED IN THEM, DIFFERENT TYPES OF

CANCERS. WE'LL LOOK AT ALL OF THEM USING THIS IMAGING EQUIPMENT.

MAYBE WHILE DR. PETERS AND DR. YANG COME FORWARD AND SET UP A LITTLE BIT, I COULD ASK THE COURT TO CONSIDER STEPPING DOWN FROM THE BENCH. I THINK IT WOULD BE USEFUL TO LOOK AT THE MICE JUST IN ORDINARY CONDITIONS WITHOUT -- BEFORE WE PUT THEM IN THE EQUIPMENT, SO THAT THE COURT CAN SEE, WITH ITS NAKED EYE, WHAT THESE MICE LOOK LIKE BEFORE WE DO START DOING IMAGING BECAUSE I DO THINK THAT IS A PERTINENT THING.

THE COURT: MR. LAWTON, I THINK WE ALL WANT TO SEE THIS. I'M NOT SURE WHERE THE BEST PLACE IS TO SEE THIS. I'M NOT SURE WHERE THE BEST PLACE IS. I'M HAPPY TO STEP DOWN TO OBSERVE, BUT I DON'T KNOW WHERE YOU WOULD WANT US ALL. I KNOW THEY WOULD LIKE TO SEE ALSO, PROBABLY. IS THIS GOING TO BE PROJECTED OR DO WE ALL NEED TO STAND DOWN HERE?

MR. LAWTON: I THINK WE MIGHT STAND IN THE WELL TO LOOK AT THE MICE, IF THE COURT DOESN'T OBJECT TO PEOPLE BEING IN THE WELL. WE DON'T NEED TO BRING EVERYBODY FORWARD, BUT MAYBE JUST A COUPLE OF --

MR. KRACHT: IT WILL BE PROJECTED.

MR. LAWTON: LOOKING AT THE MICE WITH OUR -- EVENTUALLY, WHEN WE USE THE IMAGING EQUIPMENT, ALL THOSE IMAGES WILL BE PROJECTED, BUT I WANTED THE COURT TO SEE THE ACTUAL MICE WITH THE COURT'S NAKED EYE.

THE COURT: WHERE ARE THEY?

MR. LAWTON: THEY'RE IN A CAGE.

THE COURT: THEY'RE CONTAINED.

MR. LAWTON: OH, YES, THERE WILL BE NO ESCAPING ANIMALS.

THE COURT: THE OTHER THING I WANT TO SAY AS WE GO THROUGH THIS DEMONSTRATION, PLEASE BE MINDFUL MY COURT REPORTER IS TAKING THINGS DOWN SO I DON'T KNOW WHAT KIND OF EXPLANATION OR COMMENTARY'S GOING TO BE PROVIDED OR BY WHOM, BUT LET'S BE CLEAR WHO IS SPEAKING AND NOT SPEAK OVER EACH OTHER AS WE DO THIS. I'LL STEP DOWN.

MR. LAWTON: I EXPECT I'LL BE DOING ALL THE SPEAKING SO I HOPE THAT WILL KEEP IT AS SIMPLE AS WE CAN KEEP IT.

IF DR. YANG COULD SHOW JUDGE SAMMARTINO THE MICE. JUST FOR THE RECORD, WHAT WE'RE SEEING ARE FIVE MICE IN A BOX. THEY ARE ANTICANCER MICE, AND THEY ARE NUDE MICE, MEANING THEY'RE HAIRLESS MICE WHO ARE GENETICALLY IMMUNOCOMPROMISED. DR. PESAVENTO TALKED A LITTLE BIT ABOUT NUDE MICE AND THE FACT THAT THEIR IMMUNE SYSTEMS DO NOT ENABLE THEM TO FIGHT OFF THINGS, WHICH MAKES THEM USEFUL FOR THE SORT OF RESEARCH THAT PEOPLE ARE DOING PRACTICING OUR METHODS.

MR. VALENTI: MAY I SUGGEST, IF POSSIBLE, WE SHOW THE COURT A TUMOR IN THE MOUSE.

MR. LAWTON: NO, THAT'S OKAY FOR NOW.

IF ANYONE WOULD LIKE TO STEP CLOSER AND TAKE A LOOK BEFORE WE START DOING SOME IMAGING.

ONE THING THAT IS POINTED OUT BY MY COLLEAGUE, MR. VALENTI, IS THAT JUST LOOKING AT THE MOUSE WITH THE NAKED EYE DOES NOT ENABLE THE VIEWER, WHETHER IT'S US OR A SCIENTIST, TO SEE A TUMOR INSIDE A MOUSE. IN OTHER WORDS, EVEN THOUGH THESE MICE CONTAIN TUMOR CELLS YOU CAN'T NECESSARILY SEE THE TUMORS JUST BY LOOKING AT THE MOUSE WITH THE NAKED EYE UNAIDED.

ALL RIGHT, IF WE COULD ALL RETURN TO OUR SEATS, IF THE COURT IS SATISFIED.

THE FLUORVIVO IMAGING SYSTEM IS RELATIVELY SIMPLE IN CONCEPT, BUT I WILL EXPLAIN IT JUST SO WE UNDERSTAND WHAT THE COMPONENT PARTS ARE.

THE COURT WILL SEE THERE'S ESSENTIALLY A LIGHTPROOF BOX WITH A DOOR ON IT. THERE'S A CCD CAMERA AT THE TOP, AND A YELLOW FILTER UNDERNEATH THE LENS OF THAT CCD CAMERA. THE CCD CAMERA SHOOTS IMAGES THROUGH THAT YELLOW FILTER, AND THE YELLOW FILTER IS IMPORTANT IN ORDER TO SEE THE FLUORESCING PROTEINS DO THEIR THING. THERE IS A COMPUTER AND IMAGE PROCESSING SOFTWARE THAT'S MANUFACTURED BY INDEC SYSTEMS, AND THERE'S OBVIOUSLY A SCREEN.

SO WHAT DR. YANG AND DR. PETERS WILL NOW DEMONSTRATE IS GFP-BASED IMAGING OF LIVE ANIMALS USING ANTICANCER'S PATENTED METHODS. WE MAY HEAR SOME SQUEAKING. WE HEARD SOME SQUEAKING YESTERDAY. I'VE DONE SOME RESEARCH INTO THE SQUEAKING AND I'M TOLD THAT THAT DOES NOT MEAN THAT WE'RE HURTING THE ANIMALS, BUT THEY ARE A LITTLE NERVOUS, AND HERE WE ARE IN FEDERAL COURT

AND IT'S THESE MICE'S ONLY THEIR SECOND TRIP TO FEDERAL COURT, THE FIRST TIME BEING YESTERDAY, AND I WOULD FIND THAT A LITTLE DISADVANTAGING ALSO.

MAYBE WE COULD DIM LIGHTS AGAIN. WHAT THE COURT IS SEEING IS A LIVE MOUSE WITH WHAT I BELIEVE IS HUMAN METASTATIC PROSTATE CANCER IN ITS ABDOMEN. THE TUMOR CELLS HAVE BEEN ENGINEERED TO EXPRESS GFP.

AS DR. PETERS IS DEMONSTRATING, YOU CAN CREATE DIFFERENT TYPES OF IMAGES USING AN IMAGING SYSTEM LIKE THIS ONE AND LIKE CRI'S. YOU CAN CREATE STILL IMAGES, AS DR. PETERS JUST DID. YOU CAN CREATE A FILM STRIP DOWN AT THE BOTTOM BASED ON THE IMAGES YOU'VE JUST MADE IN REAL TIME. YOU CAN ZOOM IN, AND MAYBE DR. PETERS COULD SHOW US HOW WE WOULD ZOOM IN ON THAT AREA OF THE ABDOMEN WHERE THE PROSTATE CANCER'S METASTASIZING. YOU CAN MEASURE, AS DR. PETERS IS SHOWING, THE SIZE OF TUMORS IN MICRONS, A MICRON BEING ONE ONE-THOUSANDTH OF A MILLIMETER, WHICH IS OBVIOUSLY USEFUL FOR STUDYING WHETHER TUMOR CELLS ARE METASTASIZING OR WHETHER THEY'RE NOT.

MAYBE WE COULD LOOK AT ANOTHER MOUSE, IF THAT'S ALL RIGHT. THIS IS ANOTHER MOUSE EXPRESSING PROSTATE CANCER AND THE PROSTATE CANCER CELLS EXPRESSING, AGAIN, GREEN FLUORESCENT PROTEIN.

LET'S LOOK AT A THIRD MOUSE. IN THE OLD DAYS, BEFORE THESE METHODS WERE INVENTED, YOU WOULD HAVE TO SACRIFICE THE ANIMAL. THERE WOULD BE A PASSAGE OF TIME, SOME TIME WOULD BE

NECESSARY IN ORDER TO SACRIFICE THE ANIMAL, TAKE OUT THE TISSUES AND STUDY THE TUMOR. THAT OBVIOUSLY INVOLVED SACRIFICING A LOT OF ANIMALS, BUT IT ALSO INVOLVED NOT GETTING NECESSARILY THE BEST ANALYSIS AND RESULTS.

WITH THESE METHODS YOU CAN DO STUDY IN REAL TIME AND WITHOUT SACRIFICING ANIMALS AND DO IT ALL NONINVASIVELY, IF THAT'S YOUR CHOICE. YOU CAN ALSO EXCISE FRESH ORGAN TISSUES IF YOU'RE PRACTICING THE '038, AS I SAID.

THE NEXT MOUSE THAT WE WILL LOOK AT, FOR THE RECORD, IS A MOUSE CONTAINING RED FLUORESCENT PROTEIN EXPRESSING PANCREATIC CANCER. AS WE SAID BEFORE, GFP DOES COMPREHEND COLORS OTHER THAN GREEN AS A TERM OF ART. DS RED IS A TYPE OF FLUORESCENT PROTEIN THAT DOES OCCUR NATURALLY IN NATURE, UNLIKE SOME OF THE OTHER COLORS OF GFP THAT DR. TSIEN WAS DISCUSSING IN THE BBC VIDEO THAT WE SAW.

THIS MOUSE THAT'S NOW INSIDE THE IMAGING SYSTEM CONTAINS A HUMAN BREAST CANCER TUMOR IN ITS BREAST REGION, AND AS YOU SEE WE'VE CREATED A STILL PHOTO BASED ON THAT.

I THINK IT IS IMPORTANT TO BEAR IN MIND THAT NONE OF THESE IMAGES THAT WE'RE NOW SEEING, THE BRIGHT SIGNAL EMANATING FROM THE RFP EXPRESSING TUMOR CELL, WERE THINGS THAT WE COULD HAVE SEEN WITH OUR NAKED EY WHEN WE WERE DOWN IN THE WELL LOOKING AT THE MICE IN THE CAGE. THEY'RE IMAGES THAT YOU CAN ONLY SEE USING EQUIPMENT LIKE THIS.

THIS NEXT MOUSE, I'M TOLD BY DR. YANG, IS A TRANSGENIC

MOUSE, ALL OF WHOSE CELLS EXPRESS GREEN FLUORESCENT PROTEIN. SIMILAR TO THE SLIDE THAT WE DISPLAYED EARLY IN OUR TUTORIAL, THIS MOUSE WAS CREATED -- OR THE FLUORESCENT EXPRESSION OF THIS MOUSE IS POSSIBLE BECAUSE THIS MOUSE, WHEN SHE WAS AN EMBRYO, HAD THE DNA FOR GFP INJECTED INTO HER FERTILIZED EGG AND WAS BORN THIS WAY. THIS IS A MOUSE THAT WOULDN'T LOOK GREEN AS WE SAW IT LOOKING WITH THE NAKED EYE.

THE COURT: MR. LAWTON, WHAT IS THE STUDY PURPOSE OF THE ALL GREEN MOUSE? I UNDERSTAND WITH THE TUMORS, AND WHATNOT, AND TRACKING THAT, I'M JUST CURIOUS, IT'S INTERESTING BUT I DON'T UNDERSTAND HOW IT RELATES TO SCIENTIFIC RESEARCH.

MR. LAWTON: YOUR HONOR, I THINK THAT DR. HOFFMAN COULD ANSWER THAT QUESTION BETTER THAN I, AND, AS DR. PESAVENTO DID, I HOPE THERE'S NO OBJECTION TO DR. HOFFMAN ANSWERING A QUESTION ABOUT SCIENCE.

MR. PAVANE: NO OBJECTION.

MR. LAWTON: THANK YOU.

DR. HOFFMAN: YOUR HONOR, THE MICE SUCH AS THIS THAT EXPRESS GREEN FLUORESCENT PROTEIN IN ALL THE CELLS HAVE MANY USES, ONE OF WHICH, AND A VERY IMPORTANT ONE OF WHICH, IS, FOR EXAMPLE, TO TRANSPLANT A RED TUMOR TO THAT MOUSE, WHICH WE DIDN'T SHOW TO YOU TODAY. BUT SUCH A MOUSE WITH A RED TUMOR, THE MOUSE BEING GREEN, WE CAN STUDY VERY EASILY, BY IMAGING, THE INTERACTION BETWEEN THE TUMOR CELLS AND THE NORMAL CELLS.

THE COURT: OKAY. THANK YOU, DR. HOFFMAN, UNDERSTOOD.

DR. HOFFMAN: YOU'RE WELCOME.

MR. LAWTON: THESE MICE ARE -- ALSO CAN BE BRED TO CREATE FURTHER CELLS TO CREATE FUTURE SUCH MICE, WHICH IS USEFUL IN ITSELF.

ALL RIGHT, ONE LAST MOUSE TO LOOK AT USING THE IMAGING SYSTEM, AND THIS IS A MOUSE ALL OF WHOSE CELLS EXPRESS RED FLUORESCENT PROTEIN. HE'S NOT DOING ANY SQUEAKING. HE'S A LITTLE LESS PHASED BY THE JUDICIAL --

THE COURT: MR. LAWTON, THEY'RE JUST PUT UNDER A PARTICULAR TYPE OF LIGHTING DEVICE.

MR. LAWTON: YES, YOUR HONOR, A BLUE LIGHT THAT IS SHOWN THROUGH A YELLOW FILTER. THERE IS A YELLOW FILTER UNDERNEATH THE LENS OF THIS CCD CAMERA.

THE COURT: I THINK I CAN SEE IT FROM HERE. I CAN SEE A YELLOW FILTER, AND I CAN SEE A BLUE LIGHT BELOW.

MR. LAWTON: RIGHT. THE GFP, AS MR. PAVANE SAID, ESSENTIALLY ABSORBS THE BLUE LIGHT AND THEN EMITS GREEN LIGHT, OR IN THIS CASE RED LIGHT, IN RESPONSE TO THAT. WHEN YOU TAKE THE LIGHT AWAY, THE FLUORESCENCE DISAPPEARS.

THERE'S SOMETHING CALLED PHOSPHORESCENCE, WHICH HAS THE PHENOMENON OF THE SIGNAL LINGERING AFTERWARD. FLUORESCENCE IS NOT LIKE THAT, YOU TAKE THE LIGHT SOURCE AWAY AND THE SIGNAL GOES AWAY AS WELL.

YOUR HONOR, I WANT TO THANK OUR FINE SCIENTISTS HERE, DR. PETERS AND DR. YANG, FOR THEIR EFFORTS AND THEIR PATIENCE.

I WANT TO THANK ALSO MS. O'CONNELL AND MR. RAMOS FOR BEING SO PATIENT YESTERDAY AND HELPING US SET ALL THIS UP AND BEING VERY TOLERANT.

THE COURT: SO DOES THAT CONCLUDE?

MR. LAWTON: IT DOES, YOUR HONOR. THAT CONCLUDES JUST THE LIVE PRESENTATION, AND I'LL GET TO THE THIRD PART OF MY TUTORIAL, WHICH WILL JUST TAKE A COUPLE OF MINUTES, AND I'LL BE DONE.

THE COURT: OKAY, THERE'S A QUESTION.

MR. PAVANE: IF I COULD, I'LL DIRECT IT TO YOUR HONOR, BUT I'M CURIOUS TO FOLLOW UP BASICALLY ON A QUESTION YOU ASKED. THE BLUE LIGHT, YELLOW FILTER, AND THEN I UNDERSTOOD THEM TO SAY THERE WAS A CAMERA ON TOP THAT WAS THEN TAKING THAT IMAGE THAT WE'VE SEEN UP ON THE SCREEN. I WAS JUST CURIOUS IF YOU TOOK THE CAMERA AWAY, AND LEFT THE BLUE LIGHT AND THE YELLOW FILTER, COULD YOU SEE THE GREEN THROUGH THE YELLOW FILTER WITH YOUR EYE?

MR. LAWTON: YES, YOU COULD.

MR. PAVANE: THANK YOU.

THE COURT: THANK YOU FOR THE DEMONSTRATION. GO AHEAD, MR. LAWTON.

MR. LAWTON: THANK YOU, YOUR HONOR. THIS TAKES US TO THE THIRD PART OF OUR TUTORIAL TODAY, THE THIRD AND LAST PART OF OUR TUTORIAL, WHICH IS THE PREVIEW OF THE MAJOR CLAIM TERMS THAT ARE IN DISPUTE.

WE DO AGREE SOMETIMES WITH OUR FRIENDS FROM CRI ON SOME THINGS AND ONE OF THE THINGS THAT WE AGREE ON IS THERE ARE FIVE MAJOR CLAIM TERMS IN DISPUTE, THE ONES THAT ARE DISPLAYED IN THIS SLIDE. FOUR OF THESE TERMS ARE FROM THE '038 AND THE '384 PATENTS, ONE OF THESE TERMS IS FROM THE '159 PATENT, AND THAT ONE IS THE FOURTH ONE DOWN, WHICH IS WHOLE BODY EXTERNAL FLUORESCENT OPTICAL IMAGING.

THE FIRST MAJOR CLAIM TERM THAT WE'LL BE TALKING ABOUT TODAY OR THAT'S IN DISPUTE IS THIS ONE THAT'S HIGHLIGHTED ON THE SLIDE, A PRIMARY TUMOR THAT STABLY EXPRESSES GFP, ETC., ETC. HERE THE PARTIES DIFFER BY A SINGLE WORD AND THAT IS USE OF THE WORD CONSISTENTLY. OUR CONSTRUCTION OF THIS PHRASE USES THE WORD CONSISTENTLY, WHICH IS ITALICIZED THERE AT THE BOTTOM, ESSENTIALLY AS A SYNONYM FOR THE WORD STABLY. CRI ESSENTIALLY HAS NO SYNONYM OR ADVERB, AND THAT'S THE ONLY DIFFERENCE BETWEEN THE TWO CONSTRUCTIONS.

MR. PAVANE: I DON'T OBJECT.

THE COURT: GO AHEAD, SIR.

MR. PAVANE: I DON'T OBJECT TO THIS PER SE, BUT WE'RE KIND OF GETTING INTO THE CLAIM CONSTRUCTION. I THOUGHT THERE WAS A SCHEDULE FOR THAT.

THE COURT: THERE IS A SCHEDULE FOR THAT.

MR. LAWTON: VERY WELL, YOUR HONOR, I THOUGHT I WOULD JUST GIVE AN OVERVIEW OF THE TERMS WITHOUT DOING ARGUMENT, BUT I'LL CONCLUDE QUICKLY IF THAT PLEASES THE COURT.

THE COURT: I THINK THAT WOULD BE BENEFICIAL. I WOULD SAY THIS, YOU'RE ONLY POINTING TO THESE FIVE. I HAD OUTLINED A SCHEDULE THAT I THINK HAD A FEW MORE.

MR. LAWTON: YES, YOUR HONOR, 13 IN ALL.

THE COURT: I WOULD BE HAPPY TO ACCEPT ANY AGREEMENTS THAT YOU MAY ALL HAVE AS OF THIS MORNING THAT I HAD NOT RECEIVED PRIOR TO TODAY.

I THINK YOU'LL HAVE TIME, MR. LAWTON, DURING THE BALANCE OF THE SCHEDULE TO COMMENT.

MR. LAWTON: YES, YOUR HONOR. I WANTED TO SHOW THE COURT JUST A COUPLE OF OTHER IMAGES --

THE COURT: SURE.

MR. LAWTON: -- AND THEN FINISH UP. WHAT I'M GOING TO SHOW THE COURT IS A BRIEF VIDEO CLIP THAT ESSENTIALLY HAS TWO DIFFERENT SEGMENTS OR SEQUENCES, THE FIRST ONE -- AND BOTH SEGMENTS INVOLVE A BLOOD VESSEL THAT'S IN A TUMOR THAT'S IN THE FOOTPAD OF A MOUSE, BEFORE AND AFTER.

IN THIS FIRST SEQUENCE, WHAT YOU SEE ARE GFP EXPRESSING BLOOD CELLS, ORDINARY WHITE BLOOD CELLS WHOSE NUCLEI ARE GREEN AND CYTOPLASM IS RED. WHAT YOU SEE THERE IS BLOOD FLOW THROUGH A BLOOD VESSEL IN A TUMOR IN THE FOOTPAD OF A MOUSE, NOT SOMETHING YOU COULD SEE WITH YOUR NAKED EYE, EVEN IF YOU WERE LOOKING THROUGH A YELLOW FILTER. IT'S TOO SMALL. THIS IMAGE WAS CREATED USING A MICROSCOPE.

IN THE SECOND SERIES WHAT YOU SEE IS POST-CHEMOTHERAPY.

WE SEE IS THAT THE WHITE BLOOD CELLS ARE GONE, BECAUSE THE CHEMO KILLED THEM OFF, AND WHAT YOU SEE ARE RED CYTOPLASMIC FRAGMENTS OF DEAD CANCER CELLS THAT ARE STILL MOVING THROUGH THE BLOODSTREAM AND STILL EXPRESSING RFP. NO WAY COULD YOU SEE THIS WITH THE NAKED EYE, ABSOLUTELY NO WAY. YOU NEED AN INSTRUMENT.

THE COURT: YOU SAID THEY'RE DEAD?

MR. LAWTON: YES.

THE COURT: HOW CAN YOU TELL THAT?

MR. LAWTON: BECAUSE THEIR NUCLEI ARE GONE AND THEIR NUCLEI WERE PREVIOUSLY EXPRESSING GFP AND SO ALL YOU HAVE LEFT IS THIS DEAD CYTOPLASM WHICH WAS TAGGED WITH RFP.

THE COURT ASKED EARLIER ABOUT WHAT IS THE USEFULNESS, PARAPHRASING, BUT WHAT WOULD BE THE USEFULNESS OF USING DIFFERENT COLORS OR HAVING A MOUSE THAT WAS EXPRESSING ONE COLOR, AND DR. HOFFMAN SAID IT'S USEFUL TO CREATE CONTRAST. THIS IS ONE EXAMPLE OF WHY IT CAN BE USEFUL TO USE TWO DIFFERENT GREEN FLUORESCENT PROTEINS. THESE CANCER CELLS HAD NUCLEI THAT WERE EXPRESSING GFP AND CYTOPLASM, THE PART SURROUNDING THE NUCLEUS RFP. WHEN YOU KILL CANCER WITH A CHEMICAL, SOME DEAD TISSUE REMAINS, AND HERE THE DEAD TISSUE THAT REMAINED WAS THE CYTOPLASMIC FRAGMENTS.

JUST TO GIVE SOME SENSE OF SCALE OR PROPORTION, THE IMAGES THAT WE SEE -- OR THOSE RED DOTS THAT THE COURT SAW IN THIS VIDEO ARE ONLY ABOUT 10 TO 20 MICRONS WIDE, A MICRON BEING

ONE ONE-THOUSANDTH OF A MILLIMETER. AGAIN, NO WAY YOU COULD SEE THAT USING JUST YOUR NAKED EYE.

THIS IS THE LAST VIDEO THAT WE'LL SEE. THIS IS A BLOOD VESSEL. THERE ARE DUAL-COLORED CANCER CELLS TRAVELING IN IT, EXPRESSING, AGAIN, GFP IN THE NUCLEI, RFP IN THE CYTOPLASM. SOME OF THEM ARE CRAWLING ALONG THE WALL OF THE CAPILLARY THERE, SLOWER THAN THE ORDINARY RED BLOOD CELLS THAT ARE PUMPED BY THE HEART, AND I'LL JUST SHOW THAT ONE MORE TIME. THERE IS SOMETHING CALLED HEMATOGENOUS SPREAD, AND WHAT THAT REFERS TO IS THE SPREAD OF CANCER IN THE BLOOD VESSELS, AND THAT'S WHAT THIS SLIDE DEPICTS, AND THAT IS SOMETHING THAT IS ONLY POSSIBLE TO DO USING THE METHODS THAT ARE CLAIMED IN THE PATENTS IN SUIT.

I WONDER IF WE COULD SHOW THE LAST SLIDE FROM THE CRI TUTORIAL, WOULD THAT BE POSSIBLE? IS THAT STILL UP, IF I SWITCH -- THE CLONTECH ARTICLE.

WHILE THEY'RE GETTING THAT UP, AND I WON'T DELAY THINGS IF THEY CAN'T BRING IT UP QUICKLY.

BUT MENTION WAS MADE OF THE CLONTECH ARTICLE. THE LAST PAGE OF THE CRI TUTORIAL IS THE CLONTECH ARTICLE, AND I TOOK FROM PRESENTATION OF THIS ARTICLE, AS PART OF THE CRI TUTORIAL, A SUGGESTION THAT AS OF 1995 METHODS LIKE THOSE THAT ARE CLAIMED IN ANTICANCER'S PATENTS WERE WELL-KNOWN, IN THE ART, PEOPLE WERE DOING IT, SO FORTH AND SO ON, BUT SOMETHING VERY IMPORTANT WAS LEFT OUT OF THAT STATEMENT WITH WHICH THEY

CONCLUDED, AND THAT IS THE LANGUAGE, AND I WISH WE COULD CALL THIS OUT BUT WE CAN'T BUT I'LL READ IT INTO THE RECORD, THAT APPEARS IN THE LEFT-HAND COLUMN, WHERE I'M POINTING FOR THE RECORD, AND GOING UP TO THE RIGHT-HAND COLUMN, ABOUT THE MIDDLE OF THE IMAGE, AND I'LL READ THE SENTENCE, "GFP FLUORESCENCE IS STABLE, SPECIES INDEPENDENT, AND CAN BE MONITORED NONINVASIVELY IN LIVING CELLS AND, IN THE CASE OF TRANSPARENT ORGANISMS, WHOLE ANIMALS."

TRANSPARENT ANIMALS ARE NOT MICE. TRANSPARENT ANIMALS ARE THINGS LIKE JELLYFISH. I DON'T THINK WE WOULD ARGUE THAT IN 1995 PEOPLE KNEW THAT YOU COULD SEE GFP IN A JELLYFISH, BUT WHAT IS SPECIAL -- OR ONE OF THE THINGS THAT'S SPECIAL ABOUT THE ANTICANCER METHODS IS THAT THEY CAN ENABLE RESEARCHERS TO LOOK AT CELLS IN OPAQUE ANIMALS, MICE, RATS, PRIMATES, HUMANS, NOT JUST JELLYFISH, AND I DIDN'T THINK THAT THAT WAS ADEQUATELY EXPLAINED.

YOUR HONOR, THANK YOU, VERY MUCH.

THE COURT: OKAY, THANK YOU.

MR. PAVANE: THIS IS NOT THE TIME OR PLACE TO ARGUE VALIDITY, BUT I WILL POINT OUT THAT WE DO BELIEVE WE HAVE ART THAT PREDATES THEIR PATENT THAT SHOWS IMAGING IN LIVE ANIMALS THAT ARE NOT TRANSPARENT, BUT AGAIN WE'LL GET TO THAT.

THE COURT: I UNDERSTAND.

I THINK IT'S APPROPRIATE THAT WE TAKE OUR BREAK AT THIS POINT, BUT I WOULD ASK YOU ALL TO LOOK AT THE SCHEDULE THE

COURT PUT OUT. YOU SEE THE TERMS THAT THE COURT WAS GOING TO LET YOU ALL DISCUSS AND IT TAKES US SEQUENTIALLY THROUGHOUT THE DAY. YOU'RE ASKING TO ARGUE LESS THAN THAT NUMBER, MR. LAWTON, IF YOU ALL ARE IN AGREEMENT ON THAT OR HAVE AGREED ON ANY OTHER TERMS, I'M HAPPY TO ACCEPT THAT AGREEMENT.

MR. LAWTON: I WASN'T CLEAR. I WAS JUST TRYING TO -- IN THE INTERESTS OF ECONOMY, I WAS TRYING TO JUST SUMMARIZE SOME MAJOR CLAIM TERMS, BUT OUR INTENT IS TO ABIDE BY THE SCHEDULE THAT WE GOT FROM THE COURT, WHICH WE THINK IS PERFECTLY WORKABLE.

MR. PAVANE: I WOULD ADD ONE MODIFICATION. I THINK THAT BEYOND THE FIVE TERMS THAT MR. LAWTON HIGHLIGHTED, WHICH I'M IN AGREEMENT WITH HIM ON, THE OTHER TERMS I THINK YOU WILL FIND WILL BE ADDRESSED KIND OF EN MASS BY OUR SIDE; IN OTHER WORDS, OUR POSITION ON THOSE IS SIMILAR, AND I DON'T THINK IT WILL TAKE NEARLY THE AMOUNT OF TIME TO ADDRESS THEM ALL.

THE COURT: PERFECT. I WILL START DOWN THIS SCHEDULE, AND IF THINGS MORPH INTO SOMETHING ELSE, SO BE IT.

I JUST HAVE ONE QUESTION, AND IT'S KIND OF A GENERAL QUESTION. IT DOESN'T REALLY RELATE TO THIS CASE SO MUCH, BUT I JUST WANT TO UNDERSTAND SOMETHING. WE HAVE ADVANCED IMAGING TECHNIQUES IN SCIENCE TODAY THAT DOES NOT REQUIRE -- THAT DO NOT REQUIRE SACRIFICING AN ANIMAL OR PERSON, WE HAVE CONTRASTING AGENTS, WE HAVE A VARIETY OF THINGS THAT WE CAN DO TO SEE TUMORS AND SEE THE IMPACT ON TUMORS. MY UNDERSTANDING

OF THIS IS THAT IT'S INJECTED -- IT'S AN INTERNAL VIEW THAT WOULD NOT OTHERWISE BE POSSIBLE UNDER ANY OF THE MOST ADVANCED IMAGING THAT EXISTS TODAY -- AND I SEE DR. HOFFMAN'S NODDING YES -- SO THIS TAKES IT TO A WHOLE DIFFERENT LEVEL. I'VE SEEN THINGS ON HERE THAT YOU WOULDN'T NORMALLY SEE NO MATTER WHAT THE NATURE OF THE SCAN IS. I DON'T KNOW WHAT THE MOST ADVANCED SCAN IS TODAY. I UNDERSTAND THAT IN RESEARCHING YOU PROBABLY DON'T DO THAT -- OR MAYBE YOU DON'T DO THAT ON ANIMALS THAT YOU'RE STUDYING, I DON'T KNOW, BUT THAT'S KIND OF MY QUESTION. SO THAT'S WHERE WE ARE ON THIS, TAKING IT TO A VERY DIFFERENT LEVEL.

BUT WOULD YOU AGREE, DR. HOFFMAN, AND THE OTHER DOCTORS HERE TODAY, THAT YOU COULD, WITHOUT SACRIFICING SOMEBODY, MONITOR THE IMPACT OF, SAY, CHEMOTHERAPY ON A TUMOR SIZE TODAY, CORRECT?

DR. HOFFMAN: MAY I?

THE COURT: PLEASE, GO AHEAD, DR. HOFFMAN. I'M TRYING TO JUST GET A HANDLE ON -- WE'RE SEEING THINGS IN GREATER DETAIL AND WITH GREATER EASE, BUT GO AHEAD.

DR. HOFFMAN: THANK YOU, YOUR HONOR. I THINK YOU HAVE EXACTLY DISCERNED THE POINT. THE IMAGING METHODS WITH FLUORESCING PROTEINS THAT WE'VE INVENTED ALLOW THE SUBCELLULAR VIEW INSIDE THE ANIMAL. WE CAN'T DO THIS YET WITH HUMANS BECAUSE WE DIDN'T DO ALL THE SAFETY TESTING YET, BUT WE HAVE TECHNOLOGY IN WHICH WE CAN TAKE AN ANIMAL THAT ALREADY HAS A

TUMOR AND INTRODUCE THE GENE SPECIFICALLY INTO THE TUMOR CELLS, MAKE THEM LIGHT UP, MAKE THEM VISIBLE EVEN AT THE SUBCELLULAR LEVEL. I THINK THIS WILL BE TRANSLATED INTO THE CLINIC WITHIN THE NEXT FIVE YEARS, BUT YOUR UNDERSTANDING IS EXACTLY CORRECT.

THE COURT: GO AHEAD, YOU MAY RESPOND. I'M JUST TRYING -- I TEND TO BE A LITTLE BIT PRACTICAL AND I WANTED TO UNDERSTAND.

MR. PAVANE: THAT'S A GOOD POINT, AND I THINK THERE'S NO QUESTION THERE WAS A MIRACLE BREAKTHROUGH HERE IN THE ABILITY TO DO THIS. OUR POSITION IS IT WASN'T THESE GUYS THAT DID IT.

THE COURT: I UNDERSTAND.

MR. PAVANE: OKAY.

THE COURT: I'M LOOKING AT THE BIGGER PICTURE FOR HUMANKIND.

MR. PAVANE: ABSOLUTELY.

THE COURT: NO MATTER WHO GETS THE CREDIT OR WHERE THIS CASE ENDS UP, FOR HUMANKIND SOMETHING GOOD IS GOING TO GO FORWARD HERE.

MR. PAVANE: ABSOLUTELY.

THE COURT: SO ANYTHING ELSE? LET'S TAKE A 10, 15 MINUTE BREAK, WE'LL COME BACK AND START IN ON THE CLAIMS CONSTRUCTION.

MR. LAWTON: THANK YOU, YOUR HONOR.

THE COURT: THANK YOU.

(COURT WAS AT RECESS.)

THE COURT: BEFORE WE GET STARTED, I HAVE A HARDCOPY OF ANTICANCER'S PRESENTATION. ON THE SLIDES THAT YOU PUT UP HERE, I WOULD VERY MUCH APPRECIATE A HARDCOPY, IF YOU HAVE --

DO YOU HAVE ONE, MS. GODDARD?

MS. GODDARD: KINKO'S IS MAKING IT RIGHT NOW.

THE COURT: EXCELLENT.

MS. GODDARD: I'LL HAVE IT FOR YOU AT LUNCH.

MR. LAWTON: I HAVE ONE HANDY, YOUR HONOR. I CAN JUST GIVE IT TO THE COURT.

MR. PAVANE: DAN, WE MAY HAVE A DIFFERENT COPY.

(DISCUSSION HELD OFF THE RECORD.)

MR. LAWTON: MAY I APPROACH, YOUR HONOR.

THE COURT: MR. LAWTON'S GOING TO GIVE THE COURT HIS COPY, IS THAT AGREEABLE?

MR. PAVANE: SURE.

THE COURT: AND YOU CAN GET MR. LAWTON ANOTHER COPY. THANK YOU, SIR.

MR. LAWTON: YOU'RE WELCOME.

THE COURT: MS. GODDARD, IF YOU WANT TO TRADE IT OUT, THAT'S FINE.

MR. LAWTON: I CAN JUST PRINT OUT ANOTHER ONE.

THE COURT: APPARENTLY YOU'VE ALREADY ORDERED IT AT KINKO'S. WHEN YOU GET IT, YOU CAN COMPARE IT AND THEN GIVE ME A COPY AND ONE TO MR. LAWTON.

MR. LAWTON: THAT'S FINE, YOUR HONOR, I JUST HAVE IT SAVED ON A DISK, SO THAT'S FINE.

THE COURT: I'M GOING TO GO STRAIGHT DOWN THE COURT'S SCHEDULE. NOW, IF YOU ALL THINK THINGS CLUSTER IN A DIFFERENT WAY -- I THINK THINGS MAY FALL OFF THE AGENDA AS WE GO THROUGH THIS, BUT THE COURT WAS GOING TO START WITH THE FIRST TERM THAT'S THERE. YOU SEE THE TIME ALLOCATIONS SO THAT WE STAY ON TARGET AND WE FINISH SOMETIME THIS AFTERNOON.

ONE COMMENT WAS A POSITIVE ONE THAT THEY THOUGHT WE WOULD FINISH EARLIER THAN THAT, AS WE GO THROUGH THIS, BUT THE FIRST TERM FOR DISCUSSION IS METASTASIS, AND ON SOME OF THESE I'LL GIVE YOU THE COURT'S COMMENTS VERY BRIEFLY. I'M GOING TO TAKE THIS MATTER UNDER SUBMISSION. THE TUTORIALS ON BOTH SIDES WERE VERY HELPFUL TO THE COURT. IT ADDS A GREAT DEAL.

SO, OF COURSE, I'M GOING TO TAKE THIS MATTER UNDER SUBMISSION, GO BACK THROUGH EVERYTHING, AND YOU'LL HEAR FROM THE COURT BY WAY OF A WRITTEN ORDER. BUT I DO HAVE SOME IMPRESSIONS, BASED ON EVERYTHING THAT WE'VE GONE THROUGH PRIOR TO TODAY'S PRESENTATION, AND I'M GOING TO MAKE IT VERY SHORT.

I GUESS ON THIS PARTICULAR TERM, I WAS OF A MIND THAT CRI'S CONSTRUCTION OF THIS WAS PREFERABLE. AGAIN, THAT'S JUST A TENTATIVE, IT COULD CHANGE, BUT IT'S KIND OF A STARTING POINT FOR YOU, IF THAT'S HELPFUL, MR. LAWTON, AND WHY DON'T YOU BEGIN, SIR.

MR. LAWTON: THANK YOU, YOUR HONOR. CRI'S CONSTRUCTION

IS UNNECESSARILY NARROW, OVERLY NARROW, IMPROPERLY NARROW, AND IT DOES NOT ENCOMPASS THE FULL SCOPE OF THE MEANING OF THE WORD METASTASIS, WHICH WE THINK IS THE SPREAD OF CANCER TO OTHER PARTS OF THE BODY, NOT LIMITED TO THE GROWTH OF SECONDARY TUMORS AT THE SITE THAT IS DISTAL FROM THE PRIMARY TUMOR.

WHAT'S THE DIFFERENCE OR WHAT ARE THE LINES I'M KIND OF DRAWING HERE? I CAN'T APPEAR IN LOS ANGELES UNLESS I FIRST GET ON THE FREEWAY OR BOARD AN AIRPLANE OR BOARD AN AMTRAK TRAIN. I HAVE TO DO ONE OF THOSE THINGS BEFORE I CAN GO TO LOS ANGELES. THAT'S A CRUDE ANALOGY, BUT IN THE SAME WAY SECONDARY TUMORS CAN'T APPEAR AT A SITE DISTAL FROM THE PRIMARY TUMOR WITHOUT TUMOR CELLS HAVING TRAVELED THERE THROUGH THE BLOODSTREAM OR THROUGH THE LYMPHATIC SYSTEM.

I WOULD LIKE TO SHOW THE COURT THE IMAGE AGAIN. I THINK A PICTURE IS WORTH A THOUSAND WORDS HERE. THIS IS METASTASIS. THESE ARE TUMOR CELLS THAT ARE TRAVELING THROUGH THE BLOODSTREAM ON THEIR WAY TO A DISTAL SITE.

THE COURT: AND THERE MAY BE NO OTHER TUMOR, BUT THEY'RE GOING TO GET SOMEWHERE AND MAYBE THERE WILL BE, AND YOU'RE SAYING THIS IS AN EXAMPLE OF METASTASIS.

MR. LAWTON: ABSOLUTELY.

THE COURT: WHETHER OR NOT THERE'S ANOTHER TUMOR, I SEE.

MR. LAWTON: RIGHT. NOW -- FINE, I THINK THE COURT GETS WHAT MY IDEA OF IT IS, BUT IS IT OBJECTIVELY JUSTIFIABLE?

IS IT A CONSTRUCTION THAT WE CAN JUSTIFY. WE SAY YES, AND IN ORDER TO DO THAT, WE CAN LOOK NO FURTHER THAN ONE PIECE OF CRI'S EXTRINSIC EVIDENCE ON THIS, WHICH IS THEIR MERRIAM-WEBSTER'S MEDICAL DICTIONARY DEFINITION OF METASTASIS. LET ME CALL OUT A PART THAT I THINK IS PERTINENT.

DEFINITION 1(A) SPEAKS OF "TRANSFER OF A DISEASE-PRODUCING AGENCY, AS CANCER CELLS OR BACTERIA, FROM AN ORIGINAL SITE OF DECEASE TO ANOTHER PART OF THE BODY WITH DEVELOPMENT OF A SIMILAR LESION IN THE NEW LOCATION." THE SECONDARY DEFINITION WE SEE THERE IS, (B), "A SECONDARY METASTATIC GROWTH OF A MALIGNANT TUMOR."

WHY WOULD WE NEED DEFINITION 1(A) IF THE ONLY DEFINITION OF METASTASIS IS 1(B), THE GROWTH OF SECONDARY TUMORS. CRI'S LOGIC OR CONSTRUCTION IS THAT YOU SHOULD IGNORE EVERYTHING BEFORE (B), (B) IS THE ONLY THING THAT METASTASIS COULD POSSIBLY BE. THAT'S WRONG, ACCORDING TO CRI'S OWN EXTRINSIC EVIDENCE.

THE COURT: LESION ISN'T A TUMOR.

MR. LAWTON: NOT NECESSARILY A TUMOR.

THERE'S ANOTHER NOTABLE PART OF THIS DICTIONARY DEFINITION, WHICH IS SUPPLIED BY CRI, "METASTASIS IN THE LUNG USUALLY OCCURS BY WAY OF THE BLOODSTREAM." NOW, THAT PART OF THE DEFINITION ISN'T TALKING ABOUT CANCER GROWING -- A TUMOR GROWING IN THE BLOODSTREAM. IT'S TALKING ABOUT THE TRAVELING OF TUMOR CELLS THROUGH THE BLOODSTREAM ON THE HIGHWAY TO THE

DISTAL SITE. THAT'S METASTASIS, TOO.

I REMEMBER A TIME WHEN THERE WAS A LAWYER FROM ARKANSAS WHO MADE A DEFINITION -- OR WHO MADE AN ARGUMENT OR ASKED A QUESTION -- I GUESS I SHOULD SAY, THIS LAWYER FROM ARKANSAS ASKED A QUESTION ABOUT THE DEFINITION OF THE WORD "IS." THIS DEPENDS ON WHAT THE MEANING OF THE WORD "IS" IS. AND IN THIS HEARING CRI IS GOING TO FOCUS THE COURT, WHEN IT'S MR. PAVANE'S TURN, ON THE WORD IS IN OUR SPECIFICATION AND SAY, "HERE IN ANTICANCER'S OWN SPECIFICATION, THEY SAY METASTASIS 'IS' THE GROWTH OF SECONDARY TUMORS." AND THEN THEY'RE GOING TO TRY TO TELL YOU THAT THE MEANING OF THE WORD "IS" IS EXCLUSIVE, IS ALL INCLUSIVE, ADMITS OF NO OTHER POSSIBILITY, AND THAT IS NOT CORRECT. MR. PAVANE WILL SHOW YOU THE PART OF THE SPECIFICATION. I'M SURE THE COURT IS FAMILIAR FROM THE BRIEFING.

TWO IS HALF OF FOUR. IS THAT THE ONLY THING TWO IS? TWO IS A THIRD OF SIX. TWO IS A FIFTH OF 10. TWO IS ONE-FIFTIETH OF 100.

BASEBALL IS A SPORT. BASEBALL IS A PROFESSION TO PRO PLAYERS. BASEBALL IS A GAME OF NINE INNINGS. BASEBALL IS A SPHERE THAT YOU CAN THROW, CATCH, HIT.

"IS," AS USED IN THAT SPECIFICATION, IS NOT EXCLUSIVE OF THE COMMON SENSE MEANING OF THE WORD METASTASIS, ACCORDING TO CRI'S OWN EXTRINSIC EVIDENCE. THE STEDMAN'S DEFINITION, WHICH WE PROFFER, WHICH IS A MEDICAL DICTIONARY, ALSO IS IN

ACCORD WITH OUR DEFINITION. THANK YOU.

THE COURT: THANK YOU, MR. LAWTON.

COUNSEL.

MR. PAVANE: THANK YOU, YOUR HONOR.

THE COURT: MR. PAVANE.

MR. PAVANE: YOUR HONOR, I THINK YOU KNOW FROM THE BRIEFS, AND I'M SURE YOUR PRIOR EXPERIENCE, THAT CLAIM CONSTRUCTION IS, IN THE FIRST INSTANCE, TO BE BASED ON THE INTRINSIC RECORD. SO WE'RE SUPPOSED TO LOOK TO THE PATENT CLAIMS AND THE PATENT SPECIFICATION AND, IF APPROPRIATE, THE FILE HISTORY, AND IF THOSE TERMS LEAVE AMBIGUITY, IF THERE'S AMBIGUITY LEFT AT THE END OF THE DAY, THEN, YES, LET'S GO OUTSIDE AND LET'S START LOOKING AT EXTRINSIC EVIDENCE, SUCH AS DICTIONARY DEFINITIONS, BUT ONLY IF THE RECORD IS AMBIGUOUS, AND THAT'S IMPORTANT.

I PUT UP ON THE SCREEN A PASSAGE FROM THE '384 PATENT IN SUIT. THAT'S ONE OF THE PATENTS THAT HAS THE DISPUTED WORD "METASTASIS," AND MR. LAWTON SUGGESTED TO YOU -- I'M POINTING YOU TO SOME LANGUAGE IN THE SPECIFICATION AT COLUMN ONE, LINES ABOUT 22 TO 24, IT LOOKS LIKE, AND IT SAYS, "METASTASIS IS THE GROWTH OF SECONDARY TUMORS AT SITES DIFFERENT FROM THE PRIMARY TUMOR."

NOW, THERE'S NOTHING AMBIGUOUS ABOUT THAT. IT'S TELLING YOU WHAT THIS -- THIS PATENT IS GOING TO REFER TO AS METASTASIS. MR. LAWTON DIDN'T REFER YOU TO ANY OTHER PART OF

THE SPECIFICATION AND SAY, "OH, BUT THERE ARE OTHER PLACES WHERE METASTASIS IS DESCRIBED AS SOMETHING OTHER THAN THIS." WHAT HE DID IS HE JUMPED DIRECTLY TO A DICTIONARY AND SAID, "OH, WELL, THERE ARE OTHER WAYS OF DEFINING METASTASIS IN DICTIONARIES." THAT IS CERTAINLY CORRECT, BUT TWO OBSERVATIONS THERE, ONE, IT'S EXTRINSIC EVIDENCE, CERTAINLY. AND, TWO, AND IF WE COULD HAVE THAT EXHIBIT BACK UP, I THINK WE HAVE IT EXHIBIT 15, THE DICTIONARY THAT MR. LAWTON PUT UP.

REFERRING TO DICTIONARIES IS A VERY SLIPPERY SLOPE, YOUR HONOR, FOR A VERY SIMPLE REASON. MR. LAWTON POINTED YOU, AS APPROPRIATE FOR HIS ARGUMENT, TO DICTIONARY DEFINITION 1(A), BUT LOOK AT DICTIONARY DEFINITION 1(B), IT SAYS, "A SECONDARY METASTATIC GROWTH OF A MALIGNANT TUMOR." THAT'S ANOTHER DEFINITION THAT SCIENTISTS USE, WHICH IS COMPLETELY CONSISTENT WITH WHAT'S WRITTEN IN THEIR OWN SPECIFICATION.

THE COURT: YOU BOTH AGREE WITH (B). THE QUESTION IS DOES IT INCLUDE MORE THAN (B).

MR. PAVANE: CORRECT. THAT'S MY POINT, MY POINT IS THAT YOU CAN GO AND FIND A DICTIONARY DEFINITION THAT WILL SAY A LOT OF DIFFERENT THINGS, AND HERE (B) IS ENTIRELY CONSISTENT WITH THE INTRINSIC RECORD WHICH SAYS IT'S THE GROWTH OF SECONDARY TUMORS.

NOW, AGAIN, IF THE INTRINSIC RECORD WERE AMBIGUOUS, I WOULD SAY, YEAH, LET'S GO FIND -- AND THEN WE COULD ALL ARGUE ABOUT WHICH OF THESE MANY DEFINITIONS IS CORRECT, BUT A, IT'S

NOT AMBIGUOUS, AND, B, AS YOU SEE, THE ISSUE OF GOING TO DICTIONARIES YOU CAN FIND A DEFINITION THAT WILL SAY MANY DIFFERENT THINGS SO THAT'S NOT NECESSARILY HELPFUL BECAUSE SOME PEOPLE MAY USE METASTASIS TO MEAN WHAT'S IN 1(B), WHEN THEY'RE SPEAKING AMONG SCIENTISTS, SOME PEOPLE/SCIENTISTS MAY USE WHAT'S IN 1(A), AND THAT MAY BE THEIR INTENT, BUT HERE THE INTENT IN THE PATENT, THE INTRINSIC RECORD, SPECIFICALLY SAYS "METASTASIS IS THE GROWTH OF SECONDARY TUMORS," AND THAT'S WHY THAT SENTENCE, WHICH IS OUR DEFINITION, OUR CONSTRUCTION IS LIFTED DIRECTLY FROM THE SPECIFICATION, THE INTRINSIC RECORD. THANK YOU.

THE COURT: THANK YOU.

GO AHEAD, MR. LAWTON.

MR. LAWTON: I GUESS IT DOES DEPEND ON WHAT THE MEANING OF THE WORD "IS" IS. BUT IF WE WANT TO TALK ABOUT THE INTRINSIC EVIDENCE, OUR SPECIFICATION, I'M ALL FOR IT, SO LET'S DO IT, AND BEFORE WE DO IT, LET'S REMIND THE COURT THAT THE PART OF THE SPECIFICATION THAT MR. PAVANE SHOWED WAS THE BACKGROUND SECTION, NOT THE DESCRIPTION OF THE INVENTION, NOT THE DISCLOSURE OF THE INVENTION, NOT THE MODES OF CARRYING OUT THE INVENTION, THE BACKGROUND.

I'M GOING TO SHOW THE COURT THE MORE PERTINENT PART OF OUR SPECIFICATION WHICH DOES DISCLOSE AND DESCRIBE THE INVENTION.

THE COURT: ARE WE STILL ON THE '384 PATENT? WE'RE ON

THE '384, RIGHT?

MR. LAWTON: I'M PULLING FROM THE '038 SPEC, WHICH IS THE SAME AS THE '384 SPEC.

THE COURT: OKAY.

MR. LAWTON: COLUMN ONE, LINES 24 THROUGH 28 -- PARDON ME, COLUMN FIVE, LINES 24 THROUGH 28, OF THE '038 SPECIFICATION, AND I READ FROM THE MIDDLE SENTENCE, AND I QUOTE, "THE TUMOR IS THUS ALLOWED TO PROGRESS AND DEVELOP AND THE VERTEBRATE IS MONITORED FOR APPEARANCE OF THE GFP-LABELED CELLS AT SITES DISTAL FROM THE ORIGINAL IMPLANTATION SITE."

WHAT IS THAT DESCRIBING? THAT'S DESCRIBING A PROCESS OF STUDYING THE SPREAD OF CANCER THROUGH THE BODY. THAT SENTENCE, AND THE PART THAT I'M HIGHLIGHTING WITH THE LASER POINTER, IS NOT TALKING ABOUT THE APPEARANCE OF A SECONDARY TUMOR AT A SITE DISTAL FROM THE ORIGINAL IMPLANTATION SITE, BUT THE APPEARANCE OF GFP-LABELED CELLS AT SITES DISTAL FROM THE ORIGINAL IMPLANTATION SITE.

WHEN CANCER METASTASIZES, IT SPREADS. IT'S JUST INSIDIOUS. WE'VE SEEN A VIDEO OF WHAT IT LOOKS LIKE, BUT TO PRETEND THAT ALL IT IS IS THE RESULT OF METASTASIS, TO PRETEND THAT METASTASIS ITSELF IS THE RESULT OF METASTASIS, WHICH IS SECONDARY TUMORS SHOWING UP, IS NOT COMMON SENSE, AND WE ARE TOLD BY THE FEDERAL CIRCUIT THAT THE COURT IS TO EMPLOY COMMON SENSE IN CONSTRUING CLAIM TERMS. THIS IS INTRINSIC EVIDENCE. IT IS PART OF OUR SPECIFICATION. IT'S NOT PART OF THE

BACKGROUND OF THE INVENTION. IT'S PART OF THE DISCLOSURE OF THE INVENTION.

THE STEDMAN'S DEFINITION IS IN ACCORD, AND WE'RE TOLD THAT INTRINSIC EVIDENCE -- OR EXTRINSIC EVIDENCE, RATHER, IS ALL RIGHT WHEN IT IS NOT IN CONFLICT WITH THE SPECIFICATION.

I APOLOGIZE FOR THE TECHNICAL DIFFICULTY, BUT WHAT I'M DISPLAYING FOR THE COURT IS A PIECE OF OUR EXTRINSIC EVIDENCE, WHICH IS THE STEDMAN'S MEDICAL DICTIONARY DEFINITION. WHICH TALKS ABOUT, IN DEFINITION TWO, "THE SPREAD OF A DISEASE PROCESS FROM ONE PART OF THE BODY TO ANOTHER, RESULTING FROM THE DISSEMINATION OF TUMOR CELLS BY THE LYMPHATIC OR BLOOD VESSELS OR BY DIRECT EXPRESSION THROUGH SEROUS CAVITIES OR SUBARACHNOID OR OTHER SPACES."

THERE'S NOTHING ABOUT THAT DEFINITION, THAT DOES COME FROM A DICTIONARY, THAT'S AT ALL IN CONFLICT WITH THAT EXCERPT OF COLUMN FIVE OF OUR SPEC, WHICH I READ TO THE COURT, METASTASIS IS THE SPREAD OF CANCER THROUGH THE BODY, INCLUDING BY MIGRATION OF TUMOR CELLS THROUGH THE BLOOD AND LYMPHATIC SYSTEM. WHEN THOSE CELLS APPEAR, AS WE SAW IN THE VIDEO, AT SITES DISTAL FROM THE PRIMARY TUMOR, WHAT DO WE KNOW? WE KNOW THE CANCER IS SPREADING.

THE CRI DEFINITION DOES NOT ACCORD WITH COMMON SENSE. THE CRI DEFINITION WOULD SAY, "SEE THOSE TUMOR CELLS MIGRATING THROUGH THAT BLOODSTREAM, THAT'S NOT METASTASIS. THIS TUMOR ISN'T METASTASIZING AT ALL. THERE'S NO METASTASIS GOING ON,"

NOT UNTIL THE SECONDARY TUMOR SHOWS UP IN THE LUNG OR THE BLADDER OR THE PANCREAS. NOT COMMON SENSE. THANK YOU.

THE COURT: MR. PAVANE.

MR. PAVANE: JUST TO BRING THE FOCUS BACK TO WHAT IT'S SUPPOSED TO BE, THE FOCUS IS SUPPOSED TO BE HOW DID THE INVENTORS USE THE TERM IN THE PATENT, NOT CAN WE GO FIND A DICTIONARY DEFINITION THAT MAY HAVE MEANINGS OR ALTERNATIVE MEANINGS, BUT WHAT HAVE WE DEFINED FROM WHAT THEY SAID. MR. LAWTON POINTED TO THIS PASSAGE IN THE '384 PATENT AT, I BELIEVE, COLUMN FIVE. IT RUNS FROM LINE 23 ON. THERE'S NOTHING IN THAT STATEMENT --

(DISCUSSION OFF THE RECORD.)

MR. PAVANE: IN THE '038 PATENT. I'M LOOKING AT '384. IT'S THE SAME THING.

THE COURT: IT'S THE SAME.

MR. PAVANE: IT'S THE LINE WITH THE UNDERLINE THAT I PUT IN THERE JUST NOW. I DIDN'T REALIZE I WAS MARKING UP THE COPY WE WERE GOING TO USE.

THE POINT I WANT TO MAKE IS MR. LAWTON, WHEN HE REFERRED TO THAT PASSAGE, TALKED ABOUT HOW THIS TALKS ABOUT THIS SPREAD OF CANCER. FIRST OF ALL, THE WORD "SPREAD" AND "MIGRATION" NEVER APPEAR IN THIS PASSAGE. THOSE ARE MR. LAWTON'S WORDS. WHAT THE SENTENCE SAYS IS THAT "YOU'RE LOOKING FOR THE APPEARANCE OF CELLS AT SITES DISTAL FROM THE ORIGINAL IMPLANTATION SITE."

NOW, TUMORS, THAT IS, METASTASES, ACTUALLY TAKING OF A SECONDARY GROWTH, OBVIOUSLY IS COMPOSED OF CELLS. THAT'S WHAT ALL TUMORS ARE MADE UP OF.

THE COURT: AND THOSE CELLS HAD TO GET THERE.

MR. PAVANE: TRUE, THOSE CELLS HAD TO GET THERE, BUT THEY'RE COMPOSED OF CELLS. MY POINT IS, WHEN YOU TALK ABOUT THE APPEARANCE OF CELLS AT SITES DIFFERENT, THERE'S NOTHING THERE THAT'S INCONSISTENT WITH THE DEFINITION GIVEN IN COLUMN ONE, WHICH SAYS THAT IT'S THE GROWTH OF SECONDARY TUMORS. THOSE SECONDARY TUMORS ARE, OF COURSE, COMPOSED OF CELLS AND THEY'RE AT SITES DISTAL FROM THE ORIGINAL TUMOR SITE. SO THE SECONDARY TUMORS -- THE DEFINITION THAT SAYS IT'S THE GROWTH OF SECONDARY TUMORS IS FULLY CONSISTENT WITH THIS PASSAGE. THERE'S NOTHING INCONSISTENT.

THE COURT: THAT DOESN'T SAY "TUMORS" AT SITES DISTAL, IT SAYS CELLS.

MR. PAVANE: THAT'S RIGHT, IT DOES, BUT THE POINT I'M MAKING IS THAT TUMORS ARE COMPRISED OF CELLS. AGAIN, THEY DEFINED IN THE SPEC, IN COLUMN ONE, THEY SAID WHAT METASTASIS IS, SO THEY'RE TELLING US WHAT THEY WANT US TO UNDERSTAND METASTASIS TO BE WHEN USED IN THIS PATENT. THEY'RE ENTITLED TO DO THAT. THEY DID THAT.

NOW THEY WANT TO EXPAND THAT BEYOND SIMPLY THE GROWTH OF SECONDARY TUMORS TO SOMETHING DIFFERENT, TO THE ACTUAL DETECTION OF SPREADING. I DON'T SEE ANYWHERE IN THIS

SPECIFICATION WHERE THEY TALK ABOUT DETECTING SPREADING OF CANCER AS OPPOSED TO DETECTING THE METASTASES THAT ACTUALLY RESULT WHEN THOSE SPREADING CELLS TAKE SOMEWHERE, THAT IS, THEY ATTACH TO TISSUE AND START TO FORM SECONDARY GROWTHS.

AND THAT'S WHAT THEY DEFINE METASTASIS IS, WHICH, AS I POINTED OUT, IS COMPLETELY CONSISTENT WITH ONE OF THE DEFINITIONS THAT WAS IN THE DICTIONARY THAT WE LOOKED AT WHEN I WAS UP HERE LAST TIME, EXHIBIT 15. ONE OF THOSE DEFINITIONS IS THE GROWTH OF SECONDARY TUMORS. THAT'S A WAY PEOPLE USE IT.

SO THEY CHOSE THAT DEFINITION. THEY PUT IT IN THEIR PATENT, AND NOW THEY WANT TO CHANGE IT, AND THE LAW SAYS YOU CAN'T DO THAT. IF YOU MAKE IT CLEAR WHAT YOU MEAN, THAT'S WHAT YOU MEAN, AND NOW DON'T GO OUTSIDE THE PATENT DOCUMENT AND START TELLING ME YOU MEAN SOMETHING ELSE. THANK YOU.

THE COURT: ARE WE CONCLUDED WITH THIS TERM OR DO YOU NEED TO SAY SOMETHING ELSE, MR. LAWTON?

MR. LAWTON: JUST VERY BRIEFLY.

THE COURT: CERTAINLY.

MR. LAWTON: IF THE INTRINSIC EVIDENCE IS JUST SO CONCLUSIVE OF THE MATTER, AS MR. PAVANE INSISTS, THEN WHY IS HIS CLIENT OFFERING A DICTIONARY DEFINITION, WHICH, IRONICALLY, SUPPORTS OUR VIEW, THE COMMON SENSE VIEW OF THE MEANING OF METASTASIS. THE USE OF THE WORD "IS" -- THEY'RE SORT OF OBSESSED WITH THAT -- IT'S AN ILLUSTRATIVE WORD, NOT AN EXCLUSIVE WORD. THANK YOU.

MR. PAVANE: FIFTEEN SECONDS. JUST WHY ARE WE OFFERING A DICTIONARY DEFINITION? WE DIDN'T OFFER A DICTIONARY DEFINITION, AND WE DO NOT. I OFFERED IT SIMPLY TO SHOW, IN RESPONSE TO MR. LAWTON'S OFFERING OF A DICTIONARY DEFINITION, THAT, HEY, IT'S A SLIPPERY SLOPE. YOU CAN FIND DEFINITIONS THAT WILL SAY JUST ABOUT ANYTHING. THERE ARE MULTIPLE DEFINITIONS OUT THERE, ONE OF WHICH IS FULLY CONSISTENT WITH WHAT'S IN THE PATENT. THANK YOU.

MR. LAWTON: THANK YOU, YOUR HONOR. ARE WE ON TO THE NEXT TERM OF PRIMARY TUMORS?

THE COURT: I WASN'T SURE THE WAY YOU GOT UP, MR. LAWTON, BUT YES, WE ARE.

MR. LAWTON: I'M TRYING TO KEEP THIS ON TIME, YOUR HONOR. I FEEL RESPONSIBLE FOR THE TIME TABLE TODAY.

THE COURT: NO, NO, THAT'S FINE. WE'LL GET THROUGH ALL THESE TERMS TODAY. WE'RE ONTO THE SECOND TERM, A PRIMARY TUMOR THAT STABLY EXPRESSES GFP AND CELLS OF SAID TUMOR WHEN SAID TUMOR METASTASIZES.

NOW, LET ME SAY THIS ON THIS ONE, I WAS WONDERING IF KIND OF AN INTERMEDIATE CONSTRUCTION WOULD BE APPROPRIATE IN THIS CASE, AND MAYBE THIS WORKS, MAYBE IT DOESN'T WORK. IT PROBABLY DOESN'T. BUT CONSIDER THIS, A PRIMARY TUMOR WHOSE CELLS AND WHOSE DAUGHTER CELLS MAINTAIN THE EXPRESSION OF GFP DURING METASTASIS.

YOU CAN COMMENT ON THAT. YOU CAN JUST IGNORE IT, MR.

LAWTON. I'LL READ IT AGAIN.

MR. LAWTON: THANK YOU.

THE COURT: A PRIMARY TUMOR WHOSE CELLS AND WHOSE DAUGHTER CELLS MAINTAIN THE EXPRESSION OF GFP DURING METASTASIS.

IF IT DOESN'T WORK, JUST GO OFF AND TELL ME WHAT YOUR POSITION WOULD BE.

MR. LAWTON: THE PROBLEM THAT WE WOULD SEE, YOUR HONOR, AND I APPRECIATE THE COURT COMING UP WITH THAT, AND I THINK WE MAY BE TALKING ABOUT THE SAME IDEA BUT USING DIFFERENT WORDS, IS FINDING AN ADVERB THAT IS SYNONYMOUS WITH "STABLY." WE ARE DESCRIBING A METHOD IN WHICH GFP PRODUCES A SIGNAL THAT IS CONSISTENT OVER TIME, THAT DOESN'T DEGRADE. I'M AFRAID THAT SOME MIGHT READ THE WORD "MAINTAINS THE EXPRESSION," I'M AFRAID SOME MIGHT READ THAT AND SAY MAINTAIN CAN MEAN IF THE SIGNAL DEGRADES OVER TIME --

THE COURT: SO IF THE SIGNAL NEVER DEGRADES, YOUR POSITION WOULD BE THEN IT WOULD HAVE TO CONSISTENTLY MAINTAIN THE EXPRESSION.

MR. LAWTON: RIGHT.

THE COURT: YOU'VE SAID CONSISTENTLY EXPRESS.

MR. LAWTON: RIGHT, AND WE'VE FOUND THAT WORD "CONSISTENTLY" THE CLOSEST TO STABLY THAT WE COULD FIND.

THE COURT: OKAY.

MR. LAWTON: NOW, CRI DOESN'T GIVE US ANYTHING. THEY

GIVE US A BLANK BRACKETED AREA THERE. WE LIKE THE WORD "CONSISTENTLY." WE THINK THAT THE PROBLEM WITH THE CRI DEFINITION, AND POSSIBLY WITH THE "MAINTAINS THE EXPRESSION" PHRASE THAT THE COURT CAME UP WITH, RESPECTFULLY, IS THAT IT BROADENS THE CLAIM, POSSIBLY UNDULY, TO INCLUDE CELLS THAT ARE NOT CONSISTENTLY AND NOT STABLY EXPRESSING GFP, BUT CELLS THAT, YOU KNOW -- ALL CELLS.

THIS IS A VERY SPECIFIC CLAIM TERM. WE DON'T THINK IT'S AN ADEQUATE SUBSTITUTE FOR AN ADVERB LIKE STABLY TO SAY, WELL, LET'S JUST TAKE IT OUT. THERE IS NO ADVERB. WHY IS THE ADVERB THERE IN THE FIRST PLACE UNLESS WE'RE GOING TO CONSTRUE WHAT THAT ADVERB MEANS? WE THINK "CONSISTENTLY" COMES THE CLOSEST TO DOING IT.

THE DICTIONARY DEFINITION OF "STABLE," IF THE COURT DOESN'T LIKE "CONSISTENT."

THE COURT: IS IT UNIFORM? IS IT A UNIFORM EXPRESSION? NO. JUST FOR THE RECORD, I'M LOOKING AT DR. HOFFMAN, HE'S SHAKING HIS HEAD NO, IT'S NOT UNIFORM. I'M NOT MEANING TO GO AROUND YOU, MR. LAWTON, BUT I'M JUST SPECULATING OUT HERE AS TO SYNONYMS AND WORDS. SO GO AHEAD, IT'S NOT UNIFORM EXPRESSION.

MR. LAWTON: THIS IS THE MERRIAM-WEBSTER DICTIONARY DEFINITION OF THE WORD "STABLE," APPENDED TO THE MATERIALS THAT WE HAVE FILED WITH THE COURT, "FIXED, STEADFAST, NOT CHANGING OR FLUCTUATING, UNVARYING, PERMANENT, ENDURING," THEN WE GET INTO EMOTIONAL ILLNESS, AND THAT'S SOMETHING ELSE, BUT THAT IS

WHAT STABLE MEANS. THAT IS THE COMMON SENSE ENGLISH DEFINITION OF THE WORD STABLE.

IN THE CONTEXT OF OUR METHODS, IT MEANS MAINTAINING THE ORIGINAL LEVEL OF EXPRESSION, AND MAYBE THAT WOULD BE A WAY TO AUGMENT THE COURT'S ORIGINAL CONSTRUCTION OF THIS TERM -- OR PROPOSED CONSTRUCTION TO SAY THAT MAINTAINS THE ORIGINAL LEVEL OF EXPRESSION. WE WOULD ABIDE BY THAT, I THINK.

THE COURT: SO WHATEVER THE ORIGINAL LEVEL IS, IS CONTINUOUS AND NEVER FLUCTUATES.

MR. LAWTON: THAT'S RIGHT.

THE COURT: OKAY.

MR. LAWTON: THANK YOU.

THE COURT: OKAY, THANK YOU, MR. LAWTON.

MR. PAVANE.

MR. PAVANE: THANK YOU, YOUR HONOR.

WELL, THAT WAS USEFUL. FIRST OF ALL, I WOULD HAVE ACCEPTED YOUR DEFINITION. YOUR CONSTRUCTION WAS ACCEPTABLE TO OUR SIDE.

THE COURT: OKAY.

MR. PAVANE: AND MR. LAWTON'S PRESENTATION WAS USEFUL INSOFAR AS I NOW UNDERSTAND WHAT HE MEANS BY "CONSISTENTLY," MAINTAINING THE SAME LEVEL OF GFP EXPRESSION OVER TIME. SO, IN OTHER WORDS, IF I UNDERSTAND CORRECTLY, AND I WOULD LOVE TO BE CORRECTED IF I'M WRONG, IF THE GFP IS A CERTAIN BRIGHTNESS IN THE FIRST GENERATION, THE DAUGHTER CELLS ARE GOING TO BE THE

SAME BRIGHTNESS, THEIR GRANDDAUGHTERS ARE GOING TO BE THE SAME BRIGHTNESS, THE GREAT, GREAT GRANDDAUGHTERS, AND SO ON; AM I ACCURATE?

MR. LAWTON: YES.

MR. PAVANE: I'M TOLD YES. OKAY, HERE'S MY PROBLEM WITH THAT.

THE COURT: OKAY.

MR. PAVANE: I HAVE A COUPLE OF PROBLEMS WITH IT. THE FIRST PROBLEM IS I WOULD LOVE TO SEE ANY REFERENCE -- LET ME BACK UP. ANTICANCER CITES NO INTRINSIC SUPPORT WHATSOEVER FOR THE POSITION THAT IT'S ARTICULATING. THERE'S NONE IN THE JOINT CLAIM CONSTRUCTION CHART. NOT A CITE TO THE SPECIFICATION, PROSECUTION HISTORY, NOTHING, NOT A DICTIONARY DEFINITION, NOTHING, SO THIS IS KIND OF NEW STUFF.

BUT PUTTING THAT ASIDE, THERE HAS TO BE -- FOR ANTICANCER TO NOW COME AND ASK THE COURT TO IMPOSE THAT TYPE OF RESTRICTION ON THE CLAIM TERM, THAT EVERYTHING HAS TO HAVE THE SAME BRIGHTNESS ALL THE WAY NO MATTER HOW MANY GENERATIONS YOU GO DOWN, IT SEEMS TO ME THERE OUGHT TO BE SOMETHING THAT DESCRIBES THAT IN THE SPECIFICATION SO THAT A PERSON OF ORDINARY SKILL IN THE ART READING IT IS INFORMED THAT TO VIOLATE THIS CLAIM I'VE GOT TO BE DEVELOPING SOMETHING WHERE MY BRIGHTNESS IS MAINTAINED THROUGH ALL THESE SAME LEVELS.

AND CONVERSELY, AND THIS IS WHAT I'M WORRIED ABOUT BECAUSE WE'RE IN INVALIDITY NOW, THAT I COME UP WITH A

REFERENCE -- A PRIOR ART REFERENCE, THE PRIOR ART REFERENCE TEACHES THAT I'VE GOT GFP THAT IS PRESENT IN DAUGHTER CELLS AND GRANDDAUGHTER CELLS, AND SO ON, AND THEN MR. LAWTON GETS UP AND SAYS, "WAIT A MINUTE, THAT REFERENCE DOESN'T ANYWHERE SAY THAT THE BRIGHTNESS IS THE SAME IN THE GRANDDAUGHTERS AS IT WAS IN THE PARENT, SO THIS IS NOT GOOD PRIOR ART. MINE SAYS STABLY."

WELL, AGAIN, THERE'S NOTHING IN THE SPECIFICATION THAT MAKES CLEAR THAT IT HAS TO HAVE THE SAME LEVEL OF EXPRESSION -- SAME LEVEL OF BRIGHTNESS, IF YOU WILL, IN THE GRANDDAUGHTER CELLS AND ALL THE GENERATIONS THAT IT HAD IN THE ORIGINAL.

I WOULD ALSO LIKE TO SHOW, YOUR HONOR, THIS IS DIRECTLY FROM THE PROSECUTION HISTORY OF THIS PATENT, WHEN THEY WERE GOING BACK AND FORTH WITH THE PATENT EXAMINER TO TRY TO GET CLAIMS ALLOWED, AND YOU'LL HEAR MORE ABOUT THIS AS THE CASE GOES ON. THERE WERE REJECTIONS. THEY ARGUED THEY CHANGED THE CLAIMS. THEY ARGUED WHY THE CLAIMS NOW ARE PATENTABLE. IT WAS REJECTED AGAIN. THEY CAME BACK WITH MORE CHANGES. BUT DURING THE COURSE OF THESE VARIOUS EXCHANGES, ONE OF THE THINGS THAT CAME UP WAS THE EXAMINER QUESTIONED WHAT "STABLY" MEANS. HE DIDN'T KNOW EITHER. HE SUGGESTED TO THEM --

LET ME SEE IF I CAN READ IT. I CAN READ IT FROM HERE. THE EXAMINER -- THIS IS THE EXAMINER SUMMARIZING THE RESULT OF AN INTERVIEW THAT HE HAD WITH ANTICANCER'S LAWYER, WHO WAS PROSECUTING THE CASE FOR THEM, MS. MURASHIGE -- DR. MURASHIGE, WHO MR. LAWTON REFERRED TO EARLIER, AND THE EXAMINER WRITES,

"IN REGARDS TO THE REJECTION OF THE CLAIMS UNDER 35 U.S.C. 103, WHICH IS OBVIOUSLY OVER ZOLOTUKHIN ET AL., CONTAG ET AL., AND ROMER ET AL., IT WAS SUGGESTED THAT THE APPLICANT AMEND THE CLAIMS TO DIFFERENTIATE THE APPLICANT'S CELL LINES WHICH STABLY EXPRESS GFP FROM THOSE TAUGHT BY ZOLOTUKHIN ET AL. BY EITHER INCLUDING THE SPECIFIC RETROVIRAL VECTOR USED BY THE APPLICANTS IN THEIR WORKING EXAMPLES OR BY INCLUDING LANGUAGE WHICH SERVES TO DEFINE THE MEANING OF STABLE EXPRESSION, SUCH AS THE MAINTENANCE OF GFP EXPRESSION OVER A PARTICULAR NUMBER OF CELL DIVISIONS."

IN THE EXAMINER'S MIND HE'S SAYING, "WAIT, OKAY, MAYBE IT MEANS THAT IT'S MAINTAINING EXPRESSION OVER A CERTAIN NUMBER OF CELL DIVISIONS, THAT IS, A CERTAIN NUMBER OF DAUGHTERS AND GRANDDAUGHTERS, BUT AT SOME POINT IT STOPS." IN HIS MIND IT DIDN'T TALK ABOUT THE FACT IT HAD TO BE THE SAME BRIGHTNESS, HE THOUGHT MAYBE IT PETERS OUT AT SOME POINT AND IT'S ONLY A CERTAIN NUMBER OF CELL DIVISIONS THAT YOU CAN HAVE.

SO THE EXAMINER READING THIS SPEC DIDN'T DEVINE THIS CONSTRUCTION OF THE TERM "CONSISTENTLY," THAT I'M NOW HEARING PRESENTED IN THIS COURTROOM. AND I THINK, AGAIN, THIS IS A VERY BROAD CLAIM. IT'S NOT LIMITED TO ANY PARTICULAR CELL LINE. IT TALKS GENERALLY ABOUT CELLS. WE DON'T KNOW IF ALL CELLS ARE GOING TO HAVE THIS PROPERTY THAT MR. LAWTON NOW ATTRIBUTES TO THE TERM "STABLY." THE CLAIM IS FAR BROADER THAN THAT.

AND SO I THINK THE ONLY TYPES OF DEFINITION THAT WOULD BE APPROPRIATE, IF YOU'RE GOING TO CONSTRUE IT AT ALL, AND I'M NOT SURE IT NEEDS CONSTRUCTION BECAUSE "STABLY" IS A WORD, AND I THINK MOST PEOPLE UNDERSTAND "STABLY," AND I THINK YOU COULD JUST LEAVE IT, AND THEN WE COULD ARGUE ABOUT WHETHER A REFERENCE IS STABLE OR NOT, BUT I THINK IT'S TOTALLY INAPPROPRIATE FOR THEM TO NOW TAKE THE POSITION THAT "STABLY" SOMEHOW IMPARTS THIS AMAZING CHARACTERISTIC -- AND I DON'T KNOW IF IT'S AMAZING OR NOT, I SHOULDN'T SAY THAT, BUT THIS CHARACTERISTIC OF THE SAME BRIGHTNESS NO MATTER HOW MANY GENERATIONS OF DIVISION YOU GO THROUGH. IT'S JUST NOT SUPPORTED ANYWHERE. THANK YOU.

THE COURT: I MEAN, IF WE JUST LOOKED AT "STABLE EXPRESSION OF GFP," "STABLE EXPRESSION," TO THE COURT, PUTTING A LOT OF THIS ASIDE, TO THE COURT THAT WOULD MEAN CONSISTENT.

MR. LAWTON: RIGHT.

THE COURT: IT WOULDN'T MEAN PEAKS. IT WOULDN'T MEAN VALLEYS. IT WOULDN'T MEAN DECLINES. IT WOULD MEAN STABLE EXPRESSION. I MEAN, SOMETIMES IN ALL OF THIS WE JUST GET DOWN TO WHAT DOES THIS REALLY SAY?

I MEAN, HELP ME HERE, MR. LAWTON, WITH YOUR POSITION ON THIS. IT'S JUST ONE VIEW OF IT.

MR. LAWTON: THE COURT IS RIGHT. THEY WANT TO TAKE THE WORD "STABLY" AND JUST READ IT OUT OF THE PATENT, OUT OF THE CLAIM TERM ITSELF. THEY SEE THAT ADVERB "STABLY," THEY DON'T

LIKE IT FOR SOME REASON BECAUSE IT INTERFERES WITH THEIR STRATEGY OF GETTING OUR PATENTS INVALIDATED SO THEY SAY, "LET'S JUST TAKE THE WORD OUT. LET'S PRETEND THE WORD ISN'T THERE." YOU SAW THE GAP IN THE BRACKETS. HOW CAN WE DO THAT?

THE COURT: HE SAID IT NEEDS NO CONSTRUCTION, THAT WAS ONE OF HIS COMMENTS. WOULD YOU AGREE WITH THAT?

MR. LAWTON: NO, I WOULDN'T AGREE WITH THAT BECAUSE IT'S OBVIOUS THAT THEY DON'T AGREE WITH THE COMMON SENSE DEFINITION THAT THE COURT IS EXPRESSING WHICH MEANS CONSISTENTLY, FIXED, STEADFAST, NOT VARYING.

THE COURT: DR. HOFFMAN DOESN'T LIKE IT, BUT IT'S UNIFORM EXPRESSION.

MR. LAWTON: YES, OVER TIME.

THE COURT: THERE ARE A LOT OF DOCTORS AND SCIENTISTS IN THE COURTROOM TODAY. TO A LAYPERSON.

MR. LAWTON: THE COURT IS APPLYING COMMON SENSE, AND WE'RE TOLD BY THE FEDERAL CIRCUIT THAT COMMON SENSE PLAYS A ROLE IN THE CONSTRUCTION OF CLAIM TERMS THAT HAVE MEANINGS THAT ARE SUSCEPTIBLE TO INTERPRETATION BY LAY PEOPLE.

NOW, TO RESPOND TO A COUPLE OF -- SO I THINK THE COURT IS RIGHT. I LIKE THE IDEA THE COURT IS EXPRESSING. I THINK IT'S COMMON SENSE, AND I THINK IT'S CONSISTENT WITH THE CLAIM TERM ITSELF.

MR. PAVANE SAYS, "WELL, THEY HAVEN'T OFFERED ANY EXTRINSIC EVIDENCE WHATSOEVER TO SUPPORT THIS MEANING THAT THEY

ATTRIBUTE TO THE WORD 'STABLY,'" MAYBE OVERLOOKING, FOR A MOMENT, THAT THE CLAIM TERMS THEMSELVES ARE INTRINSIC EVIDENCE, AND, AS WE KNOW, THE CLAIM TERMS THEMSELVES GIVE GUIDANCE AS TO THE MEANING OF A PARTICULAR CLAIM TERM.

THAT'S ACCORDING TO THE FEDERAL CIRCUIT IN *PHILLIPS*, AND IT'S ALSO ACCORDING TO THIS COURT IN THE *MYTEE PRODUCTS* CASE WHERE THE COURT SAID THAT "CLAIM CONSTRUCTION CENTERS ON THE WORDS ACTUALLY USED IN THE CLAIMS. CLAIM CONSTRUCTION BEGINS AND ENDS WITH THE ACTUAL WORDS OF THE CLAIMS." THOSE ARE YOUR HONOR'S WORDS. THOSE ARE WISE WORDS. THEY WANT TO SAY, "TAKE A WORD IN A CLAIM TERM. IT REALLY ISN'T THERE. IT DOESN'T BELONG THERE, JUST LEAVE A GAP."

THEY SAY THAT WE DON'T CITE A DICTIONARY DEFINITION. WE DO CITE A DICTIONARY DEFINITION, THE MERRIAM-WEBSTER, THAT WE'VE ALREADY DISPLAYED FOR THE COURT.

THEY WANT TO SAY THAT WE OFFER NOTHING FROM THE SPECIFICATION THAT WOULD SUPPORT OUR DEFINITION, AND MR. PAVANE HIMSELF DOESN'T HAVE ANYTHING FROM THE SPECIFICATION THAT SUPPORTS READING THE CLAIM TERM OUT OR READING THAT WORD OUT, NOTHING. THE ONE SNIPPET THAT THEY CITE FROM THE SPECIFICATION NOWHERE USES ANY OF THE WORDS IN THEIR PROFFERED CONSTRUCTION, WHICH IS DAUGHTER CELLS WHICH EXPRESS GFP DURING METASTASIS, THAT'S THEIR PROFFERED CONSTRUCTION. THERE'S NOTHING IN THE SPECIFICATION THAT SAYS THAT, AND THE PART OF THE SPECIFICATION THAT THEY CITE FOR THAT DOESN'T HAVE THOSE WORDS.

ABOUT PROSECUTION HISTORY, THERE'S REASON THAT IN THE HIERARCHY OF CANONS OF CONSTRUCTION THAT WE HAVE THAT PROSECUTION HISTORY FALLS BELOW THE CLAIM TERMS THEMSELVES, THE SPECIFICATION. WHY? WELL, PROSECUTION HISTORY REFLECTS A NEGOTIATION OFTEN BETWEEN EXAMINERS AND PATENTEES, AND IT'S NOTABLE, IN THIS INSTANCE, THAT THE CHANGE THAT MR. PAVANE SAYS THE EXAMINER WAS SUGGESTING WAS NOT DONE, AND YET THE PTO ISSUED THE PATENT ANYWAY.

I THINK THAT'S A PRETTY GOOD ILLUSTRATION RIGHT THERE OF WHY PROSECUTION HISTORY IS NOT ALWAYS A GOOD GUIDE TO CLAIM CONSTRUCTION, WHEREAS, HERE WE HAVE A PLAIN ENGLISH WORD THAT'S SUSCEPTIBLE OF A DICTIONARY DEFINITION. THE CLAIM TERM ITSELF ACCORDS WITH WHAT THE COURT IS THINKING. THANK YOU.

MR. PAVANE: MAY I?

THE COURT: CERTAINLY, MR. PAVANE.

MR. PAVANE: I HAVE A COUPLE QUICK POINTS I WANT TO MAKE.

I THINK A LITTLE BIT LIKE PASSING SHIPS IN THE NIGHT, THE -- FIRSTLY, IF I UNDERSTOOD CORRECTLY, THE "MAINTAINING" THAT YOUR HONOR WAS REFERRING TO WAS THE FACT THAT THE EXPRESSION IS MAINTAINED IN THE DAUGHTER CELLS, WITH WHICH WE HAVE NO DISPUTE. WE AGREE WITH THAT.

THE COURT: WHAT YOU DON'T AGREE WITH IS THE CONSISTENT LEVEL.

MR. PAVANE: THAT THE LEVEL -- OF THE GLOWING

BRIGHTNESS LEVEL. THE EXPRESSION IS CONSISTENTLY OCCURRING, THE EXPRESSION ITSELF; IN OTHER WORDS, THE GFP IS ALWAYS BEING EXPRESSED IN THE DAUGHTER CELLS, BUT THAT DOESN'T SPEAK ANYTHING TO HOW BRIGHT IT IS IN THE PARENT VERSUS THE DAUGHTER VERSUS THE GRANDDAUGHTER. THAT'S NOT SOMETHING THAT'S EXPLAINED ANYWHERE IN THE PATENT SPECIFICATION. NOWHERE WILL YOU FIND A DISCUSSION OF THAT. AND ALSO --

THE COURT: LET ME JUST STOP YOU FOR A SECOND.

MR. PAVANE: SURE.

THE COURT: DOES THAT RELATE TO THE DEGREE AND LEVEL OF EXPRESSION?

MR. PAVANE: I THINK THEY'RE TWO DIFFERENT CONCEPTS.

THE COURT: I DON'T KNOW. YOU'RE ALL SCIENTISTS OUT THERE AND LAWYERS, WHETHER OR NOT SUBSEQUENT GENERATIONS DOWN THE CHAIN WITH THE SAME LEVEL OF EXPRESSION HAVE THE SAME GLOWING EFFECT, I DON'T KNOW, COULD BE OR MAYBE THEY DON'T, I DON'T KNOW.

MR. PAVANE: I DON'T KNOW EITHER, AND THE POINT IS THAT IT'S NOT IN THE SPEC AND IT'S NOT EXPLAINED ANYWHERE. IF THAT'S THE SCIENTIFIC FACT OF THE MATTER, AND THEY'RE GOING TO COME INTO COURT AT SOME POINT DURING THE VALIDITY AND SAY THAT THAT'S A SCIENTIFIC FACT, AND IT HAS TO BE, WELL, THEN IT'S ALSO GOING TO BE EQUALLY TRUE OF THE PRIOR ART THAT HAS THE SAME --

THE COURT: AREN'T WE JUST TALKING ABOUT THE CONSISTENT

LEVEL OF EXPRESSION, WITHOUT WORRYING ABOUT WHAT THE EFFECT IS FOUR GENERATIONS DOWN ON THESE CELLS.

MR. PAVANE: EXACTLY. I AGREE WITH THAT.

THE COURT: SO WHETHER IT'S THE SAME DEGREE OF FLUORESCENCE OR NOT, THAT'S NOT WHAT WE'RE TALKING ABOUT HERE.

MR. PAVANE: THAT'S MY UNDERSTANDING, AND THAT'S WHY I WAS PREPARED TO ACCEPT YOUR HONOR'S PROPOSED CONSTRUCTION.

I JUST HAVE ONE OTHER POINT I WANT TO MAKE, JUST TO RESPOND.

THE COURT: SURE.

MR. PAVANE: I JUST WANT TO BE CLEAR THAT WE'RE NOT TRYING, AS MR. LAWTON SUGGESTS, TO READ ANYTHING OUT OF THE CLAIM, TO IGNORE "STABLY." I THINK YOU HAVE TO READ THE CLAUSE THAT WE'RE TRYING TO CONSTRUE IN THE CONTEXT OF THE CLAIM, I MEAN, OBVIOUSLY COMMON SENSE.

SO IT SAYS, "ADMINISTERING SAID PROTOCOL OR DRUG TO A MAMMALIAN SUBJECT WHICH CONTAINS A PRIMARY TUMOR," AND HERE WE GO, "THAT STABLY EXPRESSES GREEN FLUORESCENT PROTEIN IN CELLS OF SAID TUMOR WHEN SAID TUMOR METASTASIZES." OKAY, SO ALL WE'RE SAYING IS THE "STABLY" IS MAKING IT CLEAR THAT THAT GFP EXISTS NOT ONLY IN THE TUMOR BUT WHEN THE TUMOR METASTASIZES, I.E., DIVIDES, DAUGHTER CELLS, GRANDDAUGHTER CELLS, IT'S GOING TO STILL BE PRESENT IN THOSE DAUGHTER AND GRANDDAUGHTER CELLS, EXACTLY WHAT YOUR HONOR SAID, THE EXPRESSION WILL CONTINUE.

SO "STABLY" IS SIMPLY EXPLAINING THAT CONCEPT WHICH IS

RIGHT -- ARTICULATED DIRECTLY IN THE CLAIM ITSELF BY THE WORD METASTASIZES. IT DOESN'T SAY WHOSE CELLS -- YOU UNDERSTAND, YES, THANK YOU.

THE COURT: CAN WE MOVE ON TO THE NEXT TERM?

MR. LAWTON: YES, YOUR HONOR.

THE COURT: OKAY. WE'RE TO FLUORESCENT OPTICAL TUMOR IMAGING.

MR. LAWTON: THE ONE PART OF THIS CLAIM TERM WHERE WE DON'T AGREE INVOLVES THE NAKED EYE. WE THINK THAT'S A PHRASE THAT IS CONFUSING AND UNNECESSARY. WHEREVER YOU LOOK IN THE SPECIFICATION ABOUT HOW YOU'RE DOING IMAGING, VIA THE METHODS CLAIMED IN THE TWO PATENTS, THE '038 AND THE '384, YOU'RE READING ABOUT THE USE OF AN INSTRUMENT LIKE THE FLUORVIVO IMAGING SYSTEM THAT WE SAW DEMONSTRATED EARLIER THIS MORNING.

I WON'T BELABOR ALL THE CITATIONS, BUT IT'S FAIR TO SAY THAT OBSERVATION BY THE NAKED EYE IS NOT MENTIONED IN THE SPECIFICATION AND YET IT IS A PHRASE THAT CRI WANTS TO ADD TO THE CONSTRUCTION. IT'S NOT SUGGESTED BY THE CLAIM TERMS. IT'S NOT SUGGESTED IN THE SPECIFICATION OR ANY OTHER INTRINSIC EVIDENCE. WE THINK IT'S SUPERFLUOUS AND MISLEADING.

MR. PAVANE HAD A QUESTION AT THE END OF OUR LIVE DEMONSTRATION AND HE SAID, "WELL, COULDN'T YOU -- IF YOU TOOK AWAY THE CAMERA OFF THE TOP OF THE BOX, COULDN'T YOU JUST LOOK THROUGH THE FILTER AND SEE THE GFP-EXPRESSING TUMORS IN THE MICE?" AND I SAID AT THE TIME "THE ANSWER IS YES," BUT IT'S

IMPORTANT TO REMEMBER THAT THE QUESTION THAT MR. PAVANE ASKED WAS PREDICATED ON USING THE REST OF THAT APPARATUS. THAT'S NOT THE CAMERA, THE FILTER -- THE YELLOW FILTER, AND THE EXCITATION LIGHTS. THOSE ARE PART OF THE INSTRUMENT.

IF YOU TOOK THESE MICE, YOUR HONOR, AND WE CAN DO IT WITH A LITTLE MORE DETAIL IF THE COURT WANTS TO DO IT, IF YOU TOOK THESE MICE AND YOU PUT THEM OUT HERE ON THIS CABINET IN FRONT OF THE WELL, AND YOU TRIED TO SEE THOSE TUMORS THAT WE SAW DISPLAYED ON THE SCREEN THIS MORNING, WITH THE COURT'S NAKED EYE, UNDER THESE LIGHTS OVERHEAD HERE, THE COURT WOULD NOT SEE THEM WITH THE NAKED EYE.

WHAT DOES THE NAKED EYE REALLY MEAN? I THINK TO CRI IT MEANS IF I'M USING MY EYE, INCLUDING WITH AN INSTRUMENT -- IF I TAKE MY NAKED EYE AND I PUT IT UP TO THE LENS OF A TELESCOPE, I CAN SEE, YOU KNOW, NEPTUNE ON A CLEAR NIGHT, I DON'T KNOW, FROM MY FRONT YARD. BUT IF I'M STANDING IN MY FRONT YARD WITHOUT A TELESCOPE, WITH JUST MY NAKED EYE, UNAIDED BY AN INSTRUMENT, I'M NOT GOING TO SEE NEPTUNE PROBABLY, OR A LOT OF OTHER THINGS THAT ARE OUT THERE.

BY THE SAME TOKEN, WE ARE NOT GOING TO SEE FLUORESCENCE EXPRESSED THROUGH THE SKIN OF AN OPAQUE ANIMAL WITHOUT THE AID OF INSTRUMENTS, MICROSCOPES, LIKE SOME OF THE VIDEOS THAT WE SAW. WE WERE DOWN TO THE CELLULAR AND SUBCELLULAR LEVEL ON THOSE TWO VIDEOS THAT WE SAW OF THE BLOODSTREAM IN THE TUMOR IN THE MOUSE. NOT SOMETHING THAT YOU CAN SEE WITH THE NAKED EYE,

NO WAY, AND YET WHAT THEY WANT THE COURT TO CONSTRUE IS THE NAKED EYE, AND THAT'S JUST NOT IN ANY WAY CONSISTENT WITH OUR METHODS.

THERE ARE A COUPLE OF OTHER TERMS HERE. WE'RE TALKING ABOUT TUMOR CELLS, NOT JUST TUMORS. THEY SEEM TO WANT TO LIMIT IT TO TUMORS.

I'LL JUST CONCLUDE WITH THIS QUOTATION FROM ONE PIECE OF EXTRINSIC EVIDENCE THAT WE OFFERED. AND THE INTRINSIC EVIDENCE FROM THE SPECIFICATION IS VERY THOROUGH, SO I DON'T THINK THE COURT NEEDS TO STRAY FAR FROM THAT. BUT IF IT WANTED TO, ON THIS IDEA OF WHAT IS THE NAKED EYE, WE HAVE THE AMERICAN HERITAGE DICTIONARY OF IDIOMS, AND THIS WAS SUBMITTED WITH OUR MATERIALS, AND I QUOTE, "SIGHT UNASSISTED BY AN INSTRUMENT, SUCH AS A MICROSCOPE OR TELESCOPE, FOR EXAMPLE, THESE INSECTS ARE TOO SMALL TO BE SEEN WITH THE NAKED EYE." DICTIONARY DEFINITION. COMMON SENSE. THANK YOU.

THE COURT: OKAY, THANK YOU.

MR. PAVANE.

MR. PAVANE: THANK YOU, YOUR HONOR.

FIRSTLY, I DIDN'T HEAR ANY ARGUMENT AT ALL REGARDING ANTICANCER'S PROPOSAL FOR INCLUSION OF THE TERMS "REAL TIME" AND "CONTINUOUS," AND I DON'T THINK -- SO I DON'T KNOW WHETHER YOU'RE ABANDONING THAT OR RELYING ON YOUR PAPERS FOR THAT.

MR. LAWTON: NO.

MR. PAVANE: OKAY, NOT ABANDONING IT. SO I WANT TO

ADDRESS THAT AS WELL.

I THINK THE FIRST THING THAT I WANT TO POINT OUT IS THERE'S A TERM HERE, FLUORESCENT OPTICAL TUMOR IMAGING. ALL OF THOSE WORDS HAVE MEANINGS AND -- FAIRLY ORDINARY COMMON MEANINGS, AND THE QUESTION IS SHOULD WE NOW START IMPARTING LIMITATIONS AND RESTRICTIONS ON WHAT THAT REALLY MEANS.

NOW, I WASN'T FULLY CLEAR ON THIS ISSUE ABOUT NAKED EYE THAT MR. LAWTON WAS SAYING. IN OTHER WORDS, IF MR. LAWTON IS SAYING IT CAN'T BE BY THE NAKED EYE BECAUSE YOU HAVE TO LOOK THROUGH A YELLOW LENS, AND HAVE AN EXCITATION LIGHT, WE AGREE THAT THAT, AT A MINIMAL, IS NECESSARY, BUT THERE'S NO NEED FOR A MICROSCOPE. THERE'S NO NEED FOR A CAMERA, AND THERE'S NO NEED FOR ANY OTHER INSTRUMENTS IN MANY APPLICATIONS.

NOW, AGAIN, THE CLAIM -- AGAIN, WE MUST REMEMBER THE CLAIM IS NOT LIMITED TO SIMPLY LOOKING AT THOSE TINY CELLS THAT MR. LAWTON PUT UP ON THE SCREEN. YES, TO LOOK AT THOSE, WOULD YOU HAVE TO USE A MICROSCOPE? OF COURSE, YOU HAVE TO MAGNIFY THAT. THE CLAIM IS MUCH BROADER THAN THAT. IT COVERS LOOKING AT LARGE TUMORS. SO THERE ARE MANY THINGS IN WHICH YOU WON'T NEED ANY KIND OF EXTRA IMAGING EQUIPMENT TO SEE, YOU CAN SEE IT WITH THE "NAKED EYE."

I WOULD LIKE TO REFER YOUR HONOR TO COLUMN -- AGAIN, INTRINSIC RECORD, IF WE COULD LOOK AT COLUMN FIVE.

THE COURT: ARE WE IN THE '038?

MR. PAVANE: I'M SORRY, I'M LOOKING IN THE '384, YOUR

HONOR, COLUMN FIVE, ABOUT LINE 26, LET'S START THERE, DOWN TO ABOUT LINE 33, 34, SO THE SPECIFICATION SAYS "THE MONITORING," THAT IS, THE MONITORING OF THE GFP LABELED CELLS, "CAN OCCUR EITHER ON THE WHOLE VERTEBRAE, BY OPENING THE ANIMAL AND OBSERVING THE ORGANS DIRECTLY WITH A FLUORESCENT MICROSCOPE, OR THE TISSUES MAY BE EXCISED AND EXAMINED MICROSCOPICALLY." SO YOU CAN CUT THE ANIMAL OPEN AND LOOK IS WHAT THAT'S SAYING.

THEN IT GOES ON TO SAY, "IN SOME CASES, THE TUMORS ARE SUFFICIENTLY BRIGHT THAT OPENING THE ANIMAL IS UNNECESSARY, THEY CAN BE SEEN DIRECTLY THROUGH THE SKIN. IN ANY CASE, AS GFP IS VISIBLE TO THE NAKED EYE, NO DEVELOPMENT SYSTEMS TO STAIN THE TISSUE SAMPLES ARE REQUIRED." SO THEY'RE ACKNOWLEDGING THAT IN SOME SITUATIONS YOU CAN SEE THIS WITH THE NAKED EYE, AND WE JUST WANT TO BE SURE THAT'S ENCOMPASSED WITHIN THE DEFINITION. WE'RE NOT SAYING IT'S LIMITED TO VIEWING BY THE NAKED EYE, ABSOLUTELY NOT, WE JUST WANT TO BE CLEAR THAT LOOKING AT A GFP-GLOWING INTACT ANIMAL IS SOMETHING THAT IS WITHIN THE SCOPE OF THE DEFINITION. YES, IT ALSO INCLUDES LOOKING WITH A CAMERA. IT INCLUDES LOOKING WITH A MICROSCOPE, AND SO ON. SO IT'S A QUESTION OF INCLUSION VERSUS EXCLUSION.

I ALSO WANT TO TALK BRIEFLY ABOUT THE "REAL TIME" AND "CONTINUOUS." YOU KNOW, IT'S A LITTLE UNUSUAL HERE BECAUSE NORMALLY WHAT HAPPENS IS THAT WHEN A PLAINTIFF BRINGS A PATENT SUIT, AND THEN THEY HAVE A CLAIM, AND THEN THEY'RE TYPICALLY

TRYING TO IMPORT LIMITATIONS INTO THE CLAIM TO TRY TO SAVE THE CLAIM, TO MAKE THE CLAIM -- LET ME BACK UP. I HAD IT BACKWARDS.

NORMALLY WHAT HAPPENS IS THE INFRINGER IS TRYING TO IMPORT LIMITATIONS INTO THE CLAIM SO HE CAN SAY, "LOOK, IT MEANS THIS, AND I DON'T HAVE THAT SO I DON'T INFRINGE." HERE WE'RE KIND OF IN THE REVERSE SITUATION. THEY WANT TO DRAG "REAL TIME" AND "CONTINUOUS" INTO THE DEFINITION THAT THEY'VE OFFERED FOR THE TERM FLUORESCENT OPTICAL TUMOR IMAGING SO PRESUMABLY, AND I'M NOT SURE OF THIS, BUT PRESUMABLY SO THEY CAN THEN ARGUE, "OH, THAT PIECE OF PRIOR ART OVER THERE IS NOT REAL TIME AND CONTINUOUS," AND THEREBY TRY TO SAVE THEIR CLAIM, SO IT'S A LITTLE BIT OF A REVERSE SITUATION.

THE BOTTOM LINE IS, AGAIN, THE WORDS THEMSELVES, THE COMMON, EVERYDAY WORDS, WHERE IN THOSE FOUR WORDS DO WE IMPORT LIMITATIONS OF REAL TIME AND CONTINUOUS? THE FEDERAL CIRCUIT HAS TOLD US AGAIN AND AGAIN UNLESS THERE'S SOME BASIS IN THE CLAIM ITSELF FOR READING A TERM OR A PHRASE A PARTICULAR WAY, YOU SHOULDN'T START IMPORTING PREFERRED EMBODIMENTS FROM THE SPECIFICATION INTO THE CLAIM, BUT YET THAT'S EXACTLY WHAT THEY WANT TO DO. THEY POINT TO CERTAIN PASSAGES WHERE IT TALKS ABOUT YOU CAN DO THIS IN REAL TIME. I THINK THE LANGUAGE IS, "FOTI PERMITS THIS TO BE DONE IN REAL TIME." AND THEY SAY, "THERE, SEE, IT SAYS REAL TIME." WELL THAT'S A PARTICULAR EMBODIMENT, AND YOU DON'T IMPORT EMBODIMENTS INTO THE

SPECIFICATION.

MOREOVER, WE CITED A CASE TO YOUR HONOR REGARDING THE SPECIFIC WORD "PERMITS," AND THAT CASE SAYS THAT "PERMITS" IS A WORD OF -- LET ME SEE, IS A NON-LIMITING WORD. IT'S AN EXAMPLE. IT DOESN'T REQUIRE IT SIMPLY BECAUSE IT PERMITS IT.

SO THERE'S ABSOLUTELY NO BASIS IN THE CLAIM WORDS THEMSELVES OR IN ANYTHING THAT'S A DEFINITION IN THE SPECIFICATION THAT JUSTIFIES IMPORTING THOSE LIMITATIONS INTO THE CLAIM. THANK YOU.

MR. LAWTON: IF MR. PAVANE IS RIGHT ABOUT WHAT THE SPECIFICATION THAT HIS CLIENT DIDN'T WRITE MEANS, WE CAN TAKE SOME OF THESE MICE OUT, NOT USING THE IMAGING SYSTEM, NOT OUT OF THE CAGE, NOT LET THEM ESCAPE, BUT LOOK AT THEM IN THEIR CAGE WITH OUR NAKED EYES AND SEE WHETHER WE CAN SEE ANY OF THE TUMORS THROUGH THEIR SKIN WITH OUR NAKED EYE.

WOULD THAT BE AN EXERCISE THAT MIGHT HELP THE COURT?

THE COURT: WELL, I'VE SEEN THEM. I DID LOOK AT THEM ALREADY.

MR. LAWTON: I THINK THE COURT REMEMBERS WELL WHAT WE SAW WHEN WE WERE THERE IN THE WELL TOGETHER. WE DIDN'T SEE ANY TUMORS THROUGH SKIN WITH THE NAKED EYE.

I THINK THAT A COMMON SENSE READING OF THAT PASSAGE, THAT MR. PAVANE HAS SNIPPETED FOR THE COURT, IS THAT WITH YOUR NAKED EYE AND A YELLOW FILTER AND A BLUE EXCITATION LIGHT YOU CAN SEE DIRECTLY THROUGH THE SKIN, AS YOU COULD IN THE

HYPOTHETICAL THAT MR. PAVANE POSITED THIS MORNING DURING OUR TUTORIAL.

IF YOU TOOK THE CAMERA OFF THE TOP OF THE BOX AND YOU TOOK YOUR NAKED EYE AND STUCK IT DOWN OVER THE APERTURE, AND THE TOP OF BOX AND YOU LOOKED THROUGH THE YELLOW FILTER WITH THE BOX CLOSED AND THE BLUE EXCITATION LIGHT ON, YOU COULD SEE THE TUMORS THROUGH THE SKIN, YES, YOU COULD DO THAT, BUT THAT IS NOT WHAT THEY MEAN.

FOR SOME REASON, THEY INSIST ON A CONSTRUCTION THAT WOULD CREATE A CONFUSING IMPRESSION WITH A JUROR OR WITH THE COURT ITSELF, WHICH IS THAT THESE METHODS INCLUDE LOOKING AT FLUORESCENT TUMORS WITHOUT THE AID OF ANY INSTRUMENT, AND THAT ISN'T -- THAT'S IMPOSSIBLE. IT CAN'T BE DONE.

I APOLOGIZE FOR NOT ADDRESSING "REAL TIME" AND "CONTINUOUS." I SHOULD HAVE DONE THAT. I KNOW THAT CRI LIKES TO EMPHASIZE THE IMPORTANCE OF THE SPECIFICATION IN CERTAIN SETTINGS, SO LET'S LOOK AT THE SPECIFICATION ON "REAL TIME" AND "CONTINUOUS."

WE'RE STARTING WITH THE '038 SPECIFICATION AT COLUMN THREE, LINES 19 THROUGH 22. AND THIS SAME LANGUAGE, JUST FOR THE RECORD, IS REPEATED IN THE '384 SPECIFICATION, SAME COLUMN THREE, LINES 15 THROUGH 18, REAL TIME (INDICATING).

LET'S LOOK AT COLUMN FIVE, REAL TIME, CONTINUOUS (INDICATING).

COLUMN 12, THIS PASSAGE DOESN'T CONTAIN THE WORD "REAL

TIME" BUT IT IMPLIES WHAT WE ARE DOING IS WE ARE LOOKING IN REAL TIME BECAUSE IT'S TALKING ABOUT THE PROGRESS OF METASTASIS, SOMETHING THAT CAN BEST BE MEASURED IN REAL TIME.

SO IF CRI WANTS TO TALK ABOUT SPECIFICATION, I CAN DO THAT ALL DAY. ON "REAL TIME" AND "CONTINUOUS," I THINK THE SPECIFICATION HAS AT LEAST TWO REFERENCES TO "REAL TIME" AND "CONTINUOUS" THAT WE'VE SHOWN THE COURT.

CRI IN ITS BRIEF DID HAVE A POINT THAT I WANTED TO ADDRESS BRIEFLY. THEY SAY THAT THE INVENTORS WOULDN'T HAVE USED THE WORDS "REAL TIME" THE WAY WE THINK -- THEY SAY THE INVENTORS WOULDN'T HAVE USED THE WORDS "REAL TIME" IN THE MANNER WE THINK THOSE WORDS MEAN BECAUSE USING REAL TIME TO DEFINE OUR METHOD WOULD BE REDUNDANT.

IN OTHER WORDS, THEY SAY, IF THE INVENTORS MEANT REAL TIME, THEY WOULDN'T HAVE SAID REAL TIME AS THEY DID, SO BY SAYING REAL TIME THEY DIDN'T REALLY MEAN REAL TIME BECAUSE THAT WOULD BE REDUNDANT OF THE CLAIM TERM. THAT'S NONSENSE, YOU KNOW, THESE INVENTORS SAID REAL TIME. WE SAW THE PASSAGES, THEY MEANT REAL TIME. THEY SAID "CONTINUOUS." THEY MEANT IT. AGAIN, CRI, WITH RESPECT TO THEM, IS TRYING TO FOIST ON US CONSTRUCTIONS THAT READ WORDS OUT. NOW, WE SHOULDN'T DO THAT. THANK YOU.

MR. PAVANE: AGAIN, FIRST PRINCIPLES, SIMPLY BECAUSE YOU CAN FIND A REFERENCE IN THE SPEC TO A SPECIFIC EMBODIMENT THAT TALKS ABOUT IT CAN BE REAL TIME AND CONTINUOUS IS NOT A

BASIS FOR IMPORTING THAT INTO THE CLAIM. IF THEY WANTED TO HAVE THAT AS A LIMITATION IN THE CLAIM, IT WOULD HAVE BEEN EASY ENOUGH TO SAY FOTI ON A REAL TIME AND CONTINUOUS BASIS, AND IT DOESN'T SAY THAT.

WOULD YOUR HONOR OBJECT IF WE TURN THE LIGHTS OFF IN THE COURTROOM FOR FIVE SECONDS, ONE SECOND -- COULD WE JUST DO THAT, JUST ONE SECOND.

IF IT WAS REALLY DARK AND THE SCREEN WEREN'T THERE, COULD ANYBODY SEE ANYTHING? PROBABLY NOT. LET'S TURN THE LIGHTS BACK ON.

OKAY, NOW I'M SEEING YOU WITH MY NAKED EYE. I NEED LIGHT TO SEE YOU, OBVIOUSLY, THAT'S STILL WITH MY NAKED EYE. NOBODY WOULD ARGUE THAT BECAUSE LIGHT HAS TO BE ON IN THE ROOM I CAN'T SEE YOU WITH -- THAT THAT MEANS THAT I'M NOT LOOKING AT YOU WITH MY NAKED EYE. OF COURSE, I AM, AND THAT'S ALL WE'RE SAYING. THE POINT OF OUR NAKED-EYE ARGUMENT IS NOT THAT YOU DON'T NEED EXCITATION LIGHT, YOU DO. BUT YOU DON'T NEED A CAMERA. YOU DON'T NEED A MICROSCOPE. THERE ARE SITUATIONS WHERE YOU CAN EASILY SEE THE MOUSE GLOWING.

NOW, EVEN IF THE MOUSE THAT MR. LAWTON HAD IN THAT -- WELL, THEY'RE NOT HERE ANYMORE, I GUESS.

MR. LAWTON: THEY ARE HERE.

MR. PAVANE: EVEN IF THEY WEREN'T ABLE TO SHOW YOU GREEN WITHOUT THE AID OF A CAMERA, AND THAT'S -- I DON'T KNOW HOW SENSITIVE THAT CAMERA IS, BUT EVEN IF THEY WEREN'T ABLE,

THAT WOULDN'T PROVE ANYTHING. THAT WOULD PROVE THAT THOSE PARTICULAR MICE, WITH THAT PARTICULAR TUMOR, WITH WHATEVER THEY DID TO IT, IS NOT BRIGHT ENOUGH TO BE SEEN BY THE NAKED EYE, I.E, UPON EXCITING IT AND LOOKING AT IT WITH BLUE LIGHT. IT DOESN'T SAY ANYTHING ABOUT THE BILLIONS OF OTHER APPLICATIONS THAT'S ENCOMPASSED BY THAT CLAIM, AND THERE'S NOTHING IN THE CLAIM THAT EXCLUDES IT.

I WOULD ALSO LIKE TO RESPOND TO THE VERY LAST ARGUMENT THAT MR. LAWTON MADE WHICH WAS A MISCHARACTERIZATION OF WHAT WE'RE SAYING.

IF YOU COULD GO TO COLUMN THREE, LINES 15 TO 18.

THE COURT: WE'RE IN THE '038?

MR. PAVANE: I'M ACTUALLY IN THE '384.

THE COURT: WHAT COLUMN?

MR. PAVANE: COLUMN THREE, AT LINES 15 TO 18. WHAT WE SAID IN OUR BRIEF IS THE FOLLOWING, WE SAID, "LOOK, THE EXPRESSION HERE IS REAL TIME FLUORESCENCE OPTICAL TUMOR IMAGING." SO THE POINT SIMPLY IS THAT, LOOK, IF YOU WANTED -- IF IT WAS EVIDENCE THAT FLUORESCENT OPTICAL TUMOR IMAGING WAS NECESSARILY AND INHERENTLY REAL TIME, WHY DO YOU HAVE TO SAY REAL TIME FOTI? THOSE WORDS WOULD BE COMPLETELY REDUNDANT.

YOUR HONOR, IF I SAID I WANTED SOME CARBONATED WATER, AND YOU TURNED AROUND TO ME AND SAID, "WELL, WATER IS INHERENTLY CARBONATED. THERE'S NO REASON FOR YOU TO SAY 'CARBONATED.'" WELL, OF COURSE, IT'S NOT. WATER CAN BE FLAT.

IT CAN BE CARBONATED.

FOTI CAN BE REAL TIME. IT CAN BE NON-REAL TIME. AND WHEN THEY WANTED TO SAY REAL TIME IN THE SPEC, YEAH, THEY SAID THAT, BUT THEY NEVER DEFINED AND LIMITED REAL TIME -- EXCUSE ME, FLUORESCENT OPTICAL TUMOR IMAGING OR FOTI. THEY NEVER LIMITED IT TO REAL TIME, AND THEY SURE AS HECK DIDN'T PUT THOSE WORDS IN THE CLAIM, WHICH THEY EASILY COULD HAVE DONE AND DID NOT.

AGAIN, THERE'S NOTHING IN THOSE WORDS THEMSELVES, THOSE FOUR WORDS, FLUORESCENT OPTICAL TUMOR IMAGING, THAT SUGGESTS OR IMPLIES OR CALLS OUT FOR A FURTHER CLARIFICATION AS TO WHETHER IT'S REAL TIME OR CONTINUOUS. IT'S JUST -- IT'S A CONSTRUCTION MADE OF WHOLE CLOTH BY ANTICANCER HERE.

I WOULD ALSO LIKE TO POINT TO THE PASSAGE IN THE '384 AT COLUMN FIVE, LINES -- ABOUT LINE 42. MR. LAWTON ACTUALLY PUT IT UP ON THE SCREEN. IT SAYS, ABOUT THE THIRD LINE OF THIS PARAGRAPH, LINE 42 THERE --

(DISCUSSION HELD OFF THE RECORD.)

MR. PAVANE: WELL, THE WHOLE THING, START AT THE BEGINNING OF THE PARAGRAPH AND GO THROUGH LINE 45, IF YOU CAN DO THAT. WE CAN JUST READ IT.

THE COURT: I'VE GOT IT IN FRONT OF ME.

MR. PAVANE: IT SAYS, "IT IS PARTICULARLY CONVENIENT TO VISUALIZE THE MIGRATION OF TUMOR CELLS IN THE INTACT ANIMAL THROUGH FLUORESCENT OPTICAL TUMOR IMAGING. THIS PERMITS REAL

TIME OBSERVATION AND MONITORING, AND SO ON." "THIS PERMITS." NOW, MR. LAWTON DIDN'T READ THE WORD "PERMITS," BUT, YOUR HONOR, I WOULD LIKE TO DIRECT YOUR ATTENTION TO THE *SEAMAN'S* CASE WE CITED FROM THE FEDERAL CIRCUIT, IT'S ON PAGE 9 OF OUR SECOND RESPONSIVE BRIEF ON CLAIM CONSTRUCTION, AND THAT VERY ISSUE WAS ADDRESSED IN THAT CASE, AND THE COURT SAID, "PERMITS IS A NON-LIMITING EXAMPLE. IT'S NOT SOMETHING THAT'S APPROPRIATE TO IMPORT INTO THE CLAIM. IT'S NON-LIMITING."

ONE LAST POINT I WANT TO MAKE IS IN THE *PHILLIPS* CASE ITSELF, ANOTHER FEDERAL CIRCUIT CASE FROM 2005, WHICH WE CITED ON PAGE 9 OF OUR OPENING BRIEF, THE FEDERAL CIRCUIT HAD THIS TO SAY ABOUT THE TERM STEEL BAFFLES, IT SAID, "THE USE OF THE TERM STEEL BAFFLES STRONGLY IMPLIES THAT BAFFLES ARE NOT INHERENTLY MADE OF STEEL." WELL, DITTO REAL TIME FLUORESCENT OPTICAL TUMOR IMAGING. BY PUTTING THAT ADJECTIVE "REAL TIME" IN FRONT SUGGESTS THAT THE PHRASE ITSELF DOESN'T INHERENTLY INCLUDE REAL TIME AND, LIKEWISE, CONTINUOUS.

THANK YOU, YOUR HONOR.

THE COURT: FINAL COMMENT, MR. LAWTON, ON THIS MATTER.

MR. LAWTON: I'M JUST A LITTLE TAKEN ABACK BY THE ABSURDITY OF SAYING THAT INVENTORS WHO DIDN'T MEAN REAL TIME WROTE THE WORDS REAL TIME. INVENTORS WHO DIDN'T MEAN CONTINUOUS, WROTE THE WORD CONTINUOUS. THEY PUT THIS PASSAGE UP ON THE SCREEN, AND THEY ASK THE COURT -- THEY PRAY THAT THE COURT SAYS, "ALL RIGHT, THE WORD 'REAL TIME' IS IN THERE BUT

THEY DIDN'T MEAN THAT, SO WE'RE TAKING THAT OUT. THE WORD 'CONTINUOUS' IS IN THERE, BUT THEY DIDN'T MEAN THAT SO I'M GOING TO READ THAT OUT," IN VIOLATION OF THE CANON OF STATUTORY CONSTRUCTION, THE CANON OF PATENT CONSTRUCTION, THAT WE KNOW SO WELL, BACKWARDS AND FORWARDS, FROM *PHILLIPS* THAT WE CAN SAY IT IN OUR SLEEP. IT'S NONSENSICAL.

TURNING OFF THE LIGHTS IN THE COURTROOM, TURNING OFF THE SCREEN, "OH, I NEED AN INSTRUMENT. I NEED A FLUORESCENT LIGHT TO SEE THE BENCH," THAT'S ONE THING. YOU KNOW, PUT A COUPLE OF OUR MICE UP ON THE BENCH, TURN OUT THE LIGHTS OR LEAVE THEM ON, WHATEVER, TURN THEM OUT, WITHOUT THESE INSTRUMENTS YOU WOULD NOT SEE THE FLUORESCENT TUMORS WITH THE NAKED EYE. AGAIN, THE COMMON SENSES ESCAPES THE CRI CONSTRUCTION, AND THAT'S ALL I HAVE ON THAT.

THE COURT: I THINK WE'RE AT AN APPROPRIATE POINT TO TAKE THE NOON RECESS. WE'RE ONE TERM BEHIND. WE DIDN'T GET TO SURGICAL -- TO THE FOURTH TERM, SURGICAL ORTHOTOPIC IMPLANTATION. I WILL, HOPEFULLY, PICK UP THE PACE THIS AFTERNOON, MAYBE SOME OF THESE TERMS WILL BATCH A LITTLE COME THE AFTERNOON, BUT I THINK WE'LL CLEARLY FINISH.

MR. LAWTON: THANK YOU, YOUR HONOR.

THE COURT: YOU'RE WELCOME TO LEAVE EVERYTHING YOU DON'T NEED. THE COURTROOM WILL BE SECURE OVER THE LUNCH HOUR.

MR. LAWTON: THANK YOU VERY MUCH.

MS. GODDARD: YOUR HONOR, WHAT TIME WOULD YOU LIKE US

TO RETURN?

THE COURT: 1:30, YES.

(COURT WAS AT RECESS.)

AFTERNOON SESSION

THE COURT: SO I HAVE A NEW COPY OF CRI'S PRESENTATION, AND YOU TOOK THE ONE THAT MR. LAWTON GAVE ME, CORRECT?

MS. GODDARD: I NEED THE OLD ONE BACK.

THE COURT: DO YOU HAVE IT, ALEX?

THE CLERK: NO, I DON'T HAVE IT, YOUR HONOR.

THE COURT: OH, HERE IT IS. THANK YOU.

SO YOU'RE ONTO OUR FOURTH TERM, WHICH IS THE SURGICAL ORTHOTOPIC IMPLANTATION.

MR. LAWTON: THANK YOU, YOUR HONOR.

THE DIFFERENCE BETWEEN THE COMPETING CONSTRUCTIONS HERE MOSTLY CONCERNS WHAT IS BEING IMPLANTED. ANTICANCER CONSTRUES THIS TERM TO MEAN TUMORS OR TUMOR FRAGMENTS TO BE IMPLANTED. CRI CONSTRUES IT MORE BROADLY TO INCLUDE CELLS. WE THINK THE SPECIFICATIONS HERE SHED LIGHT ON THE DIFFERENCE BETWEEN THE TWO AND WHICH ONE IS MORE SUPPORTED BY THE INTRINSIC EVIDENCE.

I WILL SHOW THE COURT IN A MOMENT, BUT JUST TO SUMMARIZE FOR AN OVERVIEW, WHAT THE COURT WILL SEE IN THE SPEC IS A DISTINCTION BETWEEN INJECTING TUMOR CELLS INTO MICE, FOR EXAMPLE, THROUGH A TAIL VEIN, WHICH IS SOMETHING THAT'S DONE -- WHICH IS NOT SURGICAL ORTHOTOPIC IMPLANTATION, AND, ON THE OTHER HAND, SURGICALLY IMPLANTING A TUMOR OR A TUMOR FRAGMENT INTO THE ANIMAL, WHICH IS SOMETHING COMPLETELY DIFFERENT.

THE CRI CONSTRUCTION WOULD INCLUDE PUTTING TUMOR CELLS INTO THE MOUSE, AND THAT IS JUST NOT SUPPORTED BY THE

CONSTRUCTION -- OR BY THE SPECIFICATION, RATHER, WHICH DOES TAKE PAINS TO DRAW A DISTINCTION BETWEEN THOSE TWO DIFFERENT MEANS.

LET ME DEMONSTRATE FIRST WITH THE '038 SPECIFICATION, AND COLUMN FIVE OF THAT SPECIFICATION, LINES 41 THROUGH 46, AND, JUST FOR THE RECORD, THIS SAME LANGUAGE APPEARS IN THE SPECIFICATION FOR THE '384 PATENT, THE TWIN IN THE SAME COLUMN FIVE, AT LINES 40 THROUGH 45. PARDON ME, YOUR HONOR, AND JUST BEAR WITH ME FOR A MOMENT.

(DISCUSSION OFF THE RECORD.)

MR. LAWTON: I'M SORRY, I'M ACTUALLY IN COLUMN TWO, LINES 11 THROUGH 22, OF THE '038, AND THE CORRESPONDING CITATION TO THE '384 AS TO COLUMN TWO, LINES 8 THROUGH 19.

THE COURT: WHAT'S THE LINE REFERENCES AGAIN?

MR. LAWTON: COLUMN TWO, LINES 11 THROUGH 22 OF THE '038.

IF YOU LOOK AT THE LAST LINE OF THIS PASSAGE, WHICH BEGINS ABOUT LINE 18 AND I'LL READ, AND I QUOTE, "CLONE-38 CELLS WERE INJECTED INTO MICE TO OBTAIN TUMOR FRAGMENTS WHICH WERE THEN IMPLANTED BY SURGICAL ORTHOTOPIC IMPLANTATION, SOI, ON THE OVARIAN TUMOR SEROSA OF NUDE MICE. METASTASIS COULD BE FOLLOWED IN THIS MODEL."

THERE ARE OTHER EXAMPLES OF SIMILAR PASSAGES IN THE SPECIFICATIONS, AND THEY'RE CITED IN OUR BRIEF, AND I WON'T BELABOR THOSE.

WE BELIEVE CRI SEEKS TO USE A TERM THAT'S OVERLY BROAD, "CELLS." WE SAW INDIVIDUAL CELLS MIGRATING IN THE BLOODSTREAM OF THAT TUMOR IN THOSE TWO VIDEOS THAT WE SAW, AND THEN OVER HERE WITH THE IMAGING SYSTEM WE SAW ACTUAL TUMORS INSIDE MICE, TWO VERY DIFFERENT THINGS, BUT THE BOTTOM LINE IS THAT TUMORS OR TUMOR FRAGMENTS ARE IMPLANTED VIA SOI, SURGICAL ORTHOTOPIC IMPLANTATION. CELLS ARE INJECTED VIA OTHER MEANS.

IF SOI MEANT INJECTING CELLS -- OR IF SOI, ACCORDING TO THE CRI CONSTRUCTION, MEANT PUTTING JUST CELLS IN, THEN I DON'T BELIEVE THESE INVENTORS WOULD HAVE TAKEN PAINS TO DISTINGUISH BETWEEN THE TWO DIFFERENT PROCESSES IN THEIR OWN LEXICOGRAPHY. THEY WERE THEIR OWN LEXICOGRAPHERS, AND THEY CHOSE TO DESCRIBE AND DISTINGUISH FROM EACH OTHER TWO DIFFERENT PROCESSES; ONE, INJECTING CELLS INTO MICE, AND THE OTHER IMPLANTING TUMOR FRAGMENTS OR TUMORS INTO MICE.

THERE'S A CONFLATION, WE BELIEVE, THAT CRI WISHES TO PUT INTO THIS SETTING BETWEEN CELLS ON THE ONE HAND AND TUMORS AND TUMOR FRAGMENTS ON THE OTHER.

THERE IS A MORE MINOR DISAGREEMENT CONCERNING A PHRASE OF THE TYPE -- TISSUE OF THE TYPE FROM WHICH THE CELLS WERE DERIVED, BUT I MAY SAVE MY COMMENTS ON THAT FOR THE NEXT SEGMENT, IF THAT PLEASE THE COURT, OR I CAN ADDRESS IT NOW.

THE COURT: NO, THAT'S FINE, YOU CAN WAIT.

MR. LAWTON: VERY WELL. THANK YOU.

MR. PAVANE: I THINK I CAN HELP ON THAT LAST MINOR

POINT.

THE COURT: OF THE TYPE?

MR. PAVANE: YEAH, WE'RE FINE WITH HIS PROPOSAL ON THAT. IT'S NOT REALLY IN DISPUTE.

THE COURT: SO THAT CAN BE DELETED.

MR. PAVANE: YEAH.

THE COURT: SO WE'RE DOWN TO "OR TUMOR CELLS."

MR. PAVANE: EXACTLY.

THE COURT: THANK YOU.

MR. LAWTON: WE APPRECIATE THAT.

THE COURT: IT'S AMAZING HOW AS THE DAY GOES ON WE GET MORE AND MORE AGREEMENTS, MINOR THOUGH THEY MAY BE, IT'S ALWAYS APPRECIATED. THANK YOU BOTH.

SO "OR TUMOR CELLS."

MR. PAVANE: AGAIN, I THINK AGAIN PART OF THE PROBLEM HERE, AND WHY SOME OF THESE THINGS ARE BEING DISCUSSED TODAY, IS I THINK MR. LAWTON MADE THE POINT JUST NOW THAT, YES, YOU HAVE EVERY RIGHT IN A PATENT TO BE YOUR OWN LEXICOGRAPHER, MEANING YOUR OWN DEFINERS, YOUR OWN DICTIONARY MAKER, BUT THE PROBLEM IS MOST PEOPLE, WHEN THEY DO THAT IN A PATENT, AND WE'LL ACTUALLY SEE IT IN THE '159 PATENT SHORTLY, MOST PEOPLE, WHEN THEY DO THAT, THEY SAY "AS USED IN MY PATENT, THIS IS OR THIS MEANS THIS," AND THEY TELL YOU WHAT IT MEANS SO YOU'RE NOT LEFT TO WONDER WHAT THIS TERM, THAT PERHAPS YOU HAVEN'T ENCOUNTERED BEFORE, IS INTENDED TO MEAN BY THE INVENTORS.

UNFORTUNATELY, THAT WAS NOT DONE HERE. THAT WASN'T DONE WITH FOTI, AND NOW, AGAIN, IT'S NOT DONE ANYWHERE IN THE PATENT. THEY NEVER DEFINE SURGICAL ORTHOTOPIC IMPLANTATION. SO IT SEEMS LOGICAL, AND ALWAYS CORRECT AS A FIRST PRINCIPLE, YOUR HONOR, TO REFER BACK TO THE CLAIM, AND LET'S SEE WHAT THE CLAIM SAYS.

I THINK THIS IS INSTRUCTIVE. THE RELEVANT PASSAGE THAT WE'RE ATTEMPTING TO CONSTRUE IS IN THAT RED BOXED PARAGRAPH THERE FROM COLUMN 14, LINES ABOUT 3-7 OR 8 OF THE '384 PATENT. IT'S VERY INTERESTING WHAT IT SAYS, IT SAYS, "THE SUBJECT HAS BEEN MODIFIED TO CONTAIN SAID TUMOR THAT EXPRESSES GFP BY SURGICAL ORTHOTOPIC IMPLANTATION OF SAID TUMOR." OKAY, SO IT SAYS "SURGICAL ORTHOTOPIC IMPLANTATION OF SAID TUMOR." NOW, THAT CLAIM LANGUAGE NOWHERE SAYS BY SURGICAL ORTHOTOPIC IMPLANTATION OF SAID TUMOR FRAGMENTS. IT SAYS TUMOR.

YET, THEIR DEFINITION -- OR THEIR CONSTRUCTION, I SHOULD SAY, AS WELL AS OURS, BOTH RECOGNIZE THAT IT GOES FURTHER THAN SIMPLY PUTTING THE TUMOR IN. IT CAN ALSO BE PUTTING THE FRAGMENT IN, AND THE REASON FOR THAT IS BECAUSE THE FRAGMENT CAN GROW INTO THE TUMOR, AND YOU'LL HAVE THE RESULTS YOU WANT, WHICH, OF COURSE, ULTIMATELY IS THE FACT THAT YOU'VE GOT A TUMOR NOW GROWING IN THIS MOUSE.

BY THE SAME TOKEN, YOUR HONOR, YOU COULD PUT CELLS, AND, OF COURSE, TUMORS AND TUMOR FRAGMENTS ARE COMPRISED OF CELLS, AND IT MIGHT EVEN BE DIFFICULT FOR SOMEONE TO TELL YOU

OR DRAW A LINE WHERE A TUMOR FRAGMENT STARTS BECOMING A FRAGMENT AND STARTS BECOMING SOMETHING THAT SOMEONE WOULD REFER TO AS CELLS, WHERE DO YOU DRAW THAT LINE? BUT PUTTING THAT METAPHYSICAL QUESTION ASIDE FOR THE MOMENT, BY THE SAME TOKEN THAT YOU CAN PUT A FRAGMENT IN, WHICH BOTH SIDES RECOGNIZE WOULD BE ENCOMPASSED BY SURGICAL ORTHOTOPIC IMPLANTATION, THERE'S NO REASON YOU CAN'T PUT CELLS IN SURGICALLY AND LET THOSE GROW INTO A TUMOR. SO THE CONCEPTS THAT'S TRYING TO BE ACHIEVED COULD BE ACHIEVED WITH CELLS. IT COULD BE ACHIEVED WITH FRAGMENTS, AND IT COULD BE ACHIEVED WITH FULL-GROWN TUMORS.

THE COURT: HOW WOULD YOU PUT THE CELLS IN? WOULDN'T YOU INJECT THE CELLS?

MR. PAVANE: NOT NECESSARY.

THE COURT: IF YOU COULD PUT THE CELLS IN SURGICALLY, THEN YOU WOULD HAVE A FRAGMENT. IF YOU COULDN'T PUT THEM IN SURGICALLY, WOULDN'T THEY BE INJECTED? I MEAN, I HATE TO BE SIMPLISTIC ABOUT IT, BUT MAYBE THAT'S THE BENCHMARK, YOU CAN'T INJECT A FRAGMENT, CAN YOU?

MR. LAWTON: NO, IT CANNOT BE DONE.

THE COURT: I LOOKED AT YOU, BUT I NEED AN ANSWER FROM HIM.

OKAY, MR. PAVANE, WHAT DO YOU THINK, CAN YOU INJECT A FRAGMENT?

MR. PAVANE: AGAIN, I'M NOT A SCIENTIST, YOUR HONOR,

AND I DON'T WANT TO GIVE AN ANSWER THAT I'M UNCERTAIN OF, SO I'M NOT GOING TO ANSWER THAT. I GUESS THE QUESTION IS, IN MY MIND, IF YOU HAD A SYRINGE, WHERE YOU HAD A SMALL ENOUGH FRAGMENT THAT WAS ENCAPSULATED IN SOME KIND OF LIQUID INJECTION SYSTEM, YES, MAYBE YOU COULD. I THINK IT'S DECIDING WHAT CONSTITUTES A FRAGMENT AT THAT POINT. BUT, YES, YOU COULD CERTAINLY INJECT SOME SOLID MATTER INTO A LIVING BODY, AND I THINK THAT'S DONE ALL THE TIME. IT DOESN'T HAVE TO BE -- I THINK YOU HAVE THIS CONCEPT, IF I'M FOLLOWING CORRECTLY, OF KIND OF LOOSE CELLS.

THE COURT: I'M LOOKING AT A CELLULAR LEVEL VERSUS CELLS VERSUS TUMOR, CELL VERSUS FRAGMENT OF A TUMOR, WHICH TO ME MEANS IT'S MORE OF A MASS OR A PART OF A MASS.

MR. PAVANE: OKAY, I DO UNDERSTAND THAT, AND THE -- MY ANALYSIS WAS BASED ON THE FACT THAT, AGAIN, THAT A FRAGMENT AND A TUMOR, FOR THAT MATTER, THEY'RE ALL CRIES COMPRISED OF "CELLS."

THE COURT: ABSOLUTELY.

MR. PAVANE: I GUESS THE QUESTION IS WHEN WE SAY CELLS CAN GO IN, IS THERE SOME POINT AT WHICH WE'RE DRAWING THE LINE AND SAYING IT'S GETTING SO SMALL THAT NOW IT'S NO LONGER A FRAGMENT, IT'S ONLY CELLS, AND, THEREFORE, SINCE IT'S ONLY CELLS WE CAN'T SURGICALLY IMPLANT IT INTO THE TUMOR.

I DON'T KNOW WHERE YOU WOULD GET THAT FROM READING THIS PATENT. I DON'T THINK THIS PATENT EVER SAYS THAT OR IMPLIES

THAT. IT'S JUST A QUESTION OF WHAT THE SCOPE OF THAT TERM IS. AGAIN, YOU KNOW, EVERYBODY RECOGNIZES THAT THE TERM IS BROADER THAN SIMPLY PUTTING THE TUMOR IN, EVEN THOUGH THAT'S WHAT THE CLAIM SAYS, SO I WOULD THINK THAT IT WOULD GO BEYOND SIMPLY PUTTING IN TUMORS.

I WOULD ALSO POINT OUT THAT IN THE SECOND SENTENCE OF ANTICANCER'S CONSTRUCTION, AND ALSO THE SECOND SENTENCE OF OURS, WE HAVE NO DISAGREEMENT HERE, BUT NOTE WHAT THEY SAY AFTER SAYING IT'S TUMOR OR TUMOR FRAGMENTS, IN THE NEXT SENTENCE THEY SAY, "THE CELLS NEED NOT HAVE ORIGINATED WITHIN THE HOST," RECOGNIZING THAT IT'S CELLS WE'RE PUTTING IN THERE, WHETHER IT'S A FRAGMENT, IT'S A TUMOR, WHATEVER IT IS, WE'RE PUTTING CELLS IN, AND IT'S JUST A QUESTION OF HOW MANY, I GUESS, MAYBE BEFORE YOU DISTINGUISH BETWEEN CELLS AND A FRAGMENT. THAT'S ALL I HAVE, YOUR HONOR, THANK YOU.

THE COURT: MR. LAWTON.

MR. LAWTON: THANK YOU, YOUR HONOR.

WE START WITH THIS IDEA THAT THE SPECIFICATION NOWHERE EXPLICITLY DEFINES THE TERM SURGICAL ORTHOTOPIC IMPLANTATION, AND IF THESE PEOPLE ARE THEIR OWN LEXICOGRAPHERS, WHY AREN'T THEY DOING THAT? I THINK THE COMMON SENSE ANSWER TO THAT IS NOT EVERY TERM NEED BE DEFINED IN A SPECIFICATION BY AN INVENTOR BECAUSE SOME TERMS HAVE PLAIN ENGLISH DEFINITIONS OR DEFINITIONS THAT ARE CLEAR TO THOSE SKILLED IN THE ART.

SURGICAL ORTHOTOPIC IMPLANTATION IS SUCH A TERM. IT'S

NOT DEFINED IN THE SPECIFICATION, SURE, BUT "STABLY" ISN'T DEFINED IN THE SPECIFICATION EITHER, AND I THINK THERE IS A COMMON SENSE UNDERSTANDING OF WHAT THAT TERM MEANS. BUT THIS IDEA THAT THERE'S NO GUIDANCE IN THE SPECIFICATIONS TO ME THAT TERM IS COMPLETELY WRONG. THIS PROCEDURE, SOI, IS DISTINGUISHED AT MULTIPLE PLACES IN THE SPECIFICATION FROM THE INJECTION OF MERE TUMOR CELLS.

I'LL SHOW THE COURT JUST ONE OTHER EXAMPLE OF THAT BECAUSE THERE IS SOME REDUNDANCY HERE AND I DON'T WANT TO OVERDO THAT.

WE'RE LOOKING AT COLUMN TWO OF THE '038 SPEC, AT LINES 44 THROUGH 46. AGAIN, THE DISTINGUISHING -- BEGINNING AT LINE 44, AND I QUOTE, "CELLS FROM THIS CELL LINE WERE INJECTED INTO NUDE MICE AND THE RESULTING SUBCUTANEOUSLY GROWING LABELED TUMORS WERE TRANSPLANTED BY SOI INTO THE LEFT LUNG OF NUDE MICE." IS SOI EXPRESSLY DEFINED THERE? NO. IS IT DISTINGUISHED FROM THE PROCESS OF PUTTING MERE CELLS IN? ABSOLUTELY.

THE COURT'S QUESTION IS SO WELL TAKEN AND THAT IS, "WELL," AND AGAIN PARAPHRASING, "COULDN'T YOU OR COULD YOU TAKE A TUMOR FRAGMENT, PUT IT IN A SYRINGE, AND INTRODUCE IT INTO THE ANIMAL BY MEANS OTHER THAN SURGICAL ORTHOTOPIC IMPLANTATION?" AND I'M SORRY, I STEPPED OUT OF SCHOOL AND SAID NO WHEN IT WASN'T MY TURN, BUT THAT IS THE RIGHT ANSWER. YOU CAN'T PUT A TUMOR FRAGMENT IN A SYRINGE AND IN A SOLUTION AND

THEN INJECT IT INTO AN ANIMAL. IT LOSES ITS STRUCTURE, AND YOU WIND UP DEFEATING THE ENTIRE PURPOSE.

MR. PAVANE MADE REFERENCE TO WHERE'S THE LINE -- WHERE'S THE LINE DRAWN HERE? I THINK ONE PLACE THE LINE COULD EASILY BE DRAWN IS THE POINT AT WHICH YOU CAN NO LONGER INJECT TUMOROUS MATERIAL, LET'S SAY, A TUMOR OR A TUMOR FRAGMENT, VIA INJECTION, YOU HAVE TO IMPLANT IT.

DR. HOFFMAN CAN ANSWER THE COURT'S QUESTION WITH SOME REAL FIRSTHAND KNOWLEDGE, IF THE COURT WOULD LIKE A LITTLE MORE DETAIL ON WHY COULDN'T A TUMOR FRAGMENT BE INJECTED, WHY COULD IT ONLY BE PUT IN BY SURGICAL ORTHOTOPIC IMPLANTATION. WOULD THE COURT LIKE TO HEAR BRIEFLY FROM HIM ON THAT.

THE COURT: VERY BRIEFLY.

MR. LAWTON: YES, YOUR HONOR.

DR. HOFFMAN: THANK YOU, YOUR HONOR, I'LL TRY TO BE AS BRIEF AS I CAN.

AS YOU SAW EARLIER IN THE MORNING, MR. LAWTON SHOWED YOU A MOVIE OF A TUMOR. IT CONTAINED GREEN NORMAL CELLS BECAUSE IT WAS IN A GREEN MOUSE. IT CONTAINED TWO COLOR CANCER CELLS BECAUSE THOSE WERE PUT IN THERE. IT SHOWED A BLOOD VESSEL. IT SHOWED CELLS MOVING WITHIN THE BLOOD VESSEL. THAT TUMOR HAD VERY SPECIFIC STRUCTURE. THE NORMAL CELLS AND THE TUMOR CELLS OR CANCER CELLS WERE INTERACTING WITH EACH OTHER. THERE WAS A BLOOD VESSEL IN THERE SUPPLYING NUTRIENTS. THERE WERE CELLS WITHIN THAT BLOOD VESSEL. IF A FRAGMENT OF THAT

TUMOR WERE DISASSOCIATED OR INJURED THROUGH A SYRINGE, IT WOULD LOSE THAT STRUCTURE.

THE SURGICAL ORTHOTOPIC IMPLANTATION IS A PATENTED TECHNOLOGY -- WE HAVE EXISTING PATENTS ON THAT -- WHERE THE TUMOR IS IMPLANTED AS AN INTACT STRUCTURE. THE SO-CALLED NORMAL CELLS OF THE TUMOR ARE IN THEIR PROPER JUXTAPOSITION WITH THE CANCER CELLS. ANY BLOOD VESSELS THAT MAY BE EXISTING WOULD BE IN THERE. THEY COULD CONNECT WITH THE BLOOD VESSELS OF THE HOST. SO STRUCTURE IS OF UTMOST IMPORTANCE AND IF YOU DISRUPT IT YOU HAVE A NONPHYSIOLOGICAL SITUATION.

THE COURT: THANK YOU, DOCTOR.

DR. HOFFMAN: YOU'RE VERY WELCOME.

THE COURT: DID YOU HAVE ANYTHING FURTHER, MR. LAWTON?

MR. LAWTON: NOTHING FURTHER, YOUR HONOR.

THE COURT: MR. PAVANE, ANYTHING FURTHER ON THIS TERM?

MR. PAVANE: NO, JUST TO SAY I SEE NO REASON WHY YOU CAN'T SURGICALLY IMPLANT CELLS AND HAVE A TUMOR GROW IN THE ANIMAL. I DON'T SEE ANY REASON WHY IT HAS TO BE IMPLANTED AS A FRAGMENT OR A WHOLE TUMOR, WHY YOU CAN'T JUST PUT CELLS IN THERE AND WATCH THEM GROW. I DON'T SEE THE DISTINCTION THERE. THAT'S ALL I HAVE.

MR. LAWTON: NOTHING TO ADD.

THE COURT: WELL, CONFER WITH YOUR CLIENT FOR A MOMENT.

DR. HOFFMAN: ONE SECOND --

THE COURT: WAIT, CONFER WITH MR. LAWTON.

DR. HOFFMAN: SORRY.

THE COURT: I DON'T WANT TO ENGAGE YOU DIRECTLY, DOCTOR.

DR. HOFFMAN: SORRY.

(DISCUSSION HELD OFF THE RECORD.)

MR. LAWTON: IF MERE CELLS ARE IMPLANTED VIA SURGICAL ORTHOTOPIC IMPLANTATION, ITS POTENTIAL FOR METASTASIS, WHICH IS PRESUMABLY WHAT YOU'RE TRYING TO STUDY, IS GREATLY REDUCED COMPARED TO THE POTENTIAL FOR METASTASIS THAT YOU WOULD HAVE BY IMPLANTING A TUMOR OR A TUMOR FRAGMENT INTO THE SUBJECT.

SO WOULD IT BE POSSIBLE TO IMPLANT TUMOR CELLS INTO AN ANIMAL VIA SURGICAL ORTHOTOPIC IMPLANTATION? YES. WHY WOULD YOU WANT TO DO IT FOR THE PURPOSES THAT ARE TAUGHT IN THIS SPECIFICATION? YOU WOULDN'T WANT TO. SO WE THINK THAT CLASHES WITH THE WAY THE INVENTORS CONCEIVED THIS INVENTION.

MR. PAVANE: I THINK, FRANKLY, THAT MAKES MY POINT. THE CLAIMS ARE BROAD. THERE'S NOTHING IN HERE THAT SAYS IN THE CLAIM, "YOU'VE GOT TO DO IT THE BEST WAY." I GUARANTEE YOU IF SOMEBODY WERE DOING IT THE WAY I SUGGESTED, WHERE YOU PUT THE CELLS IN AND IT RESULTED IN EVERY OTHER STEP OF THE METHOD, THEY WOULD BE IN HERE ARGUING, "WELL THAT'S WITHIN THE SCOPE OF THE CLAIM. THERE'S NOTHING IN THE CLAIM THAT LIMITS IT TO SAYING IT CAN'T BE CELLS."

SO THEY'RE ACKNOWLEDGING THAT IT'S POSSIBLE TO DO, AND IF IT'S POSSIBLE TO DO IT'S WITHIN THE SCOPE OF THE CLAIM, AND

YOU SHOULDN'T BE IMPORTING SPECIFIC LIMITATIONS THAT DEFINE THE BEST WAY OF DOING IT INTO A CLAIM TERM THAT DOESN'T HAVE THAT LIMITATION, AND THE FEDERAL CIRCUIT HAS SAID THAT OVER AND OVER AGAIN.

MR. LAWTON: I DON'T THINK WE'RE IN A PHILOSOPHY CLASS HERE. I THINK WE'RE TALKING ABOUT USEFUL INVENTIONS, WHICH IS WHAT THE FRAMERS WERE TALKING ABOUT IN THE CONSTITUTION WHEN THEY DREAMT UP THE PATENT CLAUSE. PATENTS ARE THERE PARTLY SO AS TO PROTECT MEANS OF DOING THINGS THE BEST WAY POSSIBLE, THE USEFUL ARTS, NOT JUST A POSSIBLE WAY YOU COULD DO SOMETHING. IT'S NOT USEFUL TO TAKE CELLS AND IMPLANT THEM SURGICALLY AND ORTHOTOPICALLY INTO AN ANIMAL WHEN YOU'RE PRACTICING THESE METHODS BECAUSE YOU'RE NOT GOING TO GET METASTASIS, OR YOUR CHANCES OF GETTING IT ARE SEVERELY REDUCED, AND THAT'S NOT THE PURPOSE OF THESE INVENTIONS, WHICH IS TO STUDY METASTASIS. THANK YOU.

THE COURT: THANK YOU.

LET'S MOVE ON TO THE NEXT TERM, WHICH IS EXPRESSES.

MR. PAVANE: I WOULD LIKE TO MAKE A SUGGESTION, WITH MR. LAWTON'S APPROVAL, YOUR HONOR, I THINK THE -- AFTER CONFERRING WITH MY CO-COUNSEL, MR. HOLMBERG, AND I THINK MR. LAWTON MAY AGREE, I THINK THE OTHER REAL TERM THAT'S IN DISPUTE FROM THE '159 WAS IT WHOLE BODY SOMETHING --

MR. LAWTON: WHOLE BODY EXTERNAL OPTICAL IMAGING --

MR. PAVANE: THAT'S IT.

THE COURT: WHOLE BODY EXTERNAL FLUORESCENT OPTICAL IMAGING.

MR. PAVANE: THAT'S IT.

THE COURT: WE HAVE TO SLOW DOWN. I MEAN, IT'S SECOND NATURE TO YOU ALL, BUT CERTAINLY NOT TO THE COURT AND CERTAINLY NOT TO MY STAFF.

SO THAT'S THE TERM, YOU WANT TO GO TO THAT TERM?

MR. PAVANE: YES, BECAUSE I THINK THE OTHERS YOU WILL FIND ARE HANDLED QUICKLY AND KIND OF IN A GROUP, SO WITH PERMISSION, YES.

THE COURT: CERTAINLY, WE CAN GO TO THAT TERM. LET ME JUST GET THERE.

THAT'S AGREEABLE, MR. LAWTON?

MR. LAWTON: YES, YOUR HONOR.

THE COURT: OKAY.

MR. LAWTON: HERE AGAIN -- IS THE COURT READY?

THE COURT: I AM READY.

MR. LAWTON: OKAY, THANKS.

WE RUN INTO WHAT I'LL CALL THE NAKED EYE ISSUE OR THE NAKED EYE IDEA, THE CRI CONSTRUCTION SEEKS TO ADD A PHRASE, AND I QUOTE, "THIS INCLUDES MERELY LOOKING AT THE ANIMAL." WE DON'T HAVE THAT PHRASE. THEY DO HAVE THAT PHRASE. THE IDEA, AND MR. PAVANE WILL CORRECT ME WHEN IT'S HIS TURN IF I'M WRONG, SEEMS TO BE THAT NAKED EYE OBSERVATION OF AN ANIMAL, UNAIDED BY ANY INSTRUMENT, IS ENCOMPASSED WITHIN THE SCOPE OF THESE CLAIMS

OR WE OUGHT TO CONSTRUE THE CLAIMS AS TO INCLUDE THAT.

THE '159 SPECIFICATION WE THINK IN THE PERTINENT PART, WHICH IS IN COLUMN FIVE, LINES 60 THROUGH END, OVER TO COLUMN SIX, LINE 6, IS STRAIGHTFORWARD, AND I'LL DISPLAY IT. I'LL JUST READ A SMALL EXCERPT BEGINNING AT THE TOP. "AS USED HEREIN WHOLE BODY EXTERNAL FLUORESCENT OPTICAL IMAGING REFERS TO AN IMAGING PROCESS IN WHICH THE PRESENCE, ABSENCE OR INTENSITY OF THE FLUORESCENCE GENERATED BY THE FLUOROPHORE AT VARIOUS LOCATIONS IN THE HOST ORGANISM IS MONITORED, RECORDED AND/OR ANALYZED EXTERNALLY WITHOUT ANY PROCEDURE, E.G., SURGICAL PROCEDURE, TO EXPOSE AND/OR EXCISE THE DESIRED OBSERVING SITE FROM THE HOST ORGANISM."

AND THEN WE GO OVER ONTO THE NEXT COLUMN. I WON'T READ THE REST OF IT BECAUSE WE CAN ALL READ THE ENGLISH, BUT THERE IS NO REFERENCE THERE TO WHAT CRI CALLS MERELY LOOKING AT THE ANIMAL.

IF WE DISASSEMBLED THIS MACHINE, AND WE CAN DO IT -- WE CHECKED OVER THE LUNCH HOUR WITH DR. PETERS -- WE COULD REMOVE THE CAMERA. WE COULD REMOVE THE YELLOW FILTER, NOT TURN ON THE EXCITATION LIGHTS, PUT THE MICE INSIDE, AND THE COURT AND MR. PAVANE AND ME COULD ALL PEER IN THROUGH THE HOLE IN THE TOP AND SEE IF WE COULD SEE FLUORESCENT TUMORS OR GENE EXPRESSION WITH GFP OCCURRING IN THOSE ANIMALS, AND WE WOULD NOT SEE THAT.

IF THE COURT AND MR. PAVANE DON'T WANT TO TAKE MY WORD FOR IT, WE CAN DO IT. AT THE NEXT RECESS, IT WILL TAKE US

ABOUT 10 MINUTES, WE'LL DISASSEMBLE THAT MACHINE IN THE WAY I DESCRIBED, BUT THE POINT OF THAT EXERCISE, WHETHER WE DO IT OR NOT, IS TO SHOW THE COURT THAT MERELY LOOKING AT THE ANIMAL IS NOT THE WAY THIS CLAIM TERM OUGHT TO BE CONSTRUED. YOU'RE DOING AN IMAGING PROCESS. THE SPECIFICATION TALKS ABOUT A PROCESS, AND THE CLAIMS CLAIM A METHOD THAT INVOLVES THE SORT OF PROCESS LIKE WE SAW THIS MORNING.

WHAT WOULD YOU LEARN ABOUT DIABETES OR CANCER OR ANOTHER DISEASE THAT YOU WERE STUDYING IF YOU HAD AN ANIMAL THAT YOU WERE MERELY LOOKING AT, AND THE INSULIN GENE IN THE ANIMAL THAT WAS LINKED TO THE FLUOROPHORE, IF INSULIN WASN'T BEING PRODUCED. WHAT COULD YOU SEE BY MERELY LOOKING AT THE ANIMAL? YOU COULDN'T SEE ANYTHING. YOU COULD SEE THE ANIMAL. MAYBE YOU COULD SEE IF HE HAD SOME OUTWARD SYMPTOMS OF DIABETES, BUT YOU WOULDN'T BE LEARNING VERY MUCH ABOUT THE PURPOSE OF THIS INVENTION.

SO MERELY LOOKING AT THE ANIMAL SEEMS TO BE AT LEAST A KISSING COUSIN TO THIS IDEA OF NAKED EYE OBSERVATION THAT THEY INSIST THAT THE COURT IMPORT INTO THE CONSTRUCTION OF FOTI, FLUORESCENT OPTICAL TUMOR IMAGING, THE SIMILAR TERM FROM THE OTHER TWO PATENTS THAT ARE AT STAKE TODAY.

CRI POINTS OUT THAT AN EXAMINER WROTE, AND I QUOTE, "THIS DEFINITION IS SO BROAD AS TO ENCOMPASS MERELY 'LOOKING' AT THE ANIMAL." SO THEY SAY, AS THIS MORNING IN ANOTHER CONTEXT, "HERE'S AN EXAMINER THAT WROTE SOMETHING AND THAT MUST

MEAN THAT THE INVENTORS MEANT THAT, TOO."

FIRST OF ALL, THE EXAMINER, WHEN SHE WROTE THAT CLAUSE, PUT QUOTATION MARKS AROUND "LOOKING" SO CLEARLY THERE'S AN INTENT THERE ON THE PART OF THE EXAMINER. I REALIZE WE'RE DOING SOME INTERPRETATION HERE, BUT WHEN PEOPLE PUT AIR QUOTES AROUND SOMETHING OR ACTUAL QUOTATION MARKS AROUND SOMETHING, THEY'RE QUALIFYING THE SOMETHING SOMEHOW, OTHERWISE THEY WOULDN'T PUT THE QUOTATION MARKS THERE.

AND WE HAVE THE CANON THAT WE DON'T LOOK TO THINGS THAT EXAMINERS WRITE AND PLACE THEM IN THE HIERARCHY OF CLAIM CONSTRUCTION ABOVE SPECIFICATION LANGUAGE LIKE WE HAVE BECAUSE THAT PROCESS IS A NEGOTIATION. THERE'S LOTS OF BACK AND FORTH, AND THERE WAS IN THIS PARTICULAR PATENT TO A GREATER DEGREE THAN IN THE OTHER TWO. WHAT THE EXAMINER THOUGHT IS NOT PERTINENT TO WHAT OUR INVENTOR THOUGHT.

I HAVE SOME SCIENTISTS IN THE COURTROOM, AND AT LEAST ONE ATTORNEY, WHO FEEL VERY STRONGLY THAT WE NEED TO HAVE THE COURT COME DOWN FROM THE BENCH AGAIN AND LOOK AT THESE MICE AGAIN IN THE CAGE AGAIN OR PUT THEM IN THE BOX, AND I AM HAPPY TO DO IT, BUT I WILL ONLY DO IT IF THE COURT THINKS THAT WOULD BE A USEFUL EXERCISE. THANK YOU.

THE COURT: THANK YOU.

GO AHEAD, MR. PAVANE.

MR. PAVANE: THANK YOU, YOUR HONOR.

I GUESS WE SHOULD CLEAR UP THE EASY THINGS FIRST. I'M

NOT CLEAR IF MR. LAWTON COVERED THIS, BUT IF YOU LOOK AT OUR RESPECTIVE CONSTRUCTIONS, YOUR HONOR, THE -- HE TALKED ABOUT THE NAKED EYE ISSUE OR MERELY LOOKING AT THE ANIMAL, BUT THE FIRST PART OF IT WAS NOT REALLY ADDRESSED. I THINK YOU'LL RECOGNIZE THAT OUR FIRST PART OF THE CONSTRUCTION IS IDENTICAL TO THE LANGUAGE DEFINED IN THE SPECS, SO I DON'T THINK THERE'S ANY DISPUTE. I BELIEVE IN MR. LAWTON'S OPENING BRIEF HE SAID THAT YOU COULD USE THAT, SO WE'RE REALLY JUST TALKING ABOUT THE SECOND SENTENCE AT THIS POINT AND I'LL FOCUS ON THAT, THANK YOU.

MR. LAWTON: I AGREE.

THE COURT: OKAY, EXCELLENT. YOU'RE JUST ON THE SECOND SENTENCE, GO AHEAD.

MR. PAVANE: OKAY. SO A COUPLE OF THINGS, AND -- WELL, I'LL DO THAT NEXT.

FIRSTLY, THE QUESTION OF WHETHER MERELY LOOKING AT THE ANIMAL IS USEFUL. AGAIN, WE'RE NOT TALKING HERE ABOUT THE CLAIMS HAVE TO DEFINE THE BEST AND MOST USEFUL. THE CLAIMS DEFINE A METHOD. SOME OF THEM MAY BE MORE USEFUL THAN OTHERS. I COULD CERTAINLY SEE A SITUATION WHERE YOU COULD BE CHECKING TO SEE IF THERE'S BEEN GROWTH OF SECONDARY TUMORS, I.E., METASTASIS, AND YOU WITH THE NAKED EYE OBSERVE THAT, INDEED, THE ANIMAL IS NOW GLOWING IN SPOTS OTHER THAN THOSE WHERE YOU'VE IMPLANTED A TUMOR. SO, YES, THERE'S BEEN METASTASIS.

IS THAT USEFUL? YES, IT'S USEFUL. IT GIVES YOU

INFORMATION. IS IT THE MOST USEFUL WAY OF DOING IT? I DON'T KNOW, MAYBE NOT, BUT SO WHAT? THE POINT IS IT'S COVERED BY THE SCOPE OF THE CLAIM. THERE'S NO REASON THAT THAT SHOULDN'T BE ENCOMPASSED BY THE SCOPE OF THE CLAIM.

SECONDLY, WITH RESPECT TO THE FILE HISTORY, MR. LAWTON POINTED OUT THAT IT IS AN ONGOING NEGOTIATION AND THAT'S TRUE, NOT IN EVERY CASE SHOULD IT BE THE BE ALL AND END ALL, BUT THAT DOESN'T MEAN IT HAS NO RELEVANCE.

I WOULD LIKE TO SHOW YOU ANOTHER PASSAGE, IF I MAY, FROM THE FILE HISTORY. I HAVE IT HERE, I'M SORRY.

(DISCUSSION HELD OFF THE RECORD.)

MR. PAVANE: OKAY, THIS IS EXHIBIT 12-A, PAGE 7, AND IT'S AT THE LAST SENTENCE RIGHT ABOVE THE NEW HEADING THERE WHICH STARTS WITH THE WORD "WHETHER," AND THE EXAMINER WRITES, "WHETHER ONE WERE MERELY TO OBSERVE THE MICE WITH THE NAKED EYE OR USE THE STANDARD HIGH SENSITIVITY VIDEO CAMERA SUGGESTED BY CONTAG," THAT'S A PRIOR ART REFERENCE, "EITHER WOULD QUALIFY AS WHOLE BODY EXTERNAL FLUORESCENT IMAGING." THERE'S NO QUOTE MARKS AROUND NAKED EYE. THE EXAMINER IS CLEARLY SAYING, "HEY, THE WAY I READ THIS, WHOLE BODY EXTERNAL FLUORESCENT IMAGING INCLUDES LOOKING AT IT WITH THE NAKED EYE, THAT'S ENCOMPASSED WITHIN THAT."

NOW, THIS WAS AN OFFICE ACTION, YOUR HONOR, THAT ISSUED ON MAY OF 2009, THAT'S MAY OF THIS YEAR, EXHIBIT 12-A. UNDER THE PATENT OFFICE RULES, YOU TYPICALLY FILE A RESPONSE TO AN

OFFICE ACTION WITHIN THREE MONTHS, UNLESS YOU WANT TO START PAYING EXTENSION FEES, WHICH GET EXPENSIVE. THEY DID, IN FACT, FILE A RESPONSE TO THIS OFFICE ACTION ON ABOUT AUGUST 5TH OF 2009, AND THAT'S OUR EXHIBIT 12-B TO OUR SUBMISSION.

I'M NOT GOING NO PUT IT UP ON THE SCREEN, AND THE ONLY REASON I'M NOT PUTTING IT UP ON THE SCREEN IS BECAUSE ANTICANCER NEVER REBUTS THIS. THEY'RE SILENT AS TO THE EXAMINER'S COMMENT.

NOW, YOU WOULD THINK THAT IF THEY DISAGREED WITH THAT CONSTRUCTION OF WHOLE BODY EXTERNAL FLUORESCENT IMAGING, THEY WOULD HAVE, IN THEIR RESPONSE TO THIS VERY OFFICE ACTION, WRITTEN BACK AND SAID, "NOW, WAIT A MINUTE, THAT'S NOT TRUE AND HERE'S WHY IT'S NOT TRUE," BUT THEY DIDN'T SAY THAT. THEY DIDN'T SAY ANYTHING ABOUT IT. THEY REMAINED STONY SILENT. I THINK THAT SILENCE SPEAKS VOLUMES ABOUT WHETHER THE EXAMINER IS OR IS NOT CORRECT HERE.

I'M NOT SAYING YOU HAVE TO ADOPT WHAT THE EXAMINER SAID, BUT I'M SAYING THIS IS EVIDENCE OF WHAT THE EXAMINER THOUGHT, THE PATENT OFFICE VIEWED IT, AND THEY HAVEN'T PRESENTED ANYTHING TO THE EXAMINER TO REBUT THAT, NOR HAVE THEY PRESENTED ANYTHING HERE, IN MY OPINION.

NOW, I WILL SAY THAT ALSO WHEN I WAS LOOKING AT THAT BOX BEFORE, WHEN WE ALL CAME DOWN AND LOOKED AT THE BOX, I NOTICED THAT THE BOX HAS A PLACE FOR THE MOUSE AND UNDERNEATH THE BOX THERE'S A KIND OF STORAGE AREA WHERE YOU CAN KEEP

STUFF. IT'S NOT PART OF WHAT IS GOING TO BE SEEN BY THE CAMERA, THERE'S A SHELF AND THEN UNDER THE SHELF, AND WHAT WAS UNDER THE SHELF? WELL, UNDER THE SHELF WAS A PAIR OF YELLOW GOGGLES AND A BLUE FLASHLIGHT, AND ONE OF THE GENTLEMEN HERE VOLUNTEERED TO ME THAT YOU CAN TAKE THE FLASHLIGHT AND SHINE IT ON THE ANIMAL AND LOOK THROUGH THE GOGGLES AND SEE THE GREEN GLOWING. WELL, ISN'T THAT WITH THE NAKED EYE? I MEAN, MAYBE YOU'VE GOT A FILTER ON, BUT THERE'S NO CAMERA INVOLVED. THERE'S NO BOX.

THE COURT: IT'S REPLICATING WHAT THIS BOX DOES.

MR. PAVANE: EXCUSE ME?

THE COURT: IT'S REPLICATING WHAT THIS BOX DOES, IN A CRUDER FASHION.

MR. PAVANE: YOU'RE ABSOLUTELY RIGHT, I AGREE.

THE COURT: OKAY.

MR. PAVANE: I'M JUST POINTING OUT THERE'S NO CAMERA INVOLVED. YOU DON'T NEED ANY MICROSCOPE. YOU CAN SEE IT GLOWING WITH YOUR EYE. THERE'S NO MAGNIFICATION, YOU'RE JUST SEEING IT.

THE COURT: OF COURSE, BECAUSE OF THE COLOR OF THE GOGGLES AND THE LIGHT.

MR. PAVANE: AGREED. I THINK I SAID EARLIER WITH RESPECT TO NAKED EYE ON THE FIRST ONE, I ACKNOWLEDGED THAT IF MERELY LOOKING AT IT -- WHEN WE SAY MERELY LOOKING AT IT, I HAVE NO OBJECTION TO THAT BEING CONSTRUED AND UNDERSTOOD AS

MEANING, YES, YOU NEED A FILTER, AND, YES, YOU NEED AN EXCITING LIGHT.

MY POINT OF NAKED EYE MEANING IS THAT YOU DON'T NEED MAGNIFICATION. YOU DON'T NEED A CAMERA. IT'S YOUR UNIMPROVED EYE, SO TO SPEAK, EXCEPT FOR THOSE THINGS YOUR HONOR MENTIONED, WHICH ARE THINGS, CERTAINLY, AND I ACKNOWLEDGE THAT.

THE ONLY OTHER POINT I WANT TO MAKE, IF I COULD JUST GO BACK FOR -- GIVE ME 30 SECONDS ON SOI, SURGICAL ORTHOTOPIC IMPLANTATION, BECAUSE I NOTICED SOMETHING IN THIS PATENT THAT I THINK WOULD BE RELEVANT TO YOUR HONOR, AND WHILE THIS IS NOT IN THE SAME CHAIN, AND I WANT TO BE CLEAR ABOUT THAT, IT'S NOT IN THE SAME CHAIN OF APPLICATIONS THAT LED TO THE '038 AND '384, SO I'M NOT SAYING THEY'RE ALL IN THE SAME PROSECUTION HISTORY, IT WAS SEPARATELY FILED, AND NAMED SEPARATE INVENTORS; HOWEVER, IT IS OWNED BY ANTICANCER, AND ANTICANCER IS THE ONE WHO, THROUGH MR. LAWTON A LITTLE WHILE AGO, SAID THIS IS A TERM THAT HAS A WELL UNDERSTOOD MEANING IN THE ART.

IF WE COULD LOOK AT COLUMN THREE, LINES 14 THROUGH 19, PLEASE. THIS IS WHAT SOME ANTICANCER PEOPLE SAID ABOUT SURGICAL ORTHOTOPIC IMPLANTATION WHEN THIS APPLICATION WAS FILED IN 2000 -- YES, ORIGINALLY FILED IN 2000. THEY SAY, "IN ANOTHER PREFERRED EMBODIMENT, A CELL CONTAINING A NUCLEIC ACID ENCODING A FLUOROPHORE," A FLUOROPHORE, BY THE WAY, JUDGE, IS A PROTEIN THAT GENERATES FLUORESCENCE, SO GFP, FOR EXAMPLE, IS A FLUOROPHORE. I DON'T KNOW IF THAT WAS CLEAR FROM PRIOR,

"ENCODING FLUOROPHORE OPERATIVELY LINKED TO THE PROMOTER OF THE GENE IS DELIVERED TO THE ORGANISM. MORE PREFERABLY, THE CELL IS DELIVERED TO THE ORGANISM VIA SURGICAL PROCEDURE, SUCH AS DIRECT IMPLANTATION BY SURGICAL ORTHOTOPIC IMPLANTATION AT A DESIRED SITE." THIS SUGGESTS TO ME THAT THEY ENCOMPASS WITHIN THE TERM SOI, OR SURGICAL ORTHOTOPIC IMPLANTATION, THE IMPLANTATION OF A CELL. SO IT'S NOT JUST TUMORS AND FRAGMENTS. I HAVE NOTHING FURTHER, THANK YOU.

THE COURT: OKAY, THANK YOU. I KNOW MR. LAWTON'S GOING TO RESPOND TO THAT LAST POINT, EVEN THOUGH WE'RE TAKING A SMALL STEP BACKWARD.

IF YOU WANT TO, MR. LAWTON, GO AHEAD, IF NOT, WE CAN KEEP GOING.

MR. LAWTON: I WILL RESPOND, YOUR HONOR, TO THAT LAST POINT. SO CRI NOW SAYS, "NEVER MIND THAT THIS IS A SPECIFICATION OF A COMPLETELY DIFFERENT PATENT FROM A COMPLETELY DIFFERENT FAMILY, THERE'S A TERM IN THERE THAT'S SIMILAR AND WE OUGHT TO READ IT BACK INTO THE CLAIM TERMS OF THE '038 AND '384 THAT WE ALREADY ARGUED DIFFERENT INVENTIONS, DIFFERENT PROCESSES," BUT THE IDEA THAT MR. PAVANE TALKS ABOUT WAS INTERESTING, AND THE COURT WAS INTERESTED IN IT, AND THE IDEA IS ONE OF PUTTING A CELL OR CELLS INTO A SUBJECT VIA SURGICAL ORTHOTOPIC IMPLANTATION, WHY COULDN'T YOU DO THAT? WHY WOULDN'T YOU WANT TO DO THAT?

THE ANSWER TO THAT IN THIS SETTING IS THE '159 PATENT

CLAIMS METHODS THAT ARE QUITE DIFFERENT THAN WHAT IS CLAIMED IN THE '038 AND THE '384. IN THE '159, WHAT IS THE PRACTITIONER INTERESTED IN? WHAT IS THE PRACTITIONER LOOKING AT? GENE EXPRESSION. NOT METASTASIS, NECESSARILY, BUT GENE EXPRESSION. IS INSULIN BEING PRODUCED? FOR EXAMPLE, INSULIN'S GOT A GENE. YOU CAN MONITOR IT BY LINKING IT TO A FLUOROPHORE LIKE GFP. IS INSULIN PATHOLOGICALLY NOT BEING PRODUCED?

IN THE '038 AND '384, THOSE METHODS ARE SPECIFICALLY AIMED AT STUDYING THE PROGRESSION OF METASTASIS, SO YOU'RE TRYING TO MAXIMIZE THE CHANCE THAT THE TUMOR OR THE TUMOR FRAGMENTS THAT YOU'RE PUTTING INTO THE SUBJECT ARE GOING TO METASTASIZE SO YOU CAN ACCOMPLISH THE PURPOSE OF THE INVENTION. THE '159 HAS A DIFFERENT PURPOSE. YOU'RE INTERESTED IN STUDYING SOMETHING THAT'S MUCH SMALLER IN MANY CASES, GENE EXPRESSION, SO A SINGLE CELL OR CELLS IS SOMETHING THAT YOU WOULD BE STUDYING, COULD BE STUDYING USING THE '159 METHODS.

I THINK IT'S COMPLETELY IMPROPER TO TRY TO ENGRAFT INTO THE '038 AND '384 SPECIFICATIONS THE '159 SPECIFICATION IN LIGHT OF THAT REALITY ABOUT THE DIFFERENCES BETWEEN THE INVENTIONS.

SO WE'RE BACK TO THIS THING ABOUT MERELY LOOKING AT THE ANIMAL, MERE LOOKING. WHERE ARE THESE WORDS? WHERE ARE THEY? ARE THEY IN THE CLAIM TERMS? NO. ARE THEY IN THE SPECIFICATION? NO. ARE THEY ANYWHERE IN THE INTRINSIC EVIDENCE, EXCEPT IN ONE NOTE OF AN EXAMINER, WHO IS NOT AN

INVENTOR? NO. THEY ARE ADDED, ESSENTIALLY WISHFULLY, BY CRI AND WE DON'T THINK THAT'S SUPPORTABLE UNDER THE CANONS OF CONSTRUCTION THAT WE HAVE.

I'M GOING TO INVOKE AGAIN -- I REALLY DON'T MEAN TO SOUND LIKE A BROKEN RECORD ABOUT THE WORDS "COMMON SENSE," BUT I THINK THE COURT EMPLOYS COMMON SENSE HERE, SO IN THIS SETTING WHAT IS THE COMMON SENSE?

I WILL ASK DRS. PETERS AND YANG TO DISASSEMBLE THAT DEVICE, AND I WILL ASK MR. PAVANE TO GO OVER THERE AND LOOK AT MICE THROUGH THE HOLE WITHOUT THE FILTER, IF MR. PAVANE WILL PROMISE ME THAT HE WILL FAITHFULLY TELL THE COURT WHAT HE SEES WITH HIS NAKED EYE AND WHETHER HE IS SEEING GENES BEING EXPRESSED WITH A FLUOROPHORE THROUGH THE HOLE IN THE TOP OF THAT BOX. I DOUBT MR. PAVANE WILL TAKE ME UP ON IT, BUT HIS THEORY OF NAKED EYE OR MERELY LOOKING, AND I USE THOSE SYNONYMOUSLY BECAUSE I THINK THEY'RE, FRANKLY, THE SAME IDEA, I CALLED THEM KISSING COUSINS BEFORE, MAYBE THEY'RE NOT, MAYBE THEY'RE THE SAME THING, IS NOT CONSONANT WITH COMMON SENSE.

IF I'M STANDING IN THE MIDDLE OF THE MOHAVE DESERT IN THE MIDDLE OF THE NIGHT, ON A CLOUDY NIGHT, AND IT'S PITCH BLACK, I PROBABLY WON'T BE ABLE TO SEE ANYTHING. IF I STRAP ON A PAIR OF NIGHT VISION GOGGLES, I'LL PROBABLY BE ABLE TO SEE QUITE A FEW THINGS. IS IT LITERALLY TRUE TO SAY THAT I AM LOOKING THROUGH THE NIGHT VISION GOGGLES WITH MY NAKED EYE? I SUPPOSE SO AS LONG AS THERE'S NOTHING BETWEEN MY NAKED EYE AND

THE INNER SURFACE OF THE NIGHT VISION GOGGLES, BUT NOBODY, WITH ANY COMMON SENSE, WOULD SAY THAT'S NAKED EYE OBSERVATION OR MERELY LOOKING. YOU'RE AIDED BY AN INSTRUMENT.

ONE MORE IMAGE AND THEN I'LL QUIT ON THIS. THE LAST SENTENCE OF THE -- OR THE SECOND TO THE LAST SENTENCE OF THE PARAGRAPH, JUST ABOVE THE CAPITALS, "DISCLOSURE OF THE INVENTION," I'LL READ THE SENTENCE OUT LOUD FOR THE RECORD, AND I QUOTE, "HOWEVER, WHOLE BODY EXTERNAL OPTICAL IMAGING OF GENE EXPRESSION WHICH OFFERS SIMPLE NONINVASIVE, HIGHLY SELECTIVE AND REAL TIME RECORDING AND ANALYSIS OF GENE EXPRESSION IN AN INTACT MULTICELLULAR ORGANISM, E.G., ANIMALS, IS NOT AVAILABLE CURRENTLY."

NOW, WAS MERELY LOOKING AT AN ANIMAL A TECHNOLOGY THAT WAS NOT AVAILABLE AT THE TIME THIS PATENT ISSUED? HAD HUMANITY NOT YET DISCOVERED HOW TO MERELY LOOK AT AN ANIMAL? THE IDEA IS ABSURD. OF COURSE, HUMANITY HAD DISCOVERED THAT. WE KNEW HOW TO MERELY LOOK AT THINGS IN THE LAST DECADE, AND WE DID.

I DOUBT VERY MUCH THAT THESE INVENTORS WOULD HAVE WRITTEN A SENTENCE LIKE THAT UNLESS THEY WERE DESCRIBING SOMETHING NEW THAT INVOLVED A PROCESS, THAT INVOLVED INSTRUMENTS LIKE THE ONES WE'VE DEMONSTRATED TODAY. THANK YOU.

THE COURT: BEFORE YOU SIT DOWN, MR. LAWTON, WOULD YOU AGREE THAT ALL WE'RE REALLY DEBATING HERE THIS AFTERNOON, AND DISCUSSING ON THIS POINT, IS THAT WE DO NEED SOME SORT OF FILTER. WE DO NEED SOME PARTICULAR FORM OF LIGHT, AND WITH

THOSE TWO THINGS WE COULD HAVE DIRECT OBSERVATION. IF I HAVE THE YELLOW GOGGLES, IF I HAVE THE BLUE LIGHT, WHETHER IT'S SET UP AS THIS BOX IS OR WHETHER WE'RE USING THEM IN A MORE RUDIMENTARY FORM, THEN I COULD MAKE THE OBSERVATION. I DON'T NEED MAGNIFICATION. I DON'T NEED A CAMERA, NECESSARILY. I MEAN, THEY MIGHT AID IN THINGS, BUT ALL WE'RE REALLY TALKING ABOUT ARE THOSE TWO FACTORS, A FILTER AND A LIGHT.

MR. LAWTON: I DON'T THINK THAT'S NECESSARILY TRUE BECAUSE --

THE COURT: OKAY.

MR. LAWTON: -- THESE METHODS CLAIM PROCESSES FOR NOT ONLY IMAGING BUT DOING RECORDING AND ANALYSIS. YOU CAN'T REALLY -- YOU CAN'T REALLY RECORD SOMETHING --

THE COURT: YOU'RE ADDING SOMETHING DIFFERENT. I'M TALKING ABOUT JUST THE CONCEPT OF MERELY LOOKING OR THE USE OF THE NAKED EYE, AND I'M SAYING YOU WOULDN'T REALLY DISAGREE IF WE ADDED IN -- IF THERE WAS A WAY TO ADD IN THE SOURCE OF FILTER AND COLOR OF LIGHT THAT'S NECESSARY FOR THIS OBSERVATION. THAT'S BY WAY OF A QUESTION. YOU CAN CONFER WITH YOUR SCIENTISTS THERE, IF YOU NEED TO, MR. LAWTON, BUT I'M JUST TRYING TO SEE IF THERE'S SOME COMPROMISE POSITION HERE. I COULD OBSERVE IT WITH THOSE THINGS ADDED TO ASSIST ME.

MR. LAWTON: YOU COULD OBSERVE IT, BUT COULD YOU RECORD? COULD YOU ANALYZE? COULD YOU CREATE A FILM STRIP LIKE DR. PETERS CREATED? COULD YOU MONITOR AND MEASURE THE ABILITY

OF A PROMOTER TO PROMOTE EXPRESSION OF AN ENDOGENOUS GENE JUST BY LOOKING THROUGH THE FILTER AND WITH THE BLUE EXCITATION LIGHT? I DON'T THINK YOU COULD. AND THESE CLAIM TERMS SPEAK OF THAT SORT OF PROCESS RECORDING, DOING ANALYSIS, BECAUSE THE PEOPLE TO WHOM THESE METHODS ARE USEFUL ARE SCIENTISTS. THEY'RE MEASURING THINGS IN MICRONS, NOT SOMETHING THAT I CAN DO WITH MY NAKED EYE.

THE COURT: NO, UNDERSTOOD. ALL RIGHT. ANYTHING ELSE, MR. LAWTON?

MR. LAWTON: NOTHING, YOUR HONOR, THANK YOU.

THE COURT: VERY QUICKLY, AND THEN WE'LL MOVE ON TO THE NEXT TERM OR WE WON'T FINISH TODAY.

MR. PAVANE: I'LL BE BRIEF. FIRST OF ALL, THERE'S EQUIVOCATION THERE WHETHER YOU COULD OR COULD NOT. I WOULD ACCEPT THAT, BY THE WAY, WHAT YOU WERE PROPOSING. IN FACT, I WAS GOING TO SUGGEST THE SAME THING. I THOUGHT AT THAT POINT, WHEN YOU ASKED THE QUESTION, THAT WAS, INDEED, THE DISPUTE REMAINING BETWEEN US AS TO WHETHER IF YOU AT LEAST HAD YELLOW GOGGLES OR A FILTER AND LIGHT IS THAT THE BARE MINIMUM TO QUALIFY FOR WHOLE BODY EXTERNAL FLUORESCENT OPTICAL IMAGING. YOU KNOW, THAT WOULD BE A CONSTRUCTION THAT WOULD BE ACCEPTABLE TO US.

I WOULD ALSO POINT OUT THAT, AGAIN, AS OFTEN IS THE CASE SEEMS TO BE, THAT WHEN POSED WITH A QUESTION LIKE THAT MR. LAWTON FALLS BACK AND SAYS, "WELL, YOU COULDN'T RECORD," BUT

LET'S LOOK AT THE DEFINITION THEY GAVE. AGAIN, IF WE COULD PUT THAT UP JUST FOR A SECOND IN THE '159, COLUMN FIVE, 60 TO 66, I GUESS ABOUT IS ENOUGH. THIS IS THE SENTENCE THAT WE ALL AGREE -- BY THE WAY, THIS IS WHERE THE SENTENCE COMES FROM THAT WE ALL AGREE IS A DEFINITION OF WHOLE BODY EXTERNAL FLUORESCENT OPTICAL IMAGING. AGAIN, THIS IS THEIR DEFINITION FROM THEIR PATENT, AND IT SAYS, "ABSENCE OR INTENSITY OF THE FLUORESCENCE GENERATED BY THE FLUOROPHORE AT VARIOUS LOCATIONS -- I'M READING IN THE MIDDLE ACTUALLY -- IN THE HOST ORGANISM IS MONITORED, RECORDED AND/OR ANALYZED." IT DOESN'T SAY IT HAS TO BE RECORDED. IT CAN JUST BE MONITORED, THAT'S ENOUGH. IF YOU'RE MONITORING, AND YOU CAN CERTAINLY MONITOR WITH YOUR EYE, THEN YOU ARE WITHIN THE SCOPE OF THIS CLAIM. SO THERE'S NO REQUIREMENT OF RECORDING OR MAKING IMAGES THAT SPIT OUT OF A FANCY COMPUTER. THAT'S NOT A REQUIREMENT.

AND FIVE SECONDS ON MR. LAWTON'S REBUTTAL ON THE SOI TERM, WITH YOUR HONOR'S PERMISSION. THE SIMPLE POINT I WANT TO MAKE, AND I THINK YOUR HONOR UNDERSTOOD THIS, WAS THAT THEY WERE THE ONES WHO GOT UP HERE AND SAID, "LOOK, IT'S NOT DEFINED. WE ALL AGREE IT'S NOT DEFINED, BUT IT HAS A WELL UNDERSTOOD MEANING IN THE ART." NOW YOU'RE TELLING ME THAT IT'S GOT ONE MEANING IN ONE CONTEXT AND IT'S GOT ANOTHER MEANING IN ANOTHER CONTEXT? THAT MAKES NO SENSE. HOW CAN YOU HAVE THE SAME TERM MEANING DIFFERENT THINGS IN DIFFERENT CONTEXTS AND EXPECT THE PERSON OF ORDINARY SKILL IN THE ART TO

KNOW THAT WHEN IT'S A TERM YOU'RE COINING AND PUTTING IN YOUR OWN PATENT.

THE COURT: OKAY. LET'S MOVE ON TO THE NEXT TERM. NOW, ABSENT A SUGGESTION FROM THE PARTIES TO DO SOMETHING OTHER, WE CAN GO BACK AND PICK UP "EXPRESSES." MAYBE THAT WILL BE QUICK, AND MAYBE SOME OF THESE WILL GO VERY QUICKLY AT THIS POINT, I DON'T KNOW.

GO AHEAD, MR. LAWTON.

MR. LAWTON: YOUR HONOR, THIS MAY BE THE SHORTEST ONE OF THE DAY -- UNLESS I'M MISTAKEN, MR. PAVANE MAY SURPRISE ME, HE DOES THAT SOMETIMES, AND I DON'T MEAN THAT IN A BAD WAY AT ALL --

THE COURT: OKAY.

MR. LAWTON: -- WE DON'T HAVE A PROPOSED CONSTRUCTION, AS I UNDERSTAND IT, FROM CRI ON THIS. WE HAVE PROPOSED A CONSTRUCTION THAT SAYS, "EXPRESSION -- OR EXPRESSES MEANS MANIFESTATION OF INFORMATION ENCODED IN A GENE INTO AN OBSERVABLE CHARACTERISTIC," LIKE PRODUCTION OF A PROTEIN, LIKE GREEN FLUORESCENT PROTEIN.

THE LAW THAT WE THINK ENTITLES US TO HAVE THIS CONSTRUCTION ADOPTED BY THE COURT, CRI'S CONSTRUCTION WAIVED, IS IN OUR BRIEF, AND WHAT CRI HAS TO SAY ABOUT IT SEEMS LIMITED IN THEIR BRIEF TO PRIOR ART REFERENCES, BUT THEY NEVER SAY IN THEIR BRIEF OR IN THEIR CHART WHAT PRIOR ART REFERENCES THEY'RE TALKING ABOUT OR HOW THE CONTENT OF THOSE PRIOR ART REFERENCES

SOMEHOW ARGUES AGAINST THE CONSTRUCTION OF EXPRESSES THAT WE HAVE OFFERED -- THAT WE'VE PROFFERED SOME SUPPORTING EVIDENCE, INCLUDING OUR SPECIFICATION AND THE STEDMAN'S MEDICAL DICTIONARY, WHICH WE THINK IS A FINE SOURCE, AND SO WE URGE THE COURT TO ADOPT THAT.

THE COURT: DO YOU WANT TO COMMENT, MR. PAVANE?

MR. PAVANE: WITH YOUR HONOR'S PERMISSION, I WOULD LIKE TO TURN THIS PART OF THE ARGUMENT OVER TO MY CO-COUNSEL, MR. HOLMBERG.

THE COURT: CERTAINLY.

MR. PAVANE: THANK YOU.

MR. HOLMBERG: GOOD AFTERNOON, YOUR HONOR.

THE COURT: GOOD AFTERNOON, SIR.

MR. HOLMBERG: FIRST, I WOULD BREAK THIS DOWN INTO TWO ESSENTIAL PROBLEMS; ONE WOULD BE LEGAL, THE OTHER WOULD BE PRACTICAL. LEGALLY SPEAKING, THERE IS ACTUALLY NO PRINCIPLE THAT YOU LOSE BY DEFAULT IF YOU DON'T OFFER A CONSTRUCTION.

THE COURT: I'M GOING TO LET YOU PROCEED. I'M NOT GOING TO SAY THAT YOU'VE WAIVED YOUR ABILITY TO PROPOSE SOMETHING ELSE, SO GO AHEAD. WE DON'T NEED TO WASTE TIME ON THAT THIS AFTERNOON, SO GO AHEAD.

MR. HOLMBERG: WHICH STILL LEAVES US WITH THE PROBLEM THAT WE HAVEN'T PROPOSED SOMETHING AND THEY HAVE. THE REAL QUESTION BEFORE THE COURT IS --

THE COURT: DOES IT NEED A CONSTRUCTION.

MR. HOLMBERG: EXACTLY, DOES IT NEED A CONSTRUCTION AT ALL. NO ARGUMENTS HAVE BEEN OFFERED ON THAT ISSUE. THE ONE THING THAT'S KIND OF SUGGESTED, WHICH WE WILL AGREE WITH, IS EXPLANATION IS NEEDED. YOU HAVE TO HAVE SOME KIND OF UNDERSTANDING OF THE CONCEPT. WE BELIEVE THE SOLUTION TO THAT PROBLEM IS WHAT WE HAD THIS MORNING, WHERE WE HAVE A TUTORIAL THAT EXPLAINS THE CONCEPT IN GENERAL.

BUT "EXPRESS" IS A VERY, VERY GOOD EXAMPLE BECAUSE IT'S EXTREMELY BROAD AND IT HAS MANY DIFFERENT MEANINGS IN MANY DIFFERENT CONTEXTS, AND THE APPROPRIATE THING IS TO HAVE A GENERAL UNDERSTANDING OF IT, NOT NECESSARILY TO BE LIMITED TO A VERY SPECIFIC DEFINITION.

THE OTHER PROBLEM WITH IT IS THE NEXT STEP THAT WE'RE REALLY GOING TO HAVE HERE ARE SUMMARY JUDGMENT MOTIONS, AND THE FACT IS THE REFERENCES WE ARE USING, AND RIGHT NOW BECAUSE WE HAVE INVALIDITY CONTENTIONS THERE ARE ROUGHLY ABOUT 300 OF THEM, SO, YES, WE DIDN'T GO THROUGH ALL OF THEM BUT WE ALSO DID NOT PICK, YOU KNOW, ONE OR TWO EXAMPLES EITHER, THAT'S BECAUSE "EXPRESSES" IS SOMETHING THAT IS EXTREMELY CLEAR. THERE IS NO DEBATE ABOUT WHETHER "EXPRESSES" MEANS SOMETHING IN THE DIFFERENT PIECES OF PRIOR ART.

WHAT EXACTLY WE DO HAVE IN THE RECORD WOULD BE THE PREVIOUS SUMMARY JUDGMENT WE DID, WHICH HAD THE TASHIMA REFERENCES, WHERE YOU HAVE THE WORD "EXPRESSES" AGAIN, AND AGAIN, AND AGAIN, THERE'S NO DEBATE THAT IT ACTUALLY MEANS THE

SAME THING.

I BELIEVE THE DEFINITION BEING OFFERED --

THE COURT: I'VE GOT IT IN FRONT OF ME. GO AHEAD.

MR. HOLMBERG: TO ME, THE REAL QUESTION IS IS THIS GOING TO BE HELPFUL? PRACTICALLY SPEAKING, DO WE NEED THIS? AND IN THE END, I DON'T THINK HAVING THIS DEFINITION IS GOING TO ACTUALLY BE HELPFUL ONCE WE REACH THE SUMMARY JUDGMENT SCALE. I THINK WHAT WE HAD THIS MORNING, IN TERMS OF AN EXPLANATION OF WHAT GENE EXPRESSION IS, AND HOW THAT ACTUALLY PLAYS OUT, THAT IS HELPFUL.

I SHOULD SAY THE PRIMARY CONTEXT IN WHICH THAT ARGUMENT WAS MADE, IN ANTICANCER'S OPENING BRIEF, WAS THE JURY -- WHICH I SHOULD HAVE SAID TO BEGIN WITH, WAS THE NECESSITY HERE IS PERHAPS THE JURY DOESN'T UNDERSTAND WHAT "EXPRESSES" MEANS, AND, ONCE AGAIN, WE AGREED THAT AN EXPLANATION IS REQUIRED BUT NOT A RULING BY YOUR HONOR.

THERE ARE MANY GOOD CASES FROM THE FEDERAL CIRCUIT THAT ACTUALLY HAVE A VERY FINE DISTINCTION, THE *02 MICRO* CASE, WHICH WE QUOTED, WHERE THEY MAKE THE DISTINCTION BETWEEN THE SCOPE OF A TERM AND THE MEANING, AND THEY SAY, "THE COURT NEEDS TO DECIDE THE SCOPE BECAUSE THAT HAS TO DO WITH THE DISPUTE, NOT NECESSARILY THE MEANING."

WE'RE NOT HERE TO DO DEFINITIONS. WE'RE NOT HERE NECESSARILY TO DO THE SCIENCE AND FIGURE OUT EVERYTHING THAT'S COVERED BY A TERM. IN TERMS OF THE COMMON LAW, YOU'RE JUST

HERE TO FIGURE OUT THE DISPUTE. SO IF IT IS COVERED BY THE EXACT SAME THING IN THE PRIOR ART, THERE IS NO REAL DISPUTE OVER THE WORD.

I SHOULD ADD TO THAT I THINK WE'RE GOING TO GET EXTREMELY REPETITIVE WITH THE EXACT SAME ARGUMENT PRETTY MUCH FOR EVERYTHING THAT'S LEFT.

THE COURT: WELL, WE'LL GO THROUGH IT QUICKLY THEN. WE'LL GO THROUGH IT QUICKLY AND SEE WHERE WE ARE, BUT WE'RE ON THIS TERM. IS THAT EVERYTHING, SIR?

MR. HOLMBERG: YES. BUT TO MAKE IT CLEAR, WE ARE VERY MUCH ON THE FIRST STEP THEN. IT'S REALLY RIGHT NOW A MATTER OF ARGUING WHETHER IT NEEDS TO BE CONSTRUED AT ALL.

THE COURT: CORRECT.

MR. HOLMBERG: OKAY. THANK YOU.

THE COURT: VERY GOOD. THANK YOU.

MR. LAWTON, IN RESPONSE, SIR.

MR. LAWTON: IF EVERYBODY KNOWS WHAT "EXPRESSES" MEANS BECAUSE IT'S SO CLEAR, THEN WHAT IS THE OBJECTION TO HAVING A RULING EMBODYING THE MEANING OF THAT TERM? IF THE JURY WON'T UNDERSTAND WHAT THE WORD "EXPRESSES" MEANS, AS WE'RE TOLD WILL PROBABLY BE THE CASE, WHY ARE WE GOING TO LEAVE THEM DELIBERATELY IN THE DARK? OUR DEFINITION IS SUPPORTED BY OUR SPECIFICATION AND BY THE DICTIONARY DEFINITION.

CRI HAD THE OPPORTUNITY TO PROFFER IT'S OWN CONSTRUCTION. THERE'S SOMETHING THEY DON'T LIKE ABOUT OURS.

I'M NOT HEARING WHAT IT IS. I'M JUST HEARING THEY DON'T WANT A CONSTRUCTION, AND I'M GUESSING THERE'S A REASON BEHIND THAT.

IN THE ABSENCE OF A COMPETING CONSTRUCTION FROM CRI, AND NOT HEARING THAT THERE'S ANY DEFECT IN THE CONSTRUCTION WE HAVE OFFERED TO THE COURT, I SEE NO REASON WHY THE COURT SHOULD NOT CONSTRUE THIS TERM AND THE OTHER TERMS AS MR. HOLMBERG CORRECTLY POINTS OUT WHERE WE'VE GOT A SIMILAR NON-PROFFERING FLUORESCENCE RETROVIRAL VECTOR AND SO FORTH.

THE COURT: THANK YOU.

COUNSEL, WHAT -- I UNDERSTAND YOU DON'T THINK THERE'S A NEED FOR A DEFINITION, BUT MORE SPECIFICALLY, LOOKING AT WHAT ANTICANCER PROPOSES, WHAT'S THE PROBLEM WITH IT? I UNDERSTAND YOUR VIEW, WE DON'T NEED TO GO THERE, AND MAYBE WE DON'T, BUT LOOKING AT THEIRS, WHAT'S THE PROBLEM WITH IT OTHER THAN THE FACT THAT IT IS A DEFINITION, AND YOU DON'T REALLY THINK WE NEED ONE, AND YOU MAY BE CORRECT. I DON'T KNOW AT THIS POINT. BUT LOOKING AT IT SUBSTANTIVELY, WHAT WOULD YOUR CRITICISM IF ANY BE OF IT.

MR. HOLMBERG: SUBSTANTIVELY, IT IS CORRECT, THERE ARE -- IT'S A VERY BROAD TERM. WE COULD COME UP WITH PROBABLY 30 DIFFERENT DEFINITIONS. THIS IS NOT WRONG. THIS IS NOT INACCURATE. SO WE WOULD NOT SAY THAT IT IS INACCURATE.

PRACTICALLY SPEAKING, I HAVE TO ADMIT WHAT'S IN THE BACK OF MY MIND IS WHEN WE HAVE A SUMMARY JUDGMENT MOTION AND WE HAVE A PRIOR ART PIECE THAT SUDDENLY EXPRESSES WILL BECOME

AN ISSUE BASED ON SOME WORD IN HERE --

THE COURT: SO YOU'RE WORRIED ABOUT THE NEXT STEP FROM HERE, WHICH WE KNOW WE'RE ALL GETTING TO.

MR. HOLMBERG: YEAH.

THE COURT: SURE.

MR. HOLMBERG: I THINK WE MIGHT WANT TO REMEMBER, HOW DID WE GET HERE FROM THE FIRST -- WE BEGAN THIS WHERE ANTICANCER ACTUALLY WANTED TO CONSTRUE EVERY SINGLE WORD IN 25 OF THE 31 CLAIMS, WHICH WE'VE BEEN STEADILY FIGHTING AGAINST, AND IT'S BEEN CUT DOWN AND CUT DOWN AND CUT DOWN. SO I WOULD SAY -- I WOULD SAY WE'VE BEEN SUCCESSFUL IN AT LEAST CUTTING IT FROM I BELIEVE IN THE OPENING BRIEFS THERE WERE 26 TERMS, AND NOW WE'VE GOT IT DOWN TO 11. THEY JUST DON'T ALL NEED TO BE CONSTRUED.

THE COURT: OKAY.

MR. HOLMBERG: OBVIOUSLY, WE'RE GOING TO SOUND LIKE WE'RE BEATING A DEAD HORSE I THINK IF WE KEEP --

THE COURT: OKAY, THANK YOU.

FLUORESCENCE, MR. LAWTON.

MR. LAWTON: THANK YOU.

MR. PAVANE: JUDGE, CAN I MAKE A SUGGESTION TO TRY TO SPEED THINGS ALONG?

THE COURT: OKAY, WHERE DO YOU WANT TO GO?

MR. PAVANE: YEAH, I'LL TELL YOU IN A SECOND.

(DISCUSSION HELD OFF THE RECORD.)

THE COURT: THE TERM RETROVIRAL VECTOR IS ON THIS LIST, AND I GUESS IN CONJUNCTION WITH THAT WOULD BE EXPRESSION VECTOR. I DIDN'T PUT THAT ON HERE SEPARATELY.

MR. PAVANE: YEAH. I THINK YOU'LL FIND THAT A LOT OF THE ONES THAT REMAIN, EXCEPT FOR THE ONE I'M GOING TO BRING UP NOW, PERHAPS, ARE GOING TO FALL INTO THE SAME CATEGORY AS THE ONES WE JUST DID.

THE COURT: OKAY.

MR. PAVANE: THEY'RE GOING TO GO QUICKLY. BUT I DID WANT TO GET SOME CLARIFICATION, IT'S 7(B) ON YOUR LIST, YOUR HONOR.

THE COURT: OKAY, A METHOD TO MONITOR THE ABILITY OF A PROMOTER.

MR. PAVANE: AND ALSO THE WORD PROMOTER AS YOU POINT OUT AT THE END OF THAT. THE REASON I WANT TO DO THAT ONE NOW IS I'M NOT SURE WHETHER WE HAVE A DISPUTE ABOUT THAT ONE. THAT IS ONE WHERE I THINK AT LEAST THE FIRST PART WE'VE AGREED ON, MR. LAWTON AND I. I THINK MR. LAWTON AND WE HAVE AGREED ON THE FIRST PART. I'M NOT SURE ABOUT THE WORD "PROMOTER," BUT I WANT TO FIND OUT IF WE DO HAVE A DISPUTE.

THE COURT: YOU KNOW, I TEND TO AGREE WITH MR. PAVANE, I THOUGHT THE ONLY ISSUE WAS GETTING DOWN TO THE TERM "PROMOTER." WOULD THAT BE AN ACCURATE STATEMENT? THAT WAS JUST BASED ON THE READING OF EVERYTHING, SO TAKE A MOMENT AND BE SURE.

MR. LAWTON: THE COURT IS RIGHT, YOUR HONOR.

THE COURT: SO WE COULD TURN TO 11, AND REALLY THE ONLY ISSUE IS "PROMOTER."

MR. PAVANE: RIGHT. OKAY, SO THAT IS ONE WHERE WE DO WANT TO DISCUSS -- IF WE'RE STILL ARGUING ABOUT THE CONSTRUCTION OF A PROMOTER, WE DO HAVE A POSITION IN OUR BRIEF AND WE WOULD LIKE TO ARTICULATE. BUT ALL OF THE OTHERS FALL IN THE SAME CATEGORY AS "EXPRESSES," AND I THINK MR. HOLMBERG WILL AGREE WITH THAT, OF THE REMAINING ONES. I'M TOLD WE OFFERED ALTERNATIVES ON SOME OF THEM, SO MAYBE THEN WE'LL HAVE TO GO THROUGH THEM.

THE COURT: LET'S JUST KEEP GOING. WE'LL JUMP AHEAD TO 11, AND SO EVERYBODY'S IN AGREEMENT ON THE FIRST PORTION, "A METHOD TO MONITOR THE ABILITY OF A PROMOTER TO PROMOTE EXPRESSION," ETC., ETC., BUT WE'RE REALLY DOWN TO JUST THE ONE TERM OF "PROMOTER."

MR. LAWTON: WE HAVE OFFERED A CONSTRUCTION OF "PROMOTER," YOUR HONOR, THAT IS SUPPORTED BY OUR SPECIFICATION, COLUMN SIX, BEGINNING AT LINE 34. IRONICALLY, CRI INVOKES A PART OF THE SAME EXCERPT. THEY'VE GOT A POSITION ON THIS THAT IS SORT OF IN THE ALTERNATIVE, THEY SAY, "PROMOTER IS A BACKGROUND CONCEPT, NEED NOT BE CONSTRUED. IN THE ALTERNATIVE THE COURT SHOULD CONSTRUE THIS TERM AS A SEGMENT OF DNA OR RNA THAT CONTROLS TRANSCRIPTION OF THE DNA OR RNA TO WHICH IT IS OPERATIVELY LINKED."

FRANKLY, WE THINK OUR DEFINITION IS MORE CONSISTENT WITH THE SPECIFICATION, AND IT'S ALSO SIMPLER AND LESS JARGONY, LESS ESOTERIC TO A LAYPERSON THAN THE CRI DEFINITION, AND, THEREFORE, OUR CONSTRUCTION WE THINK IS PREFERABLE. THAT'S ALL I HAVE.

THE COURT: OKAY.

MR. PAVANE: YOUR HONOR, I'LL HANDLE THIS ONE.

THE COURT: CERTAINLY, GO AHEAD, SIR.

MR. PAVANE: I'LL ALSO BE EXTREMELY BRIEF HERE.

IF WE COULD JUST -- COULD WE GET THE TWO CONSTRUCTIONS UP SIDE BY SIDE.

WELL, YOUR HONOR HAS THEM, RIGHT?

THE COURT: I DO HAVE THEM, RIGHT IN FRONT OF ME.

MR. PAVANE: SO THE PRIMARY DIFFERENCE SEEMS TO BE THAT OURS INCLUDES DNA OR RNA AND OPERATIVELY LINKED, AND THEIRS IS ONLY LIMITED TO A SPECIFIC SEQUENCE OF DNA. I THINK THE TUTORIAL HERE WAS EXTREMELY HELPFUL, WE ALL UNDERSTAND THAT A PROMOTER CONTROLS A GENE, AND TURNS IT ON AND OFF, AND THE PROMOTER MAY BE ON ALL THE TIME OR MAY NOT BE, BUT, REGARDLESS, IT CONTROLS THE GENE.

I WOULD LIKE TO REFER YOUR HONOR TO THE '159 PATENT, THE PATENT WE'RE DISCUSSING NOW, AT COLUMN SIX, AND IF WE COULD LOOK AT LINES 34 TO 36, AND NOW, ADMITTEDLY, THIS IS NOT THE WORD "PROMOTER," IT'S "PROMOTER REGION" OR "PROMOTER ELEMENT," BUT I'M NOT AWARE OF ANY DIFFERENCE THAT ANTICANCER IS PARSING

"PROMOTER" TO BE DIFFERENT FROM "PROMOTER ELEMENT." SO MY UNDERSTANDING IS THIS IS A PROMOTER. IT SAYS, "AS USED HEREIN, A PROMOTER OR A PROMOTER REGION -- I'M SORRY, "A PROMOTER REGION OR PROMOTER ELEMENT REFERS TO A SEGMENT OF DNA OR RNA THAT CONTROLS TRANSCRIPTION OF THE DNA OR RNA TO WHICH IT IS OPERATIVELY LINKED." THAT'S EXACTLY WHAT WE WROTE IN OUR DEFINITION.

SO UNLESS ANTICANCER IS PREPARED TO STAND UP AND SAY A PROMOTER IS SOMETHING DIFFERENT THAN A PROMOTER REGION OR PROMOTER ELEMENT, IT SEEMS TO ME THAT THIS HAS TO CONTROL. I AM FINISHED.

THE COURT: MR. LAWTON, DO YOU WANT TO COMMENT ON THIS?

MR. LAWTON: THOSE WORDS SAY WHAT THEY SAY, BUT THE QUESTION FOR *MARKMAN* PURPOSES IS, IS REGURGITATING THOSE WORDS TO THE COURT AND JURORS GOING TO BE HELPFUL? THE PURPOSE OF THIS EXERCISE, AS I UNDERSTAND IT, IS TO GET AT WHAT THOSE WORDS MEAN. JUST PARROTING THE WORDS OR REPEATING THEM IS JUST SORT OF BEING REDUNDANT. IT'S LIKE TELLING ME THAT WHOLE BODY EXTERNAL FLUORESCENT OPTICAL IMAGING IS JUST THAT, IT'S WHOLE BODY EXTERNAL FLUORESCENT OPTICAL IMAGING. WELL, YOU'RE NOT REALLY TELLING ME WHAT IT IS. WHY DON'T YOU TALK ABOUT WHAT THE WORDS MEAN. WE HAVE TRIED TO DO THAT IN A WAY THAT IS MORE PLAIN ENGLISH AND SIMPLER.

I THINK, OBVIOUSLY, THE CANON TELLS US WHAT IT TELLS US WITH RESPECT TO THE IMPORTANCE OF THE SPECIFICATION, BUT THE

SPECIFICATION DOESN'T ALWAYS GIVE US PLAIN ENGLISH AND, WHERE IT DOESN'T, THAT'S WHERE CLAIM CONSTRUCTION COMES IN, AND THAT'S WHY WE'VE TRIED TO GIVE A PLAIN ENGLISH DEFINITION, WHICH, BY THE WAY, CRI HAS NOT TOLD US ANY DEFECT ABOUT THAT PLAIN ENGLISH DEFINITION.

MR. PAVANE: ONE PROPOSAL ON THAT. THERE IS A CLEAR DEFECT AND IT IS LIMITED TO DNA, SO THAT'S ONE CLEAR DEFECT. WHEREAS, THE DEFINITION OF THE PATENT IT SAYS DNA OR RNA.

BUT PUTTING THAT ASIDE, MR. LAWTON CERTAINLY HAS A POINT IN THE SENSE THAT, YES, THIS IS THE DEFINITION. THE FEDERAL CIRCUIT SAYS WHEN YOU'VE DEFINED SOMETHING, IT CONTROLS, AND THERE'S NO QUESTION THIS SHOULD CONTROL. BUT THERE IS THE POINT OF WHAT HAPPENS WHEN YOU GET IN FRONT OF A JURY AND YOU'VE GOT WORDS IN THERE THAT, YOU KNOW, AREN'T THAT CLEAR, AND I'M PERFECTLY WILLING, DOWN THE ROAD, TO WORK WITH MR. LAWTON TO COME UP WITH FURTHER EXPLANATION FOR A JURY, IF WE GET TO THAT POINT, OF EXPLAINING WHAT THESE THINGS ARE.

I DON'T THINK IT NEEDS FURTHER EXPLANATION, FOR EXAMPLE, FOR THE COURT, IN TERMS OF CONSTRUCTION, IF WE'RE GOING TO DO A SUMMARY JUDGMENT MOTION, BUT DOWN THE ROAD, IF IT'S NECESSARY, WE CAN ALWAYS TALK ABOUT EXPLAINING TERMS AND COMING UP WITH GLOSSARIES FOR THE JURY, BUT THE CONSTRUCTION IS THE CONSTRUCTION, AND THAT SHOULD NOT BE ALTERED.

MR. LAWTON: THAT'S NOT A CONSTRUCTION. THAT'S A PASSAGE FROM THE SPECIFICATION THAT WOULDN'T BE CLEAR TO A

LAYPERSON.

I WOULD AGREE WITH MR. PAVANE THAT WE COULD MODIFY OUR PROFFERED CONSTRUCTION TO INCLUDE THE WORDS "OR RNA," MR. PAVANE IS CORRECT ABOUT THAT, OTHERWISE, WE WOULD URGE OUR CONSTRUCTION ON THE COURT, AS MODIFIED BY THAT.

MR. PAVANE: AND ALL I WOULD SAY IS THAT THE REASON I DON'T WANT TO DO THAT IS BECAUSE I DO THINK IF WE DO THAT I THINK WE'RE VIOLATING WHAT THE FEDERAL CIRCUIT HAS TOLD US VERY CLEARLY THAT IF IT'S DEFINED, YOU GOT TO USE THAT DEFINITION. I THINK WE SHOULD STICK TO THAT, AND IF WE THEN WANT TO HAVE IT FURTHER EXPLAINED TO SOMEBODY DOWN THE ROAD, GREAT, BUT THIS IS THE CONSTRUCTION, ACCORDING TO THE FEDERAL CIRCUIT, BECAUSE IT'S DEFINED AS A TERM.

THE COURT: OKAY. SO THAT'S THE ONLY DISAGREEMENT ON THAT TERM OR PHRASE.

MR. PAVANE: I THINK WE'RE BACK TO FLUORESCENCE.

THE COURT: I THINK WE ARE BACK TO FLUORESCENCE.

GO AHEAD, MR. LAWTON.

MR. LAWTON: THANK YOU, YOUR HONOR.

THIS, JUST LIKE THE TERM "EXPRESSES," WE THINK THEY'VE CONCEDED THE CONSTRUCTION OF THE TERM BY THEIR FAILURE TO PROFFER ONE. THERE IS LAW ON IT. I WON'T BELABOR IT. IT'S CITED IN OUR BRIEF.

WE DO THINK THE TERM FLUORESCENCE IS IMPORTANT. WE'VE HEARD THAT WORD A LOT OF TIMES, I HAVEN'T COUNTED HOW MANY

TIMES, BUT THE WORD DOES APPLY 25 TIMES IN THE '384 PATENT ALONE. IT'S NOT JUST A BACKGROUND CONCEPT. WE HAVE A PERFECTLY GOOD DEFINITION OF IT. THE STEDMAN'S DEFINITION CRI IGNORES THAT AND SAYS, "WELL, A LAYPERSON'S UNDERSTANDING OF FLUORESCENCE OUGHT TO SUFFICE." WELL, I DON'T KNOW HOW MANY LAY PEOPLE REALLY HAVE AN UNDERSTANDING -- A TECHNICALLY CORRECT UNDERSTANDING OF WHAT FLUORESCENCE IS.

FOR EXAMPLE, WE TALKED THIS MORNING ABOUT THE DIFFERENCE BETWEEN FLUORESCENCE AND PHOSPHORESCENCE, AND MR. PAVANE OFFERED A THIRD TERM, BIOLUMINESCENCE, WHICH HE DISTINGUISHED FROM FLUORESCENCE, SO THERE ARE, OBVIOUSLY, DIFFERENT PHENOMENA IN THE AREA OF EMITTING LIGHT IN THE WORLD. FLUORESCENCE IS ONE OF THEM. WE OUGHT TO BE DEFINING IT. IT'S AN IMPORTANT TERM. THE COURT SAW ON THE SCREEN HOW IMPORTANT THE FLUORESCING NATURE OF FLUORESCENT PROTEINS IS IN WHAT WE DO.

I WISH THAT WE HAD A COMPETING CONSTRUCTION BECAUSE THEN I COULD ARGUE ABOUT IT, BUT WE DON'T HAVE ONE. I DON'T LIKE TO ARGUE FOR ITS OWN SAKE, I JUST -- MR. PAVANE IS A GREAT OPPONENT SO I ENJOY THE EXCHANGES WITH HIM.

THE COURT: YOU HAVE NO PROPOSED CONSTRUCTION. YOU DON'T BELIEVE ONE'S NECESSARY. ANY COMMENTS OR YOU JUST WANT TO LET IT GO?

MR. HOLMBERG: WELL, I THINK THE ARGUMENT FOR THE LAST TERM WAS, WOULD IT BE CLEAR FOR A LAYPERSON? IT'S NOT CLEAR TO

ME THAT THIS IS SOMEHOW BETTER THAN JUST SAYING "FLUORESCENCE."

THE COURT: WELL, I'M NOT SURE ANTICANCER'S CONSTRUCTION IS BETTER. IN THE CONTEXT OF THIS CASE, WOULD IT BE CLEAR TO A JURY? PROBABLY NOT. WOULD ANY OF THIS BE CLEAR? PROBABLY NOT. THAT WILL BE A CHALLENGE WHEN WE GET THERE, FOLKS, BUT GO AHEAD.

MR. HOLMBERG: I AGREE. I MEAN, WHEN IT COMES DOWN TO IT, THE ONE VERY GOOD ARGUMENT IS THE PROBLEM IS THE JURY, AND THAT'S THE PROBLEM WE ALWAYS HAVE TO DEAL WITH IN TERMS OF EXPLAINING TO THEM, BUT I DON'T THINK THAT'S THE PROBLEM WE NEED TO DEAL WITH TODAY. TODAY IS IN THE TERMS OF THE CONSTRUCTION OVER THE TERMS THAT REALLY WE HAVE TO DECIDE WHAT THE SCOPE IS, AND FLUORESCENCE DEFINITELY IS NOT ONE OF THEM, AND, IF IT WAS, I'M NOT SURE THAT THIS WOULD HELP.

THE COURT: I WAS GOING TO SAY, WHAT'S THE PROBLEM WITH WHAT ANTICANCER'S PROPOSING?

MR. HOLMBERG: AS I SAID, I'M NOT SURE -- WE DO HAVE SOME VERY GOOD CASES ON THAT, WHETHER THIS IS ACTUALLY CLEARER THAN WHAT A NORMAL PERSON WOULD UNDERSTAND FROM FLUORESCENCE. I WOULD SAY GOING UP -- TO PARSE IT SIMPLY, IF WE GO UP TO THE SEMICOLON, WHERE IT SAYS "DISTINGUISHED FROM PHOSPHORESCENCE," WHICH I'M NOT SURE WHY WE NEED TO DISTINGUISH IT FROM PHOSPHORESCENCE, BUT ALL IN ALL, ONCE AGAIN, IT'S ACCURATE. WE'RE NOT DISPUTING IT IS NOT ACCURATE. IT IS ACCURATE.

THE COURT: THERE'S NO PROBLEM WITH THIS DEFINITION,

YOU JUST DON'T THINK IT, NUMBER ONE, IS NECESSARY. NUMBER TWO, ADDS ANY CLARITY, IF YOU WOULD, TO THIS WHOLE SITUATION.

MR. HOLMBERG: YES, YOUR HONOR. THANK YOU.

THE COURT: OKAY, MR. LAWTON.

MR. LAWTON: I'M SORRY, YOUR HONOR, I WANT OUR CONSTRUCTIONS TO BE CLEAR, AND I'M SORRY IF I'VE DISAPPOINTED THE COURT WITH THIS. I DO SEE THAT, ON A RE-READING, THERE'S SOME, YOU KNOW, POLYSYLLABIC WORDS IN HERE AND WE COULD CERTAINLY WORK ON IMPROVING THAT. THE IDEA OF FLUORESCENCE IS IMPORTANT FOR A JURY TO UNDERSTAND BECAUSE FLUORESCENCE, I BELIEVE, IS NOT SELF-EVIDENT TO A LAYPERSON, AND THE PURPOSE OF OUR *MARKMAN* EXERCISE IS TO TAKE TERMS WHOSE MEANINGS ARE NOT READILY APPARENT AND TO CONSTRUE THEM.

WE'RE TALKING ABOUT SHINING A LIGHT ON AN OBJECT AND THE OBJECT ABSORBING THE LIGHT AND THEN EMITTING LIGHT IN RESPONSE TO THAT, LIGHT THAT'S OF A LONGER WAVELENGTH THAN THE WAVELENGTH OF THE LIGHT THAT IT ABSORBED, FOR SO LONG AS THAT LIGHT IS PRESENT, AND THEN WHEN YOU TAKE THE LIGHT SOURCE AWAY, THE GLOWING GOES AWAY, TOO. THAT'S A PLAIN ENGLISH WAY OF DESCRIBING IT THAT'S PROBABLY A LOT BETTER THAN THE ONE WE'VE PROFFERED, BUT THAT'S THE IDEA.

THE COURT: IT WOULD BE CORRECT, WE DON'T NEED TO DISTINGUISH THIS CONCEPT FROM PHOSPHORESCENCE.

MR. LAWTON: I THINK DISTINGUISHING THINGS CAN HELP TO DEFINE THEM SOMETIMES.

THE COURT: OKAY.

MR. LAWTON: IT WAS MR. PAVANE WHO GAVE US THE DISTINCTION THIS MORNING OF BIOLUMINESCENCE TO DISTINGUISH IT FROM FLUORESCENCE, SO I THINK DISTINGUISHING THINGS CAN BE HELPFUL SOMETIMES.

THE COURT: SHOULD WE ADDRESS RETROVIRAL VECTOR AND EXPRESSION VECTORS OR NOT? WHATEVER YOUR PLEASURE IS, FOR ALL COUNSEL. I THINK, LET'S SEE, THAT'S NO. 7 IN MY --

WE'RE IN A SITUATION WHERE CRI'S ARGUING, MR. LAWTON, NO CONSTRUCTION OR IN THE ALTERNATIVE A VECTOR OF RETROVIRAL ORIGIN.

MR. LAWTON: I THINK YOU STILL HAVE TO TELL PEOPLE WHAT IS -- WHAT DO THOSE WORDS MEAN. I MEAN, IF YOU TELL THE JURORS IT MEANS A VECTOR OF RETROVIRAL ORIGIN, IF I WERE A JURY I WOULD SAY, "WELL, THAT'S FINE, BUT I DON'T KNOW WHAT THAT IS. WHY DON'T YOU TELL ME WHAT THAT IS." THE SIMPLEST WAY I COULD EXPLAIN IT IS IT'S A VIRUS INTO WHICH YOU CAN INSERT A GENE WHICH THE VIRUS THEN DELIVERS TO DIVIDING CELLS, AND THAT IS THE MEANING THAT WE'VE SAID, IN CONCEDEDLY MORE OPAQUE LANGUAGE THAN WHAT I JUST USED, IN OUR PROFFERED CONSTRUCTION.

WE HAVE A SPECIFICATION THAT WE CAN LOOK AT IN THE '384, COLUMN THREE, LINES 37 THROUGH 41, AND FIGURES 1(A) AND 1(B), CRI HASN'T TOLD US WHY THEY THINK OUR RELIANCE ON THOSE PARTS OF THE SPECIFICATION ARE MISPLACED. CRI DOESN'T TELL US WHAT A "VECTOR" OR "RETROVIRAL" MEAN.

THE COURT: I AGREE WITH THAT, MR. LAWTON, THEY DON'T TELL US WHAT IT MEANS.

MR. LAWTON: AND WE'VE GOT TO TELL PEOPLE WHAT IT MEANS, AND OUR CONSTRUCTION IS SUPPORTED BY THE SPECIFICATION, AND WE THINK THAT'S WHAT OUGHT TO BE ADOPTED.

THE COURT: OKAY. THIS TIME YOU GAVE US AN ALTERNATIVE, BUT WE DON'T KNOW WHAT THAT ALTERNATIVE MEANS.

MR. HOLMBERG: WELL, THE IDEA WAS ADMITTING THE PROBLEM IS UNDERSTANDING, SO IT WOULD BE, I BELIEVE, IT'S A VECTOR OF -- SO THE IDEA IS YOU HAVE THE FOUNDATION OF EXPLAINING WHAT A VECTOR IS, AND THEN YOU WOULD GO TO THAT AND GO IMMEDIATELY TO RETROVIRAL VECTOR. SO THAT'S -- IT WASN'T A WAY TO ESCAPE THE QUESTION. IT WAS ACTUALLY SUPPOSED TO TRY TO MAKE IT SIMPLER.

I WOULD WANT TO POINT OUT THE ONE THING WE NOW DO SEEM TO BE AGREEING THE REAL PROBLEM HERE IS UNDERSTANDING. IT'S NOT REALLY A DISPUTE OVER THE SCOPE IN ANY WAY, IT'S REALLY THE PROBLEM OF; IS A NORMAL PERSON GOING TO UNDERSTAND THIS.

THE COURT: ANTICANCER'S IS UNDERSTANDABLE, AT LEAST TO THE COURT. I MEAN, THAT TELLS ME AN AWFUL LOT -- CONCEPTUALLY, I UNDERSTAND THAT.

MR. PAVANE: I DO HAVE ONE QUESTION ABOUT IT. I AGREE, I DON'T KNOW THAT A JURY WOULD, BUT I CAN CERTAINLY FOLLOW IT AS WELL.

THE COURT: WE HAVE TO BE CAREFUL THIS AFTERNOON, I DON'T DISAGREE WITH EVERYBODY THAT WE WERE LOOKING AT SUMMARY

JUDGMENT, WE'RE LOOKING AT JURIES AND WHATNOT, BUT TO EVERYBODY IN THIS ROOM, WHEN WE GET IN FRONT OF A JURY, BOY, YOU'VE GOT A LOT OF WORK TO DO. I MEAN, THEY'RE GOING TO ENJOY SEEING THE MICE, IF YOU BRING THEM IN, WHATEVER YOU DO THAT WILL BE A LITTLE BIT ON THE SHOWMANSHIP SIDE OF THINGS, BUT, FUNDAMENTALLY, YOU'RE GOING TO HAVE TO LOOK AT THIS A LITTLE DIFFERENTLY, I THINK.

GO AHEAD. FASCINATING AS IT IS, BUT MAYBE NOT AS MUCH TO THEM AS TO THE COURT.

MR. PAVANE: AGAIN, I DON'T MEAN TO INTERRUPT MR. HOLMBERG, BUT I THINK WE AGREE THAT GENERALLY IT'S CORRECT. THE ONLY PART I QUESTIONED IN MY MIND WAS WHAT THE DIFFERENCE WAS, IF ANY, BETWEEN "REPLICATION" AND "AMPLIFY," WHEN IT SAYS "REPLICATE" AND "AMPLIFY." "REPLICATE" I UNDERSTAND MEANS -- I THINK IT MEANS DUPLICATE, MAKE MULTIPLE COPIES OF.

THE COURT: SO YOU'RE WONDERING WHAT IT MEANS TO "AMPLIFY."

MR. PAVANE: IF THAT COULD BE CLARIFIED, I THINK THAT WOULD BE USEFUL, FROM ANTICANCER'S SIDE.

THE COURT: OKAY, GO AHEAD. IF YOU WANT TO GO AHEAD, THEY'RE CONFERRING.

MR. HOLMBERG: THE ONE THING I WAS GOING TO SAY IS I ACTUALLY THINK THIS SOUNDS OKAY IF WE GET AN IDEA OF WHAT "AMPLIFY" MEANS, BUT I GUESS I WOULDN'T MIND CHANGING IT TO BEING THE DEFINITION OF VECTOR, IF WE TAKE OUT "RETROVIRUS,"

JUST REPLACE "RETROVIRUS" WITH SOMETHING ELSE, AND THEN INDICATE THAT THIS THING -- BECAUSE THIS PRETTY MUCH TO ME DESCRIBES A -- I GUESS IT DEPENDS ON "AMPLIFY" WHETHER THIS DESCRIBES AN EXPRESSION VECTOR.

(DISCUSSION HELD OFF THE RECORD.)

THE COURT: YOU KNOW WHAT, GENTLEMEN, THIS IS NOT A NEGOTIATIONS SESSION. YOU WERE CONTACTED BY CHAMBERS ON MORE THAN ONE OCCASION TO WORK THIS OUT BECAUSE YOU ARE THE EXPERTS ON THIS.

LET ME CONTINUE, LET ME ASK MR. LAWTON, WHAT DO YOU MEAN BY -- WE UNDERSTAND "REPLICATE." I THINK IT'S A GOOD QUESTION, WHAT DO YOU MEAN BY "AMPLIFY"? BECAUSE NOW I'M NOT SO SURE I UNDERSTAND THAT PART OF THIS.

MR. LAWTON: YOUR HONOR, WE HAVE A SCIENTIST THAT COULD EXPLAIN THAT BETTER THAN A LAWYER, IF THAT'S ALL RIGHT.

THE COURT: OF COURSE, DR. HOFFMAN.

DR. HOFFMAN: THANK YOU, YOUR HONOR.

MAY I USE AN EXAMPLE OF JUST THE RETROVIRUS. THE TWO DEFINITIONS I THINK ARE SOMEWHAT INTERLOCKED. SO IF WE USE A RETROVIRUS WE CAN MANIPULATE THAT VIRUS, PUT A GENE OF INTEREST IN, SUCH AS GFP, AND GFP LINKED TO INSULIN OR WHATEVER, IT WILL DELIVER IT TO THE CELL. HOW DO WE GET THAT -- THE PRODUCT OF THAT GENE, HOW DO WE GET MORE. WE WANT MORE. WE WANT TO BE ABLE TO SEE. THAT'S THE POINT.

SO THE RETROVIRUS, IF IT'S IN A PROPER CELL, CAN

REPLICATE ITSELF, DUPLICATE ITSELF OVER AND OVER AGAIN, SO WE'RE GOING TO HAVE MORE GENE PRODUCT. THAT'S A KIND OF AMPLIFICATION THAT DEPENDS ON REPLICATION, BUT WE CAN HAVE AMPLIFICATION WITHOUT REPLICATION. WE HAVE A RETROVIRUS, AND IT WOULD HAVE, LET'S SAY, A STRONG PROMOTER, AND THAT STRONG PROMOTER COULD BE INDUCED, FOR EXAMPLE, BY SOME SUBSTANCE YOU GIVE TO THE ANIMAL OR THE CELL, AND THERE WILL BE MORE PRODUCT OF THAT GENE, MORE INSULIN COMING.

WHEN THERE'S GLUCOSE IN THE BLOODSTREAM, THE PANCREAS MAKES MORE INSULIN, AND SO THE PANCREAS DOESN'T DUPLICATE BUT THE GENE OF THE PANCREAS BECOMES MORE ACTIVE. IT'S, IN ESSENCE, AMPLIFYING, IT'S MAKING MORE OF ITS PRODUCT.

THE COURT: OKAY, UNDERSTOOD.

DR. HOFFMAN: THANK YOU, VERY MUCH.

THE COURT: THANK YOU.

DR. HOFFMAN: YOU'RE WELCOME.

THE COURT: I LEARNED SOMETHING. OKAY.

MR. HOLMBERG: ACTUALLY, JUST ONE BRIEF COMMENT.

THE COURT: CERTAINLY.

MR. HOLMBERG: THAT MIGHT HAVE BEEN AN EXTREMELY GOOD EXAMPLE OF WHY A DEFINITION WOULDN'T BE SO GREAT AND WE SHOULD PERHAPS THINK OF A DIFFERENT WAY TO GET THIS ACROSS BECAUSE IT SEEMS A Q AND A THERE WAS A LOT BETTER TO FIGURE IT OUT WHAT THAT MEANT THAN IF WE EVER DID DECIDE UPON, OKAY, IT HAS TO BE THESE SPECIFIC WORDS.

THEY'RE VERY COMPLICATED CONCEPTS, AND THE REAL QUESTION IS WHAT'S THE BEST WAY TO UNDERSTAND THEM. OUR POSITION, GENERALLY, IS THAT CONSTRUCTION IS NOT NECESSARILY THE BEST WAY TO DEAL WITH THIS PROBLEM, AND IT IS A PROBLEM.

THE COURT: NO, I UNDERSTAND YOUR POSITION ON SO MANY OF THESE TERMS, THAT YOU HAVE TO KIND OF DO FOR THE JURY, AND DO IN THE CONTEXT OF THIS CASE, KIND OF A BACKGROUND CONCEPTUAL TUTORIAL AND BRING US ALL ALONG, THE COURT AND THE JURY, UP TO A LEVEL WHERE WE CAN UNDERSTAND IT. I APPRECIATE THAT.

OKAY, MR. LAWTON.

MR. LAWTON: WE'RE TOLD THAT THIS IS A COMPLEX CONCEPT, NOT EASY TO UNDERSTAND, AND THEN WE'RE TOLD IN THE NEXT BREATH AND, THEREFORE, WE SHOULDN'T CONSTRUE IT. WHY ARE WE HERE? WE'RE HERE TO TAKE TERMS THAT HAVE MEANINGS NOT EVIDENT TO THE LAYMAN AND TRY TO CONSTRUE THEM AND BRING THEM DOWN TO EARTH SO PEOPLE CAN UNDERSTAND THEM.

THIS IS AN IMPORTANT CLAIM TERM. IT'S GIVEN TO US -- OR CONSTRUED IN A WAY THAT'S OPAQUE BY CRI. WE'VE GOT A DEFINITION THAT'S CLEAR BY ANTICANCER, SUPPORTED BY THE SPECIFICATION, AND WE ASK THE COURT TO ADOPT IT.

THE COURT: OKAY, THANK YOU.

I'M LOOKING AT MY NOTES ON EXPRESSION VECTOR. THIS IS ANOTHER ONE WHERE CRI SAYS NO CONSTRUCTION IS NEEDED, BUT, IN THE ALTERNATIVE, THEY HAVE A PROPOSAL. DO WE HAVE ANY AGREEMENT IN THIS? IS THERE ANY NARROWING OF THE DISAGREEMENT

ON THIS?

MR. PAVANE: JUST ONE SECOND HERE.

THE COURT: I THOUGHT THAT ANTICANCER, MR. LAWTON, HAD INDICATED A LIKELIHOOD OR A HOPE, IF YOU WILL, OF ELIMINATING DISAGREEMENT ON THIS.

MR. LAWTON: WE DID HAVE THAT HOPE.

THE COURT: AND IT IS NOW DASHED.

MR. LAWTON: MY HOPES ARE NEVER DASHED. THEY NEVER DIE.

THE COURT: OKAY, SO WE DON'T HAVE AN AGREEMENT ON THIS YET.

MR. LAWTON: NO, YOUR HONOR.

THE COURT: OR AT THIS TIME. OKAY.

GO AHEAD, MR. LAWTON, AND THEN AFTER THIS ONE WE'LL TAKE A BREAK. WE ARE MOVING ALONG FAIRLY QUICKLY.

MR. LAWTON: YES, WE ARE, YOUR HONOR.

THE COURT: IF YOU WOULD LIKE A BREAK NOW, WE COULD TAKE A BREAK NOW. IT'S ALMOST 3:00.

MR. LAWTON: I THINK IT MIGHT MAKE OUR TIME AFTER THE BREAK BE MORE EFFICIENT.

THE COURT: FEEL FREE TO CONSULT AND WE'LL COME BACK AND START WITH THIS.

MR. LAWTON: THANK YOU.

THE COURT: THANK YOU.

(COURT WAS AT RECESS.)

THE COURT: I THINK WE'RE UP TO -- DOES ANYBODY WANT TO SAY ANYTHING ON EXPRESSION VECTOR? I THINK WE DO. YES, SIR, YOU WANT TO ADDRESS IT.

MR. PAVANE: I WOULD LIKE TO SAY SOMETHING BRIEFLY, BUT IT'S MR. LAWTON'S TURN.

THE COURT: I THINK WE'RE UP TO THAT POINT, AREN'T WE?

MR. LAWTON: YES, YOUR HONOR.

THE COURT: LET ME ASK YOU THIS; ISN'T -- THIS IS ALL STARTING TO GET SOMEWHAT CIRCULAR, BUT ISN'T A RETROVIRAL VECTOR AN EXPRESSION VECTOR OF RETROVIRAL ORIGIN?

DR. HOFFMAN: YES.

MR. HOLMBERG: BOTH BENCHES ARE NODDING.

THE COURT: WHICH DOESN'T TELL ME ANYTHING, BUT THAT'S WHAT IT IS. I MEAN, YOU TALK ABOUT CLEAR UNDERSTANDING FOR 12 PEOPLE SITTING THERE, THAT DOESN'T MEAN ANYTHING TO THEM, BUT THAT'S WHAT IT IS, CORRECT?

MR. PAVANE: YES.

MR. LAWTON: YES.

THE COURT: SO GO AHEAD, MR. LAWTON, I GUESS WE'RE ON TO EXPRESSION VECTOR.

THE OTHER THING I WOULD SAY, IN LOOKING AT THINGS, ON EXPRESSION VECTOR CRI'S CONSTRUCTION -- THEY SAY IT NEEDS NO CONSTRUCTION, BUT, IN THE ALTERNATIVE, AND THEN YOU DEFINE THINGS AND INCLUDE THE WORDS "REPLICATE" AND "AMPLIFY," SO YOUR CRITICISM OF "AMPLIFY" ISN'T TOO WELL TAKEN. SINCE YOU'RE

USING IT YOURSELF, YOU MUST KNOW WHAT IT MEANS. I MEAN, IT'S NICE FOR US TO GET A DEFINITION, AND DR. HOFFMAN WAS VERY USEFUL, BUT YOU YOURSELF ARE USING IT IN YOUR DEFINITION OF EXPRESSION VECTOR. WITH THAT, MR. LAWTON, LET'S TRY TO FINISH UP.

I WOULD LIKE TO CONCLUDE AS QUICKLY AS POSSIBLE BECAUSE WHAT I WOULD LIKE TO DO WOULD BE TO TAKE A FEW MOMENTS, WHEN WE FINISH, AND GO THROUGH MY NOTES AND SEE IF I HAVE ANY SPECIFIC QUESTIONS THAT I WOULD LIKE TO ASK EITHER SIDE BEFORE WE RECESS THIS AFTERNOON, AND THAT MAY TAKE ME A FEW MINUTES.

SO GO AHEAD, EXPRESSION VECTOR, SIR.

MR. LAWTON: THANK YOU, YOUR HONOR.

MY HOPES MAY HAVE BEEN REALIZED DURING THE RECESS. WE THINK THAT WE CAN AGREE WITH THE CRI DEFINITION. THERE'S NOTHING INCORRECT ABOUT IT. THE ONLY MODIFICATION WE MIGHT MAKE TO IT IS TO PUT A SLASH AND THEN AN "OR" AFTER THE WORD "AND" SO THAT THAT PHRASE, BEGINNING THE SECOND LINE FROM THE BOTTOM WOULD READ, "REPLICATE AND/OR AMPLIFY." WITH THAT CHANGE, WE WOULD BE IN AGREEMENT WITH THE CRI PROFFERED CONSTRUCTION.

WE WOULD -- AND THEN IN ANSWER TO THE COURT'S CONCERN ABOUT --

THE COURT: DOES THAT HELP US AT ALL IF WE WENT BACK TO RETROVIRAL IN ANY WAY? RETROVIRAL VECTOR, WITH THAT AGREEMENT, DOES THAT HELP IN ANY FASHION, LOOKING BACK AT THAT, OR NOT?

MR. HOLMBERG: WELL, I THINK WHAT YOUR HONOR SAID BEFORE --

MR. LAWTON: WE STILL HAVE TO TELL PEOPLE WHAT RETROVIRAL MEANS, AND I WOULD PROPOSE -- AND I AGREE WITH THE COURT THAT WE'VE GOT A LOT OF ESOTERICA HERE, EVEN IN THE PROFFERED CONSTRUCTIONS, CERTAINLY SOME OF THEM ON OUR SIDE, AT A MINIMUM. WE COULD, WHEN CONSTRUCTIONS WERE DONE, PUT ATTORNEYS TO WORK ON CREATING A GLOSSARY OF SOME OF THESE TERMS, LIKE --

THE COURT: THAT'S GOING TO BE ABSOLUTELY NECESSARY. I'M JUST WORRIED ABOUT FOR TODAY'S PURPOSES, IF --

MR. LAWTON: DOES THIS HELP US WITH RETROVIRAL.

THE COURT: IF AGREEMENT ON EXPRESSION VECTOR IS OF ANY ASSISTANCE TO US, SINCE A RETROVIRAL VECTOR IS AN EXPRESSION VECTOR OF RETROVIRAL ORIGIN. DR. HOFFMAN SAYS YES. YOU'RE TELLING ME YES. WE'RE ALL AGREEING YES. DOES THAT HELP US? WE DON'T KNOW WHAT RETROVIRAL ORIGIN IS.

MR. LAWTON: WE NEED TO DEFINE THAT. I WONDER IF WE COULD DO THAT HERE AND NOW, OF RETROVIRAL ORIGIN. WOULD THAT BE HELPFUL TO THE COURT?

THE COURT: I'M WONDERING.

MR. LAWTON: AS LONG AS WE'RE ALL HERE.

THE COURT: LET'S SEE IF WE CAN GET THROUGH THE REST OF THIS AND LEAVE THAT AS AN OPEN ISSUE TO COME BACK TO.

MR. LAWTON: VERY WELL, YOUR HONOR.

THE COURT: I MEAN, WE'RE CLOSE, I THINK, IN THAT REGARD.

MR. LAWTON: YES, WE ARE.

THE COURT: I DON'T KNOW IF PEOPLE AGREE OR DISAGREE ON BEHALF OF CRI.

MR. PAVANE: I UNDERSTAND EXACTLY WHAT YOU'RE SAYING. I THINK THE ONLY PART OF THE DEFINITION HERE OF EXPRESSION VECTOR THAT WOULD HAVE TO BE MODIFIED IS THE VERY FIRST FEW WORDS THAT SAY IS A PLASMID --

THE COURT REPORTER: I CAN'T HEAR YOU.

MR. PAVANE: I'M SORRY.

I THINK THAT THE ONLY PART OF OUR DEFINITION OF EXPRESSION VECTOR THAT WOULD HAVE TO BE MODIFIED TO FIT A RETROVIRAL VECTOR WOULD BE THE FIRST FEW WORDS THAT REFER TO A PLASMID, YEAST OR ANIMAL VIRUS GENOME BECAUSE I THINK IT'S -- A RETROVIRAL VECTOR IS DERIVED FROM A VERY SPECIFIC TYPE OF THING, NAMELY, A RETROVIRUS, AS OPPOSED TO A PLASMID, YEAST.

AM I WRONG ABOUT THAT, DR. HOFFMAN?

THE COURT: LET ME SUGGEST THIS; YOU'VE GOT EXPERTS ON BOTH SIDES HERE, LET'S KEEP MOVING FORWARD, AND IF YOU THINK YOU COULD REACH AGREEMENT ON THAT, YOU'RE GOING TO HAVE A FEW MINUTES AT THE END OF THIS, BUT, IF NOT, I'LL GIVE YOU A COUPLE OF DAYS TO COME BACK WITH AN AGREEMENT, IF YOU CAN, ON THAT TERM. THAT WOULD BE SIGNIFICANT PROGRESS. IT'S GOING TO TAKE ME AT LEAST THAT AMOUNT OF TIME TO GO THROUGH THIS AND START

GETTING THE ORDER READY, SO YOU WOULD HAVE TIME.

MR. LAWTON: WE'LL WORK ON THAT, YOUR HONOR.

THE COURT: OKAY, LET'S KEEP MOVING FORWARD THEN, AND LETS MOVE ON THEN --

MR. PAVANE: I DO HAVE ONE COMMENT ON EXPRESSION VECTOR, BEFORE WE JUST LEAVE.

THE COURT: SURE.

MR. PAVANE: IF I UNDERSTOOD CORRECTLY WHAT MR. LAWTON WAS PROPOSING --

THE COURT: HE'S AGREEING WITH YOU, SIR, WITH THE ADDITION OF "OR."

MR. PAVANE: CORRECT, THAT'S EXACTLY RIGHT, WITH THE ADDITION OF "OR."

THE COURT: RIGHT.

MR. PAVANE: AGAIN, YOU SAID I SHOULD KNOW WHAT IT IS BECAUSE IT'S IN MINE, AND YOU'RE ABSOLUTELY RIGHT, I SHOULD, AND I CONFESS THAT I DON'T FULLY UNDERSTAND THE CONCEPT, BUT, IN MY DEFENSE, I GOT IT OUT OF A DICTIONARY -- A MEDICAL DICTIONARY. THAT'S WHERE WE GOT THAT DEFINITION FROM. CAN YOU JUST PUT THAT UP.

THE COURT: THAT'S OKAY, I BELIEVE YOU.

MR. PAVANE: THE POINT SIMPLY I WANT TO MAKE IS, AGAIN -- UNFORTUNATELY, DR. PESAVENTO HAS LEFT THE COURTROOM AND I CAN'T TURN TO HER AND ASK HER THESE QUESTIONS, BUT I DON'T KNOW IF IT'S APPROPRIATE, IN VIEW OF THE DICTIONARY TELLING ME THAT

IT'S REPLICATE AND AMPLIFY, WHETHER -- IF YOU NOW SAY REPLICATE OR AMPLIFY WHETHER THAT CHANGES ANYTHING, SO I WOULD LIKE TO TAKE YOU UP ON YOUR OFFER TO GIVE ME A DAY OR TWO TO THINK ABOUT THAT ONE.

THE COURT: AGAIN, THERE'S SO MUCH IN THIS CASE TO GO OVER, YOU CAN CERTAINLY HAVE A DAY OR TWO TO CHECK ON THAT ON BOTH SIDES.

MR. PAVANE: OKAY, I APPRECIATE THAT.

THE COURT: APPARENTLY, DR. HOFFMAN'S IN AGREEMENT, AND YOU CERTAINLY HAVE THE RIGHT TO CHECK.

SO LET'S MOVE ON BEYOND RETROVIRAL VECTOR AND EXPRESSION VECTOR AND TALK ABOUT VIRAL PROMOTER, AND I THINK VIRUS. AGAIN, CRI SAYS NO CONSTRUCTION IS NEEDED OR, IN THE ALTERNATIVE, A PROMOTER OF VIRAL ORIGIN.

MR. LAWTON: I THINK WE STILL HAVE TO TELL PEOPLE WHAT A PROMOTER IS AND WHAT A VIRUS IS. NOT EVERYBODY KNOWS WHAT A VIRUS IS -- MOST PEOPLE PROBABLY KNOW. I DON'T KNOW. MOST PEOPLE PROBABLY DON'T KNOW OR COULDN'T GIVE YOU A DEFINITION OF IT, A PARTICLE OF NUCLEIC ACID THAT'S ENCASED IN A PROTEIN SHELL THAT'S CAPABLE OF REPLICATING ITSELF FROM CELL TO CELL.

WELL, PROMOTERS THAT ORIGINATE FROM VIRUSES ARE PROMOTERS OF VIRAL ORIGIN, BUT I THINK WE FIRST HAVE TO DEFINE "VIRUS," AND WE HAVE DONE THAT, CONSTRUED THE TERM, PROFFERED A CONSTRUCTION OF THE TERM. WE ARE TOLD BY CRI IT'S NOT NECESSARY. WE THINK IT IS NECESSARY. AND WE'VE ALSO PROFFERED

A DEFINITION OF PROMOTER. YOU COULD MARRY UP THOSE TWO CONSTRUCTIONS THAT WE'VE OFFERED -- AGAIN, THEY DON'T REALLY OFFER ANYTHING OR WHAT THEY DO OFFER IS NOT VERY INFORMATIONAL -- AND COME UP WITH A CONSTRUCTION THAT I THINK WOULD BE LAYPERSON FRIENDLY, WHICH IS THE OBJECT OF THIS EXERCISE. I DON'T HAVE ANYTHING TO ADD TO WHAT IS SAID IN OUR BRIEF ON THAT.

THE COURT: MY REACTION IS WE NEED A DEFINITION HERE, AND I UNDERSTAND YOURS.

WHO WOULD LIKE TO COMMENT ON THIS FOR CRI?

MR. PAVANE: I'LL COMMENT BRIEFLY, YOUR HONOR. I THINK -- OKAY, VIRAL PROMOTER, I THINK JUST A LITTLE WHILE AGO WE WENT THROUGH A CONSTRUCTION OF PROMOTER, SO THAT'S BEEN DEFINED. WE ALL KNOW WHAT A PROMOTER IS, RIGHT, WE DID THAT. SO I THINK ONCE WE HAVE A DEFINITION OF PROMOTER, THEN TO SAY A VIRAL PROMOTER IS SIMPLY A PROMOTER THAT ORIGINATES FROM A VIRUS. I DON'T THINK THERE'S ANY MAGIC THERE. SO I THINK THE KEY WORD THERE IS "PROMOTER," AND AGAIN IT'S BEEN DEFINED.

MR. LAWTON: HAVE WE DEFINED IT?

MR. PAVANE: YES, IT WAS ONE OF THE TERMS WE TALKED ABOUT EARLIER. IT WAS A CLAIM CONSTRUCTION IN THE -- IT WAS IN THAT LONG PHRASE.

MR. LAWTON: OH, THAT'S RIGHT, YOU WERE TALKING ABOUT TRANSCRIPTION OF DNA AND RNA.

WE WOULD HAVE NO PROBLEM WITH TAKING THAT CONSTRUCTION

THAT WE PROFFERED AND SAYING OF VIRAL ORIGIN, I.E. ORIGINATING FROM A VIRUS, WHICH IS A PARTICLE OF NUCLEIC ACID, ETC., BECAUSE THEN YOU'RE TELLING EVERYONE WHAT A PROMOTER IS AND A VIRUS.

IS THERE AN OBJECTION TO TELLING PEOPLE WHAT A VIRUS IS?

MR. PAVANE: NO, BUT HERE'S WHAT I WOULD SAY ON THAT ONE, I THINK THIS IS A GOOD EXAMPLE. I CAN'T IMAGINE A SITUATION WHERE ANY BOOK, REFERENCE, ARTICLE, WHATEVER IT MAY BE, IS GOING TO REFER TO SOMETHING AS A PARTICLE CONSISTING OF NUCLEIC, BLAH, BLAH, BLAH, BLAH, AND NOT SAY IT'S A VIRUS. IT'S ALWAYS GOING TO SAY IT'S A VIRUS. SO THERE'S NO NEED TO GIVE THE JURY A COMPLICATED OR THE COURT A COMPLICATED DEFINITION OF THE TERM VIRUS WHEN WE'RE GOING TO SEE IN THE LITERATURE THEY TALK ABOUT A VIRUS, SO WHAT'S THE POINT OF DEFINING IT. WE KNOW THAT IT'S THE SAME THING IN THE CLAIM, THAT'S ALL WE HAVE TO KNOW.

MR. LAWTON: I'M DETECTING A DELIBERATE EFFORT TO NOT CONSTRUE TERMS. WE HAVEN'T READ, NOR DO I BELIEVE HAS ANYBODY AT CRI, READ ALL OF THIS PRIOR ART AND ATTEMPTED TO GAIN AN UNDERSTANDING OF WHETHER THE TERMS USED IN THE PRIOR ART ARE PERFECTLY CONSISTENT AND CLEAR IN THE SAME -- GIVEN THE SAME MEANING AS IN THESE CLAIM TERMS. CRI GIVES US LOTS OF REFERENCES TO PRIOR ART IN ITS CLAIM CONSTRUCTION CHART, AND IN ITS BRIEF IT SORT OF REFERS TO PRIOR ART IN THE ABSTRACT AS

SUPPORTING ITS CONSTRUCTION, BUT IT DOESN'T TELL US WHAT PART OF THE PRIOR ART REALLY SUPPORTS THAT.

I THINK WE'RE HERE TO CONSTRUE TERMS, AND I THINK IF WE'RE TELLING PEOPLE WHAT A VIRAL PROMOTER IS, WE NEED TO TELL THEM WHAT A VIRUS IS AND WHAT A PROMOTER IS.

MR. PAVANE: I THINK I CAN SHORT-CIRCUIT THIS. FIRST OF ALL, THERE'S NO DELIBERATE INTENTION NOT TO CONSTRUE, THAT'S NOT OUR PLAN. WE'RE NOT THAT CLEVER.

WHAT I WOULD SUGGEST ON THIS, YOUR HONOR, YOU'LL MAKE THE DECISION ON WHETHER YOU THINK IT'S NECESSARY TO CONSTRUE, OBVIOUSLY. GIVE ME A DAY AGAIN TO TALK TO DR. PESAVENTO, AND I WILL LET YOU KNOW IF I HAVE ANY ISSUE WITH THEIR DEFINITION OF VIRUS.

MR. LAWTON: THANK YOU.

THE COURT: OKAY.

MR. PAVANE: I THINK THAT BRINGS US TO THE LAST TERM.

THE COURT: THAT BRINGS US TO THE LAST TERM, YOU'RE CORRECT, AND THAT IS FLUOROPHORE.

MR. LAWTON: SHOULD I PROCEED, YOUR HONOR? WE THINK THIS IS AN IMPORTANT TERM. IT APPEARS 74 TIMES IN THE CLAIM TERMS AND THE SPECIFICATION. WE'VE GOT INTRINSIC EVIDENCE TO SUPPORT OUR DEFINITION. WE THINK THAT IT'S NOT PERFECTLY PLAIN ENGLISH, AND PERHAPS IT COULD BE IMPROVED ON, BUT IT'S BETTER THAN NO CONSTRUCTION AT ALL.

THE COURT: IT IS WHAT'S USED IN THE SPECIFICATION,

CORRECT?

MR. LAWTON: YES, IT IS ABSOLUTELY FAITHFUL TO WHAT'S USED.

WE ARE TOLD BY CRI THAT IT'S REDUNDANT. IRONIC, BECAUSE WE WERE TOLD EARLIER TODAY THAT WE SHOULD PULL WORDS STRAIGHT OUT OF THE SPECIFICATION AND WE'RE STUCK WITH THAT, BUT IN THIS CONTEXT WE'RE TOLD, NO, WE SHOULDN'T DO THAT BECAUSE THAT'S REDUNDANT. WE THINK IT'S NOT REDUNDANT OF ANYTHING. THAT'S WHAT THE SPECIFICATION SAYS. THAT'S WHAT THE TERM MEANS. THERE'S NO BETTER CONSTRUCTION PROFFERED BY CRI.

MR. PAVANE: I'LL BE VERY BRIEF. IF WE COULD JUST PUT UP ON THE SCREEN CLAIM 1 OF THE FIRST -- SUBPARAGRAPH A OF CLAIM 1.

SO CLAIM 1 SAYS, "DELIVERING TO AN ANIMAL CELLS CONTAINING A NUCLEIC ACID ENCODING A FLUOROPHORE OPERATIVELY LINKED," AND SO ON. NOW, LET'S GO DOWN TO THE VERY END OF THE CLAIM. SO THE WORD FLUOROPHORE APPEARS IN THIS CLAIM, AND THAT'S, OF COURSE, WHY WE'RE HERE TALKING ABOUT IT.

NOW, LET'S LOOK AT THE VERY END OF THE CLAIM, THAT VERY LAST PARAGRAPH RIGHT BEFORE THE CLAIM 2. WHAT DOES THAT SAY? IT SAYS, "WHEREIN SAID FLUOROPHORE IS A PROTEIN THAT IS AUTOFLUORESCENT, SUCH THAT NO SUBSTRATES OR COFACTORS ARE NEEDED FOR IT TO FLUORESCE." THAT'S EXACTLY THE LANGUAGE THEY WANT TO DEFINE FLUOROPHORE TO MEAN. WELL, IT'S ALREADY IN THE CLAIM. WHY DID WE NEED TO DEFINE IT AGAIN? IT'S THERE. WHEN

THE JURY SEES THE CLAIM, THEY'LL SEE THAT IT IS THAT. IT SAYS THAT.

MR. LAWTON: THE MAIN CANON OF CONSTRUCTION, THE NUMBER ONE CANON OF CONSTRUCTION, THE ONE THAT WE START WITH IS THE CLAIM TERMS THEMSELVES ARE THE BEST INTRINSIC EVIDENCE OF WHAT THE CLAIM TERMS MEAN. WE HAVE THAT FROM THE FEDERAL CIRCUIT IN *PHILLIPS.* WE HAVE THAT FROM THIS COURT IN *MYTEE PRODUCTS.* SO CRI IN THIS CONTEXT REALLY MAKES OUR POINTS FOR US.

MR. PAVANE: I'VE NEVER SEEN A CASE WHERE A TERM IS EXPLICITLY DEFINED AND EXPLAINED IN THE CLAIM WHERE THE COURT -- WHERE THE FEDERAL CIRCUIT THEN SAYS, "AND YES, YOU SHOULD CONSTRUE IT TO MEAN THAT." I'VE NEVER SEEN THAT. I'VE SEEN WHERE IT'S DEFINED IN THE SPECIFICATION, AND THEN THEY SAY, "OKAY, NOW THAT IT'S USED IN THE CLAIM THAT'S THE DEFINITION," BUT HERE IT TELLS YOU WHAT IT IS. I MEAN, I DON'T HAVE ANY OBJECTION TO WHAT HE'S SAYING THAT FLUOROPHORE MEANS, I AGREE THAT'S WHAT IT MEANS, BUT WHAT ARE YOU GOING TO SAY TO THE JURY, "FLUOROPHORE MEANS THIS," AND THEN WHAT IS HE GOING TO SAY ABOUT THAT? WHAT'S THE POINT OF THAT CLAUSE IN THE CLAIM IF WE'RE GIVING THE DEFINITION OF FLUOROPHORE UP THERE. I MEAN, IT WOULD JUST BE CONFUSING.

MR. LAWTON: WOULDN'T IT BE FAIR ARGUMENT TO THE JURY WHEN THEY SEE THAT LANGUAGE --

THE COURT: IT SAYS RIGHT THERE -- HELP ME WITH THIS, MR. LAWTON, WHY WOULD WE NEED THE DEFINITION WHEN IT'S RIGHT

THERE? WHAT DOES IT ADD? HOW DOES IT ASSIST US? I'M JUST NOT SURE OF THAT.

MR. LAWTON: WELL, IT TELLS US -- IT GIVES US THE CONSTRUCTION, I SUPPOSE, IS THE BEST ANSWER THAT I COULD THINK OF TO THAT QUESTION. IT'S TELLING US WHAT A FLUOROPHORE IS, AND THAT TERM IS USED SO MANY TIMES IN THE CLAIM AND IN THE SPECIFICATION IT'S NICE THAT --

THE COURT: BUT IT'S DEFINED RIGHT THERE.

MR. LAWTON: THAT'S RIGHT.

THE COURT: IT SAYS, "FLUOROPHORE IS," AND THEN IT'S THE EXACT LANGUAGE. YOU INSERTED THE WORD "NO OTHER," YOU'VE GOT THE WORD "OTHER" IN YOURS."

MR. LAWTON: WELL, WE WOULD AGREE TO STRIKE THAT WORD.

THE COURT: SO IT WOULD BE NO SUBSTRATES OR COFACTORS ARE NEEDED FOR IT TO FLUORESCE.

MR. LAWTON: RIGHT, OUGHTN'T THAT TO BE THE CONSTRUCTION --

THE COURT: I'M SORRY?

MR. LAWTON: OUGHT THAT NOT BE THE CONSTRUCTION THAT'S GIVEN TO THE JURY? WHAT'S CONTROVERSIAL ABOUT IT? WE'VE AGREED THERE'S NOTHING WRONG WITH THE DEFINITION.

THE COURT: SO YOUR POSITION WOULD BE WHAT HARM IS IT? IT'S HERE --

MR. LAWTON: IT'S TELLING THEM WHAT IT IS. I MEAN, IT'S TELLING THEM WHAT IT IS. IT'S ODD, I AGREE, BECAUSE

YOU'VE GOT THESE OTHER REFERENCES TO FLUOROPHORES, AS MR. PAVANE POINTS OUT, THAT ARE UNACCOMPANIED BY THE EXPLANATORY CLAUSE THERE, BUT IT IS INFORMATIVE. IT IS RIGHT.

THE COURT: SURE. OKAY.

COUNSEL, I THINK WE HAVE GONE THROUGH ALL OF OUR TERMS. WE'RE A FEW MINUTES AHEAD OF SCHEDULE. WHAT I WOULD LIKE TO DO WOULD BE THIS, I WOULD LIKE TO TAKE A BREAK, AND HOPEFULLY I'LL BE BACK OUT BY 4:00, AND IF I HAVE ANY QUESTIONS OR CONCERNS, I WOULD LIKE YOU TO GO THROUGH YOUR NOTES ALSO. WE HAVE ONE AREA WHERE YOU WANT TO CONSULT YOUR DOCTOR. WE HAVE OTHERS WHERE YOU MIGHT COME UP WITH AN AGREEMENT. I CAN GIVE YOU A COUPLE OF DAYS TO DO THAT.

I HAD PUT SOME TIME ON THE CHART FOR CLOSING ARGUMENT. I DON'T KNOW, THERE'S PROBABLY NOT ANY NEED FOR ANYTHING, BUT IF THERE IS IT COULD BE SUBMITTED, ALONG WITH WHATEVER AGREEMENT OR LACK THEREOF THAT IS GOING TO BE FORTHCOMING AFTER A DAY OR SO. I WOULD REALLY LIKE TO GO THROUGH THESE TERMS, GO THROUGH MY NOTES, AND SEE IF I HAVE ANY QUESTIONS FOR YOU ABOUT WHAT WE'VE DONE, BECAUSE WE'VE BEEN AT THIS FOR A FEW HOURS NOW.

WOULD THAT BE ALL RIGHT, MR. LAWTON, MR. PAVANE?

MR. LAWTON: YES.

THE COURT: MR. PAVANE.

MR. PAVANE: YES.

MR. LAWTON: MAYBE MR. PAVANE AND I CAN ALSO TALK

DURING THE RECESS ABOUT THE BEST WAY TO WRAP THIS UP IN THE WAY ARGUMENT MOST EFFICIENT AND MOST AGREEABLE TO THE COURT.

THE COURT: MOST IMPORTANTLY AND MOST PRESSING WOULD BE IF YOU'RE ABLE TO COME UP WITH ANYTHING THAT WOULD BE BY WAY OF AGREEMENT BEFORE THE COURT RULES ON SOME OF THESE. THERE ARE A COUPLE WHERE YOU MENTIONED YOU WANTED TO CHECK WITH YOUR EXPERT, AND LET ME KNOW ABOUT THAT, AND WE'LL SEE WHATEVER LOOSE ENDS WE HAVE.

IF YOU FEEL THAT YOU NEED SOME TIME EITHER IN PERSON OR CAN DO IT IN WRITING, WE COULD DO THAT ALSO BY WAY OF CLOSING COMMENTS. I'M NOT REALLY SURE WHAT THERE IS TO SAY. I MEAN, THIS DOESN'T LEND ITSELF TO THE USUAL CLOSING COMMENTS NECESSARILY.

MR. LAWTON: RIGHT.

MR. PAVANE: I'D BE WILLING TO FOREGO CLOSING COMMENTS.

MR. LAWTON: AND WE AS WELL.

THE COURT: SO CONFER, GO OVER YOUR NOTES, SEE IF YOU HAVE ANY AREAS WHERE YOU THINK THERE MIGHT BE POSSIBLE AGREEMENT, AND I JUST WANT TO MAKE SURE --

I WASN'T SURE, I THINK YOU OFFERED THIS EARLIER, TO TAKE ANOTHER LOOK. I WASN'T SURE WHAT YOU THOUGHT MAYBE I HADN'T SEEN OR WHAT YOU WANTED THE COURT TO OBSERVE. YOU'VE GONE THROUGH A LOT OF TIME AND EXPENSE TO DO THIS. IF THERE'S SOMETHING THAT ANYBODY WANTS ME TO SEE FROM EITHER SIDE, BASED ON THIS, I MEAN, I'M HAPPY TO LOOK THROUGH ANYTHING OR VIEW

ANYTHING AGAIN.

SO THINK ABOUT THAT ALSO BECAUSE WHEN YOU MADE THAT OFFER, AND MADE IT THE COURT'S OPTION, I WASN'T SURE WHAT YOUR SIDE WANTED TO MAKE SURE THAT I SAW. I WOULD LIKE TO MAKE SURE THAT I DO VIEW EVERYTHING YOU WOULD LIKE ME TO SEE, SO YOU CAN TELL ME THAT WHEN I COME BACK.

MR. LAWTON: THANK YOU.

THE COURT: OKAY, THANK YOU.

(COURT WAS AT RECESS.)

THE COURT: I HAVE ONE QUESTION FOR YOU, MR. LAWTON, AND THAT IS THIS; LET'S LOOK AT THE TERMS SURGICAL ORTHOTOPIC IMPLANTATION FOR A MOMENT.

MR. LAWTON: YES, YOUR HONOR.

THE COURT: AND YOUR DEFINITION WOULD BE "SURGICAL IMPLANTATION OF A TUMOR OR A TUMOR FRAGMENT AT THE SITE OF THE TISSUE FROM WHICH THE TUMOR OR TUMOR FRAGMENTS WERE DERIVED." THEN THERE'S A SECOND SENTENCE THAT SAYS, "THE CELLS NEED NOT HAVE ORIGINATED WITHIN THE HOST ORGANISM."

IS THERE ANY INCONSISTENCY USING THE TERM "CELLS" THERE WITH THE FACT THAT WE'RE REFERRING TO TUMOR OR TUMOR FRAGMENTS, BECAUSE WE HAD THE BIG DISAGREEMENT ABOUT TUMOR CELLS IN CRI'S CONSTRUCTION, OR SHOULD THE SECOND SENTENCE SAY, "THE TUMOR OR TUMOR FRAGMENTS NEED NOT HAVE ORIGINATED WITHIN THE HOST ORGANISM," JUST COMMENT ON THAT.

MR. LAWTON: THAT WOULD MAKE IT CONSISTENT, AND I'LL

CONFER FOR A MOMENT WITH MY CLIENT, BUT -- IF THE COURT WILL JUST BEAR WITH ME FOR A MOMENT.

THE COURT: SURE, GO AHEAD.

(DISCUSSION HELD OFF THE RECORD.)

MR. LAWTON: IT'S VERY LOGICAL, YOUR HONOR. WE WOULD HAVE NO OBJECTION TO THAT.

THE COURT: OKAY. I WAS JUST CURIOUS ABOUT THAT. I HADN'T CAUGHT THAT BEFORE.

I WANT TO TALK ABOUT FLUORESCENCE FOR A MOMENT, AND I'M GOING TO MENTION A NUMBER OF THINGS WHERE YOU'RE GOING TO HAVE AN OPPORTUNITY TO LOOK AT THINGS AND GET BACK TO THE COURT, BUT UNDER "FLUORESCENCE" I THINK IT NEEDS CONSTRUCTION, OKAY.

CRI DID NOT PROVIDE A CONSTRUCTION, AND IN OUR HEARING THIS MORNING AND THIS AFTERNOON ANTICANCER MENTIONED THAT POSSIBLY AFTER THE SEMICOLON YOU COULD LOSE THE REST OF THAT.

I GUESS I'M MENTIONING THAT AS A PLACE WHERE I WOULD GIVE BOTH SIDES AN OPPORTUNITY, IF IT'S POSSIBLE, TO LOOK AT THAT AND PRESENT SOMETHING, NOW THAT YOU KNOW THAT CONSTRUCTION IS NEEDED.

IF YOU THINK THAT OPPORTUNITY WOULD BE FUTILE OR OF NO VALUE TO ANYBODY, THAT'S FINE, BUT I HAVE A COUPLE OF AREAS WHERE I'M GOING TO OFFER YOU THAT OPPORTUNITY, OTHERWISE I CAN GO WITH WHAT I HAVE, SO YOU'LL HEAR THE REST OF THEM.

RETROVIRAL VECTOR. I WOULD LIKE A DEFINITION OF RETROVIRAL ORIGIN. A RETROVIRAL VECTOR IS AN EXPRESSION OF

RETROVIRAL ORIGIN. THAT'S TERRIBLY UNCLEAR TO A LAYPERSON, SO I WOULD LIKE A DEFINITION. IF IT WOULD BE AN AGREED-UPON DEFINITION, THAT WOULD BE WONDERFUL. IF IT'S NOT, I WOULD LIKE TO SEE WHAT BOTH SIDES HAVE TO SAY ON THAT.

EXPRESSION VECTOR. I THINK CRI WANTED AN OPPORTUNITY TO SEE IF THERE WAS ANY OBJECTION TO ADDING THE "OR." YOU WANTED TO CHECK WITH YOUR EXPERT.

MR. PAVANE: YES.

THE COURT: SO THAT'S -- VIRAL PROMOTER IS A PROMOTER OF VIRAL ORIGIN, ISN'T IT?

MR. PAVANE: YES.

THE COURT: SO WOULDN'T WE NEED A DEFINITION OF VIRAL ORIGIN SO THAT THAT WOULD BECOME CLEAR AND COULD CONNECT UP WITH THE DEFINITION OF PROMOTER. SO I WOULD LIKE THAT.

AND I THINK CRI HAS ASKED FOR AN OPPORTUNITY TO DETERMINE IF THEY'RE IN AGREEMENT WITH ANTICANCER ON THE DEFINITION OF VIRUS. I THINK YOU ASKED FOR THAT --

MR. PAVANE: YES.

THE COURT: -- AT THE CLOSE OF THINGS.

MR. PAVANE: CORRECT.

THE COURT: IN QUICKLY GOING THROUGH MY NOTES, THOSE ARE SOME OF THE THINGS THAT WOULD BE HELPFUL TO THE COURT, AND I'M WILLING TO GIVE YOU A REASONABLE PERIOD OF TIME, TELL ME WHAT THAT WOULD BE, BOTH FOR YOU TO DO WHATEVER YOU NEED TO DO ON YOUR OWN, TO HAVE SOME REASONABLE PERIOD OF TIME, SHOULD YOU

BOTH FEEL IT WOULD BE PRODUCTIVE TO CONFER WITH EACH OTHER ON THIS.

I'LL PUT OUT AN ORDER BY NOON TOMORROW THAT WILL DETAIL THINGS. I'LL GO THROUGH THIS AGAIN AND SEE IF THERE'S ANYTHING ELSE. I WANTED TO GIVE YOU A SENSE OF WHERE THE COURT WAS, AND I'LL RECEIVE YOUR THINGS, WHATEVER DOCUMENTS COME IN. ANY AGREEMENTS WILL BE ACCEPTED. IF THERE ARE NO AGREEMENTS, I UNDERSTAND, AND I'LL RULE ONCE I GET THOSE DEFINITIONS. IF YOU DON'T AGREE, I'LL GET A DEFINITION FROM EACH SIDE AND TAKE A LOOK AT IT.

CONFER, IF YOU NEED TO, TO SEE, NUMBER ONE, IF YOU WANT THAT OPPORTUNITY, NUMBER TWO, HOW MUCH TIME YOU THINK YOU MIGHT NEED.

(DISCUSSION HELD OFF THE RECORD.)

THE COURT: IF THERE'S ANYTHING THAT PEOPLE WANT US ALL TO OBSERVE TOGETHER, I'M HAPPY TO DO THAT. I HAVE TO LEAVE IT AT YOUR SOUND DISCRETION BECAUSE YOU KNOW MORE WHAT THE CAPABILITIES ARE AND WHAT I SHOULD BE OBSERVING HERE. I DON'T KNOW IF I'VE MISSED ANYTHING. I'VE OBSERVED, BUT I DON'T KNOW IF THERE WAS SOMETHING ELSE I SHOULD HAVE SEEN.

MR. LAWTON, WHAT'S YOUR POSITION, SIR?

MR. LAWTON: IF THERE'S ANY DOUBT IN YOUR HONOR'S MIND ABOUT WHETHER OR NOT THE COURT CAN SEE FLUOROPHORES THROUGH THE SKIN OF THESE MICE WITHOUT A FILTER, WITHOUT GOGGLES, WITHOUT EXCITATION LIGHTS, ETC., THEN AND ONLY THEN WOULD WE INVITE THE

COURT DOWN TO LOOK AT THE MICE AGAIN. MY GUESS, BASED ON THIS MORNING, AND WHAT THE COURT SAID FROM THE BENCH, AND THE OBSERVATIONS OF SOME OF OUR GROUP, WAS THAT THE COURT HAD THAT NOTION VERY WELL GRASPED AND UNDERSTOOD AND SO DOING THAT WOULD BE QUITE REDUNDANT, BUT I DON'T WANT TO PRETEND TO KNOW WHAT THE COURT IS THINKING, SO I JUST PUT THAT OUT THERE.

THE COURT: THESE ARE TINY LITTLE ANIMALS. THEY DIDN'T HAVE ANY HAIR. THE ONLY TUMORS I COULD SEE WERE THE RESULT OF BULGES. I BELIEVE THAT THE DOCTOR SHOWING AND HOLDING THE MICE, KIND OF POINTED, BECAUSE YOU COULD SEE A BULGE.

MR. LAWTON: BUT NO FLUORESCENCE.

THE COURT: BUT NO FLUORESCENCE.

MR. LAWTON: RIGHT.

THE COURT: AND WERE THEY MORE SUBSTANTIAL OF GIRTH, YOU PROBABLY WOULDN'T SEE THOSE TUMORS.

MR. LAWTON: RIGHT. WITH THAT SAID, I DON'T THINK WE NEED TO HAVE THE COURT COME BACK DOWN AND DO ANYTHING LIKE THAT. I THINK THAT'S UNNECESSARY. THANK YOU.

THE COURT: HOW MUCH TIME DO YOU THINK YOU NEED, AND DO YOU THINK THERE'S ANY POINT IN GIVING YOU THE OPPORTUNITY TO CONFER WITH THE OTHER SIDE?

MR. LAWTON: MR. PAVANE AND I SPOKE ABOUT THIS AND WE AGREED THAT A WEEK'S TIME OUGHT TO SUFFICE. WE'LL CERTAINLY TRY TO GET IT DONE FASTER THAN THAT. I THINK MR. PAVANE IS GOING HOME TONIGHT. I KNOW HE WANTED TO STAY IN SAN DIEGO.

MR. PAVANE: TOMORROW MORNING. I DIDN'T WANT TO SPEND MY LAST NIGHT WITH YOU.

MR. LAWTON: I NOTED I WASN'T INVITED.

THE COURT: WE BETTER STRIKE THAT OFF THE RECORD.

MR. PAVANE: NOTE THAT I LAUGHED WHEN I SAID THAT.

MR. LAWTON: I WASN'T INVITED, BUT I WASN'T SURPRISED BY THAT EITHER.

ALLOWING FOR THE TRAVEL, AND SOME TIME TO CHECK WITH DR. PESAVENTO, WE WOULD PROMISE TO THE COURT WITHIN A WEEK'S TIME A JOINT REPORT ON ALL THE ITEMS THAT THE COURT IDENTIFIED AND THE COMMENTS OF A COUPLE OF MINUTES AGO.

THE COURT: I'LL GET AN ORDER OUT TOMORROW MORNING DETAILING WHAT THAT WOULD ENTAIL. THAT WILL HELP YOU.

MR. LAWTON: WE'LL HAVE THAT HERE BY WEDNESDAY, THE 9TH, OR BY MIDNIGHT WEDNESDAY THE 9TH.

THE COURT: WEDNESDAY THE 9TH -- WHY DON'T WE SAY BY FRIDAY THE 11TH, ONLY FROM THE STANDPOINT THAT WE'RE GOING TO GET IT OUT TOMORROW. YOU'RE GOING TO BE TRAVELING, A VARIETY OF THINGS MAY BE GOING ON.

MR. LAWTON: VERY WELL, YOUR HONOR.

MR. PAVANE: THAT WOULD BE GREAT. I WOULD SAY BASED ON THE LIST, I THINK I SPEAK FOR BOTH OF US, I THINK THERE'S AN EXCELLENT CHANCE THAT WE CAN AGREE ON MOST IF NOT ALL OF THOSE PARTICULAR TERMS THAT YOU MENTIONED.

THE COURT: OKAY, WONDERFUL. ANYTHING ELSE?

MR. LAWTON: I WANT TO APOLOGIZE TO THE COURT, I OVERLOOKED SOMETHING THIS MORNING WHEN WE WERE DISCUSSING METASTASIS. IT'S VERY BRIEF, BUT I THINK IT IS IMPORTANT AND IT DOES REINFORCE OUR CONSTRUCTION. I KNOW IT'S IRREGULAR TO SORT OF GO BACK AND ADD SOMETHING, BUT WITH THE COURT'S LEAVE I WILL DO IT.

THE COURT: GO AHEAD.

MR. LAWTON: THANK YOU. THIS IDEA OF CELL MIGRATION, MIGRATION OF TUMOR CELLS THROUGH THE BLOODSTREAM OR THE LYMPHATIC SYSTEM AS BEING METASTASIS OR INCLUDED WITHIN THE DEFINITION OF METASTASIS IS WHAT WE'RE TALKING ABOUT. IN OTHER WORDS, METASTASIS IS NOT JUST GROWTH OF SECONDARY TUMORS, IT'S EVERYTHING THAT LEADS UP TO THAT.

THE COURT: I DON'T THINK ANYBODY DISAGREES WITH THAT. I THINK WHAT WE'RE TALKING ABOUT THOUGH IS THE RULES OF CONSTRUCTION THAT I HAVE TO LIVE BY --

MR. LAWTON: RIGHT.

THE COURT: -- IN ORDER TO DO THIS. SO THEY'VE REFERENCED WHERE IT'S DEFINED, AND THAT'S THE DIFFICULT -- DON'T TELL THE PATIENT WHO HAS CANCER CELLS FLOWING THROUGH THEIR BLOOD SYSTEM THAT SOME TUMOR DIDN'T METASTASIZE, EVEN THOUGH IT HASN'T FORMED A SECONDARY TUMOR, THEY'RE NOT GOING TO BE VERY COMFORTED.

MR. LAWTON: THAT'S EXACTLY RIGHT. THAT'S OUR POINT.

THE COURT: THE POINT IS THE LAW AND WHAT I HAVE TO DO

ON INTERPRETATION, MR. LAWTON.

MR. LAWTON: YES, YOUR HONOR. I'VE SENSED THAT THE COURT IS FOCUSED ON THE WORD "IS" BECAUSE MR. PAVANE POINTED OUT THAT SENTENCE THAT HAS THE WORD "IS" THAT SAY "METASTASIS IS THE GROWTH OF SECONDARY TUMORS." "IS" IS AN ILLUSTRATIVE WORD, NOT AN EXCLUDING WORD. IN THE EXAMPLES I GAVE THIS MORNING, I WAS TALKING ABOUT USE OF THE WORD "IS," WHAT DO WE MEAN WHEN WE SAY THAT WORD? THE WAY CRI USES IT WHEN THEY SAY IT, WHAT THEY SAY THE WORD "IS" IS, IS IT EXCLUDES EVERYTHING OUTSIDE THE CIRCLE OF WHAT THEY SAY SOMETHING IS.

THE UNITED STATES DISTRICT COURT IS A COURT. IT'S ALSO A GOVERNMENT AGENCY. IT'S ALSO A PLACE. IT'S ALSO AN EMPLOYER. IT IS MORE THAN ONE THING. BUT TO SAY THAT IT IS ONLY ONE OF THOSE THINGS, AND CAN'T BE SUSCEPTIBLE TO ANY OTHER MEANING, WOULD BE COMPLETELY WRONG. JUST AS IT WOULD BE WRONG FOR ME TO SAY THAT WATER IS A FLUID AS THOUGH THERE ARE NO OTHER FLUIDS OR AS THOUGH WATER WAS ONLY ONE THING, THAT IS, A FLUID. THERE ARE OTHER THINGS THAT ARE FLUIDS BESIDES WATER, AND WATER IS THINGS OTHER THAN BEING A FLUID. IT'S H2O.

SO THE MEANING OF THE WORD "IS" IN THAT SENTENCE WE THINK IS ILLUSTRATIVE BUT NOT EXCLUSIVE, IN THE SAME WAY THAT IT WOULD BE TO SAY, AS I SAID EARLIER, THAT BASEBALL IS A GAME. BASEBALL IS THE NATIONAL PASTIME. BASEBALL IS A PROFESSION TO THOSE WHO PLAY IT. BASEBALL IS A HOBBY.

METASTASIS CERTAINLY IS THE GROWTH OF SECONDARY TUMORS,

BUT THE QUESTION THAT I THINK THE COURT IS WRESTLING WITH IS, IS THAT ALL IT IS? IS THAT THE ONLY THING IT CAN BE? WELL, CONSTRUCTION CANONS, WE HAVE THEM, AND ONE OF THEM THAT'S VERY IMPORTANT SAYS THAT WE READ THE SPECIFICATION TOGETHER WITH THE CLAIM TERMS IN DECIDING WHAT THAT MEANS. WHAT IS THIS SPECIFICATION TALKING ABOUT BESIDES JUST THAT ONE SENTENCE? THIS IS WHAT I OVERLOOKED THIS MORNING AND, MY APOLOGIES, I'LL DO IT NOW.

THE COURT: WE'RE LOOKING AT THE --

MR. LAWTON: WE'RE LOOKING AT COLUMN THREE OF THE '384 SPECIFICATION, LINES 54 TO 67. I WILL READ, FOR THE RECORD, BEGINNING WITH THE SECOND SENTENCE, AND I QUOTE, "ADVANTAGE IS TAKEN OF THE VISIBLE MARKER GREEN FLUORESCENT PROTEIN, GFP, TO LABEL THE TUMOR CELLS SO THAT THEIR MIGRATION AND COLONIZATION IN TISSUES DISTAL TO THE TUMOR CAN BE FOLLOWED AS THE MIGRATION AND COLONIZATION PROGRESSES."

THERE'S FURTHER REFERENCE TO MIGRATION IN THE NEXT PARAGRAPH WHICH READS, AND I QUOTE, "SINCE SUFFICIENT INTENSITY CAN BE ACHIEVED TO OBSERVE THE MIGRATION OF FLUORESCENT CELLS IN THE INTACT ANIMAL, IN ADDITION TO DETERMINING THE MIGRATION OF THE CELLS BY EXCISING ORGANS, THE PROGRESSION OF METASTASIS CAN BE OBSERVED IN THE INTACT SUBJECT."

I DON'T THINK IT CAN BE SAID ANY BETTER THAN THAT OR MORE CLEARLY THAN THAT THAT WHAT THE WORD "METASTASIS" COMPREHENDS OR INCLUDES IS THE MIGRATION OF TUMOR CELLS THROUGH

THE BODY ON THEIR WAY TO WHATEVER SITE THE SECONDARY TUMOR MAY WIND UP GROWING AT.

THE COURT: I HAVE AN IRRELEVANT QUESTION.

MR. LAWTON: YES.

THE COURT: WILL YOU ALWAYS GET A SECONDARY TUMOR? DO YOU HAVE TO ALWAYS GET A SECONDARY TUMOR? COULD YOU JUST HAVE IT -- ALL THESE LOOSE CELLS EVERYWHERE IN YOUR BODY?

MR. LAWTON: IF YOU ARE UNDERGOING A CHEMOTHERAPY REGIMEN THAT IS EFFECTIVE, IT MIGHT PREVENT THAT FROM EVER HAPPENING -- LET'S HOPE IT DOES -- SO NOT EVERY CASE OF A TUMOR CELL MIGRATING THROUGH A BODY WILL RESULT IN A SECONDARY TUMOR.

THE COURT: BUT IT STILL WILL HAVE METASTASIZED FROM THE ORIGINATING SITE.

MR. LAWTON: YES.

THE COURT: ONCE THOSE CELLS ARE BEYOND THE ORIGINAL TUMOR.

MR. LAWTON: YES, THAT IS THE SPREAD OF CANCER. WE SAW THAT VIDEO, AND THAT PICTURE WAS WORTH A THOUSAND WORDS.

ANYWAY, I OVERLOOKED THIS THIS MORNING, AND IT WAS POINTED OUT TO ME DURING THE RECESS, SO I APOLOGIZE TO EVERYBODY FOR THAT. THIS LANGUAGE FROM OUR SPECIFICATION WE THINK IS ABSOLUTELY CRITICAL TO UNDERSTANDING THAT METASTASIS INCLUDES NOT ONLY THE GROWTH OF SECONDARY TUMORS, AND THE WORD "METASTASIS" IS USED REPEATEDLY IN THESE PASSAGES SIDE BY SIDE WITH THE WORDS "MIGRATION OF CELLS THROUGH THE BODY."

THE COURT: AND METASTASIS IS A PROCESS. IT MAY RESULT IN A SECONDARY TUMOR SITE OR IT MAY NOT.

MR. LAWTON: YES.

THE COURT: OKAY. I APPRECIATE THAT. I'M SURE THEY WANT TO COMMENT.

DO YOU WANT TO COMMENT ON THAT?

MR. LAWTON: THANK YOU.

THE COURT: THANK YOU, MR. LAWTON.

MR. PAVANE: TO ME -- CAN WE SEE THE BEGINNING OF THE SENTENCE UP THERE ALSO.

THE COURT: WE'RE AT THE '384.

MR. PAVANE: YEAH, I KNOW WHERE WE ARE. IT'S JUST THAT HE ONLY HAD HALF A SENTENCE THERE.

THE COURT: HERE IT IS.

MR. PAVANE: AND THEN IT GOES ON TO SAY ON THE NEXT PAGE, "IN ADDITION -- I WOULD SAY TWO THINGS ON THAT, YOUR HONOR, AND THIS WOULD APPLY TO THE EARLIER PHRASE THAT HE ALSO HAD DISPLAYED JUST A MOMENT AGO, THAT THERE IS NOTHING IN THERE THAT'S INCONSISTENT WITH SAYING THAT METASTASIS IS THE GROWTH OF SECONDARY TUMORS. YES, CELLS HAVE TO MIGRATE, CERTAINLY, TO FORM THOSE SECONDARY TUMORS, BUT WHAT YOU'RE SEEKING TO -- WHAT YOU'RE SEEKING, AS THIS SENTENCE SAYS, TO MONITOR IS THE PROGRESSION OF METASTASIS. THAT MEANS -- IT COULD MEAN, BASED ON WHAT THEY'VE SAID, THE PROGRESSION OF SECONDARY TUMORS FORMING THROUGHOUT THE BODY. THERE'S NO INCONSISTENCY. WE'VE

NEVER DISPUTED, AS YOU POINTED OUT, THAT CELLS OBVIOUSLY HAVE TO MOVE IF THEY'RE GOING TO GET TO THE POINT WHERE THEY'RE FORMING A SECONDARY TUMOR. SECONDARY TUMORS DON'T SPONTANEOUSLY FORM. THEY FORM BY CELLS LEAVING THE FIRST SITE AND GOING TO THE SECOND SITE.

BUT THE METASTASIS THAT YOU'RE LOOKING FOR, THAT IS, THE PROGRESSION OF METASTASIS, IS THOSE SECONDARY TUMORS, THAT'S WHAT THE SPECIFICATION TELLS US. IT'S THE GROWTH OF SECONDARY TUMORS. SO WE'RE GOING TO MONITOR THAT BY FOLLOWING THE CELLS AND SEEING WHERE THE SECONDARY TUMORS FORM. THERE'S NO INCONSISTENCY IN THAT.

THE COURT: NO, BUT IT MIGHT NOT RESULT IN SECONDARY TUMORS.

MR. PAVANE: IF IT WASN'T, THEN YOU'RE NOT MONITORING THE PROGRESSION, IN MY VIEW, OF METASTASIS.

THE COURT: SO YOU'RE SAYING IF CANCER CELLS LEAVE A PRIMARY SITE AND THEY'RE COURSING THROUGHOUT SOMEBODY'S BODY, THAT IS NOT METASTASIS, EVEN IF A SECONDARY TUMOR DOESN'T DEVELOP?

MR. PAVANE: EXACTLY, BECAUSE ONE OF TWO THINGS HAPPEN -- AND THIS IS MY UNDERSTANDING, AND I WILL CONFIRM THIS WITH DR. PESAVENTO, BUT SHE EXPLAINED THIS TO ME BEFORE SHE LEFT. SHE SAID, YES, CELLS, OF COURSE, LEAVE THE PRIMARY TUMOR AND THEN ONE OF TWO THINGS HAPPEN; EITHER THEY FLOAT AROUND AND THEY GET ATTACKED AND DIE --

THE COURT: WE HOPE.

MR. PAVANE: -- OR THEY GO TO A SITE, LATCH ONTO A TISSUE AND FORM A SECONDARY TUMOR OR A LESION OR EMBOLISM, OR WHATEVER YOU WANT TO CALL IT, AND THAT'S -- THE METASTASIS IS WHEN IT LATCHES ONTO THE TISSUE AND FORMS THAT SECONDARY TUMOR.

YOU DON'T HAVE -- CANCER CELLS ARE NOT -- YES, THEY'RE CANCER CELLS, BUT THEY'RE NOT HARMFUL WHEN THEY'RE JUST FLOATING AROUND UNLESS THEY LATCH ON AND FORM A SECONDARY TUMOR BECAUSE ONE OF TWO THINGS IS GOING TO HAPPEN; THEY'RE EITHER GOING TO DIE OR THEY'RE GOING TO FORM THAT SECONDARY TUMOR. SO IT'S -- YOU'RE INTERESTED IN THE SECONDARY TUMOR. THAT'S THE ISSUE THAT'S OF INTEREST.

THE COURT: BECAUSE YOU'RE EITHER HAVING CHEMOTHERAPY OR YOUR BODY'S NATURAL PROCESSES TAKE CARE --

MR. PAVANE: PRECISELY. YEAH, I DON'T THINK, AND AGAIN I'LL VERIFY THIS, BUT, YOU KNOW, JUST IN MY OWN PERSONAL EXPERIENCE, AND MY UNDERSTANDING FROM DR. PESAVENTO, PEOPLE WORKING IN THE FIELD DON'T REFER TO METASTASIS AS CELLS FLOATING AROUND YOUR BODY. WHEN THEY SAY THAT YOUR CANCER HAS METASTASIZED THEY MEAN THAT, "UH-OH, WE'VE GOT A SECONDARY TUMOR SITE NOW SOMEWHERE ELSE. IT'S IN YOUR LYMPH NODES. IT'S SPREAD TO YOUR LIVER." IT'S NOT CELLS FLOATING. IT'S SOMETHING THAT'S ACTUALLY LATCHED ONTO A TISSUE AND IS NOW MULTIPLYING. THAT'S WHAT METASTASIS, MY UNDERSTANDING, IS. I WILL VERIFY THAT.

MR. LAWTON: I DON'T THINK THAT UNDERSTANDING ON THE PART OF MR. PAVANE IS CONSISTENT WITH HIS OWN EXTRINSIC EVIDENCE. I DON'T THINK ANYBODY'S SAYING -- HE SAYS CELLS FLOATING AROUND IN THE BLOODSTREAM, WHICH IS SORT OF AN IDIOSYNCRATIC WAY TO PUT IT.

MR. PAVANE: JUST ALSO WANT TO VERIFY, YOUR HONOR, ON THIS POINT.

THE COURT: THAT'S FINE.

MR. PAVANE: SO WE'RE GOING TO WORK WITH MR. LAWTON OVER THE NEXT WEEK AND WE'RE GOING TO TRY TO WORK OUT THOSE TERMS, IF WE CAN.

MR. LAWTON: I'M SORRY, I WASN'T THROUGH SPEAKING.

MR. PAVANE: OH, I'M SORRY, MY APOLOGIES.

MR. LAWTON: I'M SORRY ABOUT THAT.

THE COURT: GO AHEAD.

MR. LAWTON: THANK YOU.

THIS IS MR. PAVANE'S EXTRINSIC EVIDENCE, WHICH SEEMS TO UNDERMINE HIS STATEMENT THAT HE JUST MADE TO THE COURT THAT NO ONE IN THE PROFESSION OR IN THE ART UNDERSTANDS THAT METASTASIS INCLUDES CELLS FLOATING AROUND IN THE BLOODSTREAM. I MEAN, LOOK AT THE BRACKETED MATERIAL ABOUT THE MIDDLE THERE, IT SAYS, "METASTASIS IN THE LUNG USUALLY OCCURS BY WAY OF THE BLOODSTREAM." SO I GUESS PEOPLE DO UNDERSTAND THAT TUMOR CELLS FLOATING AROUND IN THE BLOODSTREAM IS METASTASIS, OTHERWISE, IT WOULDN'T BE IN THE MERRIAM-WEBSTER'S MEDICAL DICTIONARY CITED

BY THE DEFENDANT.

MR. PAVANE: LET'S LOOK AT THE WHOLE QUOTE; "A CHANGE IN POSITION, STATE OR FORM AS A TRANSFER OF DISEASE-PRODUCING AGENT AS CANCER CELLS OR BACTERIA FROM AN ORIGINAL SITE OF DISEASE TO ANOTHER PART OF THE BODY WITH DEVELOPMENT OF A SIMILAR LESION IN THE NEW LOCATION." THERE'S GOT TO BE FORMATION OF A SECOND SITE. IT'S FULLY CONSISTENT.

MR. LAWTON: TO GO BACK TO THAT SPECIFICATION, MR. PAVANE SAID THAT THIS JUST SIMPLY CANNOT BE CONSTRUED TO IMPLY THAT THE INVENTORS MEANT TO SAY THAT METASTASIS INCLUDES TUMOR CELLS MIGRATING THROUGH THE BLOOD. HOW IS THAT A SUPPORTABLE INTERPRETATION OF THIS PASSAGE?

YOU KNOW, METASTASIS IS REFERENCED IN THE SECOND LINE. REFERENCE TO CELL MIGRATION AND COLONIZATION IS MADE REPEATEDLY. AND THEN WHEN YOU GO UP TO THE NEXT COLUMN, COLUMN FOUR, WHAT'S IT TALKING ABOUT? THE PROGRESSION OF METASTASIS. WHAT COULD THAT POSSIBLY MEAN IN THIS CONTEXT IF NOT THE MIGRATION OF TUMOR CELLS THROUGH THE BLOODSTREAM? THERE'S NO REFERENCE HERE, IN OTHER WORDS, TO GROWTH OF SECONDARY TUMORS. THERE'S NONE. THIS PASSAGE IS BARREN OF ANY REFERENCE TO GROWTH OF SECONDARY TUMORS, AND YET THERE'S TWO USES OF THE WORD METASTASIS IN THE SAME SENTENCE AS CELLS MIGRATING THROUGH THE BLOODSTREAM.

WELL, IT'S NONSENSICAL TO THINK THAT THIS PASSAGE CAN ONLY REFER TO THE GROWTH OF SECONDARY TUMORS. IF YOU'RE

STUDYING TUMOR CELLS MIGRATING THROUGH THE BLOODSTREAM OR THE LYMPHATIC SYSTEM, YOU ARE STUDYING METASTASIS. LIKE THE COURT SAID, IT'S NOT MUCH CONSOLATION TO A PATIENT WHO ASKS HER PHYSICIAN, "IS MY CANCER SPREADING? CAN I EXPECT THIS TO SPREAD TO MY LUNG? WHAT'S THE STORY?" TO BE TOLD, "THERE'S NO METASTASIS. THERE'S NO GROWTH OF SECONDARY TUMORS THAT WE'VE BEEN ABLE TO FIND OUT YET." THE REJOINDER TO THAT WOULD PROBABLY BE, "WELL, YOU'RE NOT ANSWERING MY QUESTION. MY QUESTION IS, IS THIS THING SPREADING? IS IT SPREADING THROUGH MY BLOODSTREAM? IF SO, CAN WE DO SOMETHING TO CHECK IT OR STOP IT?" THAT'S METASTASIS.

THIS SPECIFICATION PROVES IT AND PROVES THAT'S WHAT THE INVENTORS MEANT TO SAY. THANK YOU, VERY MUCH.

THE COURT: THANK YOU.

YOU'LL GET AN ORDER FROM THE COURT TOMORROW SOMETIME. WE'LL GIVE YOU AT LEAST A WEEK TO GET EVERYTHING INTO THE COURT. I APPRECIATE THE TIME AND THE EFFORT THAT WENT INTO THE TUTORIALS THIS MORNING AND THE ARGUMENT OF COUNSEL. THANK YOU ALL.

MR. PAVANE: MAY I JUST CLARIFY ONE SMALL POINT?

THE COURT: CERTAINLY, SIR.

MR. PAVANE: I THINK I UNDERSTOOD YOU TO SAY I'M GOING TO WORK WITH MR. LAWTON TO TRY TO COME TO AN AGREEMENT, BUT IF I CAN'T I COULD OFFER A DEFINITION ON THOSE TERMS --

THE COURT: YES, YOU CAN.

MR. LAWTON: AND WE COULD, TOO.

THE COURT: OF COURSE. AND TO THE EXTENT TO WHICH YOU DON'T TOTALLY AGREE BUT NARROW THE DISAGREEMENT, THAT'S ALWAYS APPRECIATED, TOO.

MR. LAWTON: THANK YOU, VERY MUCH, YOUR HONOR. AND THANKS TO ALL THE COURT STAFF AS WELL. THEY WERE VERY HELPFUL.

THE COURT: THANK YOU ALL FOR COMING.

(COURT WAS AT RECESS.)

C E R T I F I C A T E

I, GAYLE WAKEFIELD, CERTIFY THAT I AM A DULY QUALIFIED AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED STATES DISTRICT COURT, THAT THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT OF THE PROCEEDINGS AS TAKEN BY ME IN THE ABOVE-ENTITLED MATTER ON DECEMBER 2, 2009; AND THAT THE FORMAT USED COMPLIES WITH THE RULES AND REQUIREMENTS OF THE UNITED STATES JUDICIAL CONFERENCE.

DATED:_______________

/S/ GAYLE WAKEFIELD
GAYLE WAKEFIELD, RPR, CRR
OFFICIAL COURT REPORTER